1   A    I don't remember.  When was this?

2   Q    During June or July of 2003?

3   A    And today's May, 2006, no I don't remember.

4   Q    Okay.  That was not a significant situation with you?

5   A    I don't remember.

6   Q    Okay.  Did you claim -- do you remember the stalking

7        case against Mr. Miller?

8   A    I remember seeing you in court then.

9   Q    Do you remember what you were claiming?

10  A    We have a suit here and -- with these police officers

11       against me, and I'm not going to sit here and think

12       about being in court over being stalked.

13  Q    Do you remember, in your personal -- in that stalking

14       order, that there was a subpoena issued for 911 tapes

15       of the city?

16  A    I don't remember seeing a subpoena of anything.  I

17       don't remember.  Was I given a subpoena?

18  Q    No.  I didn't ask you that.  I asked you whether or

19       not you remember that during that litigation, that 911

20       tapes for the city were subpoenaed by Mr. Miller?

21  A    I don't -- I don't remember.

22  Q    Okay.  Do you remember having a conversation with Mr.

23       McKillican about discussions he had with Mr. Miller?

24  A    When?

25  Q    On the day that he terminated his employment?

1   A    I don't -- I don't know anything about that, I don't

2        know.

3   Q    You don't remember having a conversation with Mr.

4        McKillican?

5   A    Over tapes?

6   Q    Yes.

7   A    I don't remember that, no I don't.

8   Q    Do you remember talking to Greg Russell?

9   A    I remember talking to Greg Russell on the phone, yes.

10  Q    About Mr. McKillican?

11  A    I remember talking to Greg Russell on the phone and I

12       believe it was about McKillican.

13  Q    And did you have a complaint about Mr. McKillican?

14  A    I'll tell you what, if you want me to review the

15       McKillican stuff prior to his resigning, I -- I would

16       have to take a couple minutes to look at that.  Just

17       off the top of my head, do I remember word for word

18       what happened a couple of years ago there, no.

19  Q    Did you complain to Mr. McKillican that he had talked

20       to Mr. Miller?

21  A    About what?

22            MR. WALLERI:  Let's go off record.

23       (Off record)

24       (On record)

25  Q    (By Mr. Walleri)  Do you remember having a

1          conversation with Dave McKillican on August 11th,

2          2003?

3    A     No.

4    Q     Okay.  I'm going to play a tape recording here and if

5          -- to refresh your recollection.

6                 MR. TRICKEY:  Which of the two tapes, is it on

7    the 3rd -- on the 11th?

8                 MR. WALLERI:  This is the --

9                 MR. TRICKEY:  You gave us one marked.....

10                MR. WALLERI:  This is the 8/11 first tape.

11                MR. TRICKEY:  And on the production we got, it

12   was marked as tape number 2?

13                MR. WALLERI:  Yeah.

14                MR. TRICKEY:  Okay.  And then your --

15          (Tape playing)

16                MR. TRICKEY:  Excuse me, before we start, can

17   you go back just off the record here?

18          (Tape playing)

19                MR. TRICKEY:  Can you identify where the tape

20   is starting, Mike, on the record?

21                MR. WALLERI:  It's starting at three minutes.

22                MR. TRICKEY:  At three minutes, okay.

23   A     Where did the tape come from?

24                MR. WALLERI:  This is a tape recording of the

25   conversation on August 11th.

1   A     Where did the tape come from?

2             MR. WALLERI:  From Mr. McKillican.  Ready?

3       (Tape playing)

4   Q     (By Mr. Walleri)  After hearing that, it stopped at

5        6:17 on the tape, does that refresh your recollection

6        of your conversation with Mr. McKillican?

7   A     Of what I heard, yes.

8   Q     I have a couple questions about all of that.  What

9        rumors had you heard that Mr. McKillican was spreading

10       about you and the court proceedings related to Dick

11       Miller?

12   A     I don't remember.

13   Q     You have no recollection of what those rumors were?

14   A     I don't -- I don't remember.

15   Q     Did the recording help you refresh your recollection?

16   A     Not -- it didn't say what the rumor was so I don't

17       know what it was.

18   Q     Well, why were you angry?

19   A     I don't know.

20   Q     Okay.

21   A     But I was evidently upset.

22   Q     Okay.  Do you remember --

23   A     You don't know what happened right before he started

24       the recording, though.  I mean, there -- it seems like

25       there was something to anger two people and that's not

1           on the tape.

