Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 1 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al                    DEPOSITION OF FANNIE M. CARROLL
CASE NO. F04-0034 CIV (RRB)                                                       MAY 26, 2006

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                     FOR THE DISTRICT OF ALASKA
 3   REGINALD FLEMING, CHRISTOPHER    )
     DELEON, CHRIS HAMPTON, WILLIAM   )
 4   D. MCKILLICAN and TODD           )
     SCHLUMBOHM,                      )
 5                                    )
                Plaintiffs,           )
 6                                    )
          vs.                         )
 7                                    )
     FANNIE CARROLL and the CITY OF   )
 8   FORT YUKON, ALASKA               )
                                      )
 9             Defendants.            )
     _____) Case No. F04-0034 CIV (RRB)
10
                   DEPOSITION OF FANNIE M. CARROLL
11                         May 26, 2006
12
     APPEARANCES:
13
          FOR THE PLAINTIFFS:    MR. MICHAEL J. WALLERI
14                               Law Offices of
                                  Michael J. Walleri
15                               Attorneys at Law
                                 330 Wendell Street
16                               Suite E
                                 Fairbanks, Alaska 99701
17                               (907) 452-4716
18        FOR THE DEFENDANTS:    MR. HOWARD S. TRICKEY
                                 Jermain, Dunnagan & Owens
19                               Attorneys at Law
                                 3000 A Street, Suite 300
20                               Anchorage, Alaska 99503
                                 (907) 563-8844
21
          ALSO PRESENT:          MR. PETER SANDBERG
22
                              * * * *
23
24
25
```

Case 4:04-cv-00034-RRB    Document 57-2    Filed 07/20/2006    Page 2 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

Page 54

1  Q   (By Mr. Walleri) Okay. So you had no opinion of it?
2  A   It was something in front of me that -- there was a
3      signed complaint, that's what I had.
4  Q   But did you have an opinion as to whether or not it
5      was a credible complaint?
6  A   It needed -- it needed to be taken care of.
7  Q   So you had no opinion or you did have an opinion?
8  A   My thought was to do what is right and when someone
9      says that there has been a sexual harassment in the
10     work place and the law says that is not to be
11     tolerated, I have to follow through with it.
12 Q   Well, I'm not sure I understand what that means. Do
13     you think that you.....
14 A   My opinion to me is not there. A complaint is in
15     front of you, and you need to know what to do with it.
16 Q   So what were you going to -- if Mr. Hampton had not
17     resigned, what were you going -- did you have an
18     opinion as to what you were going to do?
19         MR. TRICKEY: Objection as to form, calls for
20 speculation.
21 A   Oh, you wanted to know what my plan was after -- after
22     the investigation?
23 Q   (By Mr. Walleri) Yeah.
24 A   I had no plan. I had to wait for the results of the
25     investigation, that's why I called an investigation.

Page 55

1  Q   So in terms of the investigation, did you have -- but
2      I guess I'm trying to get an answer. Is it true that
3      you had no opinion as to the creditability of the
4      complaint?
5         MR. TRICKEY: Objection as to form, asked and
6  answered?
7  A   I had a complaint in front of me by an employee of
8      mine that was against the work place rules.
9         MR. WALLERI: Okay. Let's take a break for a
10 second.
11 A   Thank you.
12     (Off record)
13     (On record)
14 Q   (By Mr. Walleri) Okay. Now we earlier mentioned
15     Richard Miller, correct?
16 A   You mentioned.
17 Q   And could you describe your relationship with him?
18 A   No.
19 Q   You had no relationship with him?
20 A   I don't want to, it's private.
21        MR. TRICKEY: How is it relevant counsel in
22 this case?
23 A   He's not a plaintiff.
24        MR. WALLERI: It's profoundly relevant.
25        MR. TRICKEY: Would you like to give me a --

Page 56

1      give us a clue or two as to the relevance? I've talked about
2      this matter to her, I think it involves some, you know,
3      personal issues that I don't see as relevant to this case and
4      she's not comfortable talking about them.
5  Q   (By Mr. Walleri) Well, did you -- was there any,
6      let's put it this way: Was there any connection
7      between, in your mind, between the termination of
8      employment of Dave McKillican and Mr. Miller?
