Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER )
DeLEON, CHRIS HAMPTON, WILLIAM )
D. McKILLICAN, and TODD )
SCHLUMBOHM, )
)
        Plaintiffs, )
)
vs. )
)
FANNIE CARROLL and the CITY OF )
FORT YUKON, ALASKA, )
)
        Defendants. )
)

Case No. 4:04-cv-00034-RRB Civil

DEPOSITION OF REGINALD FLEMING
July 20, 2006

APPEARANCES:

    FOR THE PLAINTIFFS:    MR. MICHAEL J. WALLERI
                              Attorney at Law
                              330 Wendell Street, Suite E
                              Fairbanks, Alaska 99701
                              (907) 452-4716

    FOR THE DEFENDANTS:    MR. MATTHEW SINGER
                              Jermain, Dunnagan & Owens
                              Attorneys at Law
                              3000 A Street, Suite 300
                              Anchorage, Alaska 99503
                              (907) 563-8844

\* \* \* \*

Page 2

1  PURSUANT TO NOTICE, the Deposition of REGINALD FLEMING
2  was taken on behalf of Defendants, before Marci Lynch, Notary
3  Public in and for the State of Alaska, and Reporter for Liz
4  D'Amour & Associates, Inc., at the offices of D'Amour and
5  Associates, 330 Wendell Street, Suite A, Fairbanks, Alaska
6  99701, on the 20th day of July, 2006, commencing at the hour of
7  8:30 o'clock a.m.
8         * * * *
9       TABLE OF CONTENTS
10  Direct Examination by Mr. Singer .......... 4
    Cross Examination by Mr. Walleri ......... 268
11  Redirect Examination by Mr. Singer ........ 272
12  EXHIBITS:
13  # 1 (Employment Agreement) ............ 35
    # 2 (Employment Agreement) ............ 44
14  # 3 (Personal History Statement, Fleming) .... 52
    # 4 (Personnel Handbook) .............. 58
15  # 5 (Letter from Phillip Solomon, 10/27/03) ... 97
    # 6 (Letter from Fannie Carroll, 2/9/04) ..... 164
16  # 7 (Job Listing) ................. 165
    # 8 (Memos re: reporting for duty) ........ 167
17  # 9 (Letter from Fannie Carroll, 2/9/04) ..... 173
    #10 (Letter from Joseph Wallace, 2/6/04) ..... 190
18  #11 (Employee Time Sheet) ............. 229
    #12 (Employee Time Sheet) ............. 230
19  #13 (Dish Network account details) ........ 236
    #14 (Notice of Leave of Absence) ......... 239
20  #15 (Employee Time Sheet) ............. 240
    #16 (Personal History Statement, Schlumbohm) ... 261
21
         * * * *
22
23
24
25

Page 3

1        PROCEEDINGS
2        (On record)
3        COURT REPORTER: We're on the record. My name
4  is Marci Lynch with Liz D'Amour and Associates in Fairbanks,
5  Alaska. Today's date is July 20th, 2006. The time is
6  8:35 a.m. We are here in the case of Fleming, DeLeon, Hampton,
7  McKillican, and Schlumbohm versus Carroll and the City of Fort
8  Yukon, case number 4:04-cv-00034-RRB. We're meeting for the
9  deposition of Mr. Reginald Fleming. Will counsel please
10 identify themselves for the record before I swear the witness?
11       MR. SINGER: Good morning, Mr. Fleming. My
12 name is Matt Singer. I'm an attorney for the defendants in
13 this lawsuit and I'm from the law firm called Jermain Dunnagan
14 and Owens in Anchorage.
15       MR. WALLERI: Mike Walleri on behalf of the
16 plaintiff -- or defendant, excuse me. No.....
17       MR. SINGER: Plaintiff.
18       MR. WALLERI: .....I'm the plaintiff. That's
19 right.
20       MR. SINGER: A whole bunch of them.
21       COURT REPORTER: Sir, would you please raise
22 your right hand?
23    (Oath administered)
24       MR. FLEMING: I do.
25       COURT REPORTER: Thank you.

