Deposition of Christopher DeLeon  
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER )
DELEON, CHRIS HAMPTON, )
WILLIAM D. MCKILLICAN, and )
TODD SCHLUMBOHM, )
                               )
    Plaintiffs, )
                               )
    vs. )
                               )
FANNIE CARROLL, and the CITY )
OF FORT YUKON, ALASKA, )
                               )
    Defendants. )
_____)

Case No. 4:04-cv-00034-RRB

CONFIDENTIAL
DEPOSITION OF CHRISTOPHER DeLEON
Taken Wednesday, July 19, 2006
From the hour of 9:05 a.m. to 3:03 p.m.
Pages 1 through 232, inclusive
Volume 1

Taken by Counsel for Defendants

At

Offices of Heartland Court Reporters
100 Cushman Street, Suite 308
Fairbanks, Alaska 99701

Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

---

**Page 2**

APPEARANCES

For Plaintiffs:
    MICHAEL J. WALLERI, ESQ.
    ATTORNEY AT LAW
    330 Wendell Street, Suite E
    Fairbanks, AK 99709
    907-452-4725

For Defendants:
    MATTHEW SINGER, ESQ.
    JERMAIN, DUNNAGAN & OWENS, P.C.
    3000 A Street, Suite 300
    Anchorage, AK 99503
    907-563-8844

Witness:
    CHRISTOPHER DeLEON
    July 19, 2006

Reported by:
    CAROL A. McCUE, RMR
    Heartland Court Reporters

BE IT KNOWN that the deposition of the above-named witness was taken this date in the foregoing action before Carol A. McCue, Registered Merit Reporter and Notary Public within and for the State of Alaska.

---

**Page 3**

I N D E X

WITNESS: CHRISTOPHER DeLEON     July 19, 2006
EXAMINATION BY                       Page
Mr. Singer.........................................5
Mr. Walleri......................................220

FURTHER EXAMINATION BY

Mr. Singer.......................................227

E X H I B I T S

| Exhibit No. | | Page Marked |
|---|---|---|
| 1: | 7-page document, Personal History Statement, Alaska Police Standards Council, regarding Christopher DeLeon | 55 |
| 2: | 30-page document, City of Fort Yukon, Employee Personnel Manual Handbook | 70 |
| 3: | 1-page document, entitled Part 1 - Introduction, page from City of Fort Yukon, Inc., Personnel Policy Manual Handbook, dated 9/15/03 | 70 |
| 4: | 2-page document, Petition demanding city manager to relieve Officer Christopher DeLeon of his position of City Patrolman | 112 |
| 5: | 2-page document, letter from Fannie Carroll, City Manager, to Officer Christopher DeLeon, dated 2/9/04 | 148 |

---

**Page 4**

EXHIBITS, Continued

| Exhibit No. | | Page Marked |
|---|---|---|
| 6: | 2-page document, letter from Fannie Carroll, City Manager, to Officer Christopher DeLeon, dated 2/11/04 | 148 |
| 7: | 1-page document, letter to Fannie Carroll, City Manager, from Thomas R. Wickwire, dated 2/13/04 | 152 |
| 8: | 1-page document, letter to Fort Yukon City Council from Thomas R. Wickwire, dated 2/13/04 | 152 |
| 9: | 3-page document, City of Fort Yukon Job Description, Police Officer II | 173 |
| 10: | 2-page document, Fort Yukon Police Department Employee Performance Review, Peer Review, regarding Christopher DeLeon, dated 11/20/03 | 176 |
| 11: | 1-page document, Oath of Office document regarding Eric Tremblay, dated 10/28/03 | 177 |
| 12: | 2-page document, letter to Chief Fleming from Christopher DeLeon dated 2/5/04 | 192 |
| 13: | 2-page document, letter to Chief Fleming from Christopher DeLeon dated 2/6/04 | 192 |
| 14: | 2-page document, undated letter to Chief Fleming from Christopher DeLeon dated 2/5/04 | 192 |
| 15: | 22-page document, Complaint, in case No. 4FA-04-0034 dated 12/28/04 | 203 |

Ex A pg 1 of 11

---

1 (Pages 1 to 4)

Heartland Court Reporters
Carol A. McCue, RMR

CONFIDENTIAL

Phone: (907) 452-6727
Fax: (907) 488-7701

Case 4:04-cv-00034-RRB   Document 92-3   Filed 09/06/2006   Page 2 of 11

Deposition of Christopher DeLeon
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 25

1   A.   He's not.
2       MR. WALLERI:   Okay.
3   BY MR. SINGER:
4   Q.   Do you know when he left employment with the
5   City of Fairbanks?
6   A.   I can't recall the date, but it's eight months
7   ago.  I mean, that's a guess.
8   Q.   And that was to go work for the Department of
9   Defense, as far as you know?
10  A.   I mean, he found other employment.  So...
11  Q.   And then Todd Schlumbohm?
12  A.   Yes, sir.
13  Q.   When did you first meet him?
14  A.   In Fort Yukon.
15  Q.   As a colleague with the department?
16  A.   Correct.
17  Q.   And did you become friends with him?
18  A.   Yes.
19  Q.   Are you still friends with him?
20  A.   Yes.
21  Q.   And how often do you see Mr. Schlumbohm?
22  A.   On a regular basis.  He -- he works downtown,
23  so I see him on a regular basis.
24  Q.   You socialize together?
25  A.   Well, as far as after hours, no, but I mean,

Page 26

1   we see each other.
2   Q.   Where is he working, as far as you know?
3   A.   He works for the Downtown Association in
4   Securitas, so basically, he kind of patrols downtown.
5   Q.   Do you see him out on the streets?
6   A.   Yes.
7   Q.   Now, tell me about the circumstances under
8   which you became employed by the City of Fort Yukon.
9   How did you learn there was a job there?
10  A.   I think just Reggie and I started talking and,
11  you know, he -- he needed an officer up there, so...
12  Q.   Did Mr. Fleming call you?
13  A.   I think I called him.
14  Q.   At the time -- do you remember when that was?
15  A.   I don't.  Sorry.
16  Q.   So you -- would you agree that you started
17  work on or about June 30th, 2003, with the City of
18  Fort Yukon?
19  A.   That sounds about right.
20  Q.   Do you know how much time transpired between
21  your first conversation with Mr. Fleming about working
22  for the city?
23  A.   It wasn't long.  It wasn't like a year or
24  anything.  Maybe a couple months or three months.
25  Q.   So roughly the spring of 2003?

