Howard S. Trickey
Matthew Singer
JERMAIN, DUNNAGAN & OWENS, P.C.
3000 A Street, Suite 300
Anchorage, Alaska 99503
(907) 563-8844

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| REGINALD FLEMING, CHRISTOPHER DELEON, CHRIS HAMPTON, WILLIAM D. MCKILLICAN, and TODD SCHLUMBOHM, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| FANNIE CARROLL, and the CITY OF FORT YUKON, ALASKA, | ) ) ) |
| Defendants. | ) ) |
| | ) Case 4:04-cv-00034-RRB |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT ON EMPLOYMENT
CLAIMS, COUNTS III AND IV (CHRIS HAMPTON)**

**I.    INTRODUCTION**

Chris Hampton is suing the City of Fort Yukon and former City Manager Fannie Carroll, alleging that he was "constructively discharged" and that he was denied due process because he did not receive progressive discipline or a grievance hearing. Because there was no hostile work environment, and Hampton simply quit of his own volition, he has no legitimate basis for asserting a "constructive discharge" claim.

Moreover, Hampton was a probationary employee who had no due process rights to continued employment. And because Hampton never sought a grievance of any employment issue, he utterly failed to comply with the available administrative remedies and cannot now complain about a denial of due process. For these reasons, Defendants are entitled to partial summary judgment as to Hampton's constructive discharge claim (Count III) and his § 1983 due process claim (Count IV).

## II.   STATEMENT OF UNDISPUTED FACTS

Hampton began work in January 2003 as a police officer for the City of Fort Yukon Police Department. [Hampton dep., pp. 14-15] All City employees are subject to a 90-day probationary period. The City's Personnel Handbook in effect at the time of Hampton's hire explained: "All newly hired employees shall be subject to a probationary period of ninety days during which the employee may be terminated, demoted, or transferred without cause by the hiring authority." [Ex. D, p. 8]

On February 9, 2003, a dispatcher named Halona Cadzow formally complained that she had been the subject of sexual harassment by Hampton on January 31, 2003. [*See* Ex. E] Ms. Cadzow submitted a written complaint, indicating that Hampton had engaged in an "IM" or "Instant Messenger" chat session with Ms. Cadzow, wherein he purportedly made a number of comments to which she took offense. [*Id.*] These comments included reference to his cold bed, that if she was to knock on his door, he would not turn her away, that he had an unhappy marriage, and that he wanted to "eat pussy." [*Id.*]

The City took this complaint seriously and determined that an investigation was necessary. It contacted the State Troopers to see if the Troopers would conduct the investigation, but according to Police Chief Reginald Fleming, the Troopers did not want to get involved. [Fleming dep., p. 253]

The City Manager then called the Alaska Municipal League, which contacted Greg Russell about conducting an investigation. [Russell dep., p. 9] Mr. Russell served as a law enforcement officer for over twenty years, including as the Chief of Police for the City of Kotzebue, and he now maintains a private consulting business where he conducts employment investigations for police departments, advises on training, and promotes law enforcement accreditation. [Russell dep., pp. 6-7]

Mr. Russell traveled to Fort Yukon and conducted an investigation on February 17, 2003. [Ex. F] Russell interviewed the complainant, another dispatcher, Hampton, and the other officers. [*Id*., Russell Dep., pp. 9-10] The question of whether Hampton had engaged in this sexually inappropriate IM conversation with Ms. Cadzow came down to a credibility determination. Mr. Russell concluded that Ms. Cadzow was credible and forthright, and that Hampton was not. [*See* Ex. F, p. 1] During the course of the investigation Hampton had confirmed many of the same facts as Ms. Cadzow, but then offered shifting explanations that appeared to Mr. Russell to be duplicitous. [*Id*.] Mr. Russell prepared a report which he intended to present to the City Council on February 18, 2003. [*See id*.] Mr. Russell recommended that the City terminate Hampton, in part because he was still in his probationary period. [*Id.; see also,* Russell dep., p. 24]

Mr. Russell informed Hampton of his conclusion that he did not believe Hampton and that he would recommend his termination. However, by Hampton's own admission in deposition, Mr. Russell made it clear, repeatedly, that he was not the decision-maker, and could not predict what action, if any, the City Council would take against Hampton. [Hampton dep., p. 33] Hampton further testified that he did not know if he would be terminated, and that nobody from the City ever threatened him with termination. [*Id.*, p. 34]

After his interview with Mr. Russell, and before the City Council had an opportunity to meet, Hampton resigned. Hampton hand-wrote his own resignation letter, stating: "I am writing this to inform you of my intent to resign. My resignation is due to family hardship. I cannot continue to be separate from my family and continue to work in Fort Yukon." [Ex. G]

Following his resignation, Hampton submitted a claim to the State of Alaska for unpaid wages. In that claim, he wrote: "On February 18th I terminated my employment with Fort Yukon Police Department due to family hardship." [Ex. H] Despite his repeated written statements, confirmed as true in his deposition, that he quit due to family hardship, Hampton now opportunistically joins his friends and former co-workers in this lawsuit, claiming "constructive discharge." This claim is factually and legally unsupported.

