Case 4:04-cv-00034-RRB     Document 101-3     Filed 09/13/2006     Page 1 of 18

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER     )
DELEON, CHRIS HAMPTON,            )
WILLIAM D. MCKILLICAN, and        )
TODD SCHLUMBOHM,                  )
                                  )
            Plaintiffs,           )
                                  )
    vs.                           )
                                  )
FANNIE CARROLL, and the CITY      )
OF FORT YUKON, ALASKA,            )
                                  )
            Defendants.           )
_____)

Case No. 4:04-cv-00034-RRB

DEPOSITION OF CHRIS HAMPTON
Taken Wednesday, July 19, 2006
From the hour of 4:04 p.m. to 5:15 p.m.
Pages 1 through 70, inclusive
Volume 1
Taken by Counsel for Defendants
At
Offices of Heartland Court Reporters
100 Cushman Street, Suite 308
Fairbanks, Alaska 99701

Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

## Page 2

A P P E A R A N C E S
For Plaintiffs:
    MICHAEL J. WALLERI, ESQ.
    ATTORNEY AT LAW
    330 Wendell Street, Suite E
    Fairbanks, AK 99709
    907-452-4725

For Defendants:
    MATTHEW SINGER, ESQ.
    JERMAIN, DUNNAGAN & OWENS, P.C.
    3000 A Street, Suite 300
    Anchorage, AK 99503
    907-563-8844

Witness:
    CHRIS HAMPTON
    July 19, 2006
Reported by:
    CAROL A. McCUE, RMR
    Heartland Court Reporters

BE IT KNOWN that the deposition of the
above-named witness was taken this date in the
foregoing action before Carol A. McCue, Registered
Merit Reporter and Notary Public within and for the
State of Alaska.

## Page 3

I N D E X
WITNESS:  CHRIS HAMPTON          July 19, 2006
EXAMINATION BY                        Page
Mr. Singer.................................4
Mr. Walleri...............................64

FURTHER EXAMINATION BY

Mr. Singer...............................66

E X H I B I T S
Exhibit No.                        Page Marked
1:     9-page document, Application
       For Employment dated 1/14/03,
       Chris Hampton......................23
2:     1-page document, Letter of
       Resignation dated 2/18/03,
       signed by Chris Hampton............31
3:     4-page document, Statement of
       Helona Cadzow dated 2/9/03,
       with attachments...................37
4:     1-page document, typewritten
       statement, undated, unsigned.......39
5:     3-page document, letter to
       Ms. Vicki Thomas, Mayor, from
       Harold Conklin, Alaska
       Department of Labor, Wage and
       Hour, dated 3/11/03................42
6:     1-page document entitled
       Confidentiality, Appendix 1,
       City of Fort Yukon, dated 1/5/03......57

## Page 4

1          P R O C E E D I N G S
2       (The following proceedings commenced
3          at 4:04 p.m., July 19, 2006.)
4       (Witness sworn.)
5            CHRIS HAMPTON,
6   being called as a witness, having been first duly sworn
7   to state the truth, the whole truth, and nothing but
8   the truth, testified under oath as follows:
9                 EXAMINATION
10  BY MR. SINGER:
11     Q.  Hi, Mr. Hampton, my name is Matt Singer, I'm
12  an attorney for the defendants in this lawsuit.  Do you
13  understand that you just took an oath that requires you to
14  tell the truth today?
15     A.  Yes, sir.
16     Q.  And as part of that, you're required to answer
17  my questions to the best of your ability.  Do you
18  understand that?
19     A.  Yes, I do.
20     Q.  Have you ever been in a deposition before?
21     A.  No.
22     Q.  Let's talk a few ground rules.  First, the
23  court reporter's creating a written transcript of this
24  proceeding.  Do you understand that?
25     A.  Yes, I do.

Exhibit A
Page 1 of 18

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

---

Page 5

1    Q.   So it's important that you answer my questions
2    with words, verbally.  She can't record a nod.
3    A.   Yeah.  Of course.
4    Q.   Along the same lines, it's important that we
5    try not to speak over each other.  That makes them
6    crazy.
7    A.   Okay.
8    Q.   If you want to talk to counsel, your counsel,
9    at any time today, you're entitled to do that.  I'd ask
10   if a question's pending that you answer my question
11   first.  Do you understand that?
12   A.   Yes.
13   Q.   If you don't understand one of my questions,
14   will you let me know?
15   A.   Yes.
16   Q.   If you need to take a break at any point, just
17   tell me, okay, and we'll take a break.
18   A.   Okay.
19   Q.   Are you currently employed?
20   A.   Yes, I am.
21   Q.   Who are you employed by?
22   A.   Fort Knox.
23   Q.   How long have you worked at Fort Knox?
24   A.   About three years.
25   Q.   Three years?

---

Page 6

1    A.   Yeah.
2    Q.   After you left employment with Fort Yukon, did
3    you work for anybody before you went to work for
4    Fort Knox?
5    A.   No.
6    Q.   How long were you unemployed?
7    A.   It's so long ago.  I believe it was about
8    six months.
9    Q.   So after you --
10   A.   I think it was five months, somewhere around
11   there.
12   Q.   After you left the City of Fort Yukon, you
13   were unemployed for five or six months?
14   A.   Right about five, yeah.  Somewhere in there.
15   Q.   What did you do to look for work in that
16   period of time?
17   A.   Just searched jobs and job sites and things
18   like that.  Newspaper.
19   Q.   Did you prepare a --
20   A.   Went to Home Depot.  Pardon me.
21   Q.   I'm sorry.
22   A.   I ended up working at Home Depot after this.
23   Q.   Oh, so you weren't unemployed for those five
24   or six months?
25   A.   Yeah.  About five months.  And then after that

---

Page 7

1    I found a job at Home Depot and set up their loss
2    control.
3    Q.   How long did you work at Home Depot?
4    A.   About a year.
5    Q.   And then you went to work for the Fort Knox?
6    A.   Yes.
7    Q.   Did those jobs overlap for a period of time?
8    A.   No.
9    Q.   I just want to get all the documents I need
10   here.  What are you paid at -- how are you paid at
11   Fort Knox?  Are you on hourly?
12   A.   Hourly.
13   Q.   What's your hourly rate there?
14   A.   20 plus an hour.
15   Q.   And when you say, 20 plus, is it 25?
16   A.   A little over 20 -- 22 or 23 an hour.
17   Q.   And you receive pay stubs from them?
18   A.   Yes.
19   Q.   Are you paid weekly?
20   A.   Bi-weekly.
21   Q.   And you can provide those pay stubs to your
22   counsel?
23   A.   Yes.
24   Q.   And do you -- how many hours do you work every
25   week?

---

Page 8

1    A.   Probably 45, right around there.
2    Q.   You regularly get about five hours of
3    overtime?
4    A.   Yeah, if not more.  It varies.
5    Q.   What's your work there?  What's your job
6    title?
7    A.   I'm lead security officer there.  I run the
8    security department there.
9    Q.   Okay.  You have people working under you?
10   A.   Yes, I do.
11   Q.   Do you like the work?
12   A.   Yes.
13   Q.   An what's your career, what plan?
14   A.   Security work, stuff like that.
15   Q.   Do you intend to -- do you anticipate staying
16   employed with Fort Knox?
17   A.   Yes.
18   Q.   You see a career there?
19   A.   Maybe.
20   Q.   Do you see opportunities for continued income
21   growth?
22   A.   Maybe.  I don't know.
23   Q.   Have you had pay raises since you started?
24   A.   Yes.
25   Q.   How many pay raises?

---

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 2 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 9

1    A.   About two.
2    Q.   What did you start at there paywise?
3    A.   20 something an hour.  20, around 20 an hour.
4    Q.   Are there annual pay increases?
5    A.   No.  Just depending on your -- your service
6    and what you've done and stuff like that.  Your
7    progress.
8    Q.   Who is your supervisor there?
9    A.   Rowdy Heiser.
10   Q.   What's his title?
11   A.   He's a manager.
12   Q.   You report directly to the manager?
13   A.   Yes.
14   Q.   And how many people report to you?
15   A.   About four.
16   Q.   Since taking the job with Fort Knox, have you
17   looked for any other positions?
18   A.   No.
19   Q.   You're satisfied with this job?
20   A.   Yes, I am.
21   Q.   And satisfied with your income there?
22   A.   Yes.
23   Q.   Where do you live?
24   A.   North Pole.
25   Q.   And for the record, can you state your

Page 10

1    residence address.
2    A.   3370 Venus, North Pole.
3    Q.   Now, your testimony is that you -- after you
4    left employment with Fort Yukon, You were unemployed
5    for a period of months and then went to work for Home
6    Depot?
7    A.   Yes.
8    Q.   What were you paid at Home Depot, do you
9    recall?
10   A.   I don't recall.
11   Q.   Was it over 20 an hour?
12   A.   No.
13   Q.   Over 15?
14   A.   You're probably looking at maybe 12 an hour.
15   Q.   How did it compare with your wages in
16   Fort Yukon?
17   A.   I guess comparable.
18   Q.   Did you receive --
19   A.   Enough to survive off of.  Excuse me.
20   Q.   Sorry.  My fault.  Did you receive a -- did
21   you work any overtime at Home Depot?
22   A.   No.
23   Q.   Did you receive a W-2 that year from Home
24   Depot?
25   A.   Yes.

