IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER
DELEON, CHRIS HAMPTON, WILLIAM
D. MCKILLICAN, and TODD
SCHLUMBOHM,

    Plaintiffs,

-vs-

FANNIE CARROLL, and the CITY OF
FORT YUKON, ALASKA,

    Defendants.
_____/

Case No. F04-0034 CIV (RRB)





AUG 3 1 2006

DEPOSITION OF GREG RUSSELL

Pages 1 - 129 inclusive

August 16, 2006, 9:00 a.m.

Anchorage, Alaska

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF ALASKA
 3
   REGINALD FLEMING, CHRISTOPHER
 4 DELEON, CHRIS HAMPTON, WILLIAM
   D. MCKILLICAN, and TODD
 5 SCHLUMBOHM,
 6       Plaintiffs,
 7 -vs-
 8 FANNIE CARROLL, and the CITY OF
   FORT YUKON, ALASKA,
 9
         Defendants.
10 _____/
   Case No. F04-0034 CIV (RRB)
11
12
13
14       DEPOSITION OF GREG RUSSELL,
15 Taken on behalf of the Plaintiff pursuant to notice, at
16 the offices of Alaksa Stenotype Reporters, 511 West Ninth
17 Avenue, Anchorage, Alaska, before Britney Chonka, Court
18 Reporter for Alaska Stenotype Reporters and Notary Public
19 For the State of Alaska.
20
21
22
23
24
25
```

**Page 3**

