Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 1 of 11

Deposition of Todd Schlumbohm
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER )
DELEON, CHRIS HAMPTON, WILLIAM )
D. MCKILLICAN, and TODD )
SCHLUMBOHM, )
            )
        Plaintiffs, )
            )
vs. )
            )
FANNIE CARROLL and the CITY )
OF FORT YUKON, ALASKA, )
            )
        Defendants. )
_____)
Case 4:04-cv-00034-RRB

VIDEOTAPE DEPOSITION OF TODD SCHLUMBOHM
Taken Thursday, August 17, 2006
From the hour of 1:48 p.m. to 3:36 p.m.
Pages 1 through 103, inclusive
Volume 1
Taken by Counsel for Defendants
At
Offices of Heartland Court Reporters
100 Cushman Street, Suite 308
Fairbanks, Alaska 99701

Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

**Page 2**

APPEARANCES
For Plaintiffs:
    MICHAEL J. WALLERI, ESQ.
    ATTORNEY AT LAW
    330 Wendell Street, Suite E
    Fairbanks, AK 99709
    907-452-4725

For Defendants:
    MATTHEW SINGER, ESQ.
    JERMAIN, DUNNAGAN & OWENS
    3000 A Street, Suite 300
    Anchorage, AK 99503
    907-563-7322

Witness:
    TODD SCHLUMBOHM
    August 17, 2006

Reported by:
    CAROL A. McCUE, RMR
    Heartland Court Reporters

BE IT KNOWN that the deposition of the above-named witness was taken this date in the foregoing action before Carol A. McCue, Registered Merit Reporter and Notary Public within and for the State of Alaska.

**Page 3**

I N D E X
WITNESS: TODD SCHLUMBOHM        August 17, 2006
EXAMINATION                              Page
Direct Examination by Mr. Singer.................5
Cross-Examination by Mr. Walleri................90
Redirect Examination by Mr. Singer..............97
Recross-Examination by Mr. Walleri.............100

E X H I B I T S
Exhibit No.                          Page Marked
1:   1-page document, To Whom it
     May Concern, letter of resignation
     signed by Todd Schlumbohm dated
     2/16/04.....................................78

2:   4-page document, City of Fort
     Yukon Job Description, Police
     Sergeant (Investigations)...................82

3:   1-page document, entitled City of
     Fort Yukon, Confidentiality,
     Appendix 1, signed by Todd
     Schlumbohm, dated 3/3/03....................84

**Page 4**

1           P R O C E E D I N G S
2       (The following proceedings commenced
3       at 1:48 p.m., August 17, 2006.)
4       THE VIDEOGRAPHER:  This is the videotape
5  deposition of Todd Schlumbohm taken by counsel for the
6  defendant, in the matter of Reginald Fleming,
7  Christopher DeLeon, Chris Hampton, William D.
8  McKillican, and Todd Schlumbohm versus Fannie Carroll
9  and the City of Fort Yukon, Alaska.
10       The time is 1:48 p.m., Thursday, August 17th,
11  2006.  We're located here at the offices of Heartland
12  Court Reporters.  The court reporter is Carol A. McCue,
13  and she's the court reporter with the firm of Heartland
14  Court Reporters, 100 Cushman Street, Fairbanks, Alaska.
15       The videographer is Jay Gelber with the firm
16  of Video Services, Fairbanks, Alaska.
17       Will counsel please introduce themselves.
18       MR. SINGER:  My name is Matt Singer, I'm an
19  attorney for the defendants in this lawsuit.
20       MR. WALLERI:  Mike Walleri for the plaintiffs.
21       THE VIDEOGRAPHER:  Will the court reporter
22  please swear in the witness.
23       (Witness sworn.)
24  ///
25  ///

1 (Pages 1 to 4)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit A
Page 1 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 2 of 11

Deposition of Todd Schlumbohm
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

**Page 9**

1  A.  In Fairbanks.
2  Q.  You were driving your vehicle?
3  A.  I was.
4  Q.  What was your blood alcohol?
5  A.  I cannot recall that.
6  Q.  Were you taken into custody when you were
7  arrested?
8  A.  I was.
9  Q.  Did you spend time in jail?
10 A.  I did.
11 Q.  How much time?
12 A.  72 hours.
13 Q.  And there was a conviction?
14 A.  That one was, yes.
15 Q.  And the 72 hours was part of the penalty?
16 A.  Yes.
17 Q.  Is there -- were there other penalties?
18 A.  I know there was a fine and a license
19 revocation.
20 Q.  And then there was an Assault IV charge?
21 A.  There was.
22 Q.  When did that occur?
23 A.  Whew.  I want to say that was in '92.
24 Q.  And what were the circumstances under which --
25 A.  Me and my girlfriend were in an argument.  She

**Page 10**

1  called the police.  The police came, arrested both of
2  us.
3  Q.  What happened with that charge?
4  A.  Nothing.  I -- I went to jail, bailed out, and
5  never heard anything else about it.
6  Q.  Were you convicted?
7  A.  No.
8  Q.  Charges were not -- the DA did not prosecute
9  you?
10 A.  No.  The charges were not filed.
11 Q.  Where did that -- where were you arrested for
12 the Assault IV?
13 A.  That was in Klamath Falls, Oregon.
14 Q.  Are you originally from Oregon?
15 A.  I am.
16 Q.  Klamath Falls?
17 A.  Yes.
18 Q.  And what's your educational background?
19 A.  Educational background is 12 years of high
20 school, I've been through accredited college at TVC
21 through law enforcement academy.
22 Q.  Anything else?
23 A.  I've been through some classes while I worked
24 at the high school.  There was some peer mediation
25 involved.  There was -- there was another class was

**Page 11**

1  drug identification and symptoms of people being on
2  drugs.
3  Q.  Did you graduate from high school in Klamath
4  Falls?
5  A.  I did.
6  Q.  How did you come to Alaska?
7  A.  I flew up here.  A friend of mine moved up
8  here, and he loved to hunt and fish, as well as I did,
9  and that's why I came up.
10 Q.  What was your friend's name?
11 A.  Pat.
12 Q.  What's his last name?
13 A.  Kaiser.
14 Q.  What year did you move to Alaska?
15 A.  I came up in '94, I went back for a little
16 bit, and then moved back up.
17 Q.  What did you do for work when you came here?
18 A.  I worked at the Fairbanks Sand & Gravel, I
19 believe, was my first -- no, my first job was at
20 University of Fairbanks.
21 Q.  Doing what?
22 A.  It was a dishwasher at first, and then I was
23 in charge of the espresso machine.
24 Q.  And when did you go to the Tanana Valley
25 campus for the police academy?

