IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER
DELEON, CHRIS HAMPTON, WILLIAM
D. MCKILLICAN, and TODD
SCHLUMBOHM,

      Plaintiffs,

-vs-

FANNIE CARROLL, and the CITY OF
FORT YUKON, ALASKA,

      Defendants.
_____/

Case No. F04-0034 CIV (RRB)




AUG 3 1 2006

DEPOSITION OF GREG RUSSELL

Pages 1 - 129 inclusive

August 16, 2006, 9:00 a.m.

Anchorage, Alaska

Page 1

Page 6

1  background for me?
2      A. How far back would you like me to go?
3      Q. Just after high school, how's that?
4      A. I graduated from high school in 1973 in Butte,
5  Montana. In 1974 I attended Montana Institute of the
6  Bible in Lewistown, Montana for four years. Graduated
7  with a Bachelor's degree in general Bible. I attended
8  the Municipal Police Academy in 1983 in Sitka. I've had
9  over a thousand hours of Alaska Police Standards Council
10 certified training, I'm a 1995 graduate of the FBI
11 National Academy in Quantico. In a thumbnail, that's
12 pretty much it.
13     Q. Okay. In terms of your work history, when --
14 could you kind of describe that for me, since you got out
15 of high school?
16     A. In 1977 after I got out of college I pastored a
17 church in Montana and I did that for three years. I also
18 worked summers on the Pipeline for various oilfield or
19 construction companies. In 1981 I went to work for the
20 Alaska State Troopers as a specialty commissioned trooper
21 working undercover narcotics. I did that for almost a
22 year as a narc. In 1982 I became a uniformed police
23 officer in Soldotna.
24         I attained rank in 1985 as a patrol sergeant.
25 And over the next almost 15 years, supervised patrol

Page 7

1  investigations, administration, property and evidence.
2  In 2000 I accepted a job as a chief of police in Kotzebue
3  and remained there until I retired in late fall of 2002.
4          In 2003 I formed my own consulting business as a
5  sole proprietorship. In 2006 it became an LLC, which is
6  Russell Consulting.
7      Q. And do you have a contract with the Municipal --
8      A. The Alaska Municipal League Joint Insurance
9  Association, AMLJIA, yes, I do.
10     Q. Could you describe that contract, what it's --
11 what are you contracted to do?
12     A. I provide consulting services. Working
13 predominantly, primarily with their law enforcement line
14 of police pool, the ones that they provide coverage. I
15 do new chief mentoring. I help with policy and
16 procedures. I help on recruiting of police personnel,
17 kind of a troubleshooter in agencies that work that way.
18         I also do on-site visits to help identify
19 potential problems and help avoid them if there is a
20 claim or something like that where my services may be of
21 value. And sometimes I'm sent in to assist in the
22 investigation or the resolution of some internal
23 problems.
24         I also am the program manager for the law
25 enforcement agency accreditation and that's supported by

Page 8

1  AMLJIA, help facility and arrange training in management
2  issues. I'm also a -- they support the skid car trainer.
3  I'm a master trainer for that to help other trainers get
4  certified.
5      Q. Do you have other contracts other than with the
6  Municipal League?
7      A. Yes, I do.
8      Q. Could you describe some of those?
9      A. In broad terms I do preemployment background
10 checks for some agencies, generally on the department
11 head or the executive level for the agencies. And that's
12 the city and boroughs.
13         I also do workplace investigations for other
14 non-AMLJIA members pertaining to various kinds of issues
15 that come up in the workplace.
16     Q. How much of your business is with the Municipal
17 League, would you say, what percentage?
18     A. The majority of it.
19     Q. Over 75 percent?
20     A. I'd say between 75 and 80 percent, yeah.
21     Q. And your familiarity or your association with
22 the City of Fort Yukon, could you describe when you first
23 became involved with the City of Fort Yukon?
24     A. That would have been in February of 2004.
25     Q. Did you have anything -- did you have anything

Page 9

1  to do with them before, between 2002 and 2004?
2      A. I misspoke, it was February of 2003, not 2004.
3      Q. Okay. And that was your first contact with the
4  City of Fort Yukon?
5      A. Yes.
6      Q. And could you describe that contact? I take it
7  that was with -- that had something to do with Officer
8  Hampton?
9      A. Right. That was my first contact with them.
10 I'd received a phone call from Kevin Smith who was the
11 executive director of AMLJIA. I had just come back from
12 a -- another on-site and he asked if I'd be available to
13 go up to Fort Yukon to assist with a sexual harassment
14 investigation or a complaint, to investigate it. I
15 agreed and I went.
16     Q. Could you tell me what -- could you basically
17 tell me what happened?
18     A. Yes, I flew in to Fort Yukon and met with the --
19 one of the dispatchers -- it was -- I conducted an
20 investigation to the allegation of sexual harassment in
21 the police department.
22     Q. And could you describe that investigation?
23     A. It consisted of getting what information was
24 available as far as the complaint, talking to the city
25 manager, talking to the dispatcher that raised the

