## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER )
DELEON, CHRIS HAMPTON, WILLIAM )
D. MCKILLICAN, and TODD )
SCHLUMBOHM, )
)
      Plaintiffs, )
)
vs. )
)
FANNIE CARROLL and the CITY )
OF FORT YUKON, ALASKA, )
)
      Defendants. )
_____)

Case 4:04-cv-00034-RRB

VIDEOTAPE DEPOSITION OF WILLIAM D. McKILLICAN
Taken Thursday, August 17, 2006
From the hour of 8:40 a.m. to 11:50 a.m.
Pages 1 through 141, inclusive
Volume 1
Taken by Counsel for Defendants
At
Offices of Heartland Court Reporters
100 Cushman Street, Suite 308
Fairbanks, Alaska 99701

Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

## Page 2

APPEARANCES

For Plaintiffs:
    MICHAEL J. WALLERI, ESQ.
    ATTORNEY AT LAW
    330 Wendell Street, Suite E
    Fairbanks, AK 99709
    907-452-4725

For Defendants:
    MATTHEW SINGER, ESQ.
    JERMAIN, DUNNAGAN & OWENS
    3000 A Street, Suite 300
    Anchorage, AK 99503
    907-563-7322

Witness:
    WILLIAM D. McKILLICAN
    August 17, 2006

Reported by:
    CAROL A. McCUE, RMR
    Heartland Court Reporters

BE IT KNOWN that the deposition of the above-named witness was taken this date in the foregoing action before Carol A. McCue, Registered Merit Reporter and Notary Public within and for the State of Alaska.

## Page 3

INDEX

WITNESS: WILLIAM D. McKILLICAN    August 17, 2006
EXAMINATION                                    Page
Direct Examination by Mr. Singer.....................5
Cross-Examination by Mr. Walleri...................122
Redirect Examination by Mr. Singer.................133

EXHIBITS

Exhibit No.                                  Page Marked
1:     28-page document, City of
      Fairbanks Payroll Change
      Form, with attachments....................19
2:     30-page document, City of
      Fort Yukon, Inc., Employee
      Personnel Manual Handbook 2001...........74
3:     1-page document, letter to
      The City Council from Sgt.
      William David McKillican
      dated 2/14/03............................89

## Page 4

PROCEEDINGS

1                P R O C E E D I N G S
2       (The following proceedings commenced
3   at 8:40 a.m., August 17, 2006.)
4       THE VIDEOGRAPHER: This is the videotape
5   deposition of William D. McKillican, taken by counsel
6   for the defendant, in the matter of Reginald Fleming,
7   Christopher DeLeon, Chris Hampton, William D.
8   McKillican, and Todd Schlumbohm, plaintiffs, versus
9   Fannie Carroll and the City of Fort Yukon, Alaska.
10  Today's date is Thursday, August 17, 2006, the time is
11  8:45 -- 8:40 a.m.
12       We're located at the offices of Heartland
13  Court Reporters, Fairbanks, Alaska. The court reporter
14  is Carol A. McCue and she's with the firm of Heartland
15  Court Reporters, 100 Cushman Street, Fairbanks, Alaska.
16  The videographer is Jay Gelber with the firm of Video
17  Services.
18       Will counsel please introduce themselves.
19       MR. SINGER: Good morning. My name is Matt
20  Singer, I'm an attorney for the defendants in this
21  matter.
22       MR. WALLERI: Michael Walleri on behalf of the
23  plaintiffs.
24       THE VIDEOGRAPHER: Will court reporter please
25  swear in the witness.

Heartland Court Reporters                                              Telephone: 907-452-6727
Carol A. McCue, RMR        E-mail: carol.mccue@acsalaska.net       Fax: 907-488-7701

Exhibit A
Page 1 of 5

Case 4:04-cv-00034-RRB   Document 105-3   Filed 09/13/2006   Page 2 of 5

Deposition of William D. McKillican
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