2   Q       Okay.  Did something happen before the recording?

3   A       I -- I don't know, I mean, that's what I'm saying, I

4           don't know what it is.

5   Q       Well, why were you going to do his evaluation?

6   A       Why?  Because they work shifts and I wanted his

7           evaluation done before -- before his one year was

8           over.

9   Q       Was there any particular reason why you wanted to do

10          it that day?

11  A       It could possibly be that I didn't know when he was

12          coming back.

13  Q       Well, let's get back to the Mr. Miller thing.  What --

14          how was it that you came to file a petition against

15          Mr. Miller?

16  A       I don't want to talk about that petition here and it's

17          not this case.....

18               MR. TRICKEY:  And I don't think.....

19  A       .....and I'm not going to talk about it.

20               MR. TRICKEY:  I don't see how that's relevant.

21  This has to do with a rumor generated as a result of the court

22  proceeding and evaluation of a police officer's performance.

23  What happened between her and Mr. Miller and why a complaint

24  was filed is irrelevant.  I'm not going to let you inquire

25  into it.  It's upsetting to the witness and I don't think it

1  is relevant, I don't think it'll be productive for the

2  continuation of the deposition.  We'll just have to take it up

3  with the judge later.

4               MR. WALLERI:  Okay.  Are you asserting any

5  privilege?

6               MR. TRICKEY:  I'm not asserting any privilege,

7  I didn't represent Ms. Carroll on that matter, but it is a

8  matter that's personally upsetting and embarrassing to her,

9  and I don't think it has any relevance to this case for

10  purposes of proving the claims related to this case in any

11  way.  So I don't think you can inquire into that in a way in

12  which will be embarrassing and upsetting to the witness and

13  it's not relevant.

14               MR. WALLERI:  Well, let's get into that.

15  Q       (By Mr. Walleri)  Were the circumstances surrounding

16          your dispute with Mr. Miller embarrassing to you?

17  A       It is very upsetting to me and I am not going to talk

18          about having to be in court with Mr. Miller.  I am not

19          going to.

20  Q       Was it embarrassing to you?

21  A       I just said I'm not going to talk about it.

22               MR. TRICKEY:  I'm not going to let you examine

23  her on this at all, Mr. Walleri.  I'm just telling you we're

24  going to have a dispute about this and we'll take it up with

25  the judge and the judge can allow you to go into this or not

1  allow you to go into it and I'm not going to -- I'm going to
2  instruct her not to answer anything further so that we can at
3  least cover the subject matters that are relevant to the
4  deposition.
5           MR. WALLERI:  Oh, we think this is terribly
6  relevant and that is that basically she was going to do an
7  evaluation because she was mad about rumors that she had
8  heard.  It's on the tape.  About relating to the proceedings,
9  it's very relevant.
10          MR. TRICKEY:  The rumors don't have to do with
11 your question which is, why did you file a stalking complaint
12 against Mr. Miller.
13          MR. WALLERI:  Well, let's go back and listen
14 to some more of it.
15          MR. TRICKEY:  Go ahead.
16          MR. WALLERI:  Well, I take it, under no
17 circumstances are we going to get into this issue?
18          MR. TRICKEY:  That's correct, unless the judge
19 orders it.
20          MR. WALLERI:  Okay.  Then we're going to have
21 to take it up with the judge.  You've heard the tape, correct?
22          MR. TRICKEY:  Yes, I just listened to the
23 tape.
24          MR. WALLERI:  Okay.  And you're instructing
25 your client not to answer the questions relating to the Dick

 1   Miller incident?

 2                MR. TRICKEY:  The stalking complaint and the

 3   proceedings at court that led to the -- the stalking complaint

 4   she filed, the circumstances involving the stalking, and the

 5   complaint she filed with the court and those court

 6   proceedings.  I don't see those as being relevant.  Those

 7   underlying facts are not relevant to this case and they're

 8   upsetting to her, and if we go into those, then she's not

 9   going to be able to continue with the deposition and so, in

10   effect, we'll be over, we'll be done.  So why don't we just

11   stay away from that subject unless the court orders that the

12   -- requires us to go into it and ask the rest of your

13   questions.

14   Q      (By Mr. Walleri)  Were you -- had you heard that Mr.

15          McKillican had gone over to see -- well, let's put it

16          this way:  Did you tell the officers that they were

17          not to speak to city council members?