9  A   You're going to have to repeat that again.
10 Q   Was there any connection between, in your mind,
11     between the termination of employment of Mr.
12     McKillican and Richard Miller?
13 A   McKillican quit. If he quit because of Miller, you'll
14     have to ask him.
15        MR. WALLERI: Let's go off record.
16     (Off record)
17     (On record)
18        MR. TRICKEY: You've asked her whether there
19 was a connection between, in her mind, McKillican's
20 termination and Miller and she said no.
21 Q   (By Mr. Walleri) Okay. You had a -- you filed a
22     stalking petition against Mr. Miller, correct?
23 A   Yes.
24 Q   Okay. Did you ever have a conversation with Mr.
25     Miller using the 911 system for the police department?

Page 57

1  A   I don't remember. When was this?
2  Q   During June or July of 2003?
3  A   And today's May, 2006, no I don't remember.
4  Q   Okay. That was not a significant situation with you?
5  A   I don't remember.
6  Q   Okay. Did you claim -- do you remember the stalking
7      case against Mr. Miller?
8  A   I remember seeing you in court then.
9  Q   Do you remember what you were claiming?
10 A   We have a suit here and -- with these police officers
11     against me, and I'm not going to sit here and think
12     about being in court over being stalked.
13 Q   Do you remember, in your personal -- in that stalking
14     order, that there was a subpoena issued for 911 tapes
15     of the city?
16 A   I don't remember seeing a subpoena of anything. I
17     don't remember. Was I given a subpoena?
18 Q   No. I didn't ask you that. I asked you whether or
19     not you remember that during that litigation, that 911
20     tapes for the city were subpoenaed by Mr. Miller?
21 A   I don't -- I don't remember.
22 Q   Okay. Do you remember having a conversation with Mr.
23     McKillican about discussions he had with Mr. Miller?
24 A   When?
25 Q   On the day that he terminated his employment?

15 (Pages 54 to 57)

Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 3 of 8

| REGINALD FLEMING, et al vs. FANNIE CARROLL, et al | DEPOSITION OF FANNIE M. CARROLL |
| --- | --- |
| CASE NO. F04-0034 CIV (RRB) | MAY 26, 2006 |

Page 58

1  A   I don't -- I don't know anything about that, I don't
2      know.
3  Q   You don't remember having a conversation with Mr.
4      McKillican?
5  A   Over tapes?
6  Q   Yes.
7  A   I don't remember that, no I don't.
8  Q   Do you remember talking to Greg Russell?
9  A   I remember talking to Greg Russell on the phone, yes.
10 Q   About Mr. McKillican?
11 A   I remember talking to Greg Russell on the phone and I
12     believe it was about McKillican.
13 Q   And did you have a complaint about Mr. McKillican?
14 A   I'll tell you what, if you want me to review the
15     McKillican stuff prior to his resigning, I -- I would
16     have to take a couple minutes to look at that.  Just
17     off the top of my head, do I remember word for word
18     what happened a couple of years ago there, no.
19 Q   Did you complain to Mr. McKillican that he had talked
20     to Mr. Miller?
21 A   About what?
22     MR. WALLERI:  Let's go off record.
23 (Off record)
24 (On record)
25 Q   (By Mr. Walleri)  Do you remember having a

Page 59

1      conversation with Dave McKillican on August 11th,
2      2003?
3  A   No.
4  Q   Okay.  I'm going to play a tape recording here and if
5      -- to refresh your recollection.
6      MR. TRICKEY:  Which of the two tapes, is it on
7  the 3rd -- on the 11th?
8      MR. WALLERI:  This is the --
9      MR. TRICKEY:  You gave us one marked.....
10     MR. WALLERI:  This is the 8/11 first tape.
11     MR. TRICKEY:  And on the production we got, it
12 was marked as tape number 2?
13     MR. WALLERI:  Yeah.
14     MR. TRICKEY:  Okay.  And then your --
15 (Tape playing)
16     MR. TRICKEY:  Excuse me, before we start, can
17 you go back just off the record here?
18 (Tape playing)
19     MR. TRICKEY:  Can you identify where the tape
20 is starting, Mike, on the record?
21     MR. WALLERI:  It's starting at three minutes.
22     MR. TRICKEY:  At three minutes, okay.
23 A   Where did the tape come from?
24     MR. WALLERI:  This is a tape recording of the
25 conversation on August 11th.