Page 4

1        REGINALD FLEMING
2  having first been duly sworn under Oath, testified as follows
3  on examination:
4        COURT REPORTER: For the record, please state
5  your full name and spell your last name.
6  A   Reginald Fleming. R-e-g-i-n-a-l-d, F-l-e-m-i-n-g.
7        COURT REPORTER: Your mailing address?
8  A   5281 Cherokee Avenue, Fairbanks, Alaska 99709.
9        COURT REPORTER: And a daytime contact phone?
10 A   Will it be work or.....
11       COURT REPORTER: Wherever, daytime.
12 A   Okay. Daytime I'll be at work. That's (907) 377-8683.
13       COURT REPORTER: Thank you. You may proceed
14 counselor.
15       DIRECT EXAMINATION
16 BY MR. SINGER:
17 Q   Mr. Fleming, just for the record, is the mailing
18     address you just listed also your residence address?
19 A   Yes, sir.
20 Q   And have you ever had a deposition taken before?
21 A   This is my first time.
22 Q   Let's just talk some ground rules first. Okay? First,
23     do you understand you just took an oath that requires
24     you to tell the truth today?
25 A   Yes, sir.

Page 5

1  Q   And part of that is you're obligated to answer my
2      questions to the best of your ability. Do you
3      understand that?
4  A   Yes, sir.
5  Q   And this is a formal proceeding. This testimony may be
6      used in court, so it's important you understand my
7      questions. Will you tell me if you don't understand a
8      question?
9  A   Yes, sir.
10 Q   The court reporter is making a written transcript of
11     today's proceeding, so she can't record a nod or a
12     shake of the head. So it's important that after I ask
13     a question that you answer verbally. Do you
14     understand?
15 A   Yes, sir.
16 Q   And along the same lines, let's try to prevent talking
17     over each other. I'm guilty of that myself, but we'll
18     try. I'll ask the question and then stop, and then you
19     answer. Do you understand that?
20 A   Yes, sir.
21 Q   During the course of today's proceeding your lawyer may
22     state an objection to one of my questions. He'll say,
23     objection, and he may have a one or two word
24     explanation. If he does, please pause, let your lawyer
25     state his objection for the record, then the rules

Page 62

1 Police Standards Council?
2 A Yes, sir.
3 Q Now, the dispatchers did not require that type of
4 training, did they?
5 A Per se, no, not by -- they had a different set of
6 standards. They just had to meet the qualifications
7 that the -- the city set forth, sir.
8 Q The dispatchers weren't required to have -- as you
9 understood as the chief of police, your dispatchers
10 were not required to have training in law enforcement
11 techniques, right?
12 A Partly, some law enforcement training, how to deal with
13 the public in situations and.....
14 Q Prior -- did your dispatchers, were they required to
15 have training in self-defense?
16 A Self-defense, no.
17 Q Your dispatch -- the dispatchers in the City of Fort
18 Yukon Police Department did not carry firearms,
19 correct?
20 A Correct, sir.
21 Q They had no training in firearms?
22 A I don't know that, sir.
23 Q You didn't offer any training to dispatchers of
24 firearms?
25 A No, I did not offer any training, sir.

Page 63

1 Q The City of Fort Yukon didn't offer any training to
2 dispatcher on firearms?
3 A No, sir.
4 Q You know, you know all the gentlemen who are plaintiffs
5 in this lawsuit, correct?
6 A Yes, sir. When you say the city didn't offer any, they
7 didn't offer none of the people that when I first got
8 there with training, neither, and I told them they
9 needed to and they blew that off.
10 Q I'd like you just to listen to the question I ask.
11 A Okay.
12 Q You know each of the gentlemen who's a plaintiff in
13 this lawsuit?
14 A Yes, sir.
15 Q Each of the gentlemen who's a plaintiff in this lawsuit
16 had training at a police academy.....
17 A Yes, sir.
18 Q .....correct?
19 A Correct, sir.
20 Q Several hundred hours of training, right?
21 A Some did. Some -- it all depends on the hours, what
22 schooling they went to and how much schooling they did,
23 sir.
24 Q DeLeon went to the TVC academy with you?
25 A Yes, sir, and trooper academy.