Page 27

1   A.   Yeah.  That would be accurate -- fair.
2   Q.   And how is it that you -- did you know
3   Mr. Fleming was the chief of police in Fort Yukon?
4   A.   Yeah.
5   Q.   How did you know that?
6   A.   Well, we went to the academy together.
7   Q.   Well, did you -- did you see him here in town
8   or --
9   A.   Yeah, I think that I did, yeah.
10  Q.   Now, you graduated from the academy in 2001;
11  is that right?
12  A.   Yeah.
13  Q.   And then did you go work for any police
14  agencies after that?
15      THE WITNESS:   Mike?
16      MR. WALLERI:   Pardon me?  Oh.  Yeah.  Go ahead
17  and answer that.
18      THE WITNESS:   Barrow, so North Slope Borough.
19  And the Alaska State Troopers.  Fort Yukon, and
20  Fairbanks Police Department.
21  BY MR. SINGER:
22  Q.   And did you go to work for the North Slope
23  Borough Police Department in January of 2002?
24  A.   Yeah.  It was either -- yeah, January or late
25  December.  I think it was January.

Page 28

1   Q.   And how long did you work there?
2   A.   Not very long.
3   Q.   Did you work there about six weeks?
4   A.   Yeah, six weeks or two months.
5   Q.   What happened?
6   A.   Both Anchorage Police Department and the
7   Troopers called and I went to work with the Troopers.
8   Q.   So you left the Barrow -- North Slope Borough
9   Police Department on good terms?
10  A.   Yes.  My wife was pregnant and she didn't want
11  to be in Barrow, so...
12  Q.   Were you -- did you move your family to
13  Barrow?
14  A.   No.  She -- she resided here, I just flew back
15  and forth once in awhile.
16  Q.   What kind of shift were you doing up there?
17  A.   Days, I think.
18  Q.   Were you two weeks on, two weeks off?
19  A.   It was actually three days on, three days off,
20  four days on, four days off.  12-hour days.
21  Q.   And how often were you coming back to
22  Fairbanks?
23  A.   I think I only flew back like two or three --
24  twice.
25  Q.   But you left that -- that department was your

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Ex A pg 2 of 11      7 (Pages 25 to 28)

Phone:  (907) 452-6727
Fax:    (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006
CONFIDENTIAL SEALED TRANSCRIPT
Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 69

1     Q.   So -- and was your paycheck the same each --
2 each pay period?
3     A.   I think so. Like -- like I said, I never
4 really looked at my checks. I mean, my wife takes care
5 of that.
6     Q.   And what do you recall was the pay period?
7 Was it a two-week pay period?
8     A.   I think that sounds right.
9     Q.   And --
10     A.   Or twice a month, or -- you know, yeah.
11     Q.   And you worked one week on, one week off?
12     A.   Initially, yes.
13     Q.   And you would receive a paycheck for the month
14 even though you were off for one week and worked for
15 one week, right?
16     A.   Well, if I can elaborate a little bit.
17     Q.   Please.
18     A.   My off week, I wasn't really off. I was
19 following up on investigations here, I was at the
20 District Attorney's Office, and I didn't -- you know, I
21 mean, if someone got hurt and they got sent to the
22 Fairbanks Memorial Hospital, I went and interviewed
23 them, I went to the District Attorney's Office to
24 follow up on cases, things like that. So my off week,
25 I wasn't really off.

## Page 70

1        (Exhibit 2 marked.)
2 BY MR. SINGER:
3     Q.   The court reporter marked as Exhibit 2 a
4 document that's -- you see the first page, it says,
5 City of Fort Yukon Employee Personnel Manual Handbook?
6     A.   Uh-hum.
7     Q.   Have you seen this document before?
8     A.   Yes.
9     Q.   And did you receive this upon taking
10 employment with the City of Fort Yukon?
11     A.   I'm not sure if it was right then, but I did
12 receive one at some point.
13        (Exhibit 3 marked.)
14 BY MR. SINGER:
15     Q.   And if you look at Exhibit 3.
16     A.   Uh-hum.
17     Q.   Does your handwriting appear on that page?
18     A.   Yes.
19     Q.   And do you see that that's a -- states at the
20 top, the provisions contained herein shall apply to all
21 employees of the City of Fort Yukon? It's the first
22 paragraph.
23     A.   Uh-hum.
24     Q.   Is that "yes"?
25     A.   Yes.

## Page 71

1     Q.   And it's the intent of this personnel policy
2 handbook to comply with applicable federal, state, and
3 local laws to the City of Fort Yukon and its
4 operations. Do you see that?
5     A.   Yes.
6     Q.   And it says in Paragraph E, the
7 current personnel manual shall be made available to all
8 employees and a signed letter of receipt shall be kept
9 in the -- it says in the employee's personnel file. Do
10 you see that?
11     A.   Yes.
12     Q.   And you signed a receipt of the personnel
13 manual on September 15th, 2003?
14     A.   Yes.
15     Q.   And you do recall that you have seen the
16 personnel manual during your terms of employment at --
17     A.   Well, I -- I know that I had one when Fannie
18 terminated me. I know -- she gave me this. So... Or
19 her attorney did or whatever.
20     Q.   So you know that you had the personnel
21 handbook at the time that you were terminated?
22     A.   Yes. Because I was provided one.
23     Q.   And you signed this acknowledgment document on
24 September 15th, 2003?
25     A.   Correct.