### III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to a judgment as a matter of law.[1] The Court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact under the correctly applied and relevant substantive law."[2] Summary judgment is appropriate in a constructive discharge case where the employee's resignation was unreasonable as a matter of law. Under Alaska law, the interpretation of the terms of a contract presents a question of law.[3] Likewise, the determination of whether exhaustion of remedies is required is a question of law.[4]

### IV. HAMPTON'S WRONGFUL TERMINATION AND RELATED CLAIMS FAIL AS A MATTER OF LAW

Hampton cannot prevail on his wrongful termination claim because he was not terminated, he quit. Further, his own sworn testimony defeats the allegation that he was "constructively discharged."

Hampton likewise cannot prevail on his Section 1983 claim because he was a probationary employee without due process rights to continued employment, and

---

[1] *See* Fed.R.Civ.P. 56(c).

[2] *See Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005) ("We apply the same standard used by the trial court under Rule 56 of the Federal Rules of Civil Procedure. We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law (citations omitted)).

[3] *Zuelsdorf v. University of Alaska, Fairbanks,* 794 P.2d 932, 933 (Alaska 1990).

[4] *Varilek v. City of Houston*, 104 P.3d 849, 852 (Alaska 2004).

because, in any event, he failed to avail himself of the administrative remedies provided to Fort Yukon employees.

### A.   Hampton Was Not Constructively Discharged

To prevail on a wrongful termination claim an employee must prove: (1) that the employee was discharged by its employer and (2) that the employer breached a contract or committed a tort in connection with the employee's termination.[5]  Hampton's claim fails because he can show neither element.

"An employee cannot simply 'quit and sue,' claiming he or she was constructively discharged."[6]  Rather, to establish a constructive discharge claim under Alaska law, Hampton must prove that: (1) his working conditions at the time of his resignation were so intolerable or aggravated that (2) a reasonable person in Hampton's position would have been compelled to resign.[7]  Summary judgment is appropriate on Hampton's constructive discharge claim "if his decision to resign was unreasonable as a matter of law."[8]

To defeat summary judgment, Hampton must show that the conditions giving rise to his resignation were extraordinary and egregious:

> In order to amount to a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before

---

[5]   *See Charles v. Interior Regional Housing Authority*, 55 P.3d 57, 59 (Alaska 2002).

[6]   *King v. A.C. & R Advertising*, 65 F.3d 764, 767 (9th Cir. 1995) (*quoting Turner v. Anheuser-Busch,* 876 P.2d 1022, 1026 (Cal. 1994)).

[7]   *See Cameron v. Beard*, 864 P.2d 538, 547 (Alaska 1993).

[8]   *See King*, 65 F.3d at 767 (citations omitted).

      the situation will be deemed intolerable.  In general, single, trivial, or isolated acts of misconduct are insufficient to support a constructive discharge claim.  Moreover, a poor performance rating or a demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge.[9]

The Alaska Supreme Court has indicated that constructive discharge claims are generally found only where the plaintiff has been subject to a sustained campaign of adverse employment actions.[10]  In this case, there is no evidence the City took a single adverse employment action against Hampton, let alone a sustained campaign of harassment.  His claim fails as a matter of law.

      Hampton's own writings and sworn deposition testimony defeat any possible assertion of constructive discharge.  In his resignation letter, he stated:  "I am writing this to inform you of my intent to resign.  My resignation is due to family hardship.  I cannot continue to be separate from my family and continue to work in Fort Yukon."  [Ex. G] With regard to his resignation, Hampton testified:

> Q. So you were separate from your family when you were in Fort Yukon?
> A. Yes.
> Q. Okay.  Now, was this a truthful statement?
> A. Yes, it was.
> Q. So this letter is a truthful statement?
> A. Yes.  I didn't want to be in Fort Yukon, and this was creating hardship because I kept being gone for two weeks on and one week

---

[9]   *Id. (quoting Turner v. Anheuser-Busch, Inc.*, 876 P.2d at 1027.