Page 11

1    Q.   Do you still have that?
2    A.   I hope so.
3    Q.   You can establish how much you earned --
4    A.   Pretty much, yeah.
5    Q.   -- at Home Depot?  Now, you worked for a short
6    period of time as a police officer at Port Yukon,
7    right?
8    A.   Yes.
9    Q.   How did you learn about the job in Fort Yukon?
10   A.   Through Dave McKillican.
11   Q.   How did you know Dave?
12   A.   He was a friend of mine from the academy.
13   Q.   From the -- which academy?
14   A.   Law enforcement academy.
15   Q.   Here at TVC?
16   A.   Yes.
17   Q.   Tanana Valley?
18   A.   Yes.
19   Q.   And did you know anybody else who was working
20   at the Fort Yukon Police Department at the time?
21   A.   No.
22   Q.   Had you ever met Reginald Fleming before?
23   A.   Yes, I did.  Had I met him before that time,
24   no.  When I was up there, yes.
25   Q.   Todd Schlumbohm, did you meet him?

Page 12

1    A.   No.
2    Q.   Did you ever work with Todd Schlumbohm?
3    A.   No.
4    Q.   Never worked with him?
5    A.   No.
6    Q.   Even, you know, not in the City of Fort Yukon
7    or at any other time in your life?
8    A.   No.  Not -- from what I recall, no.
9    Q.   When did you first meet Todd Schlumbohm?
10   A.   I didn't.  Oh, I met him -- I heard from
11   him -- about him through David McKillican, and I met
12   him during this proceedings, or during the -- the
13   lawyer visits.
14   Q.   You met him at Mr. Walleri's office?
15   A.   Yes.  Yes.
16   Q.   Reginald Fleming you met in Fort Yukon?
17   A.   Yes.
18   Q.   Never -- never --
19   A.   No.
20   Q.   You worked with him for a short period of time
21   in Fort Yukon?
22   A.   Yes.
23   Q.   Chris DeLeon, when did you first meet him?
24   A.   In Walleri's office.
25   Q.   So your -- your time as an employee at the

3 (Pages 9 to 12)

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net    Exhibit A
Page 3 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

---

Page 13

1  City of Fort Yukon never overlapped with Chris DeLeon?
2      A.   No.
3      Q.   You don't know anything about the
4  circumstances of his employment, do you?
5      A.   No.
6      Q.   Nothing about his terms of his employment, his
7  termination, anything?
8      A.   No.  There would be no reason for me to know
9  that.
10     Q.   Do you have any knowledge about Reginald
11 Fleming's termination of employment --
12     A.   No.
13     Q.   -- with the city?
14     A.   I left before he left.
15     Q.   Todd Schlumbohm?
16     A.   I think he was after me.  I think he was after
17 me.
18     Q.   If I represent to you that he was -- he
19 resigned from employment well after you --
20     A.   Yeah.
21     Q.   That's consistent with your recollection?
22     A.   Yeah.  Because he was not -- he wasn't
23 involved in there.  All I had was David McKillican and
24 the chief.  That was it.
25     Q.   Those were the only police officers --

Page 14

1      A.   Fannie Carroll.  Yes.
2      Q.   When you were -- when you were working --
3  let's just see if we can nail down the dates.  Well, do
4  you recall working for the City of Fort Yukon in the
5  beginning of the year 2003?
6      A.   Do I remember working there in 2003?  Yes.
7      Q.   Is that right?
8      A.   That's about right, yes.
9      Q.   Do you remember what months?
10     A.   No.
11     Q.   Would it be correct --
12     A.   About three months total, whatever that would
13 be from the start.  Right around three months.
14 Two months, three months, somewhere in there.
15     Q.   Is it possible it's actually about six weeks?
16     A.   Yeah.
17     Q.   January into mid February 2003?
18     A.   Yeah.  I installed a radio system for them
19 earlier, for David McKillican.  And that probably
20 lasted about a month.
21     Q.   Okay.  That wasn't -- that job was not as a
22 police officer, right?
23     A.   No.  Absolutely not.  So yes, six weeks.
24     Q.   So do you have any dispute with the City of
25 Fort Yukon regarding the work you did?

Page 15

1      A.   Absolutely not.
2      Q.   No?
3      A.   No.
4      Q.   You're a plaintiff in a lawsuit solely about
5  your employment as a police officer?
6      A.   Yes.
7      Q.   And that was a period of approximately
8  six weeks?
9      A.   Six weeks.
10     Q.   January 2003 into -- until February 18th,
11 2003, does that sound right?
12     A.   I guess that sounds about right, yeah.
13     Q.   Now, prior to your work as a police officer in
14 Fort Yukon, had you ever worked in law enforcement
15 before?
16     A.   No.
17     Q.   What police certification did you possess?
18     A.   I had gone through the academy, police academy
19 law enforcement academy, and I needed to -- I think it
20 was six months of that to get your full-time law
21 enforcement academy certificate.  So that was it.
22     Q.   Did you -- did you graduate from the academy?
23     A.   Yes, I did.
24     Q.   Were you -- did you have basic police
25 certification from the Alaska Police Standards Council?

Page 16

1      A.   Yes.  Now, that was before -- you had to work,
2  like, six months or so before it became a full time
3  kind of thing, so I don't know -- yes, I believe
4  that's -- that's right, yes, the basic certificate.
5      Q.   Is it possible you had an academy
6  certification from the Alaska Police Standards Council
7  and you were eligible after 12 months to get the basic
8  certification?
9      A.   That sounds better, yes.  That sounds right.
10     Q.   Prior to your hire as a police officer for
11 Fort Yukon, had you ever been arrested for anything?
12     A.   No.
13     Q.   No arrests?
14     A.   No.
15     Q.   Any convictions?
16     A.   No.
17     Q.   Any DUI's?
18     A.   Absolutely not.
19     Q.   No drug use?
20     A.   No.
21     Q.   No crimes of any sort?
22     A.   No.
23     Q.   What was your educational background, other
24 than the academy?
25     A.   Took a year and a half of college courses,

---

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Exhibit A
Page 4 of 18

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 17

1  police science courses.
2      Q.   Did you graduate from high school?
3      A.   Yes.
4      Q.   Where?
5      A.   Burbank Senior High School.
6      Q.   Where is that?
7      A.   Burbank, California.
8      Q.   All right.  Jay Leno.
9      A.   Yeah.
10     Q.   Down the road.  All right.  And then a year
11 and a half of college?
12     A.   Yeah.  Right around a year.  It was full time
13 then it started to be part time.
14     Q.   What work experience did you have relevant to
15 law enforcement at the time you took that position?
16     A.   I was a Burbank Police Explorer for several --
17 three and a half years.
18     Q.   Is that sort of like a Boy Scouts program?
19     A.   Kind of, yes.
20     Q.   So that was as a high school student?
21     A.   Yes.
22     Q.   Anything else?
23     A.   Security, security in an aerospace facility,
24 but that's not law enforcement.  I mean, not police
25 kind of stuff.  Nothing I can remember offhand.

Page 18

1      Q.   You worked at Sears here in Fairbanks; is that
2  right?
3      A.   Uh-hum.  Yes.
4      Q.   How long did you work there?
5      A.   About three years.
6      Q.   Why did you leave employment there?
7      A.   Oh, that's right.  I went to Burbank -- or
8  North Pole dispatch.  North Pole police dispatcher.
9  That was for about a year after that.  That's right.
10     Q.   So prior to working for Fort Yukon you had
11 worked as a dispatcher for --
12     A.   Yes.
13     Q.   Why did you leave employment with North Pole?
14     A.   Well, they were conflicting with the academy.
15     Q.   Time?
16     A.   I couldn't take the academy and do that at the
17 same time.
18     Q.   Were you fired or did you quit?
19     A.   I quit.
20     Q.   Good terms?
21     A.   Yes.
22     Q.   Did you ask them for work when you -- when you
23 left the employment with Fort Yukon?  Did you apply?
24     A.   No, I never did.
25     Q.   And what about Sears?  Did you leave there on

Page 19

1  good terms?
2      A.   Yes, I did.
3      Q.   Did you consider going back to Sears?
4      A.   For a little while, but I wanted to try
5  something different.
6      Q.   Did you contact Sears?
7      A.   No.
8      Q.   Do you think you would have had a position
9  there?
10     A.   No.
11     Q.   Why not?
12     A.   Probably been filled.
13     Q.   So you were an asset protection supervisor and
14 an asset protection agent at Sears, right?
15     A.   Yes.
16     Q.   Is that security work?
17     A.   Yes.  And I was a manager there, as well.
18     Q.   And you've done some security work for Allied
19 Signal Aerospace Facility?
20     A.   Yes.  Yes.  Long time ago.
21     Q.   Is that just on the ground?
22     A.   Yeah.
23     Q.   Walking the ground security?
24     A.   Yeah.  That -- they are gone now.  Whole
25 facility's gone.