```
 1          A-P-P-E-A-R-A-N-C-E-S
 2 For the Defendant:
 3
   JERMAIN, DUNNAGAN & OWENS
 4 Matt Singer, Esquire
   3000 A Street, Suite 300
 5 Anchorage, Alaska 99503
 6
 7 For the Plaintiff
 8 Michael J. Walleri, Esquire
   330 Wendell Street, Suite E
 9 Fairbanks, Alaska  99701
10
11
12
13
14
15 Reported By:      Britney Chonka, Court Reporter
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2              I-N-D-E-X
 3 EXAMINATION BY:                    PAGE
 4
   Mr. Walleri                       5, 125
 5
   Mr. Singer                         112
 6
 7
 8
 9
   EXHIBITS:
10
11 No. 1 Composite of field notes and information   49
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1 THEREUPON:
 2          GREG RUSSELL
 3 was called as a witness herein, after having been duly
 4 sworn upon oath by Britney Chonka, Notary Public, was
 5 examined and testified as follows:
 6          EXAMINATION
 7 BY MR. WALLERI:
 8    Q. Mr. Russell, have you ever had your deposition
 9 taken before?
10    A. Yes.
11    Q. Okay. I take it that Mr. Singer -- that you
12 have an attorney/client relationship with Mr. Singer; is
13 that true?
14    A. I do not have an attorney/client relationship
15 with Mr. Singer.
16    Q. Okay. Have -- did you review any items in
17 preparation for this depo?
18    A. I was asked to bring other material in my notes
19 that hadn't already been disclosed, and I did bring this.
20 And I believe this is your copy.
21    Q. Can I take a look?
22    A. Yeah.
23    Q. Okay. When were you born?
24    A. August 11th, 1955.
25    Q. Okay. And could you describe your educational
```

Page 6

1  background for me?
2      A. How far back would you like me to go?
3      Q. Just after high school, how's that?
4      A. I graduated from high school in 1973 in Butte,
5  Montana. In 1974 I attended Montana Institute of the
6  Bible in Lewistown, Montana for four years. Graduated
7  with a Bachelor's degree in general Bible. I attended
8  the Municipal Police Academy in 1983 in Sitka. I've had
9  over a thousand hours of Alaska Police Standards Council
10 certified training, I'm a 1995 graduate of the FBI
11 National Academy in Quantico. In a thumbnail, that's
12 pretty much it.
13     Q. Okay. In terms of your work history, when --
14 could you kind of describe that for me, since you got out
15 of high school?
16     A. In 1977 after I got out of college I pastored a
17 church in Montana and I did that for three years. I also
18 worked summers on the Pipeline for various oilfield or
19 construction companies. In 1981 I went to work for the
20 Alaska State Troopers as a specialty commissioned trooper
21 working undercover narcotics. I did that for almost a
22 year as a narc. In 1982 I became a uniformed police
23 officer in Soldotna.
24     I attained rank in 1985 as a patrol sergeant.
25 And over the next almost 15 years, supervised patrol

Page 7

1  investigations, administration, property and evidence.
2  In 2000 I accepted a job as a chief of police in Kotzebue
3  and remained there until I retired in late fall of 2002.
4      In 2003 I formed my own consulting business as a
5  sole proprietorship. In 2006 it became an LLC, which is
6  Russell Consulting.
7      Q. And do you have a contract with the Municipal --
8      A. The Alaska Municipal League Joint Insurance
9  Association, AMLJIA, yes, I do.
10     Q. Could you describe that contract, what it's --
11 what are you contracted to do?
12     A. I provide consulting services. Working
13 predominantly, primarily with their law enforcement line
14 of police pool, the ones that they provide coverage. I
15 do new chief mentoring. I help with policy and
16 procedures. I help on recruiting of police personnel,
17 kind of a troubleshooter in agencies that work that way.
18     I also do on-site visits to help identify
19 potential problems and help avoid them if there is a
20 claim or something like that where my services may be of
21 value. And sometimes I'm sent in to assist in the
22 investigation or the resolution of some internal
23 problems.
24     I also am the program manager for the law
25 enforcement agency accreditation and that's supported by

Page 8

1  AMLJIA, help facility and arrange training in management
2  issues. I'm also a -- they support the skid car trainer.
3  I'm a master trainer for that to help other trainers get
4  certified.
5      Q. Do you have other contracts other than with the
6  Municipal League?
7      A. Yes, I do.
8      Q. Could you describe some of those?
9      A. In broad terms I do preemployment background
10 checks for some agencies, generally on the department
11 head or the executive level for the agencies. And that's
12 the city and boroughs.
13     I also do workplace investigations for other
14 non-AMLJIA members pertaining to various kinds of issues
15 that come up in the workplace.
16     Q. How much of your business is with the Municipal
17 League, would you say, what percentage?
18     A. The majority of it.