**Page 12**

1  A.  I graduated in 2002, the fall of 2002.
2  Q.  Prior to that had you had any law enforcement
3  experience?
4  A.  No law enforcement experience.
5  Q.  Security guard experience?
6  A.  At the high school.
7  Q.  When did you first work for the high school?
8  A.  That was in 19 -- '98, '99, I believe.
9  Q.  How long did you work for the high school?
10 A.  I believe it was four years there.  And during
11 that time was when I started going to the police
12 academy.
13 Q.  Were you employed by the school while you went
14 to the police academy?
15 A.  Yes.  I took a leave of absence.
16 Q.  And did you graduate from the police academy?
17 A.  I did.
18 Q.  Receive a certificate for your graduation?
19 A.  Yes, I did.
20 Q.  And how long after you graduated from the
21 police academy did you obtain a job in law enforcement?
22 A.  Let's see.  That was about six months.
23 Q.  What was that job?
24 A.  Working in the City of Fort Yukon.
25 Q.  When was that, do you recall?

3 (Pages 9 to 12)

Heartland Court Reporters
Carol A. McCue, RMR     E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit A
Page 2 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 3 of 11

Deposition of Todd Schlumbohm  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 33

1  A.  That's a good question. I want to say roughly
2  a year. Somewhere right around a year.
3  Q.  In your interrogatory response you said that
4  you worked there from May 5th, 2004, through
5  October 22nd, 2005; is that right?
6  A.  Yeah, like I said, I'll have to check the
7  paperwork I got.
8  Q.  A year -- almost a year and a half?
9  A.  That very well could be, so...
10 Q.  And what was your job there?
11 A.  I was a merchandiser.
12 Q.  Now, at any time after leaving Fort Yukon, did
13 you seek employment with other police agencies?
14 A.  No, I did not.
15 Q.  Why not?
16 A.  I knew I was involved in this case, and I
17 didn't want to go through the harassment of other
18 police departments going through all this again because
19 if they ask you if you've been involved in a lawsuit,
20 the answer is yes.
21 Q.  Well, certainly, you didn't file a lawsuit
22 immediately, did you?
23 A.  I believe it was already started. I don't
24 know exact dates.
25 Q.  So did you -- when you -- when you resigned,

### Page 34

1  did you know you were going to file a lawsuit?
2  A.  Not at that exact time, no.
3  Q.  But you didn't look for work with other police
4  agencies, is that --
5  A.  I had looked at some on the website that were
6  not hiring at that time. There was people, agencies
7  outside of Fairbanks which I'm not moving from
8  Fairbanks. So I didn't apply.
9  Q.  At any time after leaving employment with the
10 City of Fort Yukon, have you sought a position in law
11 enforcement?
12 A.  I applied for Alaska State Troopers, the
13 judicial services.
14 Q.  What came of those -- that application?
15 A.  I applied for that application, got called for
16 a physical fitness test. I called the hiring agency
17 and told her that -- or asked her if it was a waste of
18 my time or their time if I apply with having two DUIs.
19     She says, no, we allow troopers to have two
20 DWIs. So I went through with it. I went to the PT, I
21 failed the PT test.
22 Q.  Failed the physical test?
23 A.  Yes.
24 Q.  Have you tried again?
25 A.  I have not. I've been asked numerous times to

### Page 35

1  apply with the Fairbanks Police, and my -- my response
2  is I will apply this winter, hoping that this is
3  resolved.
4  Q.  Are you also waiting until you have 10 years
5  behind you with the two DUIs?
6  A.  I believe that's already up.
7  Q.  You now have 10 years since your last DUI?
8  A.  That's correct.
9  Q.  You understand that that -- that 10-year
10 period without a DUI now makes you eligible to work for
11 Fairbanks Police Department?
12 A.  I believe that I was eligible before, but my
13 understanding was it would be the chief's decision.
14 Q.  Again, that's based on what Reggie Fleming
15 told you?
16 A.  Yes.
17 Q.  Not anything that Fairbanks Police Department
18 told you?
19 A.  No.
20 Q.  And it's different than the result you
21 obtained in Bethel, right?
22 A.  Yes.
23 Q.  What -- what were you paid by Alaska
24 Distributors?
25 A.  I would say it was started at 10.50, I

### Page 36

1  believe, may have ended about 12.50, somewhere in
2  there.
3  Q.  And why did you leave that job?
4  A.  Well, I had this job downtown and I -- and in
5  my field, and it paid more money, which I needed to
6  make up for the gap that I had lost in Fort Yukon.
7  Q.  In your interrogatory, you said that after
8  leaving Alaska Distributors, you went to work at
9  Lathrop High School?
10 A.  I did work there for a short time, yes, I
11 think that was three -- three months.
12 Q.  Your answer doesn't make sense.
13 A.  Six months.
14 Q.  It says you worked October 25th, 2005, through
15 March 18th, 2005.
16 A.  At?
17 Q.  At Lathrop High School?
18 A.  Yeah, it was just a short time.
19 Q.  But October 2005, you would agree, is after
20 March 2005, right?
21 A.  Yes.
22 Q.  So that doesn't -- those aren't the proper
23 dates, are they?
24 A.  Let me see what we're looking at here.
25 Q.  Look at Number 3.