Page 42

1  Q. Okay. And did you talk to Fannie Carroll prior
2  to going up?
3  A. I don't recall.
4  Q. And what was your understanding of your mission
5  to Fort Yukon at that time when you went up?
6  A. There was an officer, I think one officer left,
7  Officer Wallace. And -- or maybe there was two,
8  Schlumbohm, I think he may have been there, but was to
9  assist in the combing, the restructure, the organization,
10 see what would help by being there, get them back on
11 their feet.
12 Q. Why was that necessary?
13 A. Because Reggie and DeLeon had been fired and
14 there was just one officer there. And I believe that he
15 was probably the junior officer.
16 Q. That was Mr. Wallace, Officer Wallace?
17 A. Yeah.
18 Q. Okay. So tell us what happened when you arrived
19 in Fort Yukon.
20 A. Met with J.R., J.R. Wallace, found out -- tried
21 to assess what was going on, what were the issues and to
22 help him put in -- to function in his role as the police
23 in the community.
24 Q. Okay. So what did -- can you tell me about that
25 conversation or --

Page 43

1  A. What would you like to know?
2  Q. What was said.
3  A. I wish I had a recording to play that back for
4  you, because I -- I don't. I mean, that was --
5  Q. Just to your recollection.
6  A. I -- I don't even know where to begin. There
7  was the paperwork that needed to be filed with the Alaska
8  Police Standard Council regarding, I believe they called
9  it an F-4, regarding the officers that were no longer
10 there. We took a look at his policy and procedures
11 manual. I believe that was still outdated. Inventory
12 control, as far as property and evidence, kind of
13 measures that were there or not, just to get an idea, set
14 up a plan on how to recruit and select replacement
15 officers.
16 Q. In terms of personnel policy, can you tell me
17 about that? You said that the personnel policy needed to
18 be revised?
19 A. No, I didn't. I said the policy and procedures
20 manual.
21    The day-to-day operations of a police department
22 is regulated by policy and procedures manual. And as you
23 may or may not know, it should be a living document. It
24 should be reviewed and make sure that it applies to the
25 mission at hand. And the one that they were operating

Page 44

1  out of was old. Not to say that it wasn't adequate, it
2  just hadn't been revisited in a while. Needed to make
3  sure that it was brought up to date.
4     So I didn't make any mention at all to a
5  personnel manual, just the policy manual inside the
6  department.
7  Q. And you talked about inventory. What was all
8  that about?
9  A. One of the functions of the police department is
10 to take in property and make sure that it's accounted for
11 and that it's secured and there's a proper check-in and
12 check-out procedure. And, as I recall, the property
13 room -- not a property room, a property locker was
14 padlocked with a crossbar across it.
15    And I don't know -- I can't remember right now
16 if they'd had a -- a policy manual pertaining to the
17 property in evidence, and so that would be one of the
18 things that I'd be focusing on, make sure that J.R.
19 handled evidence properly.
20 Q. And do you know if Fannie Carroll had a key
21 or -- do you know if anybody had a key to the evidence
22 room other than the officers?
23 A. No, I do not know that.
24 Q. Do you know whether or not Fannie Carroll had
25 a --

Page 45

1  A. No, I do not know that.
2  Q. Do you know whether or not the Alaska State
3  Troopers got involved in the evidence room issue?
4  A. J.R. Wallace told me that they had.
5  Q. Can you tell me what they were told about that?
6  A. That, as I recall -- as I recall, they -- I
7  don't know if they were doing an audit or something, but
8  had put on a lock on -- on the crossbar, their own lock.
9  Q. The troopers basically did that?
10 A. Yes.
11 Q. Okay. Do you know why they did that?
12 A. No.
13 Q. Did you ask why they did that?
14 A. No.
15 Q. Weren't you curious why they did that?
16 A. No.
17 Q. Did you not want to know why they did that?
18 A. No.
19 Q. So you just -- the troopers just came up, put a
20 lock on, you never asked why they put a lock on it?
21 A. No.
22 Q. Is that standard procedure?
23 A. Is what standard procedure?
24 Q. The troop -- that troopers would put a lock on a
25 municipal evidence locker?