### Page 53

```
 1  police department?
 2      A.   Absolutely.
 3      Q.   What did you understand at the time of your
 4  hire regarding how the shifts were going to work?
 5      A.   I understood that it was a small department,
 6  that we were pretty much on call.  You know, it was --
 7  because of the number and the size of the community,
 8  you could be on -- you could be called out in the
 9  middle of the night.
10           I understood that, you know, unfortunately,
11  sometimes that weighs a little heavy on your sleep
12  time, but that was the responsibilities of the police
13  department.
14      Q.   What did you understand with regard to -- let
15  me -- let me strike that.
16           Where -- where was your family living in
17  August 2002?
18      A.   In Fairbanks.
19      Q.   Did you intend to --
20      A.   I take that back.  Let me rephrase.  They were
21  living in North Pole at the time.
22      Q.   And did you intend to move your family to Fort
23  Yukon?
24      A.   Absolutely not.
25      Q.   And how did you intend to maintain your family
```

### Page 54

```
 1  relationships by taking a job in Fort Yukon?
 2      A.   We were -- I was hired on with a two-week-on,
 3  one-week-off schedule.
 4      Q.   That was -- your rotation would be two weeks
 5  in Fort Yukon and then a week off?
 6      A.   And then a week off.
 7      Q.   And that was acceptable to you?
 8      A.   At the time, yes.
 9      Q.   And how -- how -- what was your understanding
10  with regard to who would pay the commuting costs to and
11  from Fort Yukon?
12      A.   I had to pay it.
13      Q.   That came out of your pocket?
14      A.   Yes.
15      Q.   So for you, a cost of doing the job in Fort
16  Yukon was paying, every two weeks, for a plane ticket
17  to or from?
18      A.   Yes.  At the time of my hire, yes.  I want to
19  clarify that.
20      Q.   And explain why you want to clarify that.
21      A.   Because after I received my -- after my two --
22  first initial two weeks there, I was pulled into the
23  city manager's office and they said after the hours
24  that I put my first two weeks in, they said they
25  couldn't afford to pay me.  So in order to maintain my
```

### Page 55

```
 1  employment, I had to go to a salaried position.
 2      Q.   So you switched to a salary position is your
 3  understanding?
 4      A.   Yes.
 5      Q.   What was your salary?
 6      A.   $40,000 a year.
 7      Q.   And no COLA, right?
 8      A.   No.
 9      Q.   And did you still understand that you have a
10  two-week-on, one-week-off schedule at that point?
11      A.   Yes.
12      Q.   And in fact, did you have a schedule where
13  you -- you would be in Fort Yukon working as a police
14  officer and then you would leave and come home and be
15  off?
16      A.   The original understanding was yes.  That's
17  not always what happened, but that's -- was the
18  understanding.
19      Q.   Now, Chris Hampton testified that he came --
20  first came to Fort Yukon to do an install job; is that
21  right?
22      A.   Uh-hum.
23      Q.   Is that a "yes"?
24      A.   I believe so.
25      Q.   Is that something you helped lined up -- line
```

### Page 56

```
 1  up?
 2      A.   Yes.
 3      Q.   And so you knew Chris Hampton had a -- had his
 4  own business, right?
 5      A.   I -- at the time, I don't believe he had a
 6  business, no.
 7      Q.   Or had a skill in -- in radio installation?
 8      A.   He did -- he had a skill, yes.
 9      Q.   And so tell me how you set that up.
10      A.   I believe the city -- the city was looking at
11  purchasing radios for the vehicles, and they had asked
12  about, you know, because of the money situation, the
13  city was going through and continued to go through,
14  they -- you know, they needed to do it cheaply, and
15  they needed -- but they needed to do it efficiently.
16           So I mentioned that I know somebody that does
17  that kind of stuff that's into radios and stuff, and
18  I'd call him and ask him, you know, what he thought --
19  he bought stuff like that all the time.  So I figure,
20  you know, if anybody knew where to get a good deal, it
21  would be him.
22           And come to find out, you know, that's when he
23  turned us in to -- he said, okay, you need to look at
24  these kind of radios, this kind of radio for the best
25  of your money and for your capabilities and your -- you
```

14 (Pages 53 to 56)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit A
Page 2 of 5

Deposition of William D. McKillican
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 65