18   A      Each officer signed a thing, a little piece of paper,

19          it's like a confidentiality sheet, do you remember

20          seeing that at all?

21   Q      Uh-huh.

22   A      And in that it says that the police department

23          business is not to be discussed with the city council

24          members and they sign that they acknowledge that.

25   Q      Well, what if a police officer learned of a

1          wrongdoing, were they prohibited from talking to a

2          city council member about it?

3                    MR. TRICKEY:  Objection as to form.

4     A    Yeah.  It's like you're speculating on a situation.

5     Q    (By Mr. Walleri)  Well, was this a blanket gag order?

6     A    I mean, are you speculating, do you want me to

7          speculate?

8                    MR. WALLERI:  Well, let's listen to the tape

9     some more.

10                    MR. TRICKEY:  Where are we?

11                    MR. WALLERI:  We're starting at the same,

12    where we left off.

13          (Tape starts playing)

14                    MR. WALLERI:  Okay.  We're going to have to go

15    back, it's not the -- it's a different copy of the tape here.

16    Excuse me.

17                    COURT REPORTER:  Would you like to go off

18    record for a second?

19                    MR. WALLERI:  No, wait a second.

20    Q    (By Mr. Walleri)  Did you talk to Mr. DeLeon after

21          this discussion with McKillican?

22    A    When?

23    Q    On the same day?

24    A    Where?

25    Q    In the city offices?

| | | |
|---|---|---|
| 1 | A | I think you have a recording that DeLeon recorded, |
| 2 | | right? |
| 3 | Q | Uh-huh. |
| 4 | A | Did one of these -- then there's your answer. |
| 5 | Q | Uh-huh.  Did you talk to him? |
| 6 | A | It says that I did, right? |
| 7 | Q | Okay.  Do you remember that conversation? |
| 8 | A | I don't remember it.  I didn't hear the tape, if you |
| 9 | | want to play it, go ahead. |
| 10 | Q | Well, did you talk to Mr. Greg Russell that day? |
| 11 | A | I did. |
| 12 | Q | Okay.  Could you describe that conversation to me? |
| 13 | A | No.  But I think your -- everything is on your tape. |
| 14 | Q | Okay.  Was there anything in the portion of the tape |
| 15 | | that is different from your recollection of what the |
| 16 | | conversation..... |
| 17 | A | I haven't heard the tape. |
| 18 | Q | No.  The tape that you have heard with Mr. McKillican? |
| 19 | A | Is that -- now what did you ask about it? |
| 20 | Q | Is that an accurate representation of the conversation |
| 21 | | that you had with Mr. McKillican? |
| 22 | A | It sounds like it's in the middle of an argument.  Of |
| 23 | | what -- you don't have a tape of that? |
| 24 | Q | Did you want to hear what happened before that? |
| 25 | A | Go ahead. |

1  Q      Okay.

2         (Tape playing)

3                 MR. WALLERI:  This is beginning at 142.

4                 MR. TRICKEY:  Is that the -- is that a.....

5                 MR. WALLERI:  The tape.

6                 MR. TRICKEY:  The tape, that's the recording,

7  not 1:42 in the afternoon?

8                 MR. WALLERI:  No, tape marker 142.

9         (Tape playing)

10                MR. WALLERI:  That ends at marker 300.

11  Q     (By Mr. Walleri)  So do you know what you were doing

12        before that conversation?  Does that help refresh your

13        recollection?

14  A     It just sounds like I was on the phone to someone.

15        Did it sound like that to you?

16  Q     Okay.  Well, I'm just.....

17  A     I mean, I don't --

18  Q     Is that your recollection?  Does that help remind you

19        of what was going on just before the conversation with

20        Mr. McKillican?

21  A     No.

22  Q     Okay.

23  A     Do you have a recording of what the rumor was?

24  Q     Well, that's what I'm trying to figure out.  I'm

25        trying to figure out.....