Page 60

1  A   Where did the tape come from?
2      MR. WALLERI:  From Mr. McKillican.  Ready?
3  (Tape playing)
4  Q   (By Mr. Walleri)  After hearing that, it stopped at
5      6:17 on the tape, does that refresh your recollection
6      of your conversation with Mr. McKillican?
7  A   Of what I heard, yes.
8  Q   I have a couple questions about all of that.  What
9      rumors had you heard that Mr. McKillican was spreading
10     about you and the court proceedings related to Dick
11     Miller?
12 A   I don't remember.
13 Q   You have no recollection of what those rumors were?
14 A   I don't -- I don't remember.
15 Q   Did the recording help you refresh your recollection?
16 A   Not -- it didn't say what the rumor was so I don't
17     know what it was.
18 Q   Well, why were you angry?
19 A   I don't know.
20 Q   Okay.
21 A   But I was evidently upset.
22 Q   Okay.  Do you remember --
23 A   You don't know what happened right before he started
24     the recording, though.  I mean, there -- it seems like
25     there was something to anger two people and that's not

Page 61

1      on the tape.
2  Q   Okay.  Did something happen before the recording?
3  A   I -- I don't know, I mean, that's what I'm saying, I
4      don't know what it is.
5  Q   Well, why were you going to do his evaluation?
6  A   Why?  Because they work shifts and I wanted his
7      evaluation done before -- before his one year was
8      over.
9  Q   Was there any particular reason why you wanted to do
10     it that day?
11 A   It could possibly be that I didn't know when he was
12     coming back.
13 Q   Well, let's get back to the Mr. Miller thing.  What --
14     how was it that you came to file a petition against
15     Mr. Miller?
16 A   I don't want to talk about that petition here and it's
17     not this case.....
18     MR. TRICKEY:  And I don't think.....
19 A   .....and I'm not going to talk about it.
20     MR. TRICKEY:  I don't see how that's relevant.
21 This has to do with a rumor generated as a result of the court
22 proceeding and evaluation of a police officer's performance.
23 What happened between her and Mr. Miller and why a complaint
24 was filed is irrelevant.  I'm not going to let you inquire
25 into it.  It's upsetting to the witness and I don't think it

Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 4 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

Page 62

1    is relevant, I don't think it'll be productive for the
2    continuation of the deposition. We'll just have to take it up
3    with the judge later.
4            MR. WALLERI: Okay. Are you asserting any
5    privilege?
6            MR. TRICKEY: I'm not asserting any privilege,
7    I didn't represent Ms. Carroll on that matter, but it is a
8    matter that's personally upsetting and embarrassing to her,
9    and I don't think it has any relevance to this case for
10   purposes of proving the claims related to this case in any
11   way. So I don't think you can inquire into that in a way in
12   which will be embarrassing and upsetting to the witness and
13   it's not relevant.
14           MR. WALLERI: Well, let's get into that.
15   Q    (By Mr. Walleri) Were the circumstances surrounding
16        your dispute with Mr. Miller embarrassing to you?
17   A    It is very upsetting to me and I am not going to talk
18        about having to be in court with Mr. Miller. I am not
19        going to.
20   Q    Was it embarrassing to you?
21   A    I just said I'm not going to talk about it.
22           MR. TRICKEY: I'm not going to let you examine
23   her on this at all, Mr. Walleri. I'm just telling you we're
24   going to have a dispute about this and we'll take it up with
25   the judge and the judge can allow you to go into this or not

Page 63

1    allow you to go into it and I'm not going to -- I'm going to
2    instruct her not to answer anything further so that we can at
3    least cover the subject matters that are relevant to the
4    deposition.
5            MR. WALLERI: Oh, we think this is terribly
6    relevant and that is that basically she was going to do an
7    evaluation because she was mad about rumors that she had
8    heard. It's on the tape. About relating to the proceedings,
9    it's very relevant.
10           MR. TRICKEY: The rumors don't have to do with
11   your question which is, why did you file a stalking complaint
12   against Mr. Miller.
13           MR. WALLERI: Well, let's go back and listen
14   to some more of it.