Page 64

1 Q And the trooper academy?
2 A Yes, sir.
3 Q Hampton?
4 A He went to TVC academy.
5 Q And Schlumbohm?
6 A TVC academy.
7 Q McKillican?
8 A TVC academy.
9 Q Now, did any of the dispatchers, during the time that
10 you worked for the Fort Yukon, any of them attend a
11 police academy?
12 A Not that I know of, sir.
13 Q And none of them had prior police academy experience
14 before becoming dispatchers?
15 A No, sir.
16 Q Now, when you say -- let me ask you this. Did the City
17 of Fort Yukon, during the time that you worked there,
18 offer any of its police department employees in-house
19 training?
20 A In-house training? No, sir, I created that.
21 Q So did you offer in-house training?
22 A We had in-house training on different subjects, sir.
23 Q Did you -- tell me what you mean by in-house training?
24 A It's keeping up, current on the state laws, which is
25 required, and that's training you have to go to, report

Page 65

1 record system, keeping up with those, just different
2 topics on patrol and how to better do our job.
3 Q Well, in what form? Was there -- did you send people
4 to Fairbanks for training?
5 A Oh, we did that. Yes, sir.
6 Q Did you ever send any dispatchers to training in
7 Fairbanks?
8 A I tried to and the city told me no.
9 Q So the city did not pay for training for dispatchers?
10 A They didn't want to, no.
11 Q The city did pay for training for police officers,
12 correct?
13 A No, sir.
14 Q But you sent -- you found a way to send police officers
15 to training in Fairbanks?
16 A Yes, sir.
17 Q What kind of training?
18 A Taser training, drug training, MOI, method of
19 instruction training, so that an officer can teach --
20 be qualified to teach different topics and then certify
21 everybody else in it. That would save money. It was
22 taser, K9 training, I think sexual assault training.
23 I -- I even got -- yeah, sexual assault training for
24 the clinic up there, too, to have them all go down for
25 a week and have our own SART nurses and officers

Page 82

| | | |
|---|---|---|
| 1 | | of police..... |
| 2 | A | Uh-huh. |
| 3 | Q | .....do they have uniforms? |
| 4 | A | Yes, sir. |
| 5 | Q | They have police uniforms? |
| 6 | A | Yes, sir. |
| 7 | Q | Do they wear utility belts? |
| 8 | A | Yes, sir. |
| 9 | Q | Do they carry firearms? |
| 10 | A | Yes, sir. |
| 11 | Q | The dispatchers do not wear uniforms? |
| 12 | A | Dispatchers -- we had a shirt for them. We ordered |
| 13 | | shirts for them. Yes, they did. They had -- they had |
| 14 | | a uniform per se top. |
| 15 | Q | A different uniform? |
| 16 | A | Yes, sir. |
| 17 | Q | It didn't look like a police officer uniform? |
| 18 | A | Well, not -- technically, it had the Fort Yukon on it, |
| 19 | | but it had in small wording, dispatchers, on it. We |
| 20 | | also had shirts that had police officer and it had the |
| 21 | | Fort Yukon stuff on it. |
| 22 | Q | So the police officers had police uniforms and shirts |
| 23 | | that said the words, police officer? |
| 24 | A | Yes, sir. |
| 25 | Q | The dispatchers had shirts that said dispatcher? |

Page 83

| | | |
|---|---|---|
| 1 | A | Right, sir. |
| 2 | Q | And the dispatchers did not wear firearms? |
| 3 | A | No, sir, not that I know of. |
| 4 | Q | Dispatchers were all hourly employees. Is that your |
| 5 | | understanding? |
| 6 | A | Yes, sir. |
| 7 | Q | Dispatchers were paid at a different rate of pay than |
| 8 | | law enforcement officers? |
| 9 | A | Yes, sir. |
| 10 | Q | Lower pay, right? |
| 11 | A | Yes, sir. |
| 12 | Q | And did you think that was fair, that the dispatchers |
| 13 | | were paid lower than police officers? |
| 14 | A | Fair to me might not be the same as far to anybody |
| 15 | | else, but, yeah, the officers out there are putting |
| 16 | | their life on the line. Yes, sir. |
| 17 | Q | The police officers had to come to Fort Yukon with |
| 18 | | prior police training, correct? |
| 19 | A | When I got there, yes. Before I got there, no. |
| 20 | Q | But during the time that you were police chief, from |
| 21 | | November 2001 until you left employment in 2004, police |
| 22 | | officers of the City of Fort Yukon had to have prior |
| 23 | | training in law enforcement techniques, self-defense |
| 24 | | and firearms, correct? |
| 25 | A | From the time I got there, no, sir, because Officer |