## Page 72

1     Q.   That's Exhibit 3.
2     A.   That's what it says, yeah.
3     Q.   Now, tell me, did you keep time sheets when
4 you worked at -- for the City of Fort Yukon?
5     A.   Excuse me. Time sheets were provided and we
6 turned them in.
7     Q.   So that's "yes"?
8     A.   I did not keep them.
9     Q.   You filled out time sheets?
10     A.   Yes.
11     Q.   And how did you fill them out?
12     A.   In pen.
13     Q.   And how did you decide what hours to write
14 down on your time sheet?
15     A.   Well, I just remember what time I woke up and
16 what time I did stuff around the office and what time
17 we were able to go to bed. And if --
18     Q.   And --
19     A.   I'm sorry. Go ahead.
20     Q.   I don't want to interrupt you. Please.
21     A.   Oh. And sometimes you go to bed and you get
22 called right back out. So...
23     Q.   To the best of your ability on your time
24 sheets, did you write down all of the time that you
25 worked?

18 (Pages 69 to 72)

Heartland Court Reporters
Carol A. McCue, RMR
Email: carol.mccue@acsalaska.net

Ex A pg 3 of 11

Phone: (907) 452-6727
Fax: (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

### Page 77

1  meals you had?
2  A.  There was some times, it's true with any law
3  enforcement job, that you're busy and you can't take
4  lunch sometimes.  And so...
5  Q.  Cook breakfast in the house?
6  A.  Sometimes, yeah.
7  Q.  And on dinner, you would sometimes cook at the
8  house, sometimes go to people's houses?
9  A.  More times than not, we would eat at the
10  residence, at the, quote, unquote, cop house.  Whatever
11  you want to call it.  I don't know.
12  Q.  Did you do -- usually do group meals?
13  A.  No.  We ate individually.
14  Q.  It wasn't like a bunch of guys sitting around
15  cooking a meal and eating a meal together?
16  A.  No.
17  Q.  Individually make your own food?
18  A.  Right.
19  Q.  So you'd go in and put something in the oven,
20  cook it up, and eat it by yourself?
21  A.  95 percent of the time, yes.
22  Q.  And then you said that to pass your free time,
23  you watched TV?
24  A.  Yeah.  And read and -- yeah.
25  Q.  Read books, magazines, would you?

### Page 78

1  A.  Yeah.
2  Q.  Did you take reading material out there with
3  you?
4  A.  Yeah.
5  Q.  Do you recall what you were reading?
6  A.  Oh, like outdoor magazines, Field & Stream
7  kind of stuff.  I'm trying to think of some of the
8  other -- the books that I read back then.  Like, Clear
9  and Present Danger, that kind of book stuff.
10  Q.  And did you say that when you first got there
11  you didn't have your own room, but then you did?
12  A.  I'm sorry?
13  Q.  You said you did not have a room and then you
14  did, something like that.
15  A.  Yeah.  I slept on the couch for a while.
16  Q.  How long?
17  A.  I don't remember.  It wasn't very long.
18  Q.  Did somebody leave?
19  A.  No.  Reggie gave me his room so I could -- so
20  I could have it and he slept on the couch.
21  Q.  And did you leave belongings in Fort Yukon?
22  A.  Yes.
23  Q.  You had clothes out there?
24  A.  Yes.
25  Q.  Winter coat?

### Page 79

1  A.  Yes.
2  Q.  What else did you have out there?
3  A.  You know, you leave food stuffs there that --
4  you know.  Our clothing.  Books.  Magazines.
5  CD player.  CD's.  Pictures of my wife and my daughter,
6  that kind of stuff.
7  Q.  Kind of your home away from home?
8  A.  Well, yeah.
9  Q.  Now, let's talk about your job duties as a --
10  when you first started at Fort Yukon, what was your job
11  title?
12  A.  Just patrol officer, police officer.
13  Q.  And did that change at some point?
14  A.  Yes.
15  Q.  When did it change?
16  A.  I don't recall the exact dates, sir.
17  Q.  How -- describe for me how it changed.  Were
18  you promoted?
19  A.  Yes.
20  Q.  And what were you promoted to?
21  A.  Investigator.
22  Q.  Was there just one promotion during your time
23  as an employee with the City of Fort Yukon?
24  A.  Yes.
25  Q.  Did that promotion come with a pay increase?

### Page 80

1  A.  No.
2  Q.  Just a change of title?
3  A.  Correct.
4  Q.  So you became Investigator DeLeon?
5  A.  Well, you know, if I can go back, there was a
6  pay increase, but I don't know if I can correlate the
7  two.  It was about the same time frame.  Okay?  So I
8  don't want to infer that I got a raise for getting this
9  promotion, but it was about the same time period.
10  Q.  There was a -- it is true that -- that you
11  received, during your time at Fort Yukon, a pay
12  increase?
13  A.  Yes.
14  Q.  Your salary was increased?
15  A.  Yes.
16  Q.  Your annual salary?
17  A.  Yes.
18  Q.  You understood you were paid on an annual
19  salary?
20  A.  Yes.
21  Q.  When you -- when you started as a basic -- is
22  it patrol officer?
23  A.  Yeah.  Patrol, slash, police officer.  Peace
24  officer.
25  Q.  Tell me what your daily duties were.