[10]   *See Cameron v. Beard*, 864 P.2d at 547 ("Courts have generally held that criticism of job performance or other management decisions do not, standing alone, create intolerable working conditions.  However, a number of courts have upheld constructive discharge judgments where an employer pursues a sustained campaign against an employee.") (citations omitted).

> off or whatever the situation was. And I just didn't want to do that anymore anyway. I didn't want to put up with this anymore.
> Q. And so you resigned?
> A. Yes.
> Q. Anybody ask you to resign?
> A. No.
> Q. Nobody ever threatened you, resign or quit?
> A. No.
> Q. You resigned of your own volition?
> A. Yes. After that interview, I did.
> Q. And just to be clear, did Greg Russell tell you what his conclusions were?
> A. Yes. He thought I was lying. I was dishonest.
> Q. That's what he told you?
> A. Yes. On several occasions.
> Q. But did he tell you what the -- you know that he was going to recommend termination?
> A. Yes.
> Q. Did you know what the outcome was going to be of that?
> A. No.
> Q. You didn't know whether -- whether or not you would be terminated?
> A. No. Because I remember him saying it was not his decision on whether this, but he was going to recommend it. To be honest with you, I'd been through too much. Enough was enough. This job was absolutely not worth it to me.
> Q. Okay. So Greg Russell told you that he was going to recommend your termination, but he -- he was not the decision-maker?
> A. On several occasions, yes.
> Q. And he told you he was not the decision-maker?
> A. Yes. [Hampton dep., p. 32:1-33:20]

Hampton submitted a claim to the State of Alaska for unpaid wages. In that claim, he wrote: "On February 18th I terminated my employment with Fort Yukon Police Department due to family hardship." [Ex. H] Regarding this letter, Hampton testified:

> Q. Is that a true statement [that he terminated employment due to family hardship]?
> A. Yes.

> Q. And you would agree that it would be improper to make a false claim –
> A. Yes.
> Q. -- to the state?
> A. Yes.
> Q. And the reason you gave to the State of Alaska for terminated your employment was family hardship?
> A. Yes.
> Q. And again, that's the distance between Fort Yukon and your family in North Pole?
> A. Yes.  [Hampton dep., p. 40:3-40:15]

Hampton certainly knew when he took a job in Fort Yukon, while his family lived in North Pole, that the job would be a strain on his family. After working the job for less than six weeks, Hampton had enough of this distance and so resigned. These facts do not even come close to establishing a "constructive discharge."

Hampton disagreed with the manner in which the investigation was handled, saying he would have preferred for the Alaska State Troopers to handle the investigation. In fact, the City tried to use the Troopers, but they were not interested in investigating an internal matter. [Fleming dep., p. 253] In any event, the Alaska Supreme Court holds that disagreement with a management decision does not constitute a constructive discharge.[11]

Hampton also disliked the interview conducted by Mr. Russell. But there is no basis by which this one-time interview by an outside party could possibly amount to a constructive discharge by the City of Fort Yukon. A single or isolated incident generally

---

[11] *See Cameron v. Beard*, 864 P.2d at 547 ("Courts have generally held that criticism of job performance or other management decisions do not, standing alone, create intolerable working conditions.").

does not support a constructive discharge claim.[12]  Also, Mr. Russell was an outside investigator, and Hampton knew that he was not responsible for making any employment decision. [Hampton dep., p. 33]  As for the conduct of the interviewer himself, Hampton testified as follows:

> Q. How was his conduct to you during the interview?
> A. Well, at first, he told me that he was a living lie detector and that he made it a point to attempt to intimidate me when we first met.  So after that, during the interview, he was – he was normal, I guess.  I mean, he –
> Q. You don't –
> A. He asked me questions, I told him answers the best I could recall.
> Q. You don't have any criticisms of – of Mr. Russell's conduct to you in the – in his interview with you?
> A. Not as far as I know.
> Q. He asked you questions you could understand?
> A. Yes.
> Q. You felt he was being fair in the way he was speaking with you?
> A. Pretty much, yes.
> Q. Now –
> A. I was intimidated by his aggressiveness at first, almost to the point where I didn't want to go through the interview, but yes. [Hampton dep., p. 27:1-27:23]

In Plaintiffs' complaint, they also allege a "pattern of harassment" by the City Manager.  But again, Hampton's own sworn testimony defeats this theory.  In his deposition, Hampton admitted that the City never took any adverse action against him:

> Q. But the city never took any adverse employment action against you, correct?
> A. No.  Not as far as I know.
> Q. You were not suspended?
> A. No.
> Q. You were not fired?