Page 20

1      Q.   So you learned about a position in Fort Yukon
2  because your friend Dave McKillican called you?
3      A.   Yes.
4      Q.   You were here in Fairbanks?
5      A.   Yes, I was.
6      Q.   What did he tell you?
7      A.   Well, he mentioned that they were looking for
8  police officers, and then I had mentioned that -- we
9  had talked earlier about radios and stuff, and radio
10 kind of work, things like that.
11          And I mentioned to him that -- asked him what
12 kind of radios they had and we ended up talking.  And
13 he said he -- he was mentioning that -- as I remember,
14 as I recall, he was mentioning that he had got on and
15 that they might have been looking for somebody else
16 later.  So I don't know.
17          Just went ahead and installed the radios for
18 him and did that, and that's when he had mentioned that
19 there was a possibility that they would take on another
20 officer and I went for it.
21     Q.   And when you -- when you were applying to work
22 for the City of Fort Yukon, what did you understand
23 would be the pay?
24     A.   I don't recall what it was offhand.  I thought
25 it might have been -- as -- man.  That was a long time

Heartland Court Reporters
Carol A. McCue, RMR

Email: carol.mccue@acsalaska.net

Exhibit A
Page 5 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 21

1   ago.  I don't recall.
2       Q.   Do you recall you were going to be paid on a
3   salary basis?
4       A.   As I remember, it was a possibility I would be
5   paid on a salary, but then it was -- it ended up being
6   an hourly situation because they didn't want to put
7   another officer on salary.
8       Q.   And then what did you understand in terms of
9   your shift whether you were -- you know, were you
10  working five days a week?  Were you on, off?
11      A.   Pretty much on call.  I'd be there living in
12  that facility and when we would receive a call, we
13  would have to go to it.
14      Q.   Were you one week on, one week off, two weeks
15  on, two weeks off?  What was the pattern?
16      A.   I believe it was three on, two off.  I
17  believe.  But yeah, I got a week to fly home.
18      Q.   So you didn't -- you weren't there full time?
19      A.   I guess it was full time.  I mean, whenever I
20  was there, I got -- yeah, I guess it was.  Yeah, it was
21  full time.
22      Q.   You had -- isn't it so that you had periods
23  where you were on duty and then you had off weeks where
24  you came back to Fairbanks?
25      A.   Yes.

Page 22

1       Q.   And who was responsible for getting you to and
2   from Fairbanks?
3       A.   Warbelow's.
4       Q.   Who paid for that?
5       A.   Sometimes the city.
6       Q.   Well, under what circumstances would the city
7   pay for it?
8       A.   I don't know.
9       Q.   Is that if you were transporting a prisoner?
10      A.   Yes.  And if I had -- we had to go home or if
11  we were going home on our normal day's office, yes.
12      Q.   Are you sure that you weren't responsible for
13  paying to get yourself if -- if there wasn't city
14  business?
15      A.   The last time I was.  The first time, the
16  first time -- hmm.  I don't recall.  I mean, I don't
17  remember how the setup was.
18      Q.   Tell me about the job application process.
19  Did you fill out a job application?
20      A.   Yes, we did.  Yes, I did.
21      Q.   And then did you have an interview?
22      A.   With Reggie, I did, and Dave McKillican.  He
23  was a sergeant at the time.
24      Q.   Anybody else?
25      A.   No.  No.  I had met with Fannie Carroll, but

Page 23

1   it wasn't an official interview.
2       Q.   And who did you understand to be responsible
3   for the hiring decision?
4       A.   At first it was Reginald Fleming, but then the
5   way Fannie Carroll started acting, I believed it was
6   Fannie Carroll.
7           MR. SINGER:  Let's just call this Hampton 1.
8           (Exhibit 1 marked.)
9   BY MR. SINGER:
10      Q.   Do you recognize the document that's been
11  marked as Exhibit 1?
12      A.   Vaguely, yes.
13      Q.   Is that your handwriting?
14      A.   Yes, it is.
15      Q.   Is this your application for employment to the
16  City of Fort Yukon?
17      A.   I believe so.
18      Q.   And did you attach the resume that appears at
19  the back?
20      A.   I remember handing a resume to them.  I don't
21  know whether I -- I did not attach it to the form.
22      Q.   Is that your resume?
23      A.   Yes, it looks like it.
24      Q.   Now, when you were hired, you understood there
25  was a personnel manual for the City of Fort Yukon?

Page 24

1       A.   No.  Personnel manual?
2       Q.   Let's look at --
3       A.   I don't remember that.
4       Q.   Let me show you --
5       A.   I don't really recall a personnel manual.
6       Q.   -- a document that's marked as DeLeon
7   Exhibit Number 2.  Do you remember if you saw DeLeon
8   Exhibit Number 2?
9       A.   No.  Actually, I don't.
10      Q.   You just don't recall one way or the other?
11      A.   I don't recall.  I think I would have.  No.
12  Doesn't -- I don't -- doesn't ring a bell to me.  I
13  mean, I just don't recall either way.  Well, there's a
14  signature for receiving it, so there must be...
15      Q.   If you look at that DeLeon Exhibit Number 2,
16  Page 8.
17      A.   Okay.
18      Q.   Do you see at the bottom of the page?
19      A.   Oh, whoa, whoa, whoa.  Wrong one.  Here we go.
20  Okay.  Go ahead.
21      Q.   Top of the page says, Chapter 2, conditions of
22  city employment?
23      A.   Yes, it does.
24      Q.   And the bottom, Section 3, probationary
25  employees.  See that?

6 (Pages 21 to 24)

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 6 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 25

1     A.     Yeah.

2     Q.     All newly hired employees shall be subject to

3 a probationary period of 90 days, during which the

4 employee may be terminated, demoted, or transferred

5 without cause by the hiring authority.

6          Do you see that?

7     A.     Yes.

8     Q.     Do you understand at the time that you were a

9 probationary employee?

10    A.     No.  They said they needed a police officer

11 and -- and I guess at the time I had fit the bill.  I

12 don't remember being on probation.  I remember a

13 training period, but I don't remember ever being on

14 probation.

15    Q.     What do you mean a training period?

16    A.     Well, I had to ride with Dave McKillican to

17 learn the ways and the way the city works and stuff

18 like that.

19    Q.     Now, so that a woman who was employed by the

20 city as a dispatcher made a complaint against you; is

21 that right?

22    A.     That's what I found out, yes.

23    Q.     And do you recall that her complaint was that

24 on January 31st, 2003, you sent her instant message

25 computer messages; is that right?

Page 26

1     A.     That's what I've been told.

2     Q.     And her allegation, those were of a sexual

3 nature.

4     A.     That's what I've been told.

5     Q.     You understood that?

6     A.     Yes.

7     Q.     And you denied those allegations?

8     A.     Absolutely.

9     Q.     And the city had somebody come investigate?

10    A.     Yes.

11    Q.     Who was that?

12    A.     I don't remember his name.

13    Q.     Do you remember if it was Greg Russell?

14    A.     That vaguely remains -- I -- I believe so.

15 I thought he was an insurance adjuster or insurance

16 person or something as far as I know.  I wasn't given

17 that much information in regards to all this.

18    Q.     Did he explain his background to you?

19    A.     Yes.

20    Q.     He was a former police officer?

21    A.     Yes.

22    Q.     Been with the Troopers for many years?

23    A.     Yes.

24    Q.     And did you have an interview with him?

25    A.     Yes.

Page 27

1     Q.     How was his conduct to you during that

2 interview?

3     A.     Well, at first, he told me that he was a

4 living lie detector and that he made it a point to

5 attempt to intimidate me when we first met.  So after

6 that, during the interview, he was -- he was normal, I

7 guess.  I mean, he --

8     Q.     You don't --

9     A.     He asked me questions, I told him answers the

10 best I could recall.