19     Q. Over 75 percent?
20     A. I'd say between 75 and 80 percent, yeah.
21     Q. And your familiarity or your association with
22 the City of Fort Yukon, could you describe when you first
23 became involved with the City of Fort Yukon?
24     A. That would have been in February of 2004.
25     Q. Did you have anything -- did you have anything

Page 9

1  to do with them before, between 2002 and 2004?
2      A. I misspoke, it was February of 2003, not 2004.
3      Q. Okay. And that was your first contact with the
4  City of Fort Yukon?
5      A. Yes.
6      Q. And could you describe that contact? I take it
7  that was with -- that had something to do with Officer
8  Hampton?
9      A. Right. That was my first contact with them.
10 I'd received a phone call from Kevin Smith who was the
11 executive director of AMLJIA. I had just come back from
12 a -- another on-site and he asked if I'd be available to
13 go up to Fort Yukon to assist with a sexual harassment
14 investigation or a complaint, to investigate it. I
15 agreed and I went.
16     Q. Could you tell me what -- could you basically
17 tell me what happened?
18     A. Yes, I flew in to Fort Yukon and met with the --
19 one of the dispatchers -- it was -- I conducted an
20 investigation to the allegation of sexual harassment in
21 the police department.
22     Q. And could you describe that investigation?
23     A. It consisted of getting what information was
24 available as far as the complaint, talking to the city
25 manager, talking to the dispatcher that raised the

Page 10

1  complaint, talking to co-workers within the department
2  that had been either identified to me or for me as being
3  involved, interviewing the officer that these complaints
4  had been brought against, Officer Hampton.
5      Q. In talking with city manager, I take it that was
6  Fannie Carroll?
7      A. Yes, it was.
8      Q. And what did -- can you describe your
9  conversation with Fannie Carroll?
10     A. She dis -- she told me that she had received a
11 complaint from one of the dispatchers through Reggie
12 Fleming, which was the chief of police, and what the
13 nature of the complaint was. And other than assisting me
14 with one of the interviews, or actually maybe two of the
15 interviews afterward -- by assisting, I mean attending
16 with me. I don't mean that she was asking the questions
17 or leading the investigation, I mean she was with me when
18 I was doing the interviews.
19     Q. Which interviews was she present at?
20     A. The dispatcher, Helena --
21     Q. Cadzow?
22     A. Cadzow and I believe she was with me when I
23 interviewed the other dispatcher, Bobbie Gail Jones,
24 Jones Gail, Gail Jones I think it is --
25     Q. James? Jones or James?

Page 11

1      A. The other dispatcher, I think it was Jones --
2  James -- if you don't mind, could I --
3      Q. Go ahead.
4      A. Bobbie James. Bobbie James.
5      Q. What did you learn from your investigation?
6      A. My -- I learned that Officer Hampton, although
7  he initially denied engaging in the conduct that he was
8  being accused of, in fact, did. And that it was in my
9  opinion that the allegations of sexual harassment had
10 merit and that Officer Hampton compounded the issues of
11 sexual harassment by trying to be deceptive and not
12 admitting to the problem. And that's what I learned.
13     Q. When you say that the incident took place,
14 exactly what did you discover took place?
15     A. She, in the complaint, alleged that Officer
16 Hampton had, sitting in close proximity, as close as like
17 what we are right here, did an IM chat, instant messenger
18 chat with her. And during the course of that offended
19 her by some of the things that he was saying. She
20 interpreted what he was saying as being sexual in nature,
21 and that it bothered her.
22     Q. And the -- the evidence supporting that, your
23 conclusion that it actually took place, is what?
24     A. In addition to her complaint to me and the fact
25 that I believed that she was very credible in the way

Page 12

1  that she gave me the complaint, that her reaction
2  afterwards was witnessed by the other dispatcher that was
3  present, saw the obvious reaction. And then with the
4  admissions that Officer Hampton made during my interview
5  with him led me to believe that it was more likely than
6  not to have happened as she said, as opposed to the way
7  that he initially --
8      Q. And what did he admit to you?
9      A. That he did do an IM chat, that he knew that it
10 was either a silly or a foolish thing do, that he
11 shouldn't have done that, and that anything that he said
12 did not have sexual overtones, although he acknowledged
13 that they could have, you know, be interpreted that way.
14 And that if he had to -- he shouldn't have done it.
15     Q. Okay. But he -- when you said that he did not
16 indicate that what he put -- that what he messaged to her
17 had sexual -- that he intended a sexual connotation to