9 (Pages 33 to 36)

Heartland Court Reporters  
Carol A. McCue, RMR  
E-mail: carol.mccue@acsalaska.net  
Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 3 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 4 of 11

Deposition of Todd Schlumbohm
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 41

1  you, right?
2  A. That's correct.
3  Q. And the lawsuit hasn't prevented him from
4  being employed?
5  A. It's had a -- well, that's correct. But I
6  know there was a big -- there was an ordeal about it
7  and they brought it up and did some investigations.
8  Q. But in fact -- point of fact, as far as you
9  know, it hasn't prevented his employment?
10 A. That's correct.
11 Q. And Dave McKillican, do you know him?
12 A. I do.
13 Q. He's involved -- he's employed in law
14 enforcement, right?
15 A. Yes, he is.
16 Q. Also in the same lawsuit as you, right?
17 A. That's correct.
18 Q. In fact, he's had a couple different law
19 enforcement jobs since leaving Fort Yukon; isn't that
20 right?
21 A. Yeah, he did.
22 Q. And doesn't appear --
23 A. That's the difference between me and them two
24 guys. I prefer to get this behind me than to jump into
25 something else and have to discuss the whole thing

Page 42

1  again.
2  Q. A personal choice on your part?
3  A. That is correct.
4  Q. And City of Fort Yukon isn't preventing you
5  from pursuing a law enforcement job?
6  A. No. They're not at this time, no.
7  Q. Neither is Fannie Carroll?
8  A. No. Just my personal choice.
9  Q. Your personal priority, decision to wait?
10 A. Right.
11 Q. You could earn more money in law enforcement,
12 couldn't you?
13 A. That's correct. Sure could.
14 Q. But you'd rather -- rather than earning more
15 money in law enforcement now, you'd rather wait so you
16 don't have to talk about it?
17 A. I'm making a decent enough salary to get
18 myself by.
19 Q. And what are you earning in Securitas?
20 A. Right now 16.61.
21 Q. And do you work overtime?
22 A. Very, very, very rarely.
23 Q. Once or twice a month?
24 A. Probably once or twice, maybe three, depends
25 on the situations that I am involved in towards the end

Page 43

1  of the shift.
2  Q. Other than the jobs we've discussed, have you
3  had any other employment since leaving Fort Yukon?
4  A. Two school districts, Alaska Distributors,
5  Securitas. I don't believe there was any other ones.
6  Q. Have you had any second jobs or do you have
7  any businesses on the side?
8  A. No.
9  Q. Each of the employers you've had since leaving
10 Fort Yukon, they provided you a W-2 form at the end of
11 the year?
12 A. Yes.
13 Q. Can you produce those W-2 forms to your
14 lawyer?
15 A. They are getting them tomorrow.
16 Q. And those accurately depict your income, as
17 far as you know?
18 A. Yes.
19 Q. And do you file tax returns every year?
20 A. Sure.
21 Q. Why did you resign from your job at the police
22 department in Fort Yukon?
23 A. I re -- I resigned from Fort Yukon because, to
24 put it bluntly, it was either get fired or resign.
25 Q. And why did -- why did you reach that

Page 44

1  conclusion?
2  A. That's what was offered to me.
3  Q. And who offered that to you?
4  A. Fannie Carroll and Greg Russell.
5  Q. Was this in a particular conversation?
6  A. Between me and Fannie, yes, and Greg Russell
7  had entered the room in private between them two and
8  discussed whatever they discussed, and he would come
9  back and talk to me, then I would go in there, and it
10 was just back and forth.
11     At that time -- the last time he entered the
12 room he came back and he says, she's probably going to
13 offer you to resign or be fired. And she did. And I
14 resigned at that time.
15 Q. Now, when was this, do you remember?
16 A. February of '04, about the 16th or so, 17th.
17 Q. So all of this occurred on the same day that
18 you resigned --
19 A. Yes.
20 Q. -- February 16th --
21 A. Yes.
22 Q. -- 2004?
23 A. (Witness nods head.)
24 Q. Who was present when you resigned?
25 A. The acting chief, J.R. Wallace, Chris DeLeon,

11 (Pages 41 to 44)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit A
Page 4 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 5 of 11

Deposition of Todd Schlumbohm                              Fleming, et al., vs. Carroll, et al.
Taken August 17, 2006                                      Case No. 4:04-cv-00034-RRB

### Page 45

1  myself, and Greg Russell.
2       Q.   And was -- Reggie Fleming was in town, as
3  well; is that right?
4       A.   He was not at Fort Yukon during this.
5       Q.   On that day, did you converse with Greg
6  Russell about your prior DUIs and your eligibility for
7  certification with the Alaska --
8       A.   We did bring that up, yes.
9       Q.   What do you recall of that conversation?
10      A.   He asked me -- he had his laptop, he went
11 down, and he said the safety -- the APSC regulations,
12 do you meet these, as he read them off.  And when he
13 said two or more DUIs in 10 years, I said, no.
14      Q.   And so Greg Russell showed you the Alaska
15 Police Standard Council regulations?
16      A.   Yeah, he read them to me.
17      Q.   And -- and you said you didn't meet one of
18 those regulations?
19      A.   That's correct.
20      Q.   And what did he say to you, do you recall?
21      A.   He said, why do you think you would be
22 employed as a police officer if you don't meet this
23 regulation?  And I said, well, it was my assumption
24 that it was up to the chief to make that decision.
25      Q.   What do you recall Mr. Russell telling you

### Page 46

1  then?
2       A.   Afterwards, I don't remember what he said.
3       Q.   Do you remember telling -- did he tell you
4  that Chief Fleming had done you a disservice?
5       A.   No, I don't.
6       Q.   Was Chief Fleming in the room, do you
7  remember?
8       A.   No, he was not.
9       Q.   So in part of this discussion about your
10 continued employment, you learned, really for the first
11 time, that the regulations prohibited employment of an
12 officer with more than two DUIs?
13      A.   Yeah.  And I had read those.
14           MR. WALLERI:  Objection as to form.  Go ahead.
15           THE WITNESS:  Yeah.  And I had read those.  I
16 mean, I looked on the computer, I pulled up APSC, I
17 read them all.  But I was told it would be up to the
18 chief of police to make that decision.
19 BY MR. SINGER:
20      Q.   Greg Russell indicated otherwise to you?
21      A.   He didn't say that -- whether Reggie could
22 hire me or not.  That was never -- that was never
23 brought up, that I remember.
24      Q.   Wasn't Fannie Carroll in the room for this
25 conversation?