1  report?
2  A.  No.
3  Q.  Did -- do you have any personal knowledge
4  about what action, if any, the city manager took?
5  A.  No.
6  Q.  Do you have any personal knowledge about
7  whether the city manager asked --
8  A.  Let me back up.  When you said personal action
9  that the city manager took?
10  Q.  Regarding Mr. Hampton and his employment.
11  A.  Once the investigation was opened, he was
12  taken off duty.  He wasn't allowed to work.
13  Q.  He was put on administrative leave?
14  A.  He was.  But he had to remain in town.
15  Q.  The city manager asked -- put him on --
16  A.  I believe, if I recall right, I'm not -- I'm
17  not for certain -- I'm not certain, but I believe he
18  was put on administrative leave with pay there in town.
19  He had to stay in town, though.
20  Q.  And other than that action, are you aware
21  of -- have any personal knowledge of any actions that
22  the city manager took towards Chris Hampton?
23  A.  Other than her demeanor toward him, no.  She
24  didn't seem like she liked him very much.
25  Q.  What -- how so?

Page 66

1  A.  Well, she always referred to him as "that
2  man."  I mean, it was like he had stepped on her
3  Cheerios or something.  I don't know, lack of better
4  terms, I apologize.  But you know, like for some
5  reason, had he made her mad for some reason, I don't
6  know.
7  Q.  Anything else?
8  A.  No.
9  Q.  Now, were you present when Chris Hampton quit?
10  A.  I was.  I believe so.  I'm pretty -- I'm not
11  certain, but I believe I was in town.
12  Q.  Were you in the room?
13  A.  No.  I don't think I was there when he -- I
14  actually think he told -- because I believe he was the
15  one that told me that he quit.
16  Q.  Now -- so you -- he actually wrote a written
17  resignation.  Did you see him write that?
18  A.  No, I didn't.  I wasn't even sure if he had a
19  written a resignation, to be honest with you.
20  Q.  First time you've heard of it?
21  A.  I may have before, but I -- excuse me.  I
22  don't recall.
23  Q.  Now, you've testified you -- you quit your job
24  in Fort Yukon on or about August 11, 2003, right?
25  A.  Yes.

Page 67

1  Q.  Why did you quit?
2  A.  Because I felt that I wasn't -- that I was
3  going to be fired.
4  Q.  Explain that to me.
5  A.  Well, the city manager had pulled me in her
6  office, she basically, you know, accused me of being a
7  troublemaker.  And when I basically denied everything,
8  she -- and she basically said that she was going to do
9  my evaluation.  And to me, it -- it came across as
10  very -- a very threatening manner, like she was going
11  to retaliate against me.
12  Q.  And so rather than allow the city manager to
13  evaluate you, you quit your job?
14  A.  I felt that if I let her evaluate me, bad
15  performance evaluation, that she was going to -- I
16  mean, there was no doubt in my mind she was going to
17  give me a bad performance evaluation.  So I felt that,
18  you know, I didn't have a chance.
19       And, you know, with a bad performance
20  evaluation, I could have been terminated because I
21  hadn't been there a complete year yet, so I was
22  technically still on probation.
23       So if I was on probation, and I believe it was
24  a year probation, I'm not certain on that, but you
25  know, if I was still on probation, they could terminate

Page 68

1  me for any cause.  So that's why I -- you know, I chose
2  to quit.  I mean, I -- I didn't have a choice.
3  Q.  But just to --
4  A.  Or get fired for something that I wasn't --
5  that I didn't do.
6  Q.  So it was -- it was specifically the city
7  manager's indication to you that she was going to
8  evaluate you that caused you to quit your job?
9  A.  Her actions, yes.
10  Q.  And so -- well, I want you to assume for a
11  minute that -- that happened in one conversation,
12  right?
13  A.  It was all the same conversation, yes.
14  Q.  Was it the day of August 11th?
15  A.  Yes, it was.
16  Q.  Where did the conversation take place?
17  A.  Her office.
18  Q.  So do you recall what time of day it was?
19  A.  Late morning, mid afternoon.
20  Q.  And -- and it's your testimony that --
21  A.  I know -- I know it was late after -- late
22  morning.  I know that for a fact because I was home
23  that evening.  I know the last flight going out of
24  Fort Yukon was, like, five o'clock, I believe, or
25  six o'clock or something, so I was home by that

17 (Pages 65 to 68)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net

Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit A
Page 3 of 5

Case 4:04-cv-00034-RRB   Document 105-3   Filed 09/13/2006   Page 4 of 5

Deposition of William D. McKillican  
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.  
Case No. 4:04-cv-00034-RRB