| 1  | A | No, no.  Do you have a recording of the rumor? |
| 2  | Q | No, I don't. |
| 3  | A | Okay.  Then I don't know. |
| 4  | Q | Okay.  Well, wait a second.  Do you remember anything |
| 5  |   | about an allegation that Reggie was caught lying on |
| 6  |   | the stand in the Miller proceedings? |
| 7  | A | Whose allegation? |
| 8  | Q | I don't know.  As a rumor? |
| 9  | A | I -- I..... |
| 10 | Q | That you were talking about? |
| 11 | A | I don't have any recollection of that.  I -- it's like |
| 12 |   | -- what you just said, I hadn't heard that before. |
| 13 | Q | You've never heard that before? |
| 14 | A | Not that I remember. |
| 15 | Q | Okay. |
| 16 | A | Do you have a tape of that? |
| 17 | Q | Yeah, we do. |
| 18 |   | MR. WALLERI:  Let's go off record for a |
| 19 |   | second. |
| 20 |   | (Off record) |
| 21 |   | (On record) |
| 22 | Q | (By Mr. Walleri)  Okay.  After you had your |
| 23 |   | conversation with Mr. McKillican, did you have a |
| 24 |   | conversation with Reggie? |
| 25 | A | I don't -- I don't remember in what order anything |

1           happened about that.

2    Q      Okay.

3                 MR. WALLERI:  I'm going to play this and let's

4    see if that helps refresh your recollection here.

5           (Tape playing)

6                 MR. TRICKEY:  And where are you starting on

7    the tape?

8    A      I can't -- yeah.

9                 MR. WALLERI:  241.

10                MR. TRICKEY:  241.

11          (Tape playing)

12   A      I can't hear it.

13          (Tape playing)

14                MR. WALLERI:  Would you like to hear -- we can

15   put it on the phone, on the speaker -- it's a little clearer

16   on the headsets.

17   A      No, I don't want to put that in my ears.

18                MR. WALLERI:  Okay.  Maybe we can find a

19   little bit clearer discussion of it.

20          (Tape playing)

21                MR. WALLERI:  Okay.  Let's try this.  This is

22   at 737.  Are we still on record?

23                COURT REPORTER:  We are.

24          (Tape playing)

25                MR. WALLERI:  Let's stop it there.  That's at

1  1436.

2  Q    (By Mr. Walleri)  Does that help refresh your

3       recollection as to what the rumors were?

4  A    Not the rumors.  But it sounds like there's also

5       complaints about the high phone bill.

6  Q    Well, you mentioned Debbie, who's Debbie?

7  A    There is Debbie McCarty, who is on the council.  I

8       don't know if she was on the council then but at one

9       time, while I was the city manager, she was on the

10      council.

11  Q   Okay.  Is that the Debbie you were referring to on the

12      recording?

13  A   It must be.  The other Debbie is a Debbie Hardy and

14      she doesn't work the city.

15  Q   Okay.  And the letters?

16  A   Letters?

17  Q   Yeah.  The letters you refer to that you later found

18      out that there were letters to Debbie?

19  A   They must be Dick Miller letters that he wrote to

20      Debbie, is the only thing that I can think of.

21  Q   And why would that have anything to do with Mr.

22      McKillican?

23  A   I don't have any idea.

24  Q   Okay.  You indicated that you'd had some meetings

25      about this.  What were those meetings about that you

1           were referring to in the tape recording?

2    A    What -- if you want to go back to that spot that

3           you're going to ask about, then that would probably be

4           the best.

5    Q    Okay.  Did you have meetings telling the police

6           officers that they were not to talk to Mr. Miller?

7    A    They were not to talk to council members about police

8           business.

9    Q    Did you specifically mention that they were not to

10          talk to Mr. Miller?

11   A    They were not to talk to council members about city

12          business, police business.

13   Q    What about the situation between you and Mr. Miller,

14          the court proceedings, was that city business?

15   A    That's not city business, that was a complaint.

16   Q    So they were able to talk to the city council members

17          about that?

18   A    Their job as police officers is to run around and

19          discuss cases with people?

20   Q    Did you consider.....

21   A    Meaning -- like you're asking if it's okay for them to

22          talk about a case to the council members?

23               MR. WALLERI:  Counsel, do you mind advising

24   your client that I'll be asking the questions?

25               MR. TRICKEY:  Well, I think she's asking for

1  clarification of the question but.....

2  A      Yeah.

3            MR. TRICKEY:   .....but go ahead and reframe

4  your question and try -- if you don't understand his question,

5  just say you don't understand and ask him to clarify it.

6  Q      (By Mr. Walleri)  Did you believe that your

7         instructions to not talk to city council members about

8         city business to the police department, included

9         discussions about the stalking complaint and

10        proceedings that you had with Mr. Miller?