15           MR. TRICKEY: Go ahead.
16           MR. WALLERI: Well, I take it, under no
17   circumstances are we going to get into this issue?
18           MR. TRICKEY: That's correct, unless the judge
19   orders it.
20           MR. WALLERI: Okay. Then we're going to have
21   to take it up with the judge. You've heard the tape, correct?
22           MR. TRICKEY: Yes, I just listened to the
23   tape.
24           MR. WALLERI: Okay. And you're instructing
25   your client not to answer the questions relating to the Dick

Page 64

1    Miller incident?
2            MR. TRICKEY: The stalking complaint and the
3    proceedings at court that led to the -- the stalking complaint
4    she filed, the circumstances involving the stalking, and the
5    complaint she filed with the court and those court
6    proceedings. I don't see those as being relevant. Those
7    underlying facts are not relevant to this case and they're
8    upsetting to her, and if we go into those, then she's not
9    going to be able to continue with the deposition and so, in
10   effect, we'll be over, we'll be done. So why don't we just
11   stay away from that subject unless the court orders that the
12   -- requires us to go into it and ask the rest of your
13   questions.
14   Q    (By Mr. Walleri) Were you -- had you heard that Mr.
15        McKillican had gone over to see -- well, let's put it
16        this way: Did you tell the officers that they were
17        not to speak to city council members?
18   A    Each officer signed a thing, a little piece of paper,
19        it's like a confidentiality sheet, do you remember
20        seeing that at all?
21   Q    Uh-huh.
22   A    And in that it says that the police department
23        business is not to be discussed with the city council
24        members and they sign that they acknowledge that.
25   Q    Well, what if a police officer learned of a

Page 65

1    wrongdoing, were they prohibited from talking to a
2    city council member about it?
3            MR. TRICKEY: Objection as to form.
4    A    Yeah. It's like you're speculating on a situation.
5    Q    (By Mr. Walleri) Well, was this a blanket gag order?
6    A    I mean, are you speculating, do you want me to
7        speculate?
8            MR. WALLERI: Well, let's listen to the tape
9    some more.
10           MR. TRICKEY: Where are we?
11           MR. WALLERI: We're starting at the same,
12   where we left off.
13       (Tape starts playing)
14           MR. WALLERI: Okay. We're going to have to go
15   back, it's not the -- it's a different copy of the tape here.
16   Excuse me.
17           COURT REPORTER: Would you like to go off
18   record for a second?
19           MR. WALLERI: No, wait a second.
20   Q    (By Mr. Walleri) Did you talk to Mr. DeLeon after
21        this discussion with McKillican?
22   A    When?
23   Q    On the same day?
24   A    Where?
25   Q    In the city offices?

Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 5 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

Page 66

| | | |
|---|---|---|
| 1 | A | I think you have a recording that DeLeon recorded, |
| 2 | | right? |
| 3 | Q | Uh-huh. |
| 4 | A | Did one of these -- then there's your answer. |
| 5 | Q | Uh-huh. Did you talk to him? |
| 6 | A | It says that I did, right? |
| 7 | Q | Okay. Do you remember that conversation? |
| 8 | A | I don't remember it. I didn't hear the tape, if you |
| 9 | | want to play it, go ahead. |
| 10 | Q | Well, did you talk to Mr. Greg Russell that day? |
| 11 | A | I did. |
| 12 | Q | Okay. Could you describe that conversation to me? |
| 13 | A | No. But I think your -- everything is on your tape. |
| 14 | Q | Okay. Was there anything in the portion of the tape |
| 15 | | that is different from your recollection of what the |
| 16 | | conversation..... |
| 17 | A | I haven't heard the tape. |
| 18 | Q | No. The tape that you have heard with Mr. McKillican? |
| 19 | A | Is that -- now what did you ask about it? |
| 20 | Q | Is that an accurate representation of the conversation |