Page 84

| | | |
|---|---|---|
| 1 | | Alexander had still worked there, and he worked there |
| 2 | | for like three years without any police training. I |
| 3 | | had to train him to keep him up on things, because the |
| 4 | | city wasn't going to send him to get training. That's |
| 5 | | why I had to get officers already trained so the city |
| 6 | | didn't have to spend money on training officers, but he |
| 7 | | still worked. |
| 8 | Q | Part of hiring you, as you understood, was to make a |
| 9 | | change in Fort Yukon..... |
| 10 | A | Yes, sir. |
| 11 | Q | .....right? |
| 12 | A | Yes, sir. |
| 13 | Q | And after the date on which you were hired, isn't it |
| 14 | | true that no police officer was hired by the City of |
| 15 | | Fort Yukon who did not have prior training in law |
| 16 | | enforcement techniques, self-defense and firearms? |
| 17 | A | That's not true, sir. |
| 18 | Q | Who? |
| 19 | A | The city paid for VPSO Mike Hardy before he even got |
| 20 | | official training. They put him on the payroll until |
| 21 | | TCC picked up his payroll, so he was -- maybe he did |
| 22 | | work for about two months for the city without having |
| 23 | | training. |
| 24 | Q | Anyone else? |
| 25 | A | After me, well, they had there Eric Tremblay who did |

Page 85

| | | |
|---|---|---|
| 1 | | it, Phillip Solomon, Charlotte Fleener went on patrol |
| 2 | | some, Audrey Fields went on patrol. I'm trying to see |
| 3 | | if I remember anybody else. So far that's the names |
| 4 | | that come to mind that have done patrols without any |
| 5 | | police training, sir. |
| 6 | Q | I didn't ask you about who had done patrol, so let me |
| 7 | | ask you the question again. During the time that you |
| 8 | | worked -- from the date you were hired as the police |
| 9 | | chief, did the City of Fort Yukon hire anyone as a law |
| 10 | | enforcement officer, police officers, who did not have |
| 11 | | prior training? |
| 12 | A | Yes, and I gave you those names. |
| 13 | Q | And the people you identified are Charlotte |
| 14 | | Fleener..... |
| 15 | A | Uh-huh (affirmative). |
| 16 | Q | .....Audrey Fields..... |
| 17 | A | Uh-huh (affirmative). |
| 18 | Q | .....Eric Tremblay and Phillip Solomon, correct? |
| 19 | A | Yes. |
| 20 | Q | And you also mentioned Gerald Alexander, who was..... |
| 21 | A | Already there when I got there. |
| 22 | Q | And he was employed for a short time when you started? |
| 23 | A | Well, no, he was employed for like three years before I |
| 24 | | even got there. |
| 25 | Q | But he left employment soon after you started? |

Page 86

1 A He didn't -- he had to leave employment soon after.
2 Q That's a yes, he left employment soon after you
3   started?
4 A Yes.
5 Q Now, Charlotte Fleener, she was employed as a
6   dispatcher for the City of Fort Yukon, correct?
7 A Yes, sir.
8 Q That was her title, dispatcher?
9 A Yes, sir.
10 Q Audrey Fields, she was a dispatcher for the City of
11   Fort Yukon, correct?
12 A Yes, sir.
13 Q Eric Tremblay was the maintenance director for the City
14   of Fort Yukon, right?
15 A Yes, sir.
16 Q Now, Phillip Solomon, Vera James has signed an
17   affidavit indicating Phillip Solomon, according to the
18   city's payroll computer system.....
19 A Uh-huh.
20 Q .....never once received a single pay stub, he's never
21   worked for the city. Do you have any evidence to the
22   contrary that he was ever on the city's payroll?
23 A Well, you have all the dispatchers -- the dispatchers
24   knew that -- told me that Phillip Solomon was riding
25   around in our vehicles and patrolling, sir.