20 (Pages 77 to 80)

Ex A pg 4 of 11

Heartland Court Reporters
Carol A. McCue, RMR
Email:  carol.mccue@acsalaska.net
Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Christopher DeLeon  
Taken July 19, 2006  
CONFIDENTIAL SEALED TRANSCRIPT  
Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

Page 81

1  A.  Patrol Fort Yukon, make sure things were safe,
2  go to calls, assist the citizens with various problems.
3  Make sure the community was safe.
4  Q.  Did you have a uniform?
5  A.  Yes.
6  Q.  A police officer uniform?
7  A.  Yes.
8  Q.  A badge or insignia of the office?
9  A.  Yes.
10  Q.  Did you carry a firearm?
11  A.  Yes.
12  Q.  What type of firearm?
13  A.  It was a personally owned Glock .21.
14  Sometimes it was a personally owned Glock .22.
15  Q.  Did you carry a utility belt?
16  A.  Yes.
17  Q.  What was on your belt?
18  A.  Again, all -- that was mine, as well.  The
19  equipment was not provided by Fort Yukon.  OC spray,
20  handcuffs, gun, a radio, I think a radio holster, and I
21  think a baton, I think, expandable baton.
22  Q.  How much of your time would you say in a given
23  day when you were working as a patrol officer, how much
24  of your time was spent patrolling Fort Yukon?
25  A.  40 percent of it.

Page 82

1  Q.  Did you patrol Fort Yukon every day while you
2  were working?
3  A.  Yes.
4  Q.  How did you patrol?
5  A.  Well, I'd just go to different sectors of the
6  community, drive around that sector for a little bit.
7  Make sure everything was okay.
8      For instance, you know, check to see the
9  airport gates were locked, that kind of thing.  Go out
10  and make sure the Air Force Base was okay.  Make sure
11  the AC Store is locked up.  Just, you know, making sure
12  that things were secure.
13  Q.  And did you -- did your patrol activities
14  change from season to season or did you do the same
15  throughout the year?
16  A.  I think they were the same.
17  Q.  Did you patrol -- did you patrol in a vehicle?
18  A.  Yes.
19  Q.  Always?
20  A.  Well, you'd park downtown and you'd walk
21  downtown, but the majority of it was vehicle, yes.
22  Q.  And which vehicle did you drive?
23  A.  I drove the Jeep.  It was a red -- I think it
24  was a 1990 Jeep.  I'm not sure of the year, to be --
25  but --

Page 83

1  Q.  The City of Fort Yukon Police Department has a
2  police Jeep, right?
3  A.  I don't know if they still do, but they did
4  when I was there.
5  Q.  Lights on top?
6  A.  Yes.
7  Q.  It's marked as a police vehicle?
8  A.  Yes.
9  Q.  And in patrolling, you would drive daily?
10  A.  Yes.
11  Q.  Did you generally patrol alone or with a
12  fellow officer?
13  A.  Generally, was alone.
14  Q.  Unusual to patrol with another officer?
15  A.  Yes.
16  Q.  During your time with the City of Fort Yukon,
17  typically, how many other police officers would be on
18  duty while you were on duty?
19  A.  One.
20  Q.  Who was that?  Did it change?
21  A.  It varied.
22  Q.  Who were the individuals that you worked with?
23  A.  Sergeant McKillican, and then Officer, then,
24  Sergeant Schlumbohm, and then Reggie, chief.  Oh, and
25  I'm sorry, and towards the end was J. R. Wallace.

Page 84

1  Q.  So the -- David McKillican, Todd Schlumbohm,
2  Reggie Fleming, and J. R. Wallace, those were the other
3  police officers that you worked with while you were --
4  during the time that you were employed at the City of
5  Fort Yukon?
6  A.  Well, there was other fill-in officers when we
7  weren't there.
8  Q.  In terms of people you worked with while you
9  were on shift.
10  A.  Yeah.
11  Q.  Okay.  You mentioned fill-ins.
12  A.  Uh-hum.
13  Q.  Who is that?
14  A.  Charlotte Fleenor, Audrey Fields, Eric
15  Tremblay, and I'm not -- I can't recall anybody else.
16  There might be other folks that Reggie knows or Todd
17  knows, but...
18  Q.  These people that you just mentioned,
19  Charlotte Fleenor, Audrey Fields, and Eric Tremblay; is
20  that right?
21  A.  Uh-hum.
22  Q.  They were fill-ins when you weren't there?
23  A.  Well, when no one was up there.  Yeah.
24  Q.  Okay.  So you won't have personal knowledge
25  about what they did as a fill-in?

Heartland Court Reporters  
Carol A. McCue, RMR  
Email: carol.mccue@acsalaska.net  
Ex A pg 5 of 11    21 (Pages 81 to 84)  
Phone: (907) 452-6727  
Fax: (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006
CONFIDENTIAL SEALED TRANSCRIPT
Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 137

1 Beth Solomon, I think is her name.
2     Well, I knew that that was going to go
3 nowhere. Mary Beth wanted to disband the police
4 department. That was one of her big issues while she
5 was on the city council. She wanted tribal police
6 officers -- police department.
7     She also didn't like me because I arrested her
8 for DUI. I knew that it was going to be futile for me
9 to have a face-to-face meeting with her.
10    Q.  Now, let's look for a minute at this City of
11 Fort Yukon manual.
12    A.  Which page?
13    Q.  And we'll -- we'll turn to -- well, you know
14 what, let's -- let's break.
15    A.  Okay.
16        MR. SINGER:  We'll go off the record.
17        THE REPORTER:  Off record.
18        (Off record, recess from
19         12:12 p.m. to 1:06 p.m.)
20        THE REPORTER:  Back on record.
21 BY MR. SINGER:
22    Q.  I'd like to have you look at Exhibit 2.
23    A.  Okay.
24    Q.  This is -- again, is the personnel manual.
25    A.  Okay.

## Page 138

1     Q.  And you received this during the course of
2 your employment?
3     A.  Uh-hum.
4     Q.  Yes?
5     A.  Like I said, I received the packet when I
6 was -- received the notice I was terminated.
7     Q.  And you -- in September 2003, you signed
8 acknowledgment of receipt of the personnel manual?
9     A.  Okay.
10    Q.  Right?
11        MR. WALLERI:  Objection. Asked and answered.
12        MR. SINGER:  All right. I'm just laying a
13 foundation here.
14 BY MR. SINGER:
15    Q.  And in your conversation with -- when Chief
16 Fleming was counseling you after this February 5th
17 meeting, you specifically referred to your ability to
18 grieve an employment matter?
19    A.  Okay.
20    Q.  Isn't that right?
21    A.  Yes.
22    Q.  Let's look at Page 20 of the personnel manual.
23    A.  Okay.
24    Q.  This is the grievance policy, correct?
25    A.  Yep.