---

[12] *See id.*

> A.  No.
> Q.  Pay wasn't withheld?
> A.  No.
> Q.  And nobody from the city ever threatened to do any of those things to you?
> A.  No. [Hampton dep., p. 34:10-34:21]

Plaintiffs also allege in their complaint that they were retaliated against for investigating criminal conduct of Fannie Carroll's family. But, again, Hampton admitted that he had never investigated Ms. Carroll or anyone from the City for any crime, nor had anyone from the City ever interfered with his administration of justice. [Hampton dep., pp. 59-62]

> When asked for the reasons he resigned, Hampton testified:
>
> A.  Hmm. Well, getting conflicting orders from Fannie Carroll, just general not wanting to be there because it's a mess there. So I didn't want to have any more part of it.
>   And I was tired of being run through the ringer for a sexual harassment situation that Mr. Human Lie Detector says I was lying and I told him I wasn't. And so there's just no reason to go any further when it's not worth it to me.
> Q.  And you – and you resigned and wrote that my resignation is due to family hardship, I cannot continue to be separate from my family?
> A.  Yes. Yes.
> Q.  And that's a true statement?
> A.  Yes. [Hampton dep., pp. 35:17-36:6]

Simply put, Hampton's own testimony establishes that he <u>never suffered a single adverse employment action</u>. He was not constructively discharged, and so his resignation was unreasonable as a matter of law. Hampton repeatedly testified under oath that his primary reason for quitting was the family hardship of working far away from his

family's home. Accordingly, defendants are entitled to summary judgment on Hampton's unsubstantiated "constructive discharge" allegations.

### B. Even If Hampton Could Show Constructive Discharge, He Can Show No Breach of Contract or Tort

Even if Hampton could somehow show a "constructive discharge," which he cannot, that would satisfy only the first element of a wrongful discharge claim. He must also show a breach of contract or some tort by Defendants.[13] He cannot make this showing.

Hampton was a probationary employee who could be terminated for any reason or no reason. [Personnel Handbook, Ex. D, p. 8] The City received a complaint alleging that Hampton had sexually harassed a co-worker. Such conduct cannot be tolerated in the workplace and the City had a duty to investigate.[14] Given his probationary status, the complaint alone, regardless of the outcome of the investigation, was more than sufficient reason to terminate a probationary employee. If the Court construes Hampton's voluntary resignation as a "termination" by the City, then it must also conclude that the City violated no contract or tort by "terminating" a probationary employee who had allegedly harassed his co-worker.

---

[13]   *See Charles v. Interior Regional Housing Authority*, 55 P.3d 57, 59 (Alaska 2002).

[14]   *See generally*, AS 18.80 (outlawing sexual discrimination in the workplace).

### C. A Probationary Employee Has No Procedural Due Process Rights to Continued Employment

Hampton also alleges a claim pursuant to § 1983 for violation of his due process rights. But Hampton was a probationary employee under the City's personnel handbook. The Alaska Supreme Court holds that a public employee has no procedural due process rights to his job as an at-will employee. "A state employee who serves at will has no expectation of continued employment and therefore no property right."[15]  Because Hampton had no property right, his claim of a procedural due process violation fails as a matter of law.[16]

### D. If Hampton Disagreed with the City's Employment Actions or with Fannie Carroll's Conduct, He is Barred From Asserting Such Theories Because He Failed to Exhaust His Administrative Remedies

As a probationary employee, Hampton had no reasonable expectation of continued employment, nor any property interest in his job. A probationary employee could be "terminated, demoted, or transferred" for any reason. [Ex. D, p. 8] However, this does not mean that Hampton had no rights under the Personnel Handbook. To the contrary, the manual provided a four-step grievance procedure for Mr. Hampton to air any concern about employment actions by the City or City Manager Fannie Carroll. Reading the probationary employee term along with the grievance terms of the contract, Hampton had no rights to challenge a termination, demotion, or transfer, but he did have grievance

---

[15]   *Blackburn v. State, Dept. of Transp. and Public Facilities*, 103 P.3d 900, 906 (Alaska 2004).

[16]   *Id.*

rights to challenge any other employment action with which he disagreed. Along with those rights comes the duty to exhaust administrative remedies prior to filing any lawsuit. Hampton never submitted a single grievance of any matter, so his claims are barred.