11    Q.     You don't have any criticisms of -- of

12 Mr. Russell's conduct to you in the -- in his interview

13 with you?

14    A.     Not as far as I know.

15    Q.     He asked you questions you could understand?

16    A.     Yes.

17    Q.     You felt he was being fair in the way he was

18 speaking with you?

19    A.     Pretty much, yes.

20    Q.     Now --

21    A.     I was intimidated by his aggressiveness at

22 first, almost to the point where I didn't want to go

23 through the interview, but yes.

24    Q.     Do you recall in that interview, you -- you

25 admitted to him that you did send instant messages to

Page 28

1 this woman?

2     A.     Yes.

3     Q.     Her name is Helona Cadzow?

4     A.     Yes.

5     Q.     You did send messages to her?

6     A.     I believe a couple of them, yes.

7     Q.     Now, and I apologize, I'm going to go through

8 these.

9     A.     I understand.

10    Q.     She said -- she said that you talked to her

11 about your unhappy marriage; is that true?

12    A.     Absolutely not.

13    Q.     Did you tell her that you had a cold bed?

14    A.     Yes.  Not through instant messaging.

15    Q.     Did you tell her if you were ever to knock --

16 if she was ever to knock on your door, you would not

17 turn her away?

18    A.     Absolutely not.

19    Q.     Did you say anything to her about wanting to

20 eat pussy?

21    A.     Absolutely not.

22    Q.     You understand that the city would have to

23 take those kind of allegations seriously, that it would

24 have to --

25    A.     I understand.  I don't agree with the way that

7 (Pages 25 to 28)

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 7 of 18

Phone: (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

---

**Page 29**

1  it was performed, but I understand.
2    Q.  You do understand the city had a duty to
3  investigate this allegation?
4    A.  If they told you that, yes.
5    Q.  So if a police dispatcher alleges in a formal
6  statement to the city that an officer has made
7  comments --
8    A.  I understand.  Yes.
9    Q.  -- you would agree that the city needs to
10 investigate?
11   A.  I would understand, yes.
12   Q.  And you take issue with how the city conducted
13 the investigation?
14   A.  Yes, I do.
15   Q.  And specifically, can you tell me what -- what
16 it is you take issue with or should have been done
17 differently in your opinion?
18   A.  Well, in my opinion, I feel that I should have
19 been represented in -- represented by maybe an outside
20 agency like a Trooper agency of sort.  I would have
21 liked that and appreciated not been intimidated at the
22 start of the meeting.
23       And the meeting took place at night.  And that
24 dragged me through the entire shift.  And it just -- I
25 don't agree with it, that's all.  I mean, I understand

**Page 30**

1  that they need to do an investigation, but I don't
2  agree with the way it went down.
3    Q.  Now, they also, the city -- the city brought
4  somebody from outside to do the investigation?
5    A.  Yes.
6    Q.  Any objection to doing that?
7    A.  Well, yeah.  I mean, I don't know who this guy
8  is.  All I knew is from some adjustment -- or some
9  insurance place, from what I was understood.  And that
10 he was going to ask me questions on behalf of the city,
11 I guess it was the city.
12   Q.  Did --
13   A.  So I didn't get any representation.
14   Q.  So you -- did you ask for a lawyer?
15   A.  No.
16   Q.  Did you ask for representation?
17   A.  No.
18   Q.  Anybody tell you, you couldn't have
19 representation?
20   A.  Nobody told me I could, either.  No.
21   Q.  Nobody told you, you could not have?
22   A.  Yeah, nobody -- no.
23       MR. SINGER:  Now, we will mark this as an
24 exhibit.  Is that Hampton Number...
25       THE REPORTER:  2.

**Page 31**

1       (Exhibit 2 marked.)
2  BY MR. SINGER:
3    Q.  Mr. Hampton, does your handwriting appear on
4  Exhibit Hampton 2?
5    A.  Yes, it does.
6    Q.  Did you write this?
7    A.  Yes.
8    Q.  Did anybody else write this?
9    A.  No.
10   Q.  What did you write in this?
11   A.  I'm writing this to inform you of my intent to
12 resign.  My resignation is due to family hardship.  I
13 cannot continue to be separate from my family and
14 continue to work in Fort Yukon.
15   Q.  Did you have family somewhere other than
16 Fort Yukon?
17   A.  No.
18   Q.  No?
19   A.  No.
20   Q.  Where is your -- do you have a wife?
21   A.  Yes.
22   Q.  Where's your wife?
23   A.  North Pole.
24   Q.  So your family was in North Pole?
25   A.  Yes.

**Page 32**

1    Q.  So you were separate from your family when you
2  were in Fort Yukon?
3    A.  Yes.
4    Q.  Okay.  Now, was this a truthful statement?
5    A.  Yes, it was.
6    Q.  So this letter is a truthful statement?
7    A.  Yes.  I didn't want to be in Fort Yukon, and
8  this was creating hardship because I kept being gone
9  for two weeks on and one week off or whatever the
10 situation was.  And I just didn't want to do that
11 anymore anyway.  I didn't want to put up with this
12 anymore.
13   Q.  And so you resigned?
14   A.  Yes.
15   Q.  Anybody ask you to resign?
16   A.  No.
17   Q.  Nobody ever threatened you, resign or quit?
18   A.  No.
19   Q.  You resigned of your own volition?
20   A.  Yes.  After that interview, I did.
21   Q.  And just to be clear, did Greg Russell tell
22 you what his conclusions were?
23   A.  Yes.  He thought I was lying.  I was
24 dishonest.
25   Q.  That's what he told you?

---

8 (Pages 29 to 32)

Heartland Court Reporters
Carol A. McCue, RMR

Email: carol.mccue@acsalaska.net     Exhibit A
Page 8 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 33

1   A.   Yes.  On several occasions.
2   Q.   But did he tell you what the -- you know that
3   he was going to recommend termination?
4   A.   Yes.
5   Q.   Did you know what the outcome was going to be
6   of that?
7   A.   No.
8   Q.   You didn't know whether -- whether or not you
9   would be terminated?
10  A.   No.  Because I remember him saying it was not
11  his decision on whether this, but he was going to
12  recommend it.  To be honest with you, I'd been through
13  too much.  Enough was enough.  This job was absolutely
14  not worth it to me.
15  Q.   Okay.  So Greg Russell told you that he was
16  going to recommend your termination, but he -- he was
17  not the decision-maker?
18  A.   On several occasions, yes.
19  Q.   And he told you he was not the decision-maker?
20  A.   Yes.
21  Q.   He told you he didn't know what would come of
22  it, of his recommendation?
23  A.   I don't remember him ever telling me that, no.
24  Q.   Who -- who was the decision-maker to be, as
25  you understood?

## Page 34

1   A.   He said he would hand it over to the city
2   council, and then from there, I don't know.
3   Q.   And never got that far?
4   A.   Yeah, it did.  Yep.  They had a meeting about
5   me.  Closed meeting.
6   Q.   Do you know the outcome of that meeting?
7   A.   No.  I wasn't invited.  I wasn't asked to show
8   up.  It was a closed meeting.  I wasn't a part of that
9   decision.
10  Q.   But the city never took any adverse employment
11  action against you, correct?
12  A.   No.  Not as far as I know.
13  Q.   You were not suspended?
14  A.   No.
15  Q.   You were not fired?
16  A.   No.
17  Q.   Pay wasn't withheld?
18  A.   No.
19  Q.   And nobody from the city ever threatened to do
20  any of those things to you?
21  A.   No.  I was in the airport when I was told I
22  was terminated or I would have been, they would have
23  suggested it.
24  Q.   This is after you -- after you resigned?
25  A.   Yeah.

## Page 35

1   Q.   So after you resigned, somebody from the city
2   said, we would have recommended terminating you?
3   A.   Probably, yes.  Yes.
4   Q.   Who told you that?
5   A.   I don't remember her name offhand.  It was
6   the -- she worked at the clinic.
7   Q.   Deb McCarty?
8   A.   Debbie, yes.
9   Q.   This is one of the city council members?
10  A.   Yes.
11  Q.   So not the whole city council?
12  A.   No.
13  Q.   But at that point, you had already quit?
14  A.   I had resigned earlier, yes.
15  Q.   Okay.  So what are the reasons that you
16  resigned?
17  A.   Hmm.  Well, getting conflicting orders from
18  Fannie Carroll, just general not wanting to be there
19  because it's a mess there.  So I didn't want to have
20  any more part of it.
21       And I was tired of being run through the
22  ringer for a sexual harassment situation that Mr. Human
23  Lie Detector says I was lying and I told him I wasn't.
24  And so there's just no reason to go any further when
25  it's not worth it to me.