18 it?
19     A. He acknowledged that it could be interpreted
20 that way, but that is not the way he said he had intended
21 it.
22     Q. There's a comment, I think, in your report about
23 one of the messages being: All I want to do is eat
24 pussy; is that correct? Oh, no. That was -- that had
25 something -- that was a comment made directly to her

Page 13

1  or -- no. No. That was part of what the IM chat was
2  about?
3      A. Are you asking me?
4      Q. Yeah.
5      A. Are you referring to something in my report
6  directly that I can look at?
7      Q. Yeah, in your report, the accusations. Did he
8  ever admit to you that he mess -- that he gave her a
9  message saying: All I want is to eat pussy?
10     A. I don't recall him saying that to me, I don't
11 remember that.
12     Q. Okay. So he didn't admit that. Did he tell you
13 what the message was that he sent to her?
14     A. As I remember, he told me that he did make
15 reference to not turning her away if she came knocking at
16 his door. I believe -- may I? He complimented her and
17 said that she looked good, in the chat. He admitted to
18 being complimentary. He admitted to having a cold bed.
19     Q. And did he explain to you what he meant by
20 saying that he had a cold bed?
21     A. I don't recall.
22     Q. Does it refresh your recollection that the whole
23 house was cold?
24     A. No, it doesn't refresh my recollection.
25     Q. Did you ever check to see if the house actually

Page 22

1  sexual connotation to it?
2     A. No.
3     Q. So, if you ever made a sexual connotation to
4  somebody, you intended it?
5        MR. SINGER: Objection, relevance.
6        THE WITNESS: I'm not certain I understand your
7  question. I thought that you were asking me whether
8  or not that I've been -- I've made a faux pas --
9  BY MR. WALLERI:
10    Q. Yes.
11    A. And said something that somebody took offense at
12 because it was sexual in nature.
13    Q. Right.
14    A. No.
15    Q. That's never happened?
16    A. I can't think of a single time.
17    Q. Have you ever seen anybody else do that?
18    A. "Ever" is such a long time.
19    Q. Well --
20    A. I can't think of anything right now.
21    Q. Okay.
22       So after --
23    A. I -- I have thought of one time, but I may not
24 be appropriate and you may think that I'm making light of
25 your question. But my four-year-old grandson thinks

Page 23

1  nothing of stepping out of the bathroom not fully
2  dressed. And I'm -- would be -- had I done that, that
3  would have been inappropriate, but a four-year-old, no,
4  so --
5     Q. But you've never seen an adult make a sexual --
6  make a faux pas in terms of saying something that other
7  people have unintentionally -- that other people have
8  basically seen as having a sexual innuendo?
9     A. I can't think of one right now. Maybe, but I
10 can't think of anything.
11    Q. You're familiar with the concept double entendre
12 though, correct?
13    A. Please explain.
14    Q. A statement having more than one meaning.
15    A. This is not my first time sitting in a room full
16 of attorneys. I know that it happens. And, again, I'm
17 not trying to make light of it, but --
18    Q. Okay. So in your -- in your conclusion, you're
19 absolutely certain that there wasn't even a possibility
20 that there was a mistake in communication here?
21       MR. SINGER: Objection, mischaracterizes prior
22    testimony.
23 BY MR. WALLERI:
24    Q. Just asking for clarification. Go ahead and
25 answer.

Page 24

1     A. Please tell me again the question.
2     Q. In your mind is there any possibility that there
3  was a mistake in communication that Mr. Hampton may have
4  said something with unintended sexual connotations that
5  Ms. Cadzow took as being -- having a sexual connotation?
6     A. Not in my mind, no.
7     Q. When you went in to interview him, Officer
8  Hampton, had you pretty much made up your mind at that
9  point?
10    A. No.
11    Q. When you began the interview, what was your
12 thought of the situation?
13    A. I was still gathering facts. I wanted to find
14 out what his side of the allegation was.
15    Q. So what happened after Mr. -- you're aware that
16 Mr. Hampton resigned?
17    A. Yes.
18    Q. Okay. And what was your next contact with the
19 City of Fort Yukon?
20    A. That -- you mean separate from this or do you
21 mean that same day that he left? What do you mean?
22    Q. Well, after -- after your interview with
23 Mr. Hampton, what was your next contact with the City of
24 Fort Yukon?
25    A. Okay. I -- I'm -- again, I'm -- I don't

Page 25

1  understand.
2     Q. Let's put it this way, you -- after your
3  interview, what happened after your interview, we'll just
4  deal with that.
5     A. Okay.
6     Q. Close that up.
7     A. Thank you.
8        He left, I want to say, around five-ish, and
9  then I went -- attended a city council meeting that same
10 evening.
11    Q. What did you tell the city council?