### Page 47

1       A.   No, she was not.
2       Q.   What were the reasons that you believed you
3  were going to be terminated if you did not resign?
4       A.   That was told to me by Greg Russell.
5       Q.   What -- what was the reason?
6       A.   I don't believe there was a reason.  He
7  said -- oh, there had been some personnel files, I was
8  on probation for that.  And that was an issue with
9  Fannie Carroll.
10           And when I returned the files, she
11 stated that -- or I told her that I did not take these
12 files to deprive or, you know, mislead anybody.
13      Q.   Tell me then about the -- your removal of the
14 personnel files.
15      A.   One afternoon I was in the police department,
16 she came in, she said she was going to Fairbanks to
17 talk with her attorneys, the city attorneys, and she
18 gave me a letter stating that she wanted 911 evidence
19 tapes, case -- case files and personnel files.
20           I thought it was kind of odd that she would
21 want these tapes and personnel files.  It stated on
22 there that I could get further permission if I felt I
23 needed to, and I felt that I needed to.
24           I called Chief Fleming and got told to secure
25 the files.  I called Captain Tanner with -- he's a

### Page 48

1  retired captain from the State Troopers, told him the
2  situation, he says, if Reggie's your boss, then that's
3  what you need to do.  So I boxed up the files and
4  secured them.
5       Q.   What -- you say Fannie Carroll gave you a
6  letter?
7       A.   She did.
8       Q.   What did you do with the letter?
9       A.   I've still got it.
10      Q.   Have you produced it to your lawyer?
11      A.   I have.
12      Q.   Has he produced it in this litigation?
13      A.   I haven't seen it, no.
14      Q.   Do you know why it hasn't been produced?
15      A.   No, I don't.
16           MR. WALLERI:  Objection.  Assumes facts not in
17 evidence.  You're assuming that it has not been
18 produced.
19 BY MR. SINGER:
20      Q.   If it -- you don't -- you don't have any
21 knowledge one way or the other if it's been produced;
22 is that your testimony?
23      A.   I don't know.
24      Q.   Tell me, then, what is it -- what is it that
25 you did to secure these files?

12 (Pages 45 to 48)

Heartland Court Reporters                                           Telephone: 907-452-6727
Carol A. McCue, RMR          E-mail: carol.mccue@acsalaska.net      Fax: 907-488-7701

Exhibit A
Page 5 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 6 of 11

Deposition of Todd Schlumbohm                            Fleming, et al., vs. Carroll, et al.
Taken August 17, 2006                                    Case No. 4:04-cv-00034-RRB

## Page 49

1  A.  The best I could, I had a -- there was a box I
2  taped. I took the box to our residence, which was
3  placed in my bedroom that only I stayed in. The next
4  morning we flew to Fairbanks and I had the files with
5  me at my residence. And that's what I was told to do
6  with them, just keep them secured.
7  Q.  Well, let me -- let me understand. Did Reggie
8  Fleming instruct you to take the files and bring them
9  to Fairbanks?
10 A.  That's correct.
11 Q.  So that's -- when he told you to secure them,
12 he specifically instructed you, get the personnel files
13 and bring them to me in Fairbanks?
14 A.  He didn't say, bring them to me in Fairbanks.
15 Q.  What did he say?
16 A.  He said secure them, and that was the best
17 that I could secure them.
18 Q.  The best you could secure them was to tape
19 them up and take them --
20 A.  Keep them in my possession, yes.
21 Q.  Now, they weren't in your possession when you
22 got on the plane, correct, you checked them as luggage?
23 A.  They were still in the same area as I was
24 because Warbelow's flies your cargo behind you.
25 Q.  Right. And there's an evidence locker at the

## Page 50

1  police department?
2  A.  There is.
3  Q.  You didn't put them in there?
4  A.  No.
5  Q.  You didn't put them under a lock and key?
6  A.  No, I did not.
7  Q.  You took -- now, what -- isn't it true that
8  the -- what you -- what you removed was one box, right?
9  A.  That is correct.
10 Q.  And that box was the personnel files for the
11 police department?
12 A.  That is correct.
13 Q.  Not 911 evidence tapes?
14 A.  No.
15 Q.  Not case files?
16 A.  Nope.
17 Q.  You didn't secure those?
18 A.  Those were in their own locker inside the
19 police department.
20 Q.  So there was a secure locker within the police
21 department?
22 A.  There's an evidence locker that is secured --
23 Q.  And it was secured?
24 A.  -- with a lock.
25 Q.  And so you felt you were complying with your

## Page 51

1  chief's direct order to secure these documents and
2  evidence by leaving them secure in the police
3  department?
4  A.  No, I brought them back with me.
5  Q.  As to the -- but there -- you said there were
6  three items, the 911 evidence tapes, right?
7  A.  Those are just what she requested, not what I
8  had taken.
9  Q.  So did Reggie Fleming tell you only to secure
10 the personnel files?
11 A.  Yeah. And he said don't -- and do not give
12 her the tapes.
13 Q.  Did he tell you to secure the tapes with the
14 case files?
15 A.  I didn't know where the tapes were that she
16 was looking for.
17 Q.  And what about the case files?
18 A.  The case files were in the same drawer that
19 they had always been put in.
20 Q.  Under lock?
21 A.  I don't believe those were locked.
22 Q.  So you weren't concerned about securing -- or
23 you took no action to secure 911 evidence tapes or case
24 files?
25 A.  The tapes were in the police department and