### Page 73

1  A. She never said.
2  Q. Never said any words to the effect of, I'm
3  going to terminate you from employment?
4  A. No.
5     MR. WALLERI: Objection. Asked and answered
6  for the fourth time.
7  BY MR. SINGER:
8  Q. What she said was I'm going to do a job
9  evaluation, right?
10 A. I don't believe those were her exact words,
11 but that -- I believe that's what she meant.
12 Q. That's what you understood her to be saying,
13 I'm going to evaluate your performance?
14 A. It was the way she said it and the way she
15 provoked it up to that point.
16 Q. That led to you conclude it was going --
17 A. Led me to conclude that I was going to get a
18 poor performance evaluation and be terminated.
19 Q. Had -- in your tenure at the City of
20 Fort Yukon, had you seen any police officer be
21 terminated for a bad job evaluation?
22 A. No.
23 Q. So you had no experience on which to base your
24 conclusion that a poor job evaluation would
25 automatically lead to termination?

### Page 74

1  A. Well, that's -- I just assume that's common
2  knowledge with any kind of employment.
3  Q. Now, you understood there was a personnel
4  policy manual in Fort Yukon, right?
5  A. I did.
6  Q. Let's take a look at that.
7     MR. SINGER: We'll label this as Exhibit 2.
8  There's a -- Court Reporter, there's a earlier label on
9  this particular copy, if you can put your label on top
10 so we don't -- don't get confused.
11    (Exhibit 2 marked.)
12    THE WITNESS: Thank you.
13    THE REPORTER: Uh-hum.
14    THE WITNESS: Are we done with this one?
15    MR. SINGER: For now.
16 BY MR. SINGER:
17 Q. I've handed you a document marked as
18 Exhibit 2, and -- and do you recognize this as the
19 Personnel Manual Handbook for the City of Fort Yukon?
20 A. I believe so.
21 Q. And you saw this during the course of your
22 employment?
23 A. I believe we were given these probably like
24 eight months after I worked -- started working there.
25 I don't know. I can't be honest. I know I didn't get

### Page 75

1  one when I first started there and it was quite awhile
2  after I started working there.
3  Q. Before you quit, you received a copy of the --
4  A. Yes, I did, because I -- I recall when they
5  first passed these out they said, well, you were
6  supposed to get this and you were supposed to sign this
7  and they wanted me to -- they wanted me to backdate it
8  and I wasn't going to do that.
9  Q. Now, let's take a look at Page 20 of the
10 Personnel Manual Handbook, Chapter 7.
11 A. Page 20. I'm sorry, what chapter?
12 Q. Up right at the top.
13 A. Okay. Right at the top? Okay. I'm sorry.
14 Q. And this is -- there's a grievance policy
15 within the City of Fort Yukon, correct?
16 A. That's what it says.
17 Q. You understood there was a process by which an
18 employee could challenge an adverse employment action?
19 A. Yes.
20 Q. And in fact, there was a multistep process,
21 right?
22 A. Yes.
23 Q. And --
24 A. I don't know it verbatim, but I see it here in
25 front of me.

### Page 76

1  Q. And it was spelled out in the -- in the policy
2  manual that you have?
3  A. Yes.
4  Q. Now, you never filed a grievance regarding
5  Ms. Carroll's indication to you that she was going to
6  perform a job evaluation, right?
7  A. No, I didn't.
8  Q. You believed that the city manager lacked the
9  authority to evaluate you, right?
10 A. I -- I didn't question her authority, I
11 told -- I did not agree that it was appropriate.
12 Q. And -- and in part, why did you think it was
13 inappropriate?
14 A. Because she was not my supervisor. She didn't
15 see my daily performances, she didn't know what my
16 duties and responsibilities were, she didn't -- she
17 didn't know my job.
18 Q. Did you also suspect that she had improper
19 motives for being angry with you?
20 A. Improper motives. Can you elaborate on that?
21 Q. Did you -- did you feel that -- that her --
22 Fannie Carroll's interest in doing a job evaluation was
23 motivated by an improper reason?
24 A. I know she wasn't happy with me for some
25 reason, she was accusing me -- like I said before, she

19 (Pages 73 to 76)

Heartland Court Reporters  
Carol A. McCue, RMR    E-mail: carol.mccue@acsalaska.net