11  A     I don't understand your question.

12  Q     Okay.  Did you believe that the police officers could

13        not talk to Mr. Miller about the legal proceedings

14        going on between you and Mr. Miller?

15  A     I don't think that, other than they're not to discuss

16        any police business with council members, I -- that's

17        what I did not want.

18  Q     Did you believe that they could not discuss the legal

19        proceedings going on between Mr. Miller and you with

20        Mr. Miller?

21  A     I don't think that talking about that case, I don't

22        want to talk about that case.

23  Q     I'm not asking you about the case, I'm asking you did

24        you believe that the police officers were directed not

25        to talk to Mr. Miller about the legal proceedings

1           going on between you and Mr. Miller?

2  A    I did not want them talking to council members about

3           police business.

4  Q    Does that include the.....

5  A    If it's going to talk about police business, I would

6           not want them to.

7  Q    But can they talk to Mr. Miller about the proceedings

8           between you and Mr. Miller?  Is that included within

9           your understanding of police business?

10  A    I think that the case is not supposed to be discussed

11          amongst people until you go to court, so I think that

12          them as police officers, when people are in court,

13          they can certainly get instruction and take direction

14          from the judge, but I think that's their role.

15  Q    Was Mr. McKillican a witness in that case?

16  A    I didn't see him and you're going to talk about the

17          case, I don't want to talk about it.

18  Q    Okay.  So he had no connection, official connection

19          with the case, through his police business?

20  A    I didn't see McKillican and I didn't talk through

21          McKillican.  I was with Reggie and talked so whatever

22          McKillican is doing he -- he's doing, I guess, I mean,

23          whatever he did, he must have done, I don't know.

24  Q    In terms of -- the 9-1-1 tapes are police property,

25          correct?

```
 1   A       The 9-1-1 tapes?

 2   Q       Are city property?

 3   A       City property.

 4   Q       Okay.  Did you ever use the 9-1-1 system to tape

 5           record Mr. Miller?

 6   A       I don't know if we used that to use as a recording

 7           device to record tapes that I had on my answering

 8           machine and Reggie had in his little recorder.

 9   Q       Did you ever ask Officer McKillican to destroy or hide

10           9-1-1 tapes recording you and Mr. Miller talking?

11   A       Not that I remember.

12   Q       Do you ever remember a subpoena for the 9-1-1 tapes

13           issued against the City of Fort Yukon in those legal

14           proceedings?

15   A       I -- I don't -- I don't know what subpoena you're

16           talking about.

17   Q       A subpoena for copies of 9-1-1 tapes?

18   A       Do you have a copy of the subpoena?

19   Q       I'm asking you, do you remember it?

20   A       I don't remember it.

21   Q       Okay.  In terms of the.....

22               MR. TRICKEY:  Let me just ask.  It's 12:15,

23   obviously we're going to need to take a lunch break in this

24   proceeding today.  Is this a good time or do you want to go

25   for a few more minutes and then.....
```

1           MR. WALLERI:  Just a few more minutes on the

2    McKillican thing if that's okay.

3           MR. TRICKEY:  All right.

4  Q    (By Mr. Walleri)  When you advised Mr. McKillican that

5       you were going to do an evaluation of him, did you

6       plan on giving him a good evaluation?

7  A    The evaluation, I had no forethought at that time of

8       an outline, that I was going to use.

9  Q    So you had no -- it's your testimony that you had no

10      idea whether or not it would be a good evaluation or a

11      bad evaluation?

12 A    I don't have an outline that I have possession of

13      because I never made one to do that evaluation,

14      because it never needed to be done.  So what the

15      answers to the questions would be is nobody knows.....

16 Q    Including you?

17 A    .....because it didn't happen.  That's correct.

18 Q    So you had no intentions at the time that you told him

19      that you were going to have an evaluation that day.

20 A    Uh-huh (affirmative).

21 Q    You had no idea whether or not it would be a good

22      evaluation or a bad evaluation?