| 21 | | that you had with Mr. McKillican? |
| 22 | A | It sounds like it's in the middle of an argument. Of |
| 23 | | what -- you don't have a tape of that? |
| 24 | Q | Did you want to hear what happened before that? |
| 25 | A | Go ahead. |

Page 67

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | | (Tape playing) |
| 3 | | MR. WALLERI: This is beginning at 142. |
| 4 | | MR. TRICKEY: Is that the -- is that a..... |
| 5 | | MR. WALLERI: The tape. |
| 6 | | MR. TRICKEY: The tape, that's the recording, |
| 7 | | not 1:42 in the afternoon? |
| 8 | | MR. WALLERI: No, tape marker 142. |
| 9 | | (Tape playing) |
| 10 | | MR. WALLERI: That ends at marker 300. |
| 11 | Q | (By Mr. Walleri) So do you know what you were doing |
| 12 | | before that conversation? Does that help refresh your |
| 13 | | recollection? |
| 14 | A | It just sounds like I was on the phone to someone. |
| 15 | | Did it sound like that to you? |
| 16 | Q | Okay. Well, I'm just..... |
| 17 | A | I mean, I don't -- |
| 18 | Q | Is that your recollection? Does that help remind you |
| 19 | | of what was going on just before the conversation with |
| 20 | | Mr. McKillican? |
| 21 | A | No. |
| 22 | Q | Okay. |
| 23 | A | Do you have a recording of what the rumor was? |
| 24 | Q | Well, that's what I'm trying to figure out. I'm |
| 25 | | trying to figure out..... |

Page 68

| | | |
|---|---|---|
| 1 | A | No, no. Do you have a recording of the rumor? |
| 2 | Q | No, I don't. |
| 3 | A | Okay. Then I don't know. |
| 4 | Q | Okay. Well, wait a second. Do you remember anything |
| 5 | | about an allegation that Reggie was caught lying on |
| 6 | | the stand in the Miller proceedings? |
| 7 | A | Whose allegation? |
| 8 | Q | I don't know. As a rumor? |
| 9 | A | I -- I..... |
| 10 | Q | That you were talking about? |
| 11 | A | I don't have any recollection of that. I -- it's like |
| 12 | | -- what you just said, I hadn't heard that before. |
| 13 | Q | You've never heard that before? |
| 14 | A | Not that I remember. |
| 15 | Q | Okay. |
| 16 | A | Do you have a tape of that? |
| 17 | Q | Yeah, we do. |
| 18 | | MR. WALLERI: Let's go off record for a |
| 19 | | second. |
| 20 | | (Off record) |
| 21 | | (On record) |
| 22 | Q | (By Mr. Walleri) Okay. After you had your |
| 23 | | conversation with Mr. McKillican, did you have a |
| 24 | | conversation with Reggie? |
| 25 | A | I don't -- I don't remember in what order anything |

Page 69

| | | |
|---|---|---|
| 1 | | happened about that. |
| 2 | Q | Okay. |
| 3 | | MR. WALLERI: I'm going to play this and let's |
| 4 | | see if that helps refresh your recollection here. |
| 5 | | (Tape playing) |
| 6 | | MR. TRICKEY: And where are you starting on |
| 7 | | the tape? |
| 8 | A | I can't -- yeah. |
| 9 | | MR. WALLERI: 241. |
| 10 | | MR. TRICKEY: 241. |
| 11 | | (Tape playing) |
| 12 | A | I can't hear it. |
| 13 | | (Tape playing) |
| 14 | | MR. WALLERI: Would you like to hear -- we can |
| 15 | | put it on the phone, on the speaker -- it's a little clearer |
| 16 | | on the headsets. |
| 17 | A | No, I don't want to put that in my ears. |
| 18 | | MR. WALLERI: Okay. Maybe we can find a |
| 19 | | little bit clearer discussion of it. |
| 20 | | (Tape playing) |
| 21 | | MR. WALLERI: Okay. Let's try this. This is |
| 22 | | at 737. Are we still on record? |
| 23 | | COURT REPORTER: We are. |
| 24 | | (Tape playing) |
| 25 | | MR. WALLERI: Let's stop it there. That's at |

Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 6 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

Page 70

1  1436.
2  Q    (By Mr. Walleri) Does that help refresh your
3       recollection as to what the rumors were?
4  A    Not the rumors. But it sounds like there's also
5       complaints about the high phone bill.
6  Q    Well, you mentioned Debbie, who's Debbie?
7  A    There is Debbie McCarty, who is on the council. I
8       don't know if she was on the council then but at one
9       time, while I was the city manager, she was on the
10      council.
11 Q    Okay. Is that the Debbie you were referring to on the
12      recording?