Page 87

1 Q So do you have any personal knowledge that Phillip
2   Solomon ever rode around and patrolled in a vehicle?
3   Did you ever see him do that?
4 A I have not seen him.
5 Q You have not?
6 A No, sir.
7 Q So how -- who told you that?
8 A Dispatchers.
9 Q Who?
10 A They called me at home.
11 Q Who?
12 A I want to say it was Charlotte Fleener, sir.
13 Q Charlotte Fleener called you at home?
14 A Yes.
15 Q When was this?
16 A Oh, the date. It was during -- I want to say it was
17   during the wintertime.
18 Q What year?
19 A Let's see if I can tell you what year. I want to say
20   it was in 2003.
21 Q And what is it that you say Charlotte Fleener told you
22 A That the city manager appointed -- appointed him an
23   officer, temporary officer to patrol in a vehicle.
24 Q Do you know -- you heard about this on one occasion?
25 A I heard about that one, yes. I heard about that one,

Page 88

1   and I knew about Eric Tremblay doing patrols. I knew
2   about Eric because she would say, put Eric on patrol.
3   And I got a big disagreement with that because he is a
4   convicted -- convicted of a sexual crime, and Phillip
5   Solomon has a felony conviction. And I've had my
6   thing, but city manager, like she said, she was the
7   ultimate person.
8 Q So you've testi- -- with regard to Phillip Solomon, you
9   testified that one time you heard from somebody else
10   that he was out driving a police car around?
11 A I heard it from the dispatcher.
12 Q From Charlotte Fleener?
13 A Yes, sir.
14 Q So you're aware from hearsay of one occasion.....
15   MR. WALLERI: Objection. Please don't
16 characterize the quality of the evidence.
17 Q Do you know what the word -- what does the word hearsay
18   mean to you?
19 A That someone else says.
20 Q So using the word hearsay as you understand it, the
21   only occasion you know of Phillip Solomon out on a
22   patrol is the one time when Charlotte Fleener called
23   you and told you about it?
24 A Yes, sir.
25 Q And you would agree that Charlotte Fleener, her

Page 89

1   personal knowledge would be more accurate as to what
2   actually happened there?
3 A Possible, yes.
4 Q And you don't have any personal knowledge about whether
5   or not Phillip Solomon actually went out on a patrol
6   for the City of Fort Yukon?
7 A The only actual -- like I said, the only actual
8   knowledge I have is what Charlotte Flee- -- Fleener and
9   her integrity.
10 Q But you've now told me everything you know about
11   Phillip.....
12 A Phillip Solomon.
13 Q .....Solomon doing any work as a -- for the City of
14   Fort Yukon?
15 A No, sir. What about Title 47? If I'm right, he has
16   done Title 47s for the city. And what Title 47 is, if
17   somebody is in -- not capable of taking care of
18   theirself, the state doesn't pay for that, the city
19   pays for it, and they pay for the jail guards on it.
20 Q Do you have any personal knowledge of whether Phillip
21   Solomon ever did any work as a jail guard?
22 A Yes, sir.
23 Q Now, the jail is not in the city building, is it?
24 A No, we have our office there. The city has an office
25   in it.

### Page 94

1  you know, to get the actual -- actual number for you I
2  would need to look at the paperwork.
3  Q  You'd agree he wasn't -- as far as you knew, he was not
4  a regular employee of the state as a jail guard?
5  A  No, sir.
6  Q  He served as an emergency jail guard on a couple of
7  occasions?
8  A  Yes, sir.
9  Q  The precise number you don't know?
10 A  Yes, sir.
11 Q  And he was not a regular employee of the City of Fort
12 Yukon, correct?
13 A  No, sir, only if the city manager hired him.
14 Q  And so your testimony is that the only times that
15 Phillip Solomon would have been -- would have done any
16 work for the City of Fort Yukon would have been if the
17 city manager hired him or appointed him?
18 A  As far as for the city, as far as patrol officer. As
19 far as for jail guard for Title 47, we would ultimately
20 call people to see who would be able to do it, and if
21 they say yes, then we'll tell them to come in and we
22 would document it. And we had a list of people that
23 asked to be jail guards.
24 Q  Do you remember if Phillip Solomon served as a jail
25 guard for Joel Agli? Do you remember that?