## Page 139

1     Q.  Have you seen this before?
2     A.  Okay.
3     Q.  Is that right?
4     A.  I've seen it here today. I don't know if I've
5 seen it before, but go ahead.
6     Q.  You -- you have testified, again, that you --
7 you had a copy of the -- this manual when you received
8 a notice that you were going to be terminated, right?
9     A.  Correct.
10    Q.  Now, do you see that there's a four-step
11 grievance process?
12    A.  Yes.
13    Q.  And do you see that -- what's Step 4, as you
14 understood?
15    A.  If not satisfied with the decision -- do you
16 want me to read it or just tell you what I understood.
17    Q.  I'd just to like know what you understood.
18    A.  That I'd have a right to appeal this and it
19 would be looked into.
20    Q.  Appeal to whom?
21    A.  City council.
22    Q.  You understood that you had a right to take a
23 grievance to the city council?
24    A.  Well, that's not what was stated in the
25 termination letter. That's what this says, but that's

## Page 140

1 not the letter that I received.
2     Q.  You understand that there is a multi-step
3 grievance process?
4     A.  Well, there's four steps here.
5     Q.  Okay. So you understood there were four
6 steps?
7     A.  Correct.
8     Q.  And if you weren't happy with the resolution
9 at Step 1, Step 2, or Step 3, you could keep going up
10 to Step 4?
11    A.  Okay.
12    Q.  Is that right?
13    A.  That's what it says.
14        Could I get some water, please? Sorry.
15        (Pause.)
16 BY MR. SINGER:
17    Q.  Step 4 was a -- was a right to appeal to the
18 city council, correct?
19    A.  Correct.
20    Q.  Now, you didn't do that, right?
21    A.  I was advised by counsel not to do that.
22    Q.  You did not do that?
23    A.  Correct.
24    Q.  And now, you don't have -- you don't know what
25 the outcome would have been in front of the city

Ex A pg 6 of 11              35 (Pages 137 to 140)

Heartland Court Reporters
Carol A. McCue, RMR
Email: carol.mccue@acsalaska.net
Phone: (907) 452-6727
Fax:   (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 141

```
 1  council, do you?
 2      A.  No one would, but I can speculate and I have a
 3  better idea of anybody else in this room that would --
 4  what would have happened.
 5      Q.  Had you ever had a prior hearing in front of
 6  the city council?
 7      A.  No.
 8      Q.  Had you attended city council meetings?
 9      A.  Yes.
10      Q.  You agree that the city council do not -- did
11  not walk in lock step with Fannie Carroll?
12      A.  I guess not 100 percent of the time, no.
13      Q.  A lot of times they disagreed with her?
14      A.  Well, sure.
15      Q.  Did you know some of the city council members?
16      A.  Uh-hum.
17      Q.  Were you friends with some of them?
18      A.  Friends?  No.
19      Q.  Friendly?
20      A.  Yeah.  I think.  I try to be on a friendly
21  basis with everybody, yeah.
22      Q.  I mean, you didn't have -- it's not like you
23  had bad relationships with city council members?
24      A.  As I stated, Mary Beth Solomon in -- I don't
25  think anybody in the police department really got
```

## Page 142

```
 1  along.  She particularly didn't like me for arresting
 2  her.  And Twila Strom, I arrested her daughter several
 3  times.  I can't think of anybody else that was there
 4  that night that I would have had an issue with.
 5      Q.  Did -- let's back up.  You received -- it's
 6  your testimony that you received a packet of
 7  information informing that you would be terminated; is
 8  that right?
 9      A.  Correct.
10      Q.  Including a letter?
11      A.  Yes.
12      Q.  And that letter informed you of a right to a
13  hearing before a personnel officer?
14      A.  In front of a city council member.
15      Q.  A city council member?
16      A.  Yeah.
17      Q.  Were you aware that under the grievance
18  procedure, normally it's the city manager who conducts
19  that first hearing?
20      A.  No.
21      Q.  Did you look at the grievance procedures?
22      A.  Well, what I did was, is I read through it and
23  I brought it to an attorney, and again, he advised me
24  not to go to the grievance.
25      Q.  Who was that attorney?
```

## Page 143

```
 1      A.  Wickwire, Thomas Wickwire.
 2      Q.  And again, a -- let's look at Step 2.  Step 2
 3  is a written presentation to the personnel officer.
 4  First sentence of Step 2.
 5      A.  Okay.
 6      Q.  And then Step 3 says, if an informal
 7  resolution is not promptly achieved at Step 2, then the
 8  personnel officer shall issue a formal written
 9  decision?  Do you see that?
10      A.  Uh-hum.
11      Q.  And then Step 4 is, if not satisfied with the
12  decision of the personnel officer, the employee shall
13  have a right to appeal to the city council.  Correct?
14      A.  Correct.
15      Q.  Now, you agree if Fannie Carroll was the
16  personnel officer, it wouldn't make sense for her to
17  act as a hearing officer for your employment dispute,
18  right?
19      A.  I would hope not.
20      Q.  So then you wouldn't object to the city
21  replacing her with somebody else for that second step
22  of the grievance process?
23      A.  Correct.
24      Q.  That's -- that's an effort to be fair to you,
25  right, or you certainly wouldn't -- you wouldn't
```