The Alaska Supreme Court has "consistently held that employees must first exhaust their contractual or administrative remedies, or show that they were excused from doing so, before pursuing a direct action against their employer."[17] "A central principle of this doctrine is that a party is not entitled to seek judicial relief for a supposed or threatened injury until the available administrative remedies have been exhausted."[18]

In *Voigt v. Snowden, II*, the Alaska Supreme Court upheld the trial court's decision to dismiss the employee's lawsuit because he failed to exhaust administrative remedies.[19] Voigt argued that he had been wrongfully terminated.[20] Voigt had the right to file a grievance under the Alaska Court System Personnel Rules.[21] The Personnel Rules outlined the grievance procedures that concluded with an administrative hearing.[22] Although Voigt did file a timely grievance, he failed to follow-up by requesting a

---

[17]   *Grant v. Anchorage Police Dep't.*, 20 P.3d 553, 557 (Alaska 2001) (*quoting Cozzen v. Municipality of Anchorage*, 907 P.2d 473, 475 (Alaska 1995)).

[18]   *Eidelson v. Archer*, 645 P.2d 171, 176 (Alaska 1982) (*citing McKart v. United States*, 395 U.S. 185, 193 (1969); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51 (1937)). *See also Diedrich v. City of Ketchikan*, 805 P.2d 362, 366-68 (Alaska 1991) (holding that requiring exhaustion of remedies before a public employee can bring suit for wrongful discharge is not a violation of equal protection or of the right to jury trial).

[19]   *Voigt v. Snowden, II*, 923 P.2d 778 (Alaska 1996).

[20]   *Id.* at 778-79.

[21]   *Id.* at 781.

[22]   *Id.* at 780.

hearing.[23]  The Court held that Voigt's failure to exhaust his administrative remedies was unexcused and dismissed the claim.[24]

In *Grant v. Anchorage Police Dep't.*, the Alaska Supreme Court held that a terminated police officer's lawsuit alleging wrongful termination, breach of contract, unlawful discrimination, and breach of covenant of good faith and fair dealing was precluded because the officer had failed to grieve his termination.[25]  Likewise, in *Eidelson v. Archer*, the plaintiff was required to exhaust administrative remedies in a suit alleging both contract and tort claims, including wrongful removal, intentional interference with contract and defamation.[26]  The Court held that it was appropriate to require exhaustion of remedies because "[o]ne of the primary purposes of the exhaustion of remedies rule is to promote judicial economy by affording an institution the opportunity to correct its own errors, so as to render judicial action unnecessary."[27]

---

[23]     *Id.*

[24]     *Id.* at 783.

[25]     *See Grant v. Anchorage Police Dep't.,* 20 P.3d 553, 555-56 (Alaska 2001).

[26]     *Eidelson v. Archer,* 645 P.2d 171 (Alaska 1982).

[27]     *Id.* at 181 (*citing Van Hyning v. University of Alaska*, 621 P.2d 1354, 1356 (Alaska 1981)); *see also Municipality of Anchorage v. Higgins*, 754 P.2d 745 (Alaska 1998) (holding that claims of breach of contract, breach of implied covenant of good faith, intentional infliction of emotional distress, false procurement of employment, and violation of due process were barred because the plaintiff failed to exhaust administrative remedies); *Walt v. State*, 751 P.2d 1345 (Alaska 1988) (holding that wrongful discharge, defamation, breach of duty, violation of public policy, and negligence claims were barred by failure to exhaust remedies available under an applicable collective bargaining agreement).

In applying the Alaska state law doctrine of exhaustion of remedies, a "court must decide the following: (1) is exhaustion of remedies required; (2) did the complainant exhaust those remedies; and (3) is the failure to exhaust remedies excused?"[28]

### 1. Hampton was required to exhaust his administrative remedies.

This first part of the three-part test requires the Court to characterize the claim at issue.[29] If an action is "an attempt to substitute a damage claim in tort for an unperfected administrative remedy," the complainant must first exhaust administrative remedies.[30] Hampton was subject to the City of Fort Yukon's Personnel Policy Handbook, which functioned as an employment contract. [*See* Complaint ¶ 123] The Personnel Policy Handbook expressly provides employees with a grievance process. [*See* Ex. D, pp. 14, 20-21]

Any dispute Hampton had with any employment action of his employer was subject to the grievance process. If he disagreed with instructions from Fannie Carroll or Reggie Fleming, or disagreed with the manner in which the City investigated Ms. Cadzow's complaint, he had grievance rights. [*See* Ex. D, pp. 20-21] Hampton was required to exhaust his contractual administrative remedies.[31] He failed to do so.