## Page 36

1   Q.   And you -- and you resigned and wrote that my
2   resignation is due to family hardship, I cannot
3   continue to be separate from my family?
4   A.   Yes.  Yes.
5   Q.   And that's a true statement?
6   A.   Yes.
7   Q.   Now, you mentioned one of the reasons you
8   resigned is receipt of conflicting orders?
9   A.   Yes.
10  Q.   Who are the -- who gave you conflicting
11  orders?
12  A.   Fannie Carroll.  She could march into that --
13  march into there and suddenly tell me that she gives
14  the orders around here and -- and Reggie has nothing to
15  do with the police department anymore.  I've heard
16  that.  I just didn't -- said, I don't want no part of
17  it.
18  Q.   Anything else from Fannie Carroll?
19  A.   Not that I recall.
20  Q.   Now, did Fannie Carroll ever make comments to
21  you that were discriminatory based on your race?
22  A.   No.
23  Q.   Your gender?
24  A.   No.
25  Q.   Your ethnicity?

9 (Pages 33 to 36)

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Exhibit A
Page 9 of 18

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 37

1 A. No.
2 Q. Your religious background?
3 A. No.
4 Q. Your age?
5 A. No.
6 Q. Are you alleging in this lawsuit that the City
7 of Fort Yukon or any of its officers or employees
8 discriminated against you because you're a member of
9 any protected class?
10 A. No.
11 Q. The City of Fort Yukon didn't create a
12 sexually charged workplace, did it?
13 A. No.
14 Q. No sexual harassment in the workplace?
15 A. None when I was there except for the
16 accusations against me.
17 MR. SINGER: Is that H 3?
18 THE REPORTER: 3.
19 (Exhibit 3 marked. )
20 BY MR. SINGER:
21 Q. Just for the record, this document is marked
22 as Exhibit 3. Have you seen this before?
23 A. No.
24 Q. The woman, Helona Cadzow, do you know her?
25 A. Yes.

## Page 38

1 Q. She was a dispatcher?
2 A. Sure was.
3 Q. So you would bump into her in the -- where did
4 she work?
5 A. In the police -- in the police department.
6 Q. And --
7 A. Right in the same office and everything.
8 Q. And she sat at a computer and phone terminal?
9 A. Yeah.
10 Q. What was her job, as you understood it?
11 A. Dispatcher.
12 Q. That is, she took calls and then radioed the
13 officers?
14 A. Yes. Well, yeah. Yeah.
15 Q. And then the last page of this document dated
16 February 13th, 2003, is that your signature?
17 A. Yes, it is. I don't remember reading her
18 statement.
19 Q. You're aware that a complaint had been lodged
20 against you?
21 A. Yes. When I got to work, when I flew in,
22 first thing.
23 Q. So the complaint was lodged while you were in
24 Fairbanks on leave?
25 A. Yes.

## Page 39

1 Q. And who made you aware of the complaint?
2 A. Chief Fleming.
3 Q. What did he say to you?
4 A. As I recall, he mentioned that there was a
5 sexual harassment complaint lodged -- filed against me.
6 Apparently it occurred the last time I was there. And
7 I don't recall the rest.
8 (Exhibit 4 marked. )
9 BY MR. SINGER:
10 Q. Mr. Hampton, the court reporter just marked
11 Exhibit 4. Do you recognize this document?
12 A. No.
13 Q. Did you -- did you write this?
14 A. No. Wait.
15 Q. Did you submit a claim to the State of Alaska
16 Department of Labor?
17 A. I think I ended up -- yes, I believe I did.
18 Q. And is this the document that you sent to the
19 state?
20 A. Yeah, it could be.
21 Q. So this is the document you wrote?
22 A. Yeah, I think so. Yes.
23 Q. And what does the first sentence of this
24 document say?
25 A. On February 18th I terminated my employment

## Page 40

1 with Fort Yukon Police Department due to family
2 hardship.
3 Q. Is that a true statement?
4 A. Yes.
5 Q. And you would agree it would be improper to
6 make a false claim --
7 A. Yes.
8 Q. -- to the state?
9 A. Yes.
10 Q. And the reason you gave to the State of Alaska
11 for terminating your employment was family hardship?
12 A. Yes.
13 Q. And again, that's the distance between
14 Fort Yukon and your family in North Pole?
15 A. Yes.
16 Q. Do you have children?
17 A. Yes, I do.
18 Q. How many children?
19 A. Three.
20 Q. And are they all school age in North Pole?
21 A. Yes.
22 Q. Were they in North Pole at the time?
23 A. Yes.
24 Q. Now, this letter is -- am I correct, you were
25 concerned about receipt of your last paycheck?

10 (Pages 37 to 40)

Heartland Court Reporters
Carol A. McCue, RMR

Phone: (907) 452-6727
Fax: (907) 488-7701

Email: carol.mccue@acsalaska.net    Exhibit A
Page 10 of 18

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 41

1    A.    Yes.
2    Q.    Did you receive your pay?
3    A.    I believe I did, yes.
4    Q.    And that's not -- you're satisfied now that
5  you were --
6    A.    Yeah.
7    Q.    Yeah.  That's not a part of this lawsuit?
8    A.    No.  I -- I honestly don't remember.  I mean,
9  it's been awhile, and under the circumstances, yeah.
10    Q.    While you were employed during the period in
11  January, February 2003 --
12    A.    Uh-hum.
13    Q.    -- you were employed as a police officer,
14  right?
15    A.    Yes.
16    Q.    That was your job title?
17    A.    Yes.
18    Q.    Who else worked as a police officer during
19  that period?
20    A.    Just McKillican and Fleming.
21    Q.    Anybody else?
22    A.    No.  There was a VPSO there.
23    Q.    What was his name?
24    A.    I don't remember his name.  But I mean, no,
25  other than that, no.

Page 42

1    Q.    Did you have any responsibility for payroll at
2  the City of Fort Yukon?
3    A.    No.
4    Q.    Did you have any supervisory capacity
5  whatsoever?
6    A.    No.  I was brand new.
7    Q.    Did you do any scheduling for anyone?
8    A.    No.
9    Q.    Were you responsible for assigning job duties
10  to anyone?
11    A.    Absolutely not.
12    MR. SINGER:  Just for the record, will you
13  mark this?
14         (Exhibit 5 marked.)
15  BY MR. SINGER:
16    Q.    The court reporter just marked as Exhibit 5 a
17  letter from the State of Alaska to the mayor of
18  Fort Yukon regarding your claim.  Did you see -- have
19  you seen this letter?
20    A.    No, I don't recall.  No.
21    Q.    Do you see on the very last page, it says,
22  CC claimant?  Do you recall you made a --
23    A.    The very last page?
24    Q.    Very last page.  The third page of Exhibit 5.
25    A.    Yes.

Page 43

1    Q.    You were the claimant, you made a claim
2  against --
3    A.    Right.  Right.
4    Q.    Does that help refresh your recollection that
5  you received a copy?
6    A.    I've received a lot of paperwork.  This one
7  does not ring a bell.
8    Q.    And in any event, you did receive -- you made
9  a claim to the State of Alaska for wages and benefits
10  due and payable?
11    A.    Yes.
12    Q.    And in that you explained to the state that
13  you terminated your employment due to family hardship?
14    A.    Yes.
15    Q.    And in response, the state sent a letter to
16  the City of Fort Yukon, right?
17    A.    It looks that way, yes.
18    Q.    And City of Fort Yukon sent you a check?
19    A.    I -- I think so.
20    Q.    Do you recall if you were paid on a salary
21  based on a $37,500 per year?
22    A.    I was told that it was hourly, and I believe,
23  yes, it was a 37,000 a year.  That sounds about right.
24    Q.    So once you got your first paycheck, you saw
25  you were being paid on a salary basis?

Page 44

1    A.    Hourly.  I had to enter in my hours that I
2  worked and that's where they -- I was told hourly.  So
3  maybe I was wrong, but my paychecks varied, as I
4  remember.  As I recall.  I could be wrong, but...
5    Q.    Did you keep time sheets?
6    A.    Yes.
7    Q.    Were you accurate, to the best of your
8  ability, on your time sheets?
9    A.    Yes.
10    Q.    You recorded the time that you worked?
11    A.    I was told to put down what -- I don't
12  remember what the hours were McKillican had mentioned,
13  yep, for the day shifts.
14    Q.    So if you worked, you wrote it down?
15    A.    Yes.  For the day shifts.
16    Q.    What do you mean, the day shifts?  What was
17  your --
18    A.    We were on call at night.
19    Q.    Now, is it so that you -- some days you worked
20  longer than others?
21    A.    Well, usually during the day, yeah, it varied.
22  It varied.  Couple hours.  It just varied.
23    Q.    And you would indicate that on your time
24  sheet?
25    A.    Yes.