12    A. We went into executive session.
13    Q. What did you tell the city council?
14    A. I told them that I'd concluded the
15 investigation, that I had believed the dispatcher's part
16 of it, that I did not believe McKillican -- or Hampton's
17 part of the event, that I reminded them that
18 McKillican -- I'm sorry, Hampton, was still on probation,
19 I believe he was on for less than 30 -- maybe 30 to 60
20 days, and that in addition to the sexual harassment,
21 there was a credibility issue, as far as I was concerned.
22 And that, my understanding, that he tendered his
23 resignation and moved away, that he was done.
24    Q. Okay. And did you hear anything else from -- do
25 you know what the city council's response was followed by

Page 26

1  that?
2     A. No.
3     Q. They didn't take any action?
4     A. I'm not aware of any action they took at that
5  point.
6     Q. At that point were you concerned that Ms. Cadzow
7  would file a lawsuit against the City?
8     A. No.
9     Q. Why not?
10    A. I wasn't -- anybody filing a lawsuit against the
11 City or anybody else was not my concern. I don't know
12 whether she filed a suit, who filed a suit, it just --
13    Q. Who was paying you?
14    A. AMLJIA.
15    Q. That's the insurer for the City, correct?
16    A. Yes, it is.
17    Q. So if she filed a lawsuit against the City, AMLJ
18 would have to actually pay any claim that came out of
19 that, wouldn't they?
20    A. That may be their business. I don't do
21 anything --
22    Q. Isn't that what you're paid for, to investigate
23 claims like that?
24    A. That's part of what I -- part of the service I
25 provide, yes.

Page 27

1     Q. So, in fact, it's the truth that you did know at
2  that time that if a lawsuit was brought by Ms. Cadzow
3  against the City, that AML would end up having to pay the
4  claim if they lost?
5     A. No, sir, I resent the fact that you would
6  suggest that I would lie to you by saying, in fact, this
7  is the truth. I had no clue whether she or anybody else
8  would file a lawsuit against the City or anybody else.
9  And it's really none of my concern.
10    I'm not in the insurance business. I don't
11 understand insurance. My job was to make a -- an
12 investigation and that's what I did. I have no clue or
13 interest in whether anybody files a suit or what the
14 outcome is.
15    Q. But didn't you tell me that you were working for
16 a Municipal insurer?
17    A. I have a contract with them, yes, I do.
18    Q. So you know that that -- the person that's hired
19 you is, in fact, the insurer for the City of Fort Yukon?
20    A. Yes, I do know that.
21    Q. Wouldn't you conclude reasonably that if a claim
22 were brought, that the insurer would have to pay the
23 claim?
24    A. No.
25    Q. Why not?

Page 28

1     A. The decisions on how claims are resolved or
2  decided upon is several steps above my pay grade. I do
3  not get involved with nor do I know the claims that are
4  pending or their outcome oftentimes.
5     Q. How many lawsuits have you been involved in --
6  you indicated you have done some depositions before?
7     A. Correct.
8     Q. Okay. Are those -- have any of those
9  depositions involved lawsuits against the city where the
10 AMLJ was an insurer?
11    A. Yes.
12    Q. So you know that people do sue cities and that
13 the AML is the insurer?
14    A. Yes, I do know that.
15    Q. You knew that at the time you did the Hampton
16 investigation?
17    A. I knew that AMLJIA was a member of the pool,
18 yes.
19    Q. Did the fact that if Mr. -- if Mr. Hampton
20 was for -- was intimidated to the point of resigning, and
21 that that would stop any lawsuit from Ms. Cadzow, did
22 that influence your decision that he was, in fact, a
23 liar?
24    A. No.
25    Q. Okay. After the city council meeting, what did

Page 29

1  you do then?
2     A. I think I went home.
3     Q. After you went home, when was your next contact
4  with the City of Fort Yukon?
5     A. Let me think. Can I reference -- I think I may
6  have something here.
7     MR. SINGER: Can we take a break?
8        (Thereupon, a brief recess was taken, after
9        which the following proceedings were had:)
10 BY MR. WALLERI:
11    Q. Did you want to take a look at that, you were
12 trying to figure out when the next time you had a contact
13 with Fort Yukon was.
14    A. I believe that it was in February of '04.
15    Q. Okay. And what was that all about?
16    A. In that time there was a, I believe that the
17 Fort Yukon Police Department had been reorganized and
18 that Fannie had fired the officers that were involved.
19 And I believe there was one officer that was left on the
20 department. And I was just going to go up and to help
21 get things back on track.
22    Q. Well, didn't you have a conversation with Fannie
23 over the phone in August of 2000 -- excuse me, in August
24 of 2003 with regards to Officer McKillican?
25    A. What was the nature of that conversation?