## Page 52

1  they were in a pull-out drawer. That's where all of
2  our evidence tapes were --
3  Q.  So you took --
4  A.  -- were put.
5  Q.  -- so you took no action to secure the
6  911 evidence tapes?
7  A.  Those, I did not bring with me.
8  Q.  Or -- you didn't do anything to secure the
9  911 evidence tapes?
10 A.  I didn't. I didn't.
11 Q.  Nor did you do anything to secure case files?
12 A.  Case files, no.
13 Q.  The thing -- the thing that you decided to
14 secure was the personnel files?
15 A.  That's what I was told to do.
16 Q.  By Reggie Fleming?
17 A.  That's correct.
18 Q.  Did he tell you not to bother with the
19 911 tapes and --
20 A.  Did not.
21 Q.  -- case files?
22 A.  Did not.
23 Q.  And so --
24 A.  What he told me was don't give her any of the
25 tapes. Take the personnel files and get them out of

13 (Pages 49 to 52)

Heartland Court Reporters                         Telephone: 907-452-6727
Carol A. McCue, RMR         E-mail: carol.mccue@acsalaska.net    Fax: 907-488-7701

Exhibit A
Page 6 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 7 of 11

Deposition of Todd Schlumbohm  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

## Page 53

1  there and secure them.
2      Q.   Did he tell you why?
3      A.   He did not tell me why.
4      Q.   So -- so Reggie Fleming instructed you not to
5  give the city manager the police department's personnel
6  files?
7      A.   That's correct.
8      Q.   And to bring them to -- to Fairbanks?
9      A.   He didn't say bring them to Fairbanks, he said
10 secure them.
11     Q.   And so it was your decision to bring them to
12 Fairbanks?
13     A.   My decision was I would keep them in my
14 possession.
15     Q.   So you took them to your house in Fairbanks?
16     A.   That's correct.
17     Q.   And how did you contact Reggie Fleming with
18 regard to these files?
19     A.   By phone.
20     Q.   When did you call him?
21     A.   As soon as I got the letter, probably within a
22 half hour after the letter.
23     Q.   Did you call him when you got to Fairbanks?
24     A.   I believe so.
25     Q.   And did you meet with him?

## Page 54

1      A.   I don't recall meeting with him.
2      Q.   Did he meet you at the airport?
3      A.   It's very possible.
4      Q.   Reggie Fleming met you at the airport and you
5  had the personnel files with you?
6      A.   No.  I do remember a phone call.  Yeah, Reggie
7  very well could have been there.  I -- he could have
8  been there.  I don't know.  I can't remember exactly if
9  he was there.  There was a few times we've met there.
10     Q.   And did you transfer custody of the personnel
11 files to the chief?
12     A.   No, I did not.
13     Q.   Did you -- did he look at them?
14     A.   No.
15     Q.   What happened to the files next?
16     A.   They were put in my vehicle and transported to
17 my house.
18     Q.   What did you do with them when you got to your
19 house?
20     A.   They were put in the closet in my bedroom.
21     Q.   The closet of your bedroom?
22     A.   Uh-hum.
23     Q.   That's the secure place you took them?
24     A.   That's correct.
25     Q.   Were they locked there?

## Page 55

1      A.   No.
2      Q.   In any of your law enforcement training at the
3  police academy were you ever instructed that the proper
4  place to secure evidence or items of import was your
5  closet at home?
6      A.   No.
7      Q.   And did Reggie Fleming tell you to take these
8  personnel files to your closet at home?
9      A.   Not that specific spot, no, but I felt that
10 was probably a good spot.
11     Q.   Okay.  Now, how did they make -- these files
12 make their way back to --
13     A.   I transported them back myself.
14     Q.   Okay.  Did you -- did you meet with Reggie
15 Fleming before transporting them back?
16     A.   I don't recall meeting with Reggie, no.
17     Q.   Did you look in the files to see if they were
18 complete?
19     A.   I did not look through the files.
20     Q.   Did you look at your file?
21     A.   I did not look at my file.
22     Q.   Your testimony is you didn't look at your own
23 personal file?
24     A.   I had looked at it previous, I didn't need to
25 look at it.

## Page 56

1      Q.   Where was the personnel file in the police
2  department before you removed it?
3      A.   It was in the desk, the main desk, I guess the
4  chief's desk, and then there's the bottom drawer there.
5      Q.   So then you -- you decided to take the
6  personnel files back to Fort Yukon?
7      A.   Uh-hum.
8      Q.   Yes?
9      A.   That's correct.
10     Q.   Had you been contacted by the State Troopers?
11     A.   No, I had not.
12     Q.   Had you ever been contacted by the State
13 Troopers regarding your removal of personnel files?
14     A.   Never.
15     Q.   Had you been contacted by Greg Russell?
16     A.   No, I have not.
17     Q.   Had you been contacted by anyone with
18 instructions to return those files to Fort Yukon by
19 anyone?
20     A.   By Fannie Carroll.
21     Q.   What did she say to you?
22     A.   It was a letter that was served to me stating
23 that I was on probation for, what do they call that,
24 not doing what she asked, and removing the personnel
25 files.  And she stated also in there that I had removed

14 (Pages 53 to 56)

Heartland Court Reporters  
Carol A. McCue, RMR           E-mail: carol.mccue@acsalaska.net

Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 7 of 11

Case 4:04-cv-00034-RRB    Document 103-3    Filed 09/13/2006    Page 8 of 11

Deposition of Todd Schlumbohm  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 61

```
 1   A.   My recollection was that he was still the
 2   chief at that time. And I had verified with Fleming
 3   that he was still the chief. And he stated yes.
 4   Q.   Well, let me just try and understand all the
 5   trips back and forth between Fort Yukon and Fairbanks.
 6   A.   Yeah, there was plenty.
 7   Q.   How many were there between the day when you
 8   removed the files and flew to Fort Yukon and the day
 9   you resigned?
10   A.   The day I removed them I was back here for my
11   week. Went back after my week and I -- I returned the
12   files, and that's -- that was it. That was the only
13   one flight.
14   Q.   Okay. So -- and isn't it so that the
15   instructions from Fannie Carroll to return the files
16   came after your promotion?
17   A.   That's correct.
18   Q.   I want to just have a time line here for
19   myself. There's the day when you removed the files?
20   A.   Yes.
21   Q.   And the same day you flew, right, Fleming
22   tells you to secure the files?
23   A.   Yeah. It was the next day that I flew, I
24   believe.
25   Q.   Next day. Second day after that you fly to
```

### Page 62

```
 1   Fairbanks. Right?
 2   A.   I believe so.
 3   Q.   You say you're there for a whole week?
 4   A.   I believe I was in town for a whole week.
 5   Q.   And then you fly back to Fort Yukon?
 6   A.   Correct.
 7   Q.   And you have the personnel files with you?
 8   A.   That's correct.
 9   Q.   And then how soon after that did you resign?
10   A.   I believe it was the same day.
11   Q.   Now, your testimony is that you learned
12   Reggie Fleming had been terminated while you were in
13   Fort Yukon?
14   A.   Yeah, there -- I knew something was -- was
15   happening, I wasn't sure what it was happening. Reggie
16   was not in Fort Yukon. The city manager was not in
17   Fort Yukon. I was unsure whether or not he was
18   still -- I mean, if he was fired or if he was the
19   chief. That's why had I called him. He said if he was
20   the chief. And that is the time that he told me to
21   take the files and secure them.
22   Q.   Your testimony is also that you received
23   notice that he had been terminated, you read a letter,
24   right?
25   A.   That's correct.
```

### Page 63

```
 1   Q.   And that you were promoted?
 2   A.   That's correct.
 3   Q.   And you were in Fort Yukon when you received
 4   that notice?
 5   A.   Uh-hum.
 6   Q.   Right?
 7   A.   Sure. Yes.
 8   Q.   So you received that notice before you got on
 9   the plane to Fairbanks?
10   A.   Yes, I believe so.
11   Q.   Before you got on the plane to Fairbanks --
12   A.   Yeah.
13   Q.   -- with the personnel records?
14   A.   Uh-hum.
15   Q.   Yes?
16   A.   Yes.
17   Q.   So at the time you got on the plane to
18   Fairbanks, you knew Reggie Fleming was no longer your
19   chief?
20   A.   It was a letter. I didn't know whether it was
21   true or not. That's why I had called and asked him, he
22   said, yes, I'm still the chief.
23   Q.   The letter was from whom?
24   A.   I think it was -- was it a attorney? Some
25   attorney or something. I can't remember their attorney
```

### Page 64

```
 1   at the time.
 2   Q.   So you took Reggie Fleming's word that he was
 3   chief over the letter from the city attorney who --
 4   indicating that Reggie Fleming had been terminated?
 5   A.   Yeah. He said he had not seen a letter. He
 6   said I'm still the chief, I have not got any letter
 7   from anybody.
 8   Q.   So again, what -- what is it -- what are the
 9   reasons as you understand why the city was going to
10   terminate you if you didn't resign?
11   A.   For insubordination.
12   Q.   Specifically with regard to removal of the
13   personnel files?
14   A.   Yeah.
15   Q.   You had a suspended driver's license at the
16   end of 2003; isn't that right?
17   A.   End of 2003? No, I think that was in '04.
18   Q.   Well, it was before you were terminated -- or
19   before you resigned?
20   A.   It was before. I was still up there. I was
21   still in Fort Yukon when that happened, yes.
22   Q.   And how -- how was your driver's license
23   suspended?
24   A.   I had gotten in an accident.
25   Q.   When?
```

16 (Pages 61 to 64)

Heartland Court Reporters  
Carol A. McCue, RMR  
E-mail: carol.mccue@acsalaska.net  
Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 8 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 9 of 11

Deposition of Todd Schlumbohm  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 65

1   A.   Right here leaving the District Attorney's
2   Office on Fourth Avenue.
3   Q.   Why were you -- why was your license suspended
4   as the result of an accident?
5   A.   There was no insurance on my vehicle at the
6   time.  I had discussed with my wife while I was in
7   Fort Yukon, my truck is seasonal, can you put insurance
8   on it before I get back this week because that was -- I
9   needed insurance on it to use it.
10  Q.   How long was your driver's license suspension?
11  A.   I think it was 30 days, I can't remember
12  offhand.
13  Q.   Were you placed on leave by Fort Yukon during
14  that 30-day period?
15  A.   I was not.
16  Q.   You continued to work for Fort Yukon?
17  A.   (Witness nods head.)
18  Q.   Yes?
19  A.   Yes.
20  Q.   In fact, continued to patrol.
21  A.   Yeah.
22  Q.   Continued to drive Fort Yukon police vehicles.
23  A.   Uh-hum.
24  Q.   Yes?
25  A.   Yes.