Telephone: 907-452-6727  
Fax: 907-488-7701

Exhibit A  
Page 4 of 5

Case 4:04-cv-00034-RRB   Document 105-3   Filed 09/13/2006   Page 5 of 5

Deposition of William D. McKillican
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 81

1  you know, you got a good thing going up there, you
2  know, you guys are doing a good job up there, you know,
3  it's probably good -- you really need to stay.
4       And I said, well, I said, you know, and he
5  kind of -- and to be honest with you, he -- you know,
6  he talked me into it. And so I said, well --
7       He said -- let me back up a little bit. He
8  asked -- he said if I have -- if I can get Ms. Carroll
9  to agree to it, will you go back? And I said, yes.
10   Q.   Did you understand Greg Russell was trying to
11  mediate the situation?
12   A.   Yes --
13   Q.   And --
14   A.   -- to an extent.
15   Q.   -- did he -- did he -- didn't he explicitly
16  say to you that he thought you sure put in a lot of
17  time to quit right before you obtained your APSC basic
18  certification?
19   A.   Absolutely.
20   Q.   And in fact, you started work in Fort Yukon on
21  August 16th, 2002?
22   A.   That is kind of odd, isn't it.
23   Q.   Five days, right?
24   A.   (Witness nods head.)
25   Q.   Isn't that right?

Page 82

1   A.   Yes.
2   Q.   You needed five days to have your 12 months
3  with Fort Yukon.
4   A.   Yes.
5   Q.   And so had you not quit and stuck it out for
6  five days, you would have obtained your --
7   A.   I would have obtained my certificate. Yes, I
8  would have. I just didn't feel that I was going to --
9  that anything would change. So...
10       And I just want to -- just to clarify
11  something, that, you know, when Greg Russell had called
12  me, he didn't call me to ask to get my job back
13  permanently, it was just until somebody else could get
14  into town, you know, so there wouldn't be -- the town
15  would be without a police officer by the time I was
16  leaving.
17   Q.   He was trying on the one hand to make sure the
18  city had police coverage, and on the other hand to try
19  to get you your -- your 12 months so you could get your
20  certificate?
21   A.   I don't know if he was looking to get my
22  12 months, but I know he was -- he -- he did ask if I
23  wanted -- you know, if I would permanently go back if
24  they asked me. I said, well, if she apologized to me
25  and I -- you know, and then, yeah, I would go back.

Page 83

1   Q.   In retrospect --
2   A.   Like I stated before, I liked my job up there.
3   Q.   If you had quit your job 12 months and one day
4  after starting, would you have been eligible for your
5  APSC certificate?
6   A.   No.
7   Q.   Why?
8   A.   Because you have to be employed at the time
9  you receive certification. So me just going to work
10  there for one year and leaving on that date, I would
11  have to work there for 12 consecutive months, or 365
12  days, to meet the -- meet the criteria for APSC, and
13  then I would have to be employed with them in order to
14  obtain my certification.
15   Q.   You made a tape recording of a -- the
16  conversation on August 11th you had with Fannie
17  Carroll; is that right?
18   A.   I did.
19   Q.   Tell me what -- first, what tape recording
20  device did you use?
21   A.   My personal police recorder.
22   Q.   You had a police recorder?
23   A.   I did.
24   Q.   And what -- what did you use the police
25  recorder for?

Page 84

1   A.   For work.
2   Q.   It was used for work?
3   A.   Yep.
4   Q.   And when did you use it?
5   A.   Any time I came in contact with anybody.
6   Q.   Any time you came in contact with anybody, you
7  recorded the conversation?
8   A.   When responding to incidents, yes.
9   Q.   And what did you do with tapes after
10  responding to incidents?
11   A.   It -- depending on what was the outcome of the
12  incident. If it was -- if there was no case
13  involvement, if we weren't going to take a report on
14  the incident, and it was -- you know, everything was --
15  problems were solved, and there was no criminal charges
16  to be filed or anything like that, then we would erase
17  the tapes with a magnet and reuse them.
18   Q.   And is this a -- is this a -- did everybody in
19  the department, as you understand, use the tape
20  recording devices in a similar way?
21   A.   Yes.
22   Q.   And so each -- as you understood, each of the
23  police officers in the department carried a recording
24  device?
25   A.   Yes.

21 (Pages 81 to 84)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit A
Page 5 of 5