23 A    I -- I did not have an outline drawn up with questions

24      to ask, the answers to the questions, how could I know

25      what it is now because the evaluation never occurred.

```
 1              So you're asking me a question about something that
 2              never occurred.
 3    Q         No, I'm asking about.....
 4    A         Yeah, you are.
 5    Q         .....your state of mind at the time.  Did you have any
 6              belief.....
 7    A         There was no perceived outcome of it before that,
 8              before it occurred.  How could I say what the
 9              evaluation outcome would be if I didn't give the
10              evaluation?
11    Q         I'm asking your intention, your state of mind?
12    A         I was going to give him an evaluation.  I did not.
13    Q         What was your intention as to whether it would be
14              a.....
15    A         To give an evaluation, that was the intention.
16    Q         And what was your understanding of Mr. McKillican's
17              performance as a police officer at that time?
18    A         He would have had to come into my office and answer
19              questions and he did not.
20    Q         And you.....
21    A         So I'm saying, it didn't happen, I don't have the end
22              result for you.  I can't perceive what it was going to
23              be.
24    Q         So your understanding of how you were going to conduct
25              the evaluation had nothing to do with how he -- your
```

| 1 | | observations as to the performance of his duties as a |
|---|---|---|
| 2 | | police officer, prior to your evaluation of him? |
| 3 | A | He had been there for months and months and months.  I |
| 4 | | cannot sit here and answer what the outcome would be. |
| 5 | Q | So it was all dependent on what his answers to his |
| 6 | | (ph) questions in his evaluation were going to be? |
| 7 | A | Certainly. |
| 8 | Q | Okay.  And if he gave good answers, he was going to |
| 9 | | have a good evaluation, I assume? |
| 10 | A | One would assume. |
| 11 | Q | Okay.  The -- do you believe or did you believe on |
| 12 | | August 11th that Mr. McKillican had performed his |
| 13 | | duties as a police officer in an adequate fashion? |
| 14 | A | I -- I can't -- I can't say.  All I know is that the |
| 15 | | evaluation was never performed and anything would be |
| 16 | | speculative about what the outcome would be or would |
| 17 | | have been or whatever.  It's -- I can't answer that |
| 18 | | because I don't have an answer. |
| 19 | Q | Okay.  Is there some reason why you couldn't have |
| 20 | | waited for Mr. Fleming to come back and do the |
| 21 | | evaluation with Mr. Fleming? |
| 22 | A | The only thing I can think of is what I, you know, |
| 23 | | what is the scheduling of who's coming and who's |
| 24 | | going, what is the rotation?  When Fleming came in, |
| 25 | | would McKillican be going out, or whatever, was there |

1          an overlap?  I imagine that if they kept the schedule

2          that that would be answered.

3                  MR. TRICKEY:  Seems like we're at a breaking

4    point for lunch?

5                  MR. WALLERI:  No, just a couple more

6    questions.

7    Q     (By Mr. Walleri)  At that time, were you aware of any

8          deficiencies in Mr. McKillican's performance as a

9          police officer?

10   A     I -- I can't think of exact incidences to answer that

11         question.

12   Q     So you were.....

13   A     I don't know.

14   Q     .....in your recollection, you were unaware of any

15         deficiencies in Mr. McKillican's performance as a

16         police officer for the City of Fort Yukon as of August

17         11th, 2003?

18   A     This is his first job as being a police officer and

19         I'm sure that it was a learning experience so to say

20         am I aware of any deficiencies?  I -- I couldn't

21         pinpoint anything right off the top of my head.

22   Q     Were you aware of any deficiencies or not?

23   A     I -- like I said, I can't sit here and tell you case

24         by case what -- what a deficiency of his would be.  I

25         don't know.

1   Q      Okay.  So you were unaware of any deficiencies by the

2          officer as of August 11th, 2003, in his performance of

3          his duties as a police officer?

4   A      To be exact, correct.  Could I ask you to define what

5          you mean by deficiency or does -- do I have to have

6          you ask.....

7                   MR. TRICKEY:  No, no.  If you're not sure

8   you're answering the question accurately, you can ask for

9   clarification.

10  Q      (By Mr. Walleri)  A deficiency that he had basically

11         performed his public -- his duties as an officer in an

12         inappropriate or improper manner?

13  A      Thank you for the definition.

14  Q      Does that change your answer?

15  A      I -- I can't pinpoint an exact time.

16                  MR. WALLERI:  Okay.  This is a good point.

17         (Off record)

18         (On record)

19  Q      (By Mr. Walleri)   If we could return for just a

20         minute to Mr. Hampton.  Were you aware of Mr.

21         Hampton's primary duties as a police officer when he

22         was hired?

23  A      When Mr. Hampton was hired?

24  Q      Uh-huh.

25  A      The only duties I knew of when he was hired was what