13 A    It must be. The other Debbie is a Debbie Hardy and
14      she doesn't work the city.
15 Q    Okay. And the letters?
16 A    Letters?
17 Q    Yeah. The letters you refer to that you later found
18      out that there were letters to Debbie?
19 A    They must be Dick Miller letters that he wrote to
20      Debbie, is the only thing that I can think of.
21 Q    And why would that have anything to do with Mr.
22      McKillican?
23 A    I don't have any idea.
24 Q    Okay. You indicated that you'd had some meetings
25      about this. What were those meetings about that you

Page 71

1       were referring to in the tape recording?
2  A    What -- if you want to go back to that spot that
3       you're going to ask about, then that would probably be
4       the best.
5  Q    Okay. Did you have meetings telling the police
6       officers that they were not to talk to Mr. Miller?
7  A    They were not to talk to council members about police
8       business.
9  Q    Did you specifically mention that they were not to
10      talk to Mr. Miller?
11 A    They were not to talk to council members about city
12      business, police business.
13 Q    What about the situation between you and Mr. Miller,
14      the court proceedings, was that city business?
15 A    That's not city business, that was a complaint.
16 Q    So they were able to talk to the city council members
17      about that?
18 A    Their job as police officers is to run around and
19      discuss cases with people?
20 Q    Did you consider.....
21 A    Meaning -- like you're asking if it's okay for them to
22      talk about a case to the council members?
23      MR. WALLERI: Counsel, do you mind advising
24      your client that I'll be asking the questions?
25      MR. TRICKEY: Well, I think she's asking for

Page 72

1       clarification of the question but.....
2  A    Yeah.
3       MR. TRICKEY: .....but go ahead and reframe
4  your question and try -- if you don't understand his question,
5  just say you don't understand and ask him to clarify it.
6  Q    (By Mr. Walleri) Did you believe that your
7       instructions to not talk to city council members about
8       city business to the police department, included
9       discussions about the stalking complaint and
10      proceedings that you had with Mr. Miller?
11 A    I don't understand your question.
12 Q    Okay. Did you believe that the police officers could
13      not talk to Mr. Miller about the legal proceedings
14      going on between you and Mr. Miller?
15 A    I don't think that, other than they're not to discuss
16      any police business with council members, I -- that's
17      what I did not want.
18 Q    Did you believe that they could not discuss the legal
19      proceedings going on between Mr. Miller and you with
20      Mr. Miller?
21 A    I don't think that talking about that case, I don't
22      want to talk about that case.
23 Q    I'm not asking you about the case, I'm asking you did
24      you believe that the police officers were directed not
25      to talk to Mr. Miller about the legal proceedings

Page 73

1       going on between you and Mr. Miller?
2  A    I did not want them talking to council members about
3       police business.
4  Q    Does that include the.....
5  A    If it's going to talk about police business, I would
6       not want them to.
7  Q    But can they talk to Mr. Miller about the proceedings
8       between you and Mr. Miller? Is that included within
9       your understanding of police business?
10 A    I think that the case is not supposed to be discussed
11      amongst people until you go to court, so I think that
12      them as police officers, when people are in court,
13      they can certainly get instruction and take direction
14      from the judge, but I think that's their role.
15 Q    Was Mr. McKillican a witness in that case?
16 A    I didn't see him and you're going to talk about the
17      case, I don't want to talk about it.
18 Q    Okay. So he had no connection, official connection
19      with the case, through his police business?
20 A    I didn't see McKillican and I didn't talk through
21      McKillican. I was with Reggie and talked so whatever
22      McKillican is doing he -- he's doing, I guess, I mean,
23      whatever he did, he must have done, I don't know.
24 Q    In terms of -- the 9-1-1 tapes are police property,
25      correct?

19 (Pages 70 to 73)

METRO COURT REPORTING
745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501
907.276.3876                                                                    metro@gci.net

Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 7 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

Page 74

1  A   The 9-1-1 tapes?
2  Q   Are city property?
3  A   City property.
4  Q   Okay. Did you ever use the 9-1-1 system to tape
5      record Mr. Miller?
6  A   I don't know if we used that to use as a recording
7      device to record tapes that I had on my answering
8      machine and Reggie had in his little recorder.