### Page 95

1  A  Yes, Mr. Agli. Yes, sir.
2  Q  What do you remember about that?
3  A  I think Mr. Agli was wanted for manslaughter, if I'm
4  right. He had a warrant out for him on that. We
5  picked him up, put him in jail. And if I'm correct, I
6  think that's the one that Mr. Solomon released him and
7  that's when we charged him with a felony. And we
8  have -- he testified that he wanted to go home, or
9  during the interview with him he testified that he
10 wanted to go home so he let him out. And we have
11 that -- that documentation is with the DA's office, him
12 personally.
13 Q  You arrested Phillip Solomon.....
14 A  I don't think.....
15 Q  .....for releasing him.....
16 A  .....I arrested him. I want to say that was
17 Mr. McKillican.
18 Q  The police -- the City of Fort Yukon Police Department
19 arrested Phillip Solomon for releasing a prisoner?
20 A  Yes, sir.
21 Q  And you'd agree after that date he didn't work as a --
22 he never worked again for the city or as a jail guard?
23 A  He did. He worked -- he did patrols. I think he did
24 patrols for the city. He did patrol for the city.
25 That was told to me by Charlotte Fleener.

### Page 96

1  Q  But, again, you don't have any personal knowledge of
2  whether he actually did that?
3  A  No, I didn't see him, sir.
4  Q  Now, is it possible that Fannie Carroll -- it's
5  possible that this instance that you're recalling, what
6  Charlotte Fleener told you, it was an instance when
7  there were no regular police officers in town, correct?
8  A  Correct.
9  Q  And.....
10 A  That's correct.
11 Q  .....there was -- is it possible there was a discussion
12 between Fannie Carroll and Charlotte Fleener, in which
13 Fannie Carroll said, go get Phillip Solomon to do a
14 patrol? You don't know?
15 A  I can't.....
16 Q  It's possible Charlotte Fleener said, don't do that, I
17 don't like him, and that was the end of the story?
18 A  I don't know. I wasn't there for that.
19 Q  You weren't there?
20 A  No.
21 Q  You just don't know?
22 A  No, I don't know about that.
23 Q  But it's possible Phillip Solomon never drove a police
24 car?
25 A  Well, I wouldn't there. I went on the integrity of the

### Page 97

1  police dispatcher.
2  Q  So we'd have to ask Charlotte Fleener?
3  A  Basically, yes, sir.
4  Q  Now -- and certainly your police department never used
5  Phillip Solomon for a Title 47.....
6  A  After that.....
7  Q  .....function after arresting him, correct?
8  A  Yes, sir.
9  Q  Now, I'm going to show you a letter Phillip Solomon
10 wrote.
11           (Deposition exhibit 5 marked)
12        MR. SINGER: What number is that?
13        COURT REPORTER: 5.
14 Q  Mr. Fleming, do you see on the top of the page it's
15 directed to Fannie?
16 A  Yes, sir.
17 Q  Do you understand that to be Fannie Carroll?
18 A  It could -- yes, it could be. Yes, sir.
19 Q  And what's the date?
20 A  10/27/03.
21 Q  And then if you look at the last page, who is it signed
22 by, this letter?
23 A  Phillip Solomon.
24 Q  And you knew Phillip Solomon in Fort Yukon?
25 A  Yes, sir.