## Page 144

```
 1  disagree that somebody other than Fannie Carroll should
 2  act --
 3          MR. WALLERI:  Objection as to form.
 4          MR. SINGER:  Let me finish the question and
 5  then you can state your objection.
 6  BY MR. SINGER:
 7      Q.  You wouldn't disagree that somebody other than
 8  Fannie Carroll should act as the hearing officer to
 9  hear a grievance about your termination?
10      A.  Correct.
11      Q.  But you objected to the person selected who
12  was Mary Beth Solomon?
13      A.  Yes.  And the fact that there was bad faith by
14  the -- the city, Fannie Carroll called the Daily
15  News-Miner and put a story out that Reggie and I were
16  terminated.  At that point, I knew that, you know,
17  nothing was going to rectify or nothing was going to
18  get my job back.
19      Q.  Did that story say anything about the
20  grievance procedures of the city?
21      A.  No.
22      Q.  Not one way or the other?
23      A.  No.
24      Q.  Now, did you have any conversations with Mary
25  Beth Solomon about the grievance procedures?
```

36 (Pages 141 to 144)

Ex A pg 7 of 11

Heartland Court Reporters
Carol A. McCue, RMR
Email: carol.mccue@acsalaska.net
Phone: (907) 452-6727
Fax: (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 145

1  A.  No.
2  Q.  Did she say to you, I'm not going to rule in
3  your favor?
4  A.  No.
5  Q.  You just assumed you would not get a fair
6  hearing with her because of your prior experience with
7  her?
8  A.  And her comments.
9  Q.  And her comments specifically were that she
10 thought the police department should be disbanded?
11 A.  Correct.
12 Q.  What else did she comment that you found of
13 concern?
14 A.  Well, that she wanted a tribal police, she
15 didn't want a city police.  And you know...
16 Q.  So that's the reason why you believed it would
17 be -- you use the word "futile" to have a hearing with
18 Mary Beth Solomon?
19 A.  Correct.
20 Q.  Now, you understood that if -- if she
21 disagreed with you, there was a right afterward to
22 appeal to the city council, correct?
23 A.  Correct.
24 Q.  And did you have -- did anyone from the city
25 council say anything to you that made you think there

Page 146

1  was some predetermined decision about your termination?
2  Did you have any conversation with city council about
3  your termination at all?
4  A.  Yes.
5  Q.  Who?
6  A.  Debbie Carroll.
7  Q.  Debbie Carroll?
8  A.  Yeah.
9  Q.  And what did she say to you?
10 A.  She said -- and also, I'm trying to think of
11 her name, it's Fannie Carroll's sister-in-law.  And I
12 can't recall her name.
13 Q.  Is it Vicky?
14 A.  Vicky's the mayor.
15 Q.  Okay.
16 A.  There's another city council member, and I'm
17 sorry, I apologize, I can't recall her name right now.
18 But we spoke at length, several conversations.  And --
19 Q.  When?
20 A.  When all this was happening.  When I got the
21 letter.  And you know, now that I remember, I'm not
22 sure if I was in Fort Yukon or not.  I might have been
23 served at my house.
24 Q.  In Fairbanks?
25 A.  Yes.

Page 147

1  Q.  Okay.
2  A.  So -- but they said it wasn't fair and it
3  wasn't right and that -- you know, that I wouldn't get
4  a fair hearing.
5  Q.  Well, but the city council members that you
6  spoke to said it wasn't fair --
7  A.  Correct.
8  Q.  -- that you were terminated?
9  A.  Correct.  Terminated.  Correct.  But I
10 wouldn't get a fair -- fair, I guess, hearing with Mary
11 Beth.
12 Q.  They said you wouldn't get a fair hearing with
13 Mary Beth Solomon?
14 A.  Correct.
15 Q.  Okay.  They didn't say anything about whether
16 or not you'd get a fair hearing at the city council,
17 did they?
18 A.  They did not.
19 Q.  And they told -- the city council members told
20 you they thought your termination was unfair?
21 A.  Correct.  Just two of them, not the whole
22 panel.
23 Q.  The two are -- again, what are their names?
24 A.  Well, also I spoke to Mike Hardy, as well.
25 Q.  Was he on the council at the time?

Page 148

1  A.  Yes.  And he said it wasn't fair, and they
2  were really unhappy with Fannie Carroll, and some
3  things were going to change.
4  Q.  So you had three council members siding with
5  you how you felt?
6  A.  How I felt at the time, yeah.  And again, it
7  was Mike Hardy, Debbie Hardy -- was it Debbie Hardy?
8  And I'm trying to think of the -- Fannie Carroll's
9  sister-in-law, and I'm sorry, the name escapes me.
10     MR. WALLERI:  Would it be Debbie McCarty?
11     THE WITNESS:  I'm sorry, Debbie McCarty is who
12 he spoke to.
13 BY MR. SINGER:
14 Q.  Not Debbie Carroll?
15 A.  Correct.  And I'm trying to think of Fannie's
16 sister-in-law.  She's married to -- I think his name is
17 Tony.  I apologize, I can't remember his -- her name.
18     MR. SINGER:  We'll mark the following
19 documents as exhibits.
20     THE WITNESS:  Can I close it?
21     MR. SINGER:  This is 5 and that will be 6.
22     (Cell phone ringing.)
23     THE WITNESS:  Excuse me.
24     MR. SINGER:  Let's go off the record.
25     (Exhibits 5 and 6 marked.)