---

[28]  *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 98-99 (Alaska 1992).

[29]  *Moore v. State, Dept. of Transp. & Pub. Facilities*, 875 P.2d 765, 767 (Alaska 1994).

[30]  *Id.* at 767; *State, Dept. of Transp. & Public Facilities v. Fairbanks North Star Borough*, 936 P.2d 1259, 1260-61 (Alaska 1997).

[31]  *Id*.

### 2. Hampton did not exhaust his administrative remedies.

Hampton admits he filed no grievance:

Q. And you take issue with the manner in which the city investigated Halona Cadzow's complaint, is that right?
A. Yeah. I didn't think it was proper.
Q. Did you raise that with anybody?
A. I told – I had mentioned that to both Dave McKillican and Reginald Fleming.
Q. Did you ever seek to file a grievance –
A. No.
Q. -- related to –
A. No.
Q. Why not?
A. It wasn't worth it to me. I mean, it just – why go through another kangaroo situation like I went through with that interview? No. I'm not about to do that. This job is not worth it to me to do that.
Q. Oh. Anybody ever tell you that it would be a losing proposition to file a grievance?
A. Not that I recall.
Q. Nobody ever discouraged you from filing a grievance?
A. Not that I recall.
Q. You just didn't want to bother?
A. I didn't want to go through this situation again. [Hampton dep., pp. 53:16-54:15]

Hampton's testimony establishes that he failed to file a grievance.

### 3. Hampton's failure to exhaust his administrative remedies is not excused.

The only exception the Alaska Supreme Court has recognized to the duty to exhaust remedies is "where the administrative remedy is inadequate or where the pursuit of the administrative remedy would be futile due to the certainty of an adverse decision."[32] Under this doctrine, it is a "requirement that an adverse decision be a

---

[32] *Id*.

'certainty.'"[33]  A reviewing committee's involvement in a prior decision will not establish futility unless that involvement has made it impossible for the committee to render an impartial decision.[34]  Situations where the court has found that exhaustion was excused include where one party is not subject to the contract in question,[35] where the reviewing board did not have the power to grant relief,[36] and where the form of the procedure itself was the contested issue.[37]

Hampton has no excuse for his failure to exhaust.  By his own admission, nobody ever discouraged him from filing a grievance.  [Hampton dep., pp. 53-54]  He also admits that he did not know what action the City Council would have taken regarding Greg Russell's recommendation to terminate.  [Hampton dep., p. 33]  He cannot possibly assert that a grievance would have been futile, since he never even initiated the process.  An adverse ruling in a hearing in front of the City Council would not have been a certainty, as is required by the Alaska Supreme Court, to excuse exhaustion.[38]  Therefore, having failed to exhaust, Hampton's claims are barred.

---

[33] *Voigt v. Snowden, II*, 923 P.2d 778, 782 (Alaska 1996).

[34] *Id*.

[35] *See Sprucewood Inv. Corp. v. Alaska Housing Finance Corp.*, 33 P.3d 1156, 1164 (Alaska 2001).

[36] *See State, Dept. of Revenue v. Andrade*, 23 P.3d 58, 67 (Alaska 2001).

[37] *See Kleven v. Yukon-Koyukuk School Dist.*, 853 P.2d 518, 525 (Alaska 1993).

[38] *Voigt*, 923 P.2d at 782.

## V. CONCLUSION

For the foregoing reasons, the City and Fannie Carroll respectfully request that this Court enter summary judgment in their favor on Chris Hampton's claims for constructive discharge and violation of due process. Mr. Hampton quit his job, he was not discharged, and so his claims fail as a matter of law.

DATED at Anchorage, Alaska this 13th day of September, 2006.

JERMAIN, DUNNAGAN & OWENS, P.C.

By: s/ Matthew Singer
Matthew Singer
Alaska Bar No. 9911072

By: s/ Howard S. Trickey
Howard S. Trickey
Alaska Bar No. 7610138
3000 A Street, Suite 300
Anchorage, AK 99503
Phone: (907) 563-8844
Fax: (907) 563-7322

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2006,
a true and correct copy of the foregoing
document was served electronically
on the following counsel of record:

Michael J. Walleri
330 Wendell St., Suite E
Fairbanks, AK 99701

s/ Matthew Singer