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 11 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 45

1  Q.   Did you -- were you truthful in your time
2  sheets?
3  A.   Yes.
4  Q.   Are your time sheets going to be -- what's
5  going to be more accurate, your time sheets or your
6  current recollection with regard to the hours you
7  worked per day?
8  A.   Well, I put down the day hours that I worked
9  on the time sheet, and then when we were called at
10 night to come out, I don't remember writing those down.
11 Q.   Never wrote down --
12 A.   No.
13 Q.   -- night calls?
14      Now, some nights you had no calls and some
15 nights you had calls, right?
16 A.   Yes.
17 Q.   There were nights when you went -- there
18 are --
19 A.   Very few.
20 Q.   -- quiet --
21 A.   Yes.
22 Q.   There are some quiet nights in Fort Yukon?
23 A.   One out of four, maybe.  Yes.
24 Q.   Where did you stay when you were in
25 Fort Yukon?

## Page 46

1  A.   Stayed at the police housing, it was some --
2  or not police housing, it was school for teachers.
3  Q.   And did you share that with anybody else?
4  A.   Yes.  Dave McKillican.
5  Q.   And did you sleep there?
6  A.   Yes.
7  Q.   And did you cook your meals there?
8  A.   Yes.
9  Q.   Did you have television there?
10 A.   Yes.
11 Q.   And what --
12 A.   They eventually moved us to a house.
13 Q.   What would you do in your --
14 A.   Cop house.
15 Q.   -- in your off time there?  What would you do?
16 A.   Read.  That's about it.  Not many things to do
17 in Fort Yukon.
18 Q.   Did you make any friends there?
19 A.   No.  I mean, acquaintances, I met people,
20 teachers that would come in and have to sleep in there.
21 Some of my coworkers.  Other than that, I would go out
22 of my way.  City counsel people, I guess, are some that
23 worked at the -- worked at the clinic.  Wherever we
24 would go, we would always meet somebody.
25 Q.   Where did you -- did you cook your meals at

## Page 47

1  the house?
2  A.   Yes.
3  Q.   How many meals would you get a day?
4  A.   We'd pay, and however many you wanted.
5  Q.   When you say, we pay --
6  A.   When we were busy.  Yes.
7  Q.   -- you stocked the fridge yourself and you
8  could go back --
9  A.   Yes.
10 Q.   -- go back to the house and cook?
11 A.   Yes.
12 Q.   There was times you'd do that?
13 A.   Yes.
14 Q.   Now, you -- before being hired as a police
15 officer by the City of Fort Yukon, you had been through
16 the academy?
17 A.   Yes.
18 Q.   You had training in law enforcement?
19 A.   Yes, I did.
20 Q.   Training in firearms?
21 A.   Yes.
22 Q.   Training in self-defense?
23 A.   Yes.
24 Q.   Did you receive any training while you were in
25 Fort Yukon?

## Page 48

1  A.   With McKillican on how things worked and
2  things like that, yes.
3  Q.   Kind of ride-along stuff?
4  A.   Just stuff to find out what it's all about,
5  yep.
6  Q.   Yeah.  Were there any formal trainings?
7  A.   No.
8  Q.   Did you go to Fairbanks or anywhere else for
9  trainings on the city's dime?
10 A.   No.
11 Q.   When you took the job in Fort Yukon, how long
12 did you think you'd work there?
13 A.   Longer than six weeks.  I didn't have any
14 expectations.  I mean, I was hoping that it would last
15 longer, but then again, the more I was there, the less
16 I wanted to be there.
17 Q.   Do you like Fort Yukon?
18 A.   What do you mean, like Fort Yukon --
19 Q.   What's the --
20 A.   -- specifically?
21 Q.   How is the -- how is the community?
22 A.   Pretty tight-knit community.
23 Q.   Easy place to integrate yourself?
24 A.   No.  Not as a law enforcement officer.
25 Q.   Did you feel welcome there as a law

12 (Pages 45 to 48)

Heartland Court Reporters
Carol A. McCue, RMR

Email: carol.mccue@acsalaska.net   Exhibit A
Page 12 of 18

Phone: (907) 452-6727
Fax:   (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 49

1  enforcement officer?
2       A.    50 percent of the time.
3       Q.    The other 50 percent?
4       A.    Moderate.
5       Q.    What do you like to do for fun?  Do you hunt?
6       A.    What do I like to do for fun?  Yeah.  Very,
7  very seldom.
8       Q.    Fish?
9       A.    Yes.
10      Q.    Did you get out and do any of that stuff when
11  you were in Fort Yukon?
12      A.    No.
13      Q.    Anything else?  Did you go skiing or
14  snowshoeing or anything like that?
15      A.    No.  Didn't have time to do it.
16      Q.    Did you ride snow machines?
17      A.    Used to.
18      Q.    Do any of that in Fort Yukon?
19      A.    No.  Can't get a snow machine out there, not
20  without costing an arm and a leg.  No.  I didn't have
21  time.  I was working.
22      Q.    Basically, when you were there, you work and
23  sleep?
24      A.    Yes.
25      Q.    And then you'd come home for -- on leave?

Page 50

1       A.    You're dedicated there, yes, unless you're
2  called up again to come back up, which I never was.
3       Q.    Now, did you wear a police uniform there?
4       A.    Yes, I did.
5       Q.    It was provided by the city?
6       A.    Yes -- no.  Excuse me, it was not.  We
7  purchased it.  I purchased it out of my money.
8       Q.    Did you carry a firearm?
9       A.    Yes.
10      Q.    Utility belt?
11      A.    Yes.  All purchased by me.
12      Q.    Radio?
13      A.    The handheld was theirs.
14      Q.    City had a handheld radio?
15      A.    Yes.  Old ones.
16      Q.    Now, tell me about your day-to-day job duties
17  in Fort Yukon.  What did you do?
18      A.    Usually, domestic disturbance calls.  You
19  would go in, in the morning, handle any call that came
20  up, investigate it from there, and that's it.
21      Q.    Usually get out of bed in the morning?
22      A.    Usually, yes.
23      Q.    Make breakfast?
24      A.    Yes.
25      Q.    And then go down to the police headquarters?

Page 51

1       A.    Yes.
2       Q.    What time?
3       A.    That varied depending on how much we were
4  working that night.  Probably, whew, 8:00 in the
5  morning, 9:00, somewhere in there.
6       Q.    So if it had been a real busy night, you could
7  sleep in a little and go a little later in the morning?
8       A.    Well, we had to because we'd be completely
9  worthless afterwards.
10      Q.    And mornings were pretty quiet in terms of
11  calls and crime for you?
12      A.    No.  No.  We got -- jeez.  All day and all
13  night.  We would get probably -- that day shift, we
14  would end up sometimes six calls, five and six calls.
15      Q.    During an 8, 10-hour shift?
16      A.    Yeah.
17      Q.    Physically, how did you -- did you patrol the
18  city?
19      A.    Yes.
20      Q.    Did you have a vehicle?
21      A.    Not my own.  Yes.
22      Q.    The city vehicle?
23      A.    We were able to work a vehicle, yes.  When it
24  worked, yes.
25      Q.    Is that the Jeep?

Page 52

1       A.    No.  There was a Jeep and a Explorer, I
2  believe it was.
3       Q.    You drove the Explorer?
4       A.    Tried to, yes.
5       Q.    Did you ever patrol on foot?
6       A.    No.
7       Q.    How much time would you say you spent in a
8  vehicle?
9       A.    That's hard to say.  Depending on how the
10  night goes.  Usually towards the end of the night or
11  out towards the night we would end up -- we would be in
12  the car, the vehicle.  I mean, it's hard to say.
13  Probably 50/50 between the office and the vehicle.
14      Q.    And then when you were on call, where were
15  you?
16      A.    At home.
17      Q.    And did you patrol alone or with somebody
18  else?
19      A.    With -- with somebody else.
20      Q.    The whole --
21      A.    Dave McKillican, always.
22      Q.    Oh, you always worked with Dave McKillican?
23      A.    Yes.
24      Q.    Never alone?
25      A.    No.