### Page 66

1   Q.   And Reggie Fleming knew you were -- you were
2   working on a suspended license?
3   A.   Yeah.  He had issued me a city card.  He did
4   it.  The city had something set up to where they could
5   issue permits or something.
6   Q.   So Reggie Fleming said, I'll take care of it
7   and gave you a city permit?
8   A.   That's correct.
9   Q.   He was very accommodating of you, wasn't he?
10  A.   Sure.
11  Q.   He wanted to hire you despite your
12  DUI arrests, right?
13  A.   (Witness nods head.)
14  Q.   Yes?
15  A.   Yeah.
16  Q.   And willing to look the other way with a
17  suspended license?
18  A.   He didn't actually look the other way, I mean,
19  it was kind of, hey, you screwed up here, it's -- you
20  need to -- you need to get this taken care of.  He just
21  said, you can continue working up here, but he said,
22  limit driving, obviously, which I did, which was nice,
23  I could do my reports, but he said, we'll get a city
24  permit for you.
25  Q.   But, in fact, you did drive the vehicle on

### Page 67

1   a -- while you had a suspended --
2   A.   In Fort Yukon, yes.
3   Q.   You drove the Fort Yukon police vehicle while
4   your driving privileges with the State of Alaska were
5   suspended?
6   A.   For the state, yes.
7   Q.   Do you know whether there are any laws or
8   regulations that permit a city police chief to give a
9   city driving permit to someone who has a suspended
10  state driver's license?
11  A.   I don't know.
12  Q.   You just took Reggie Fleming at his word on
13  that?
14  A.   I did, yeah.
15       MR. SINGER:  Let's take a break.  We've been
16  going an hour.  We will go off record.
17       THE VIDEOGRAPHER:  Going off record, the time
18  is 2:50 p.m.
19       (Off record, recess from
20       2:50 p.m. to 2:59 p.m.)
21       THE VIDEOGRAPHER:  Go back on record, the time
22  is 2:59 p.m.
23  BY MR. SINGER:
24  Q.   Do you -- do you know why Reggie Fleming was
25  terminated?

### Page 68

1   A.   No, actually, I don't know the final outcome
2   of why he was terminated.
3   Q.   Do you have any -- were you told any reasons?
4   A.   Not -- not -- no specific reasons, no.  I
5   really don't know why he was fired.
6   Q.   So you don't know if the -- what the city
7   manager's motivations were one way or the other for --
8   for firing Reggie Fleming, she didn't tell you?
9   A.   No.  But it was that she didn't like one of
10  the actions of DeLeon, and she was very irritated that
11  Fleming had not fired him, and so she -- I'm guessing
12  that she fired Reggie so she could fire Chris.  I...
13  Q.   What was the action of DeLeon that you think
14  the city manager didn't like?
15  A.   He was wanting to discuss something about his
16  character of -- that this -- they had a petition out.
17  Q.   Were -- were you present at that meeting?
18  A.   I was present, yeah.  Me and Reggie and Chris.
19  Q.   And the meeting was -- it was in the city
20  council conference room, right?
21  A.   Yeah, they had called the city council
22  meeting, but there was only maybe half the city council
23  members were present.
24  Q.   And they proceeded with a meeting about
25  community policing, correct?

17 (Pages 65 to 68)

Heartland Court Reporters  
Carol A. McCue, RMR  
E-mail: carol.mccue@acsalaska.net  
Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 9 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 10 of 11

Deposition of Todd Schlumbohm  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 69

1  A.  I don't know what the meeting was about. I've
2  been to a lot of city council meetings, you know.
3  Q.  And Chris DeLeon launched into discussion
4  about his character and this petition?
5  A.  Yeah. He -- he had wanted to discuss that.
6  Q.  Got a little heated?
7  A.  I suppose you could say a little heated.
8  Not -- he wasn't angry, but I could tell he was
9  agitated that they wouldn't let him speak about that.
10 Or the city manager wouldn't let him speak about that.
11  Q.  Well, actually, Reggie Fleming took him out of
12 the room?
13  A.  Yeah.
14  Q.  And you weren't privy to that conversation,
15 were you?
16  A.  No, I stayed in the city council meeting.
17  Q.  Now, did you believe it was wrong for the city
18 to tell you -- it's your testimony that Fannie Carroll
19 told you you could resign or you would be terminated?
20  A.  That's correct.
21  Q.  Do you believe that was wrong?
22  A.  It really shocked me. I mean, I had good
23 working relationships with Fannie. I had never been
24 written up for anything. Not that I believed and liked
25 everything she had discussed with me and told me, but I

### Page 70

1  had tried to do my best to get along with everybody so
2  I can continue my employment there.
3  Q.  So you may -- you didn't agree with everything
4  Fannie Carroll told you --
5  A.  No.
6  Q.  -- but -- but you were satisfied with the
7  working conditions up until the day of your
8  resignation?
9  A.  Well, not -- no, I wasn't satisfied with the
10 working conditions, but this -- I -- like I said, I
11 tried to get along with everybody the best I could.
12 But...
13  Q.  Well, let me put it this way. Up until the
14 conversation you had with Fannie Carroll on
15 February 16th, 2003, had you planned to continue your
16 employment with Fort Yukon?
17  A.  I could have -- I could have continued, yes.
18  Q.  And so the conditions were tolerable?
19  A.  Being at that time we were going to try to
20 hire on some more officers, so we could limit our time
21 that we had to put out.
22  Q.  And so specifically the reason that you
23 resigned is because of your conversation with Fannie
24 Carroll, and Greg Russell participated to some degree,
25 on February 16th, 2004?