9  Q   Did you ever ask Officer McKillican to destroy or hide
10     9-1-1 tapes recording you and Mr. Miller talking?
11 A   Not that I remember.
12 Q   Do you ever remember a subpoena for the 9-1-1 tapes
13     issued against the City of Fort Yukon in those legal
14     proceedings?
15 A   I -- I don't -- I don't know what subpoena you're
16     talking about.
17 Q   A subpoena for copies of 9-1-1 tapes?
18 A   Do you have a copy of the subpoena?
19 Q   I'm asking you, do you remember it?
20 A   I don't remember it.
21 Q   Okay. In terms of the.....
22        MR. TRICKEY: Let me just ask. It's 12:15,
23     obviously we're going to need to take a lunch break in this
24     proceeding today. Is this a good time or do you want to go
25     for a few more minutes and then.....

Page 75

1         MR. WALLERI: Just a few more minutes on the
2      McKillican thing if that's okay.
3         MR. TRICKEY: All right.
4  Q   (By Mr. Walleri) When you advised Mr. McKillican that
5      you were going to do an evaluation of him, did you
6      plan on giving him a good evaluation?
7  A   The evaluation, I had no forethought at that time of
8      an outline, that I was going to use.
9  Q   So you had no -- it's your testimony that you had no
10     idea whether or not it would be a good evaluation or a
11     bad evaluation?
12 A   I don't have an outline that I have possession of
13     because I never made one to do that evaluation,
14     because it never needed to be done. So what the
15     answers to the questions would be is nobody knows.....
16 Q   Including you?
17 A   .....because it didn't happen. That's correct.
18 Q   So you had no intentions at the time that you told him
19     that you were going to have an evaluation that day.
20 A   Uh-huh (affirmative).
21 Q   You had no idea whether or not it would be a good
22     evaluation or a bad evaluation?
23 A   I -- I did not have an outline drawn up with questions
24     to ask, the answers to the questions, how could I know
25     what it is now because the evaluation never occurred.

Page 76

1      So you're asking me a question about something that
2      never occurred.
3  Q   No, I'm asking about.....
4  A   Yeah, you are.
5  Q   .....your state of mind at the time. Did you have any
6      belief.....
7  A   There was no perceived outcome of it before that,
8      before it occurred. How could I say what the
9      evaluation outcome would be if I didn't give the
10     evaluation?
11 Q   I'm asking your intention, your state of mind?
12 A   I was going to give him an evaluation. I did not.
13 Q   What was your intention as to whether it would be
14     a.....
15 A   To give an evaluation, that was the intention.
16 Q   And what was your understanding of Mr. McKillican's
17     performance as a police officer at that time?
18 A   He would have had to come into my office and answer
19     questions and he did not.
20 Q   And you.....
21 A   So I'm saying, it didn't happen, I don't have the end
22     result for you. I can't perceive what it was going to
23     be.
24 Q   So your understanding of how you were going to conduct
25     the evaluation had nothing to do with how he -- your

Page 77

1      observations as to the performance of his duties as a
2      police officer, prior to your evaluation of him?
3  A   He had been there for months and months and months. I
4      cannot sit here and answer what the outcome would be.
5  Q   So it was all dependent on what his answers to his
6      (ph) questions in his evaluation were going to be?
7  A   Certainly.
8  Q   Okay. And if he gave good answers, he was going to
9      have a good evaluation, I assume?
10 A   One would assume.
11 Q   Okay. The -- do you believe or did you believe on
12     August 11th that Mr. McKillican had performed his
13     duties as a police officer in an adequate fashion?
14 A   I -- I can't -- I can't say. All I know is that the
15     evaluation was never performed and anything would be
16     speculative about what the outcome would be or would
17     have been or whatever. It's -- I can't answer that
18     because I don't have an answer.
19 Q   Okay. Is there some reason why you couldn't have
20     waited for Mr. Fleming to come back and do the
21     evaluation with Mr. Fleming?
22 A   The only thing I can think of is what I, you know,
23     what is the scheduling of who's coming and who's
24     going, what is the rotation? When Fleming came in,
25     would McKillican be going out, or whatever, was there

Case 4:04-cv-00034-RRB   Document 57-2   Filed 07/20/2006   Page 8 of 8

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

Page 78

1  an overlap? I imagine that if they kept the schedule
2  that that would be answered.