## Page 186

1  were Christopher DeLeon, correct?
2      MR. WALLERI: Objection; assumes facts not in
3  evidence. Mr. Fleming did not resign, but go ahead and answer
4  the question.
5      MR. SINGER: I'm sorry. Thank you, counsel.
6  Q  The day you were terminated.
7  A  Okay.
8  Q  Sorry. Christopher DeLeon was an officer, right?
9  A  Yes, sir.
10 Q  Schlumbohm?
11 A  Yes, sir.
12 Q  Yourself?
13 A  Yes, sir.
14 Q  Wallace?
15 A  Yes, sir.
16 Q  Anybody else with that title?
17 A  Fill-ins.
18 Q  We've talked about the fill-ins already, right?
19 A  Yes, sir.
20 Q  Let's talk about the fill-ins a little more. Eric
21    Tremblay you said was one of the fill-ins?
22 A  Yes, that was appointed by the city manager.
23 Q  Now, the fill -- when you say the fill-ins, there were
24    occasions when the police department, there were no
25    police officers in the City of Fort Yukon, right?

## Page 187

1  A  It didn't necessarily have to be that, sir. Just when
2     a police officer was exhausted.
3  Q  Can you think of an occasion when somebody filled in as
4     a patrol officer or police officer while you were in
5     the city?
6  A  Filled in? Yes, I can. I can, sir.
7  Q  What?
8  A  It's when I was exhausted.
9  Q  And who -- describe exactly what you remember about
10    that event.
11 A  What I remember about it is I was up for almost 48
12    hours, and that's almost -- most cases, and there -- I
13    needed to get some rest, and they had somebody else
14    fill in just on an on-call basis.
15 Q  Who was that person?
16 A  Eric Tremblay.
17 Q  And that was one occasion?
18 A  That's one occasion that I -- yeah.
19 Q  Can you recall any others when you were in the city
20    when somebody filled in, somebody who wasn't -- whose
21    title wasn't police officer?
22 A  No.
23 Q  No?
24 A  No, sir.
25 Q  Eric Tremblay has testified that he did this fill-in

## Page 188

1     work on three occasions. Is that consistent with your
2     recollection?
3  A  Like I say, I can vouch -- what I can vouch for is -- I
4     want to say I can vouch for two of the occasions. Once
5     is when I -- when he filled in for me. Second of all
6     is when he had to fill in for Officer McKillican
7     because he had a transport, and then I came up and I
8     took over after that. Now, and I know there was other
9     times that they -- and then there was other times that
10    I had to transport and I was the only officer up there
11    and he had to fill in.
12 Q  Do you have any reason to dispute his testimony that he
13    did it three times?
14 A  Oh, yes, I can definitely dispute that, at three times.
15 Q  So can you tell me the dates on which he worked?
16 A  I can't get you the dates, but if I can get the
17    transactions on my transports when I was the only
18    officer up there, he did the fill-ins.
19 Q  Do those documents indicate Eric Tremblay as the
20    fill-in?
21 A  He did fill-in work.
22 Q  Now, Eric Tremblay also indicated that -- in his
23    testimony that each time he served in a fill-in
24    capacity he wrote down that additional time on his time
25    sheet. Yes, you'd agree that that's what he did?

## Page 189

1  A  I -- I can't say that he did, but I know -- I'm
2     assuming that he got paid for it.
3  Q  So you wouldn't dispute the accuracy of Eric Tremblay's
4     time sheets?
5  A  It all depends on -- it all depends on if he used a
6     separate time sheet, or if he put it on his -- put it
7     all into one time sheet, the same time sheet.
8  Q  Now, Eric Tremblay was employed in a full time capacity
9     as the maintenance director for the city, right?
10 A  Yes, sir.
11 Q  To your knowledge, did Eric Tremblay have any
12    background in law enforcement?
13 A  No, sir.
14 Q  To your knowledge, did Eric Tremblay receive any
15    training in law enforcement?
16 A  No, sir.
17 Q  To your knowledge, did Eric Tremblay have any training
18    in self-defense or firearms?
19 A  No, sir.
20 Q  To your knowledge, did Eric Tremblay ever make an
21    arrest while in the City of Fort Yukon?
22 A  Not to my knowledge.
23 Q  Is it so that Eric Tremblay, when he served in a
24    fill-in capacity, was instructed to call the troopers
25    if there was any trouble?