Ex A pg 8 of 11   37 (Pages 145 to 148)

Heartland Court Reporters
Carol A. McCue, RMR
Email: carol.mccue@acsalaska.net
Phone: (907) 452-6727
Fax: (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006
CONFIDENTIAL SEALED TRANSCRIPT
Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 149

1  THE REPORTER: Back on record.
2  BY MR. SINGER:
3  Q. Mr. DeLeon, do you recognize the document
4  marked as Exhibit 5?
5  A. Yes.
6  Q. It's a letter dated February 9th?
7  A. Yes.
8  Q. And this is the letter notifying you of the
9  city's intent to dismiss you; is that correct?
10 A. Yes.
11 Q. Now, you don't recall where you were when you
12 received this?
13 A. I don't.
14 Q. You may have been in Fairbanks?
15 A. I -- I remember getting something in
16 Fairbanks, a court service person served me, yes. It
17 escapes me exactly what I got.
18 Q. Do you see the back of the second page of
19 Exhibit 5, do you recognize -- see it says,
20 copy-original received this 7th day of February, and
21 there's initials? Do you recognize those initials?
22 A. Yeah, they are mine.
23 Q. Those are yours?
24 A. Yeah.
25 Q. So you received this in person and

Page 150

1  acknowledged receipt?
2  A. Yeah. Like I said, I must have gotten it at
3  Fort Yukon.
4  Q. And this letter provided -- you say, along
5  with this letter came a copy of the Personnel Policy
6  Manual Handbook, which we've -- right?
7  A. With this one, the second one.
8  Q. Do you see -- do you see in this letter on the
9  second page --
10 A. Yeah.
11 Q. -- February 9th? Enclosed is a copy of
12 Chapter 5, the City of Fort Yukon Personnel Policy
13 Manual?
14 A. Actually, just a chapter.
15 Q. Okay. One chapter?
16 A. Yeah.
17 Q. And included your right to request a hearing?
18 A. Correct.
19 Q. And then -- and then it says, for your
20 information, if you request a hearing, it will not be
21 before the city manager. Is that correct?
22 A. Correct.
23 Q. And given your experiences with the city
24 manager, you had no objections to that part of it,
25 right?

Page 151

1  A. (Witness shakes head.)
2  Q. You didn't want a hearing in front of the city
3  manager?
4  A. No.
5  Q. You thought it appropriate for the city to
6  find somebody else?
7  A. Correct.
8  Q. Now, you received a second letter on
9  February 11th, 2004.
10 A. Correct.
11 Q. And provided some additional reasons for your
12 termination; is that right?
13 A. Yep.
14 Q. And then it also mentions you were also
15 previously notified as discussed above of your right to
16 request a hearing on this matter. Under the
17 circumstances, the hearing would not be before me, the
18 city manager.
19     And then it indicates further that the hearing
20 would be set for Monday, February 16th, before Mary
21 Beth Solomon at 10:30 a.m. at City Hall in Fort Yukon;
22 is that right?
23 A. Uh-hum. Correct.
24 Q. Now, you -- you acknowledged receipt of both
25 Exhibits 5 and 6?

Page 152

1  A. Yes.
2  Q. And on about the days that they're -- the
3  dates of those letters is when you received them?
4  A. About, yes. Excuse me.
5  Q. The second letter dated February 11th, how did
6  you receive that one, do you remember?
7  A. The 11th.
8  Q. Yeah.
9  A. Again, I think, if I recall, I was served by a
10 process server at my residence.
11 Q. So both of these documents were hand delivered
12 to you?
13 A. This one?
14 Q. Yeah.
15 A. I believe so.
16     MR. SINGER: We'll mark Exhibit 7 and 8 next.
17     (Exhibits 7 and 8 marked.)
18 BY MR. SINGER:
19 Q. The court reporter has marked as Exhibits 7
20 and 8, two letters from Attorney Wickwire. Do you see
21 these letters?
22 A. I do.
23 Q. Have you seen these before?
24 A. Yes, I have.
25 Q. Were you copied with these letters --

38 (Pages 149 to 152)
Ex A pg 9 of 11
Heartland Court Reporters
Carol A. McCue, RMR
Email: carol.mccue@acsalaska.net
Phone: (907) 452-6727
Fax: (907) 488-7701

Deposition of Christopher DeLeon
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 153

1  A. Yes, I was.
2  Q. -- on or about February 13th?
3  A. Yes, I was.
4  Q. Okay. And Mr. Wickwire was your attorney?
5  A. Yes.
6  Q. And you retained him for the purpose of
7  representing you or advising you regarding your
8  employment with the City of Fort Yukon?
9  A. Yes.
10 Q. And on Exhibit 7, in the third paragraph, it
11 states, Mr. DeLeon declines to participate in such a
12 hearing?
13 A. Correct.
14 Q. And that was your position?
15 A. Correct.
16 Q. Right? And Exhibit 8, Mr. Wickwire wrote,
17 Mr. DeLeon does not request and will not be
18 participating in any hearing at which any remedy for
19 job action or discipline recently taken against him
20 could result. Is that right?
21 A. That's what he wrote.
22 Q. And was that your position?
23 A. As far as the hearing was concerned, yes.
24 Q. You would not participate in any hearing at
25 which any remedy for job action or discipline recently

Page 154

1  taken against you could result?
2  A. Correct.
3  Q. Now, do you know the date, the last date on
4  which you received pay from the City of Fort Yukon?
5  A. I don't.
6  Q. Are you aware that they paid you for a handful
7  of days after you first received the notice that you
8  would be terminated?
9  A. I don't recall that.
10 Q. You wouldn't dispute that if that's what the
11 payroll records indicate?
12 A. If that's what they show.
13 Q. Do you have any objection to the timing of the
14 notice of termination?
15 A. What do you mean?
16 Q. Do you have any -- that is that part of your
17 dispute that you weren't given timely notice that you
18 were to be terminated?
19 A. Well, it was pretty abrupt. I mean, I -- I
20 guess I don't understand where you're going with the
21 question.
22 Q. I'm not going anywhere.
23 A. Okay.
24 Q. I just want to know if you have any -- if
25 that's part of your -- you know, if you have any

Page 155

1  objection to the timing of the notice?
2  A. I think the timing is fairly glaring, the fact
3  that the city manager wanted to get rid of me, under
4  the circumstances.
5  Q. Why do you think the city manager wanted to
6  get rid of you?
7  A. For a lot of issues that we've already
8  discussed.
9  Q. Well, tell me, what issues do you think the
10 city manager wanted to get rid of you for?
11 A. Well, for one, the charter. She tried to
12 sweep that under the carpet, and that didn't work too
13 well for her.
14 Q. That's the December 23rd charter flight?
15 A. Correct.
16 Q. Question of who authorized it?
17 A. Correct.
18 Q. Okay. That's one.
19 A. And the incident with Maggie John. And there
20 was an investigation, an ongoing investigation which
21 her father was involved in, and was implicated in
22 embezzlement.
23 Q. Were you involved in that investigation?
24 A. Yes, I was.
25 Q. What did you do?