13 (Pages 49 to 52)

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 13 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 53

1    Q.    Did you drive or did he drive?
2    A.    We varied.  It varied.
3    Q.    Did you ever work with Reginald Fleming?
4    A.    No.
5    Q.    He was there when you weren't?
6    A.    No.  About the same time.  I don't know what
7 business he was doing.
8    Q.    You never went on patrol with him?
9    A.    Not that I recall.
10   Q.    Okay.  Did you ever patrol with anybody else?
11   A.    No.  There was nobody else to patrol with.
12   Q.    It was just you and McKillican?
13   A.    Yeah.
14   Q.    Dispatchers didn't go on patrol?
15   A.    No.
16   Q.    And you take issue with the manner in which
17 the city investigated Helona Cadzow's complaint; is
18 that right?
19   A.    Yeah.  I didn't think it was proper.
20   Q.    Did you raise that with anybody?
21   A.    I told -- I had mentioned that to both Dave
22 McKillican and Reginald Fleming.
23   Q.    Did you ever seek to file a grievance --
24   A.    No.
25   Q.    -- related to --

## Page 54

1    A.    No.
2    Q.    Why not?
3    A.    It wasn't worth it to me.  I mean, it just --
4 why go through another kangaroo situation like I went
5 through with that interview?  No.  I'm not about to do
6 that.  This job is not worth it to me to do that.
7    Q.    Oh.  Anybody ever tell you that it would be a
8 losing proposition to file a grievance?
9    A.    Not that I recall.
10   Q.    Nobody ever discouraged you from filing a
11 grievance?
12   A.    Not that I recall.
13   Q.    You just didn't want to bother?
14   A.    I didn't want to go through this situation
15 again.
16   Q.    This -- this incident with -- or this event
17 with Helona Cadzow, you agree you were -- you two were
18 in the office, police office on the same day?
19   A.    Yes.
20   Q.    Right?  And you were both sitting at
21 computers?
22   A.    There was several of us in there.
23   Q.    Not just --
24   A.    One of her friends, I think it was one of her
25 friends and her and myself.

## Page 55

1    Q.    And you did engage in an instant message chat
2 session with her?
3    A.    I sent one message, and I believe all I sent
4 was, hi.  Yes.  That was all it was.
5    Q.    Anything else?
6    A.    Not that I recall.
7    Q.    Do you remember telling Greg Russell that the
8 chat centered on a DVD movie they were watching in the
9 office?
10   A.    No, I don't remember -- yeah, I think they --
11 yeah, we had -- they had rented a DVD movie.  Which one
12 it was, I don't know.
13   Q.    Now, I asked you about whether you told Helona
14 Cadzow that you wouldn't turn her away if she knocked
15 on your door?
16   A.    Yes.
17   Q.    And you deny that?
18   A.    I never told her that.
19   Q.    Now, you --
20   A.    I mean, it depends on what her situation is,
21 of course, but not in the meaning in which it was a
22 sexual nature.
23   Q.    So you may have said it, but it wasn't of a
24 sexual nature?
25   A.    No.  I didn't say that at all, period.  But if

## Page 56

1 she came to my door with an emergency, I would have let
2 her in.
3    Q.    Now, did you also -- did you also go to her
4 house at one point?
5    A.    I think we dropped her off -- I think we
6 dropped her off once.  Yeah.  I think we dropped her
7 off once.
8    Q.    Do you remember --
9    A.    It was a long time ago.  I didn't think I'd
10 have to remember that.
11   Q.    Do you remember telling Mr. Russell that it
12 didn't look -- that it looked bad for you?  Did you say
13 that to him?
14   A.    Well, the way that it seemed, yes.  I mean, as
15 far as the interrogation that I got before the
16 interview started, yeah, I thought I was pretty much
17 terminated, to be honest with you.  I mean, it didn't
18 look good.  I mean, I didn't want to have to go through
19 this.
20   Q.    Did you go to a woman named Bobbie's house at
21 one point?
22   A.    No, I don't recall.  Like I said, I didn't
23 think I'd remember any of that.  I don't recall.
24   Q.    Did you -- do you remember describing this
25 computer chat with Helona Cadzow as a stupid thing to

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net  Exhibit A
Page 14 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

**Page 57**

1  do and that you were just playing?
2    A.   I don't recall telling him that, but yes, that
3  would probably be a dumb thing to do.  I should have
4  been out, I guess, or home trying to get some rest.
5         MR. SINGER:  Let's mark...
6         (Exhibit 6 marked.)
7  BY MR. SINGER:
8    Q.   Is that your signature on Exhibit 6?
9    A.   Yeah, I think so.
10   Q.   That's your signature?
11   A.   Oh, yeah, it's my signature.
12   Q.   And --
13   A.   It appears to be, yes.
14   Q.   And this is a directive of the city manager?
15   A.   I guess it was.
16   Q.   Do you remember maybe it being referred to as
17 a gag order?
18   A.   No.
19   Q.   No?
20   A.   Doesn't ring a --
21   Q.   Do you remember talking about this document
22 with Greg Russell?  This document being Hampton
23 Exhibit 6.
24   A.   To be honest with you, no, I don't.
25   Q.   Do you remember that all the police officers

**Page 58**

1  were freely discussing the complaint that had been made
2  against you?
3    A.   Well, they were freely discussing it?  In what
4  manner?
5    Q.   I think you -- well, Mr. Russell indicates
6  that you told him that the officers were discussing the
7  complaint against you freely and they felt compelled to
8  speak out because they thought it was unfair.
9    A.   That's their -- that's their thing.  And Bill
10 Russell, or whatever his name was, said I was lying and
11 I wasn't.  So I don't know.  I don't remember
12 discussing this with him.
13        And as far as the other officers and what they
14 want to do or what they are doing, I don't know.  I
15 mean, I don't know about their gag order or anything
16 about their stuff.
17   Q.   This -- your letter of resignation, did you
18 write that while you were in Fort Yukon?
19   A.   Yes.
20   Q.   And did you deliver it to the city manager?
21   A.   No, I don't remember -- I don't recall who
22 I -- who I gave it to.
23   Q.   Did you --
24   A.   I would assume it was Reginald.
25   Q.   Did you crumple it up and throw it at

**Page 59**

1  somebody?
2    A.   No.  When -- after this question session I
3  went through with the gentleman from the insurance
4  department, they handed -- it was -- I forgot what it
5  was they handed me.  And then I was reminded that he
6  thought I was not telling the truth -- no, dishonest.
7  There you go.
8         So I told him that -- as I remember, or as I
9  recall, I told him something of the fact that I was not
10 dishonest, and that was it.
11   Q.   During your tenure at the city, did you see
12 Fannie Carroll engage in any conduct that you thought
13 was illegal?
14   A.   No.  Not that I recall.
15   Q.   Did you investigate Fannie Carroll for any
16 crimes?
17   A.   No, I did not.
18   Q.   Did you investigate anyone involved with the
19 city --
20   A.   No, I did not.
21   Q.   -- with crimes?  How about any of Fannie
22 Carroll's family?
23   A.   Not that I recall.  I -- the investigations
24 that went on, there's a lot of relatives involved in
25 that area, and so I don't know.  I was new.  I don't

**Page 60**

1  know who was related to who.  And to be honest with
2  you, it didn't matter with me, whether it would have
3  been her daughter or anybody of the sort.
4    Q.   Didn't affect your administration of justice
5  one way or the other?
6    A.   Absolutely not.
7    Q.   And nobody from the city ever -- did anybody
8  from the city ever tell you not to arrest somebody or
9  anything like that?
10   A.   I was involved with a -- I remember I was
11 involved in a investigation with Dave McKillican, and I
12 didn't do any of the follow-up on it, but I remember
13 that he mentioned that Fannie had told him to not
14 arrest someone.  But as far as the details go, I -- I
15 wasn't involved in the details of that.
16   Q.   Have anything to do with why you resigned from
17 the city?
18   A.   Yes.
19   Q.   How so?
20   A.   Dishonesty in the police department is no way
21 to have a police department.  So if you -- as a police
22 officer, it's very wrong to be told who you can and
23 cannot arrest, it should be up to the officer to make
24 that decision.
25   Q.   Now just be clear, nobody from the city,

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 15 of 18

Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 61

1  Fannie Carroll or anybody else, ever told you not to
2  arrest somebody?
3     A.   No.  Me personally, no.  You had mentioned if
4  I had known about that, yes, I did --
5     Q.   So you quit?
6     A.   -- to a certain extent.
7     Q.   Okay.
8     A.   It's all accumulative.  It's just accumulative
9  that one thing leads to another.  It's just
10 accumulative.
11    Q.   Okay.  Now, did anybody ever use harassing
12 language towards you?
13    A.   No.
14    Q.   And again, you've already said nobody ever --
15 from the city ever took adverse employment actions
16 against you?
17    A.   Not that I can recall, no.
18    Q.   And nobody even threatened to?
19    A.   Not that I can recall.
20    Q.   The only mention of an adverse employment
21 action against you are the two that you've testified
22 about?
23    A.   Uh-hum.
24    Q.   One is Greg Russell?
25    A.   Yes.