### Page 71

1  A.  That was the final ending, yes.
2  Q.  That was the reason why you --
3  A.  Well, that's not the whole reason, that's what
4  crossed -- that was enough that I had -- I had had
5  enough at that time. It was better for me to leave.
6  Q.  What were the other reasons if that wasn't the
7  whole reason?
8  A.  Logging in 210 hours in a two-week period.
9  Somebody telling -- or Fannie was telling us not to
10 arrest on DV cases. That's -- that's my butt when I
11 don't arrest somebody on -- that I should arrest on a
12 domestic violence. I'm being told not to arrest them,
13 I do not agree with that.
14  Q.  But those other things you've just listed,
15 those, in and of themselves, were not enough to get you
16 to resign your position?
17  A.  I was going to try to stick it out a little
18 longer. I was trying to at least get my year in.
19  Q.  Why did you want to get a year in?
20  A.  So I could get a basic certification.
21  Q.  And that was because Reggie Fleming told you
22 you would get --
23  A.  After one year, yes, you would get a basic
24 certification.
25  Q.  So you saw it as a opportunity, as a stepping

### Page 72

1  stone --
2  A.  Yes.
3  Q.  -- to other law enforcement jobs?
4  A.  Yes.
5  Q.  Do you have any personal knowledge about why
6  the city terminated Christopher DeLeon?
7  A.  Other than after the meeting that he was
8  involved where Reggie had removed him from the -- from
9  the room. She had called -- we were all in the office
10 and Fannie had called and talked to Reggie, wanted him
11 released from his duty, wants him on probation. Reggie
12 denied that. Told her that he would send him home for
13 the rest of the night.
14      She then called back again later, Reggie
15 stated that she had said that she was afraid for her
16 safety because Chris DeLeon had a gun.
17  Q.  And so the city manager instructed the police
18 chief, as you understand it, to put DeLeon on
19 administrative leave?
20  A.  Uh-hum.
21  Q.  Right?
22  A.  That's correct.
23  Q.  And Chief Fleming hung up the phone and did
24 not put DeLeon on administrative leave?
25  A.  Did not. That was not the procedures of the

18 (Pages 69 to 72)

Heartland Court Reporters  
Carol A. McCue, RMR    E-mail: carol.mccue@acsalaska.net

Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 10 of 11

Case 4:04-cv-00034-RRB   Document 103-3   Filed 09/13/2006   Page 11 of 11

Deposition of Todd Schlumbohm  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 77

1   Q.   And there was a grievance procedure with --
2   contained within the Personnel Manual Handbook, right?
3   A.   Yeah. I'd have to look back through it to
4   see.
5   Q.   So you did not file a grievance on
6   February 16th, 2004?
7   A.   No, but I had asked Fannie Carroll during this
8   meeting, I asked her, wouldn't -- I thought that a
9   certain amount of city employee -- or city council
10  members had to be present.
11  Q.   For what?
12  A.   For the meeting that we were having. I
13  thought there had to be a certain amount of city
14  council members present for her to terminate.
15  Q.   Okay. But -- but in terms of did you -- did
16  you file any grievance regarding employment action?
17  A.   I don't believe so.
18  Q.   No?
19  A.   I don't believe so.
20  Q.   Did you submit a written grievance to the
21  city?
22  A.   For my --
23  Q.   For --
24  A.   -- my resignation.
25  Q.   Yeah.

### Page 78

1   A.   Yeah. I wrote a letter.
2   Q.   You wrote a letter saying you resign, right?
3   A.   That's correct.
4   Q.   And let's -- let's mark that as an exhibit
5   today.
6   A.   I got it approved by Mr. Russell.
7       MR. WALLERI: May I have a copy of that other
8   exhibit?
9       MR. SINGER: I gave you a copy earlier.
10      (Exhibit 1 marked.)
11      MR. SINGER: Is that 1?
12      THE REPORTER: Yes.
13  BY MR. SINGER:
14  Q.   Sir, you wrote this resignation letter?
15  A.   Yes, I typed it on a laptop in there.
16  Q.   These are your words?
17  A.   Yes. Those are my words.
18  Q.   And you wrote this on 16th of February 2004?
19  A.   Yes.
20  Q.   And you were paid by the city through that
21  day?
22  A.   I don't know if that day was paid or not,
23  but...
24  Q.   Now, so you voluntarily wrote this letter
25  and -- and you --

### Page 79

1   A.   Yeah. Greg Russell had told me to -- I told
2   him what -- what I write -- I've never wrote a letter,
3   just I said what I just put on there that I resign at
4   this date. He said, don't put personal reasons. And
5   then, obviously, he made me write in the 2004 that I
6   had forgot.
7   Q.   And so after you submitted this letter of
8   resignation, did you submit to the city a written
9   grievance?
10  A.   This is the only thing that I gave Fannie
11  Carroll.
12  Q.   Okay. You didn't, then, ask for a hearing,
13  for example?
14  A.   No. I only asked about the city council
15  members being present, and that was before this.
16  Q.   That was because of your belief that the city
17  council had to be present to terminate you?
18  A.   A certain amount of members, I thought, had to
19  be present before we were given the option to resign or
20  be terminated.
21  Q.   What was -- where did that belief come from?
22  A.   That's just -- I don't -- who knows.
23  Q.   Did a -- after they were terminated, did
24  Fleming and DeLeon come back to Fort Yukon?
25  A.   Me and DeLeon were -- after terminated, after

### Page 80

1   me and DeLeon went up on this date, and he was there,
2   and I don't -- I think Reggie may have came in later
3   this day.
4   Q.   So -- so you -- DeLeon had been fired while
5   you were in Fairbanks, right?
6   A.   I can't remember if he was in Fairbanks or
7   Fort Yukon, either one, Reggie or DeLeon.
8   Q.   And you guys -- you guys flew back from
9   Fairbanks to Fort Yukon --
10  A.   Yes.
11  Q.   -- on February 16th --
12  A.   Yes.
13  Q.   -- together?
14  A.   Yes.
15  Q.   And he was no longer a police officer?
16  A.   I -- I don't know if he was or not or if
17  that's why he came up because we knew that there was
18  going to be a city council meeting that night, we
19  wanted to attend the city council meeting. We were
20  refused to go to the city council meeting.
21  Q.   Why -- why did you refuse to go to the city
22  council meeting?
23  A.   We didn't refuse to, we were asked not to go
24  into the city council member by Greg Russell. He says,
25  you guys just hang out here. They went in, they went

20 (Pages 77 to 80)

Heartland Court Reporters  
Carol A. McCue, RMR          E-mail: carol.mccue@acsalaska.net

Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 11 of 11