3       MR. TRICKEY: Seems like we're at a breaking
4  point for lunch?
5       MR. WALLERI: No, just a couple more
6  questions.
7  Q  (By Mr. Walleri) At that time, were you aware of any
8     deficiencies in Mr. McKillican's performance as a
9     police officer?
10 A  I -- I can't think of exact incidences to answer that
11    question.
12 Q  So you were.....
13 A  I don't know.
14 Q  .....in your recollection, you were unaware of any
15    deficiencies in Mr. McKillican's performance as a
16    police officer for the City of Fort Yukon as of August
17    11th, 2003?
18 A  This is his first job as being a police officer and
19    I'm sure that it was a learning experience so to say
20    am I aware of any deficiencies? I -- I couldn't
21    pinpoint anything right off the top of my head.
22 Q  Were you aware of any deficiencies or not?
23 A  I -- like I said, I can't sit here and tell you case
24    by case what -- what a deficiency of his would be. I
25    don't know.

Page 79

1  Q  Okay. So you were unaware of any deficiencies by the
2     officer as of August 11th, 2003, in his performance of
3     his duties as a police officer?
4  A  To be exact, correct. Could I ask you to define what
5     you mean by deficiency or does -- do I have to have
6     you ask.....
7       MR. TRICKEY: No, no. If you're not sure
8  you're answering the question accurately, you can ask for
9  clarification.
10 Q  (By Mr. Walleri) A deficiency that he had basically
11    performed his public -- his duties as an officer in an
12    inappropriate or improper manner?
13 A  Thank you for the definition.
14 Q  Does that change your answer?
15 A  I -- I can't pinpoint an exact time.
16      MR. WALLERI: Okay. This is a good point.
17 (Off record)
18 (On record)
19 Q  (By Mr. Walleri) If we could return for just a
20    minute to Mr. Hampton. Were you aware of Mr.
21    Hampton's primary duties as a police officer when he
22    was hired?
23 A  When Mr. Hampton was hired?
24 Q  Uh-huh.
25 A  The only duties I knew of when he was hired was what

Page 80

1     was in the city manual.
2  Q  Okay. Would it refresh your recollection to suggest
3     that he -- his primary duties were to begin
4     enforcement of traffic ordinances in Fort Yukon?
5  A  Is it my recollection that his primary duty was to
6     enforce traffic?
7  Q  Correct.
8  A  On what -- did it start a new day or from his first
9     day or --
10 Q  From his first day that his primary.....
11 A  I was the city clerk, I wouldn't have privy to that, I
12    don't know.
13 Q  Okay. Were you aware of complaints about Mr. Hampton
14    in the performance of his duties?
15 A  I think that there had to have been some
16    dissatisfaction in the community if all of a sudden
17    one day they get stopped where they were never stopped
18    before so probably.
19 Q  Okay. And do you know after -- or you became the city
20    manager during Mr. Hampton's tenure there, correct?
21 A  Correct.
22 Q  Do you remember ever talking to Mr. Hampton about his
23    enforcement of -- well, let's be very specific, about
24    his enforcement of the one stop sign in Fort Yukon?
25 A  Not specifically and not particularly.

Page 81

1  Q  Do you remember him writing a number of tickets or,
2     excuse me, do you remember him issuing a number of
3     warnings to people that the city police force was
4     going to begin enforcing traffic ordinances in Fort
5     Yukon?
6  A  Do I remember of him issuing a number of warnings?
7  Q  A number of warnings to people that -- and advising
8     them that the city police department was going to
9     start enforcing traffic ordinances in Fort Yukon?
10 A  I probably was given that information.
11 Q  Do you remember whether or not there was -- how that
12    was received generally by the citizenry of Fort Yukon?
13 A  Well, I think it was -- some people were happy and
14    some people were not. Probably the speeders were not.
15 Q  Okay.
16 A  I can't give you a census on that.
17 Q  Would it be fair to say that there was division in the
18    community about it?
19 A  Define division.
20 Q  Was it controversial?
21 A  Does that mean were people talking about it?
22 Q  Yes.
23 A  I guess people were talking about it.
24 Q  Do you remember, as the city manager, receiving any
25    complaints about Mr. Hampton's activities in this