Page 190

1  A    From that instructions, personally, told him if
2       anything ever happened, you need to call the -- the
3       troopers. If I was leaving out and I had a transport,
4       basically, the city manager will say, get Eric
5       Tremblay, put him on there, and what you call it. And
6       I -- and I felt uneasy about that, but she was in
7       control, and I had discussions with her on that.
8            MR. SINGER: What number is that?
9            COURT REPORTER: Number 10.
10              (Deposition exhibit 10 marked)
11 Q    Mr. Fleming, do you see that this is -- this exhibit 10
12      is dated February 6, 2004?
13 A    February 6?
14 Q    At the top of the page?
15 A    Yes, sir.
16 Q    And at the bottom it says, sincerely, Officer Joseph R.
17      Wallace?
18 A    Yes, sir.
19 Q    And this letter is made out to you. Is that right?
20 A    Yes, sir.
21 Q    Did you receive this letter?
22 A    Yes, sir.
23 Q    And in this letter Mr. Wallace addresses an incident
24      that occurred on January 12th, 2004 between Christopher
25      DeLeon and himself?

Page 191

1  A    Yes, sir.
2  Q    What were you -- and setting -- you can set aside this
3       letter for a second. If you want to read it, we'll
4       just.....
5       (Pause - witness reviews document)
6  A    I received this letter. Yes, sir.
7  Q    And what was your reaction to this letter by Officer
8       Wallace raising concerns about an incident he'd had
9       with Christopher DeLeon?
10 A    Took it under advisement. I talked to Chris. I asked
11      him on -- what all happened. He just -- he told me
12      what happened, and basically a lot of the stuff in here
13      was exaggerated to a certain point, and that he knew
14      that information -- that J.R. Wallace was giving out
15      information that was inside the police department that
16      shouldn't have been given to the city manager,
17      detailing cases and -- and certain situations which he
18      is not authorized to do. And that put our cases and
19      the other stuff at jeopardy. And I talked to J.R.
20      about that and I informed him that he should not be in
21      the city manager's office and she should not be asking
22      him about cases or anything dealing with the police
23      department, because she has no -- she has no right to
24      be involved in putting any information out here that
25      will mess up on further -- mess up our investigation by

Page 192

1       getting information from them. She was digging for
2       information.
3  Q    Well, you weren't party to the conversations that took
4       place between Fannie Carroll and J.R. Wallace in her
5       office, were you?
6  A    No, but I did get the information when Fannie Carroll
7       talked to me.
8  Q    All right. Now, so you received a complaint about
9       Christopher DeLeon, and in fact in the complaint
10      Officer Wallace said that he had a question about
11      whether he could trust DeLeon with his safety, or the
12      safety of the citizens of Fort Yukon. That was the
13      complaint he made, right?
14 A    From this? Let's see where it says can he trust
15      him.....
16 Q    He wrote that in the last paragraph of the letter that
17      he sent you on February 6, 2004.
18 A    Or trust Chris with my safety or safety -- he wrote
19      that in there.
20 Q    And so then you took it under advisement?
21 A    Yes.
22 Q    And you talked to Christopher DeLeon?
23 A    Yes.
24 Q    And you made a credibility determination?
25 A    Yes.

Page 193

1  Q    And you decided to believe DeLeon over Wallace?
2  A    Oh, yes, because of certain incidents. And when I come
3       back off leave, Chris would say, hey, he was in there
4       in the office, and they were in there for a long time,
5       he's giving out information. And then when I go in
6       there and talk to the city manager, she knew certain
7       stuff that -- I will put out information. I was doing
8       a check myself. I will put out only information to
9       J.R., Officer Wallace, and then while I'm gone, and
10      then when I get back that information has got to the
11      city manager, so his credibility was there.
12 Q    You would agree there was -- I mean, it came to be that
13      there was real tension between the city manager and the
14      police department.
15 A    Yes.
16 Q    And particularly certain members of the police
17      department, right?
18 A    Particularly, certain members, but it was towards
19      all -- all of us.
20 Q    Do you think the city manager's -- am I right, you
21      allege the city manager engaged in wrongful conduct
22      towards yourself?
23 A    Wrongful conduct towards the police department and
24      investigation incidents of where she interfered in
25      investigation, just stepped out and interfered,