Page 156

1  A. Well, I was involved with Reggie, we, you
2  know -- I should say Chief Fleming, he spoke to me
3  about it. Told me about the arrest of an individual
4  down in Dillingham. I executed the warrant on Maggie
5  John, which is also a portion of that case. Just kind
6  of, I guess, bounced off ideas of which way we could go
7  with the investigation.
8  Q. So your investigation of Richard Carroll for
9  embezzlement consisted of talking to Reggie Fleming?
10 A. Pretty much, yeah.
11 Q. Did you go look at documents anywhere?
12 A. No.
13 Q. Did you subpoena any records?
14 A. No.
15 Q. Did you talk to a district attorney?
16 A. Yes.
17 Q. Who?
18 A. Jeff O'Bryant.
19 Q. Jeff O'Bryant?
20 A. O'Bryant. He's the head of the District
21 Attorneys here, office.
22 Q. It's your testimony that you spoke to Jeff
23 O'Bryant about an investigation of Richard Carroll?
24 A. It was brought up, yes.
25 Q. Did you document that conversation?

Heartland Court Reporters
Carol A. McCue, RMR
Email: carol.mccue@acsalaska.net
Ex A pg 10 of 11
39 (Pages 153 to 156)
Phone: (907) 452-6727
Fax: (907) 488-7701

Deposition of Christopher DeLeon  
Taken July 19, 2006

CONFIDENTIAL SEALED TRANSCRIPT

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 205

1  BY MR. SINGER:
2  Q. You testified previously that you used a
3  personal tape recording device to record a portion of a
4  meeting on February 5th?
5  A. Yes.
6  Q. And that you also had a conversation with
7  Chief Fleming after that meeting, he took you out of
8  the room, right?
9  A. Yes.
10  Q. We're going to go off the record and I'm going
11  to have you listen to a portion of that. Okay?
12  A. Yes.
13      THE REPORTER: Off record.
14      (Off record, recess from
15      2:26 p.m. to 2:31 p.m.)
16      THE REPORTER: Back on record.
17  BY MR. SINGER:
18  Q. We just listened to a portion of the tape
19  recording that you made on February 5th, 2004.
20  A. Yes.
21  Q. In that tape recording, you would agree that
22  the chief mentioned that, she could write you up, and
23  you said, I can grieve it?
24  A. Correct.
25  Q. You also -- isn't it true he told you that you

### Page 206

1  have the right to grieve it? He used those words?
2  A. Yes.
3  Q. You heard him?
4  A. Yes.
5  Q. This was -- and this was specifically
6  referring to termination, or wrongful termination?
7  A. I thought it was in reference to her writing
8  me up but...
9  Q. Well, you can -- I'd try to rewind. I don't
10  know.
11  A. That's --
12  Q. But you understand that you said -- and we can
13  listen it to again if we need to -- I can grieve it.
14  He said, she's going to write you up, and you said, I
15  don't care, I can grieve it. Right?
16  A. Yes.
17  Q. And then you said -- you mentioned Dave
18  McKillican, right?
19  A. Yes.
20  Q. And he said, you should never have -- the
21  chief said he shouldn't have resigned, and he said she
22  can't fire you. And he said, quote, you have the right
23  to grieve it. Correct?
24  A. Yes.
25  Q. And you heard the chief?

### Page 207

1  A. I did.
2  Q. In this conversation with the chief that you
3  had on February 5th, 2004, you said to him, since
4  yesterday, I don't feel safe.
5  A. Yes.
6  Q. What -- do you know -- do you remember as you
7  sit here today what you were referring to? What
8  happened the day before?
9  A. I don't.
10  Q. You don't remember?
11  A. I don't.
12  Q. Was that the day you had a closed-door meeting
13  with the police department and the city manager?
14  A. It's possible.
15  Q. You just don't remember what it is --
16  A. No.
17  Q. -- that caused you to not feel safe in your
18  employment?
19  A. Well, I didn't feel secure for some time, but
20  why I said, since yesterday, I don't know.
21  Q. But you didn't say to him, I haven't felt
22  secure in my employment in a long time, you said, since
23  yesterday.
24  A. We had a closed-door meeting in the -- I
25  remember now. We had a closed-door meeting in the city

### Page 208

1  council's chamber.
2  Q. Did you audio record that meeting?
3  A. I'm not sure.
4  Q. You knew a Debbie McCarty in Fort Yukon?
5  A. Yes.
6  Q. She was on the city council?
7  A. Yes.
8  Q. Did you go to her house along with Mr. Fleming
9  and Mr. Schlumbohm to discuss concerns with Fannie --
10  about Fannie Carroll? Did you participate in that
11  conversation?
12  A. I don't recall that.
13  Q. You just don't know one way or the other?
14  A. Right.
15  Q. Do you recall her coming back and saying that
16  there was a need to request a full city council
17  meeting?
18  A. I remember something like that.
19  Q. It wasn't proper to go to one council member?
20  A. I don't know about proper, but --
21  Q. She couldn't take any action?
22  A. Right.
23  Q. In your military background, you had been
24  trained about -- you understand there's a chain of
25  command, right?

52 (Pages 205 to 208)

Heartland Court Reporters  
Carol A. McCue, RMR  
Email: carol.mccue@acsalaska.net

Ex A pg 11 of 11

Phone: (907) 452-6727  
Fax:   (907) 488-7701