## Page 62

1     Q.   Greg Russell was not a city employee?
2     A.   Yes, sir.  He made it clear.
3     Q.   He made that clear?
4     A.   Yes.
5     Q.   And he made it clear that he didn't know if
6  the city would follow his recommendation, right?
7     A.   As far as I can recall, yes.
8     Q.   And then the only other one you've mentioned
9  is that one of the city council members told you after
10 you had already quit that she would have voted to
11 terminate you?
12    A.   No.  They said that -- she had mentioned that
13 the city council had a meeting, a closed-door meeting,
14 and that I most likely would have been terminated.
15    Q.   To the best of your knowledge, did the city
16 council actually make a decision?
17    A.   I was told by -- I was told by her that they
18 had a closed session.  I was told by Greg Russell that
19 they had a closed session.  Reginald Fleming was there.
20 McKillican was there, as well.
21    Q.   In this session?
22    A.   That they had a closed session.  I don't know
23 who attended the session.  But I -- I understood that
24 that -- I guess.  But I had resigned because I wasn't
25 going to put up with this any longer.

## Page 63

1     Q.   So you -- so that you resigned before the city
2  council made -- took any action?
3     A.   Yeah.
4     Q.   Yeah.  And the city council never --
5     A.   After that interview, yes.
6     Q.   And city council never took action against
7  you?
8     A.   Not as far as I know.
9     Q.   And you're not asserting in this lawsuit that
10 they did?
11    A.   That they did?  No.  No, they didn't.
12    Q.   And what time of day was it when you signed
13 your resignation letter, do you remember?
14    A.   No, I don't remember.
15    Q.   Was it morning?
16    A.   It could have been.
17    Q.   So most likely it was morning?
18    A.   Yeah, I believe so.  Yeah, it was daytime.
19    Q.   Where were you when you signed the resignation
20 letter?
21    A.   I think I was at the office.  I believe I was
22 at the office, at the police department.
23    Q.   The letter is on a lined paper?
24    A.   Right.
25    Q.   Is that off a legal pad?

## Page 64

1     A.   It might be, yes.
2     Q.   Did the police department stock that kind of
3  paper?
4     A.   I don't remember.  I would imagine so.
5     Q.   You didn't -- to the best of your
6  recollection, you didn't go back to the residence and
7  write up a resignation letter?
8     A.   No, I believe that was in -- it was at that
9  police department.  I believe so.
10    Q.   Have you answered the questions I've asked you
11 today truthfully?
12    A.   Yes, sir, to the best of my knowledge.
13    Q.   Any -- any questions that you need to correct?
14    A.   No.
15         MR. SINGER:  I don't have anything further.  I
16 may have some follow up if Mr. Walleri has questions
17 for you.
18              EXAMINATION
19 BY MR. WALLERI:
20    Q.   Do you know whether or not there were any --
21 they ever had temporary officers while you were
22 employed there?
23    A.   No.  The -- all I remember was the VPSOs, or
24 the VPSO that was there, and -- no.  No.
25    Q.   And how did you relate to the VPSO?

16 (Pages 61 to 64)

Heartland Court Reporters
Carol A. McCue, RMR

Email: carol.mccue@acsalaska.net    Exhibit A
Page 16 of 18

Phone: (907) 452-6727
Fax: (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

## Page 65

1   A.   He was an acquaintance of mine, I guess.  I
2   mean, just because we were working almost side by side.
3   As far as going out to calls, I never went out on a
4   call with him.
5   Q.   Was he working in the city offices?
6   A.   Yes.  Well, the police department.  He was
7   there, yes.
8   Q.   Okay.  And do you remember his name by any
9   chance?
10   A.   No.
11   Q.   Okay?
12   A.   If I heard it, I would remember it, but I
13   don't.
14   Q.   Okay.
15   A.   Not offhand.
16   Q.   It wasn't Mike Hardy, was it?
17   A.   No.
18   Q.   You mentioned earlier David Carroll, when
19   asked about other people working in the department.
20   A.   David Carroll?
21      MR. SINGER:  He said David McKillican.
22      THE WITNESS:  McKillican?
23   BY MR. WALLERI:
24   Q.   No, you said David -- David -- or you said
25   McKillican, Fleming, and you said -- and then you were

## Page 66

1   kind of interrupted by counsel, but you were mentioning
2   somebody else.
3   A.   The -- Greg, whoever the insurance guy was
4   that I got the interview with.
5   Q.   Okay.
6   A.   I believe that's what you're talking about.
7   Yes.  That was him.
8   Q.   So it was just the three officers at the time
9   and the VPSO?
10   A.   At the very -- oh, at the time we were
11   working?
12   Q.   Yeah.
13   A.   Yes.  Yes.
14   Q.   Okay.  And there were no temporary officers
15   during your period?
16   A.   They had a jail -- well, not an officer -- not
17   a police officer, they had jail guards.  Yeah, they had
18   one that was there.
19   Q.   Do you remember who that was?
20   A.   No, not offhand.
21   Q.   And do you know who paid -- do you know, was
22   he working for the city?  Or...
23   A.   It was my understanding that he was, but I was
24   assuming that he was.
25   Q.   Okay.

## Page 67

1   A.   But as far as the details, I don't know.
2      MR. WALLERI:  Okay.  That's all I have.
3      MR. SINGER:  Just a follow up.
4         FURTHER EXAMINATION
5   BY MR. SINGER:
6   Q.   Again, did you have any involvement in the
7   city payroll?
8   A.   No.
9   Q.   Other than you receiving payroll checks?
10   A.   No, I didn't touch it.  I couldn't.  It wasn't
11   my position.
12   Q.   So if somebody was or was not employed by the
13   city, that's not something you would know?
14   A.   Other than what I would hear, and really, it
15   wasn't any of my business, to be honest with you.
16   Q.   The jail -- the jail wasn't in the city
17   building, was it?
18   A.   No.  Separate.
19   Q.   It was in the state building?
20   A.   Well, yeah -- well, I don't know if that was
21   the state building.  I don't know what that was.  It
22   was a building.
23   Q.   Not where the police -- not where the
24   police --
25   A.   No.  No.

## Page 68

1   Q.   Okay.  VPSO, now, did he carry -- he didn't
2   carry a firearm?
3   A.   No.  They couldn't.
4   Q.   They are not allowed to?
5   A.   Right.  Except for a rifle, I believe, they
6   have access to that, but other than that, I'm not --
7   I'm not familiar with his position.
8   Q.   They have a different background and training
9   than police officers, don't they?
10   A.   Yes.  Well, yes.  Yes.
11   Q.   Have you been through VPSO training?
12   A.   No, I have not.
13   Q.   It's a different academy?
14   A.   Yes, they do.  He -- I don't believe -- as I
15   remember when I was talking to him, he didn't go
16   through the academy.  He had -- he was going to and
17   either left beforehand or -- I don't recall exactly,
18   but as I remember, he didn't go through it.  But he was
19   in the process of going through it.
20      MR. SINGER:  Nothing further.  Thank you for
21   appearing and testifying, and I hope we haven't gone
22   too late tonight.
23      THE REPORTER:  Off record.
24      (Deposition proceedings adjourned
25      5:15 p.m., July 19, 2006.)

17 (Pages 65 to 68)

Heartland Court Reporters
Carol A. McCue, RMR
Email:  carol.mccue@acsalaska.net
Exhibit A
Page 17 of 18
Phone:  (907) 452-6727
Fax:  (907) 488-7701

Deposition of Chris Hampton
Taken July 19, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 69

REPORTER'S CERTIFICATE

I, CAROL A. McCUE, RMR, hereby certify:

That I am a Registered Merit Reporter for Heartland Court Reporters and Notary Public for the State of Alaska; that the foregoing proceedings, Deposition of CHRIS HAMPTON, taken July 19, 2006, were written by me in computerized machine shorthand and thereafter transcribed under my direction; that the transcript constitutes a full, true and correct record of said proceedings taken on the date and time indicated therein;

Further, that I am a disinterested person to said action.

IN WITNESS WHEREOF, I have hereunto subscribed my hand and affixed my official seal this _____ day of _____, 2006.


_____
CAROL A. McCUE, RMR
Registered Merit Reporter
Heartland Court Reporters


My Commission Expires: February 15, 2010

Page 70

C E R T I F I C A T E

I hereby acknowledge that I have carefully read this transcript and I accept it as correct except for the following changes:

============================================
PAGE     LINE     CORRECTION
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____
____     ____     _____

_____     _____
DATE            CHRIS HAMPTON        (7/19/06)

(Use additional paper to note corrections
as needed, signing and dating each page.)

Heartland Court Reporters
Carol A. McCue, RMR

Email:  carol.mccue@acsalaska.net

Exhibit A
Page 18 of 18

Phone:  (907) 452-6727
Fax:    (907) 488-7701