Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER )
DeLEON, CHRIS HAMPTON, WILLIAM )
D. McKILLICAN, and TODD )
SCHLUMBOHM, )
)
          Plaintiffs, )
)
vs. )
)
FANNIE CARROLL and the CITY OF )
FORT YUKON, ALASKA, )
)
          Defendants. )
_____)

Case No. 4:04-cv-00034-RRB Civil

DEPOSITION OF REGINALD FLEMING
July 20, 2006

APPEARANCES:

    FOR THE PLAINTIFFS:    MR. MICHAEL J. WALLERI
                           Attorney at Law
                           330 Wendell Street, Suite E
                           Fairbanks, Alaska 99701
                           (907) 452-4716

    FOR THE DEFENDANTS:    MR. MATTHEW SINGER
                           Jermain, Dunnagan & Owens
                           Attorneys at Law
                           3000 A Street, Suite 300
                           Anchorage, Alaska 99503
                           (907) 563-8844

* * * *

Page 54

1  Q     .....arrests?
2  A     No, sir.
3  Q     Have you ever had any convictions?
4  A     No, sir, that I know of, no.
5  Q     On page 4 there's a question about illicit drug use.
6  A     Yes, sir.
7  Q     Do you understand why the Police Standards Council
8        requires.....
9  A     Yes, sir.
10 Q     .....candidates to.....
11 A     Oh, yes, sir.
12 Q     And you indicated use of marijuana. Is that right?
13 A     Yes, sir.
14 Q     And what was the date of the last usage?
15 A     I want to say '97, like it says, '97.
16 Q     And none since then?
17 A     No, sir.
18 Q     Now, when you were promoted to the chief of police of
19       the City of Fort Yukon.....
20 A     Uh-huh.
21 Q     .....what did you understand to be your job duties?
22       Did they change?
23 A     My job duties? Doing -- the initial interview, the
24       whole -- the initial interview with partly the city
25       manager and the city council at Pike's Landing with

Page 55

1        Mr. Myers, the director, he made it under- --
2        understood that I had to work one year before I
3        received my certification as an officer. He made that
4        clear to them. Second of all, they said they have
5        problems with police officers selling drugs in their
6        vehicles, and police being approachable by other
7        members in the community and not doing the right thing.
8        And they were tired of seeing that and they wanted
9        stuff changed, and that the police department had a bad
10       reputation and they wanted that cleaned up.
11 Q     This was in your initial interview to be a police
12       officer?
13 A     It was the initial interview.
14 Q     Now, at what point did you -- after you -- am I
15       correct, you were first hired as a police officer, a
16       patrolman?
17 A     I was hired -- if you look at it, they hired me right
18       on that position as the police chief, because there was
19       no police chief there. So I was going to be in charge
20       of the other police officers coming in, and then
21       they -- right at that point I think -- I think right at
22       that point that had it in mind what I was going to do.
23 Q     So even though your exhibit 1, your first employment
24       agreement as chief, is dated 20th of November.....
25 A     Uh-huh.

Page 56

1  Q     .....you understood from the beginning that you would
2        be the police chief?
3  A     That I would be put in that position, sir.
4  Q     And you understood as the police chief that you would
5        be in charge of the other officers?
6  A     Yes, sir.
7  Q     And when you say in charge, what do you mean?
8  A     Just running the day-to-day operations of the police
9        department, making sure that the officers are doing
10       what they're supposed to be doing, getting -- building
11       the Fort Yukon police name, taking it from where it was
12       at to -- to higher standards, sir.
13 Q     Did you understand when you took the position as the
14       police chief that you would be responsible for
15       evaluating police officers?
16 A     With -- with Bonnie Thomas, yes, city manager Bonnie
17       Thomas that was the agreement with her.
18 Q     And did you understand you'd be responsible for the
19       day-to-day operations of the police department?
20 A     Yes, sir.....
21 Q     And.....
22 A     .....with Bonnie Thomas that was.
23 Q     And did you understand you'd be responsible for
24       scheduling employees?
25 A     Yes, sir.

Page 57

1  Q     And were you involved in -- as a police chief in hiring
2        and firing of employees?
3  A     With Bonnie Thomas I was.
4  Q     When you're saying with Bonnie Thomas I was, are you
5        suggesting that it changed?
6  A     It changed, sir.
7  Q     So your understanding as the -- when you were hired and
8        you became the chief of police is that part of the job
9        duties included running the day-to-day operations?
10 A     Yes, sir.
11 Q     And you understood when you were hired as the chief of
12       police that your job duties included scheduling the
13       employees in the police department?
14 A     Yes, sir.
15 Q     That included setting your own schedule and setting the
16       schedule of other officers?
17 A     Yes, sir.
18 Q     Also dispatchers?
19 A     Yes, sir.
20 Q     Any other employees, other than officers and
21       dispatchers?
22 A     Just officers and dispatchers, everything to do with
23       the police department, sir.
24 Q     That's the.....
25       MR. SINGER: What number is that?

July 20, 2006   Fleming, et al. v. Carroll/City of Ft. Yukon   4:04-cv-0034
Reginald Fleming

Page 70

1  is? It could be anything that they're not aware of.
2  Q  So dispatchers may not -- wouldn't necessarily know in
3     their job what an arrest is or what Title 47 is?
4  A  Right.
5  Q  Right?
6  A  That's right.
7  Q  Dispatchers didn't receive training in those subjects,
8     did they?
9  A  No, and that's why I was against it.
10 Q  So in your job as police chief, we talked -- your
11    job.....
12       MR. WALLERI: Do you mind if we just take a
13 quick break?
14       MR. SINGER: Yeah, that's fine. We've been
15 going a long time.
16       (Off record)
17       (On record)
18 Q  Now, you were paid on a salary basis, correct?
19 A  Yes, sir.
20 Q  And you're paid the same each pay period, regardless of
21    how many hours you worked in a pay period?
22 A  Yes, sir.
23 Q  As the chief of police, that's responsible for the
24    day-to-day operations of the City of Fort Yukon Police
25    Department?

Page 71

1  A  Yes, sir.
2  Q  And you understood yourself to be responsible for
3     scheduling the department?
4  A  Yes, sir.
5  Q  Including all the employees who worked for the
6     department?
7  A  Say that again, sir?
8  Q  You set the schedules for the other police officers and
9     for the dispatchers?
10 A  Yes, sir.
11 Q  And did you make decisions about promotions within the
12    department?
13 A  Promotions in the department? What type of promotion
14    are you talking about?
15 Q  For example, Chris DeLeon testified as to a promotion
16    from officer to investigator.
17 A  Oh, okay. Now.....
18 Q  Is that a determination.....
19 A  .....if you're talking about that.....
20 Q  .....you made as the chief?
21 A  Yes, sir.
22 Q  And did you make -- did you have the discretion to
23    decide which trainings your police officers would
24    attend?
25 A  Uh-huh (affirmative).

Page 72

1  Q  That's yes?
2  A  Sorry about that. Yes, sir.
3  Q  Now, police officers have a fair amount of discretion
4     in terms of whether or not to make an arrest, what
5     crimes to investigate. Is that correct?
6  A  What crime to investigate? No -- no, sir. Now, make
7     an arrest, yes, sir.
8  Q  In terms of prioritizing calls and assignments through
9     the day, as the chief of police were you responsible
10    for that for the department?
11 A  Per se, you can say if I was there, yes, but priority
12    of calls are normally done by dispatchers. Dispatcher
13    knows the priority, which ones take priority, and which
14    ones to send -- the officers on first.
15 Q  Did you conduct personnel evaluations of employees as
16    the chief?
17 A  No, sir.
18 Q  You didn't do personnel evaluations of some of the
19    officers?
20 A  The city manager did it, sir. And if you're talking
21    about the end of it, the city manager was doing it.
22 Q  Well, during the course of your employment as the chief
23    of police, did you conduct personnel evaluations?
24 A  It's hard to say, sir, if I have. It's been awhile.
25 Q  So you may have?

Page 73

1  A  But, personally, not that I know of, sir, that I did
2     anyone. She always said that she was the personnel
3     manager and she did evaluations, and she proved that by
4     doing the evaluations and writing people up.
5  Q  Let me show you a document we marked as an exhibit
6     yesterday. This is Christopher DeLeon exhibit 10.
7  A  Okay.
8  Q  And I'd like you to look at the second page of
9     exhibit 10.
10 A  Uh-huh.
11 Q  Whose signature is that?
12 A  That's mine, sir.
13 Q  That's your signature?
14 A  Yes, sir.
15 Q  And is this a Fort Yukon Police Department employee
16    performance review?
17 A  Yes, sir.
18 Q  Is it dated 20th of November 2003?
19 A  Yes, sir.
20 Q  And did you fill out this form or sign this form?
21 A  Yes, sir.
22 Q  Is this an employee evaluation?
23 A  Performance review. Yes, but nothing is marked on
24    here, sir.
25 Q  Christopher DeLeon testified that you did his

19 (Pages 70 to 73)

330 Wendell Street, Suite A    LIZ D'AMOUR & ASSOCIATES, INC.    Fairbanks, Alaska 99701
907.452.3678

Exhibit C
Page 3 of 16

2ea19ccb-bd    e0654

July 20, 2006   Fleming, et al. v. Carroll/City of Ft. Yukon   4:04-cv-0034
Reginald Fleming

Page 74

1  employment review and that you gave him all
2  exceptionals and signed this. Is that correct?
3  A   It's possible here. If he said I did it, I did it,
4  sir.
5  Q   So you don't recall whether or not you were doing
6  employment evaluations?
7  A   Well, I'm not doing employment evaluation, because
8  whatever I -- I do, she is the ultimate. She does
9  the -- she has the ultimate decision. It doesn't
10 matter what I do on there.
11 Q   And you testified that part of the reason you
12 understood you were hired was to help clean up the
13 police department?
14 A   Yes, sir.
15 Q   Did you believe you had the discretion and authority to
16 do that on a day-to-day basis?
17 A   With Bonnie Thomas, yes, sir.
18 Q   And how so?
19 A   She -- when I first got the position, she said the
20 police department is yours to handle. I don't know
21 anything about the police department. I want to see
22 the drugs off the streets, the drugs out of the police
23 department. She wanted to see a better communication
24 with the -- the city, as far as the people living
25 within the city. She wanted -- instead of the other

Page 75

1  police departments thinking that we were a bunch -- a
2  bunch of drugs and stuff going on there and a bunch of
3  corruption, she wants to see that all gone, and that --
4  that there wouldn't be anybody that would control the
5  police department per se and making them do corrupt
6  things or trying to approach the police department.
7  Q   So you understood that the chief -- you were
8  responsible for running the police department?
9  A   With Bonnie Thomas, yes, sir.
10 Q   And how much of your time -- did you also go out on
11 patrols and do.....
12 A   Yes, sir.
13 Q   .....basic law enforcement?
14 A   Yes, sir.
15 Q   How would you say you -- between the tasks of running
16 the police department, and that would include all the
17 administrative functions, scheduling, supervising --
18 you were a supervisory employee, is that correct?
19 A   Yeah, the chief of police. Yes, sir.
20 Q   So how would you say -- how much time did you spend
21 doing that, as opposed to out on the street on patrol?
22 A   25 percent and the rest of it was patrol.
23 Q   That's your -- on average you say 25 percent of your
24 time was supervising and running the police department?
25 A   Yeah, yeah.

Page 76

1  Q   And 75 percent was on patrol?
2  A   On patrol.
3      COURT REPORTER: I'm sorry, we need to take a
4  break.
5      (Off record)
6      (On record)
7  Q   Just in case there was a problem with the tape
8  recorder, let's repeat a couple of the questions we
9  just asked. I asked you to estimate how much of your
10 time was spent supervising the police department, as
11 opposed to out on the patrol doing law enforcement.
12 A   25 percent was due to supervision, another 75 percent
13 was patrol.
14 Q   And you'd agree you were always the police chief,
15 whether you're on patrol, in the headquarters, you were
16 always the chief of police?
17 A   Yes, sir.
18 Q   And did you sometimes, while on patrol, get calls from
19 say dispatch with chief questions, that is, questions
20 about how to run the office or.....
21 A   Well, occasionally, if something -- a machine or
22 something went down. Yes, sir.
23 Q   Did -- as the chief of police, did you attend city
24 council meetings?
25 A   Yes, sir.

Page 77

1  Q   Regularly?
2  A   Yes, sir.
3  Q   And was that a duty of the other officers?
4  A   Yes, they could fill in for me, sir.
5  Q   Sometimes you'd assign officers to go to council
6  meetings for you?
7  A   No, sir, not if I'm still out on a call and the city
8  council meeting is still going on, another officer
9  would come in. One of them would pick up where I'm at
10 on the call.
11 Q   Now, within the police department, did you report to
12 anybody?
13 A   Within the police department? Sir, there was nobody
14 else to report to except for the city manager or city
15 council, sir.
16 Q   You were the top of the food chain in the police
17 department?
18 A   Yes, sir.
19 Q   And the dispatchers and the other officers all reported
20 to you?
21 A   Not all reported to me. Some reported to the patrol
22 supervisor, then the patrol supervisor will come to me.
23 Q   You were the ultimate authority within the police
24 department?
25 A   No, sir. You can't -- I -- I can't say that I was the

20 (Pages 74 to 77)

330 Wendell Street, Suite A    LIZ D'AMOUR & ASSOCIATES, INC.    Fairbanks, Alaska 99701
907.452.3678

Exhibit C
Page 4 of 16

Page 134

1  intentions were with regard to when to record it?
2  A  His intention on when to start to record it, no, but I
3     knew his intention was to have documentation, which I
4     can understand.
5  Q  His testimony I believe was that he was concerned about
6     an employment dispute with Fannie Carroll?
7  A  Oh, yes.
8  Q  And that was his reason for carrying a personal tape
9     recording device?
10 A  Yeah.
11 Q  And is that -- is your testimony that that's consistent
12    with your own instructions to the officers, that they
13    should record their conversations with Fannie Carroll?
14 A  I told them that it would behoove them to have -- have
15    some documentation, because based on -- after -- like I
16    say, after she started lying, when she got caught in a
17    lie, her integrity was blown with the police
18    department. We didn't know whether or not we can trust
19    what she had to say, because we caught her in multiple
20    lies, multiple.
21 Q  Now, during that meeting with Officer DeLeon.....
22 A  Uh-huh.
23 Q  .....you pulled him out of the cops meeting and you had
24    a private discussion with him, right?
25 A  Yes, sir.

Page 135

1  Q  And in that meeting I think you told him that you were
2     going -- that the city manager might write him up?
3  A  Yes, I did.
4  Q  And do you recall him saying, I don't care, I can
5     grieve it?
6  A  I don't know.
7  Q  You don't remember?
8  A  I don't remember that.
9  Q  We may need to listen to the tape but we'll proceed
10    here a little bit.
11 A  Okay.
12 Q  Do you remember that the subject of David McKillican
13    came up during your discussion with DeLeon on that day?
14 A  Oh, we had talked about Mr. McKillican a lot of times,
15    so, you know, that could be possible.
16 Q  That Mr. DeLeon said something to the effect, she's
17    going to try to fire me the way she did.....
18 A  I told.....
19 Q  .....Dave McKillican?
20 A  I told him that she was out to fire him and that --
21    that he needs to be careful, and that's the God honest
22    truth, because she was trying to get me to fire him.
23 Q  And do you recall in that conversation that you said to
24    DeLeon, McKillican shouldn't have resigned?
25 A  Yeah, I possibly could have told him that.

Page 136

1  Q  You said, Dave McKillican should not have resigned?
2  A  I have to listen to that tape to make sure that I did
3     say that.
4  Q  And.....
5  A  And -- and if I did say that, and that was only to say
6     because he only had like, what, not even 30 days to go
7     before he was finished with his full year, and that
8     could be the possibility on why I said that.
9  Q  Well, did you also say he could grieve it?
10 A  In that -- the whole situation? Oh, yeah, because I
11    laid down the rules, because the city manager called up
12    and said that she didn't feel safe with Officer DeLeon
13    out there with a gun. And I'm like -- I said -- and I
14    told her, I said, Officer DeLeon is not going to do
15    anything to you like that. And she said, well, I want
16    him written up, and blah, blah, blah this, I don't know
17    why he's working here, and per se. And everybody was
18    in the office. She's calling on the phone telling me
19    she didn't feel safe with him being out on the streets
20    with a gun. And I told -- you know, I didn't want to
21    write him up, but she said, well, he spoke out of turn,
22    so that's what I did. I put it down on that and I told
23    him, you have the right to -- to grieve this, and which
24    he did have the right to grieve it, because it was not
25    technically a formal city council meeting, it was a --

Page 137

1     it was a community -- community orientation, a
2     community meeting, which half of the city council
3     didn't show up. Some said, well, I'm leaving, and
4     walked out on the meeting, so that made it unofficial.
5     I mean, that definitely made it unofficial when people
6     started walking out and talking about this -- we
7     thought we was coming here to listen about who did the
8     charter. A lot of the city council was waiting for
9     about who did the charter. And they're like waiting to
10    find out about who did the charter and they got up and
11    walked out. They wanted to know who spent the money.
12 Q  So that was a long answer to my question. Let me.....
13 A  Okay.
14 Q  .....focus and confirm. You advised Christopher DeLeon
15    that he could grieve an employment action that he
16    disagreed with.
17 A  Oh, yes.
18 Q  And you were aware that the city had grievance rights,
19    city employees had grievance rights?
20 A  Yes, sir.
21 Q  And you advised Mr. DeLeon of his rights?
22 A  Yes, sir, and he did plan on grieving it until they set
23    up a meeting. Actually, Deborah McCarty came in and
24    said could she be of assistance, you know, assistance
25    during this hearing. And they told her no and she

35 (Pages 134 to 137)

July 20, 2006   Fleming, et al. v. Carroll/City of Ft. Yukon   4:04-cv-0034
Reginald Fleming

Page 138

1  leaves. She was -- she was an independent person on
2  that, not the person that Chris just arrested for DWI,
3  and the city manager who didn't like Chris DeLeon, so
4  that was the setup. If you're going to have somebody
5  that didn't like Christopher DeLeon in there because he
6  arrested her for a DWI.....
7  Q  Who are you talking about?
8  A  Mary Beth Solomon. And having her in there doing this
9     grievance, she couldn't do it independently. It had to
10    be somebody that was not involved in any -- how can I
11    say, any arrests that he made, involved in any action
12    that he put against them, it had to be a fair
13    independent person.
14 Q  You're aware that the city had a multistep grievance
15    process?
16 A  A multistep?
17 Q  Take a look at exhibit 4, and on page 20 of the
18    personnel manual, the grievance procedures, correct?
19 A  Okay.
20 Q  When you advised Mr. DeLeon that he had grievance
21    rights, you were referring to the rights that are
22    contained in the city manual, right?
23 A  Uh-huh (affirmative).
24 Q  Yes?
25 A  Yeah.

Page 139

1  Q  And there's a four-step grievance process, correct?
2  A  What it says here.
3  Q  Step 1, step 2, step 3 and step 4.
4  A  Yeah.
5  Q  Step 4 is an appeal to the full city council, correct?
6  A  Uh-huh (affirmative).
7  Q  Yes?
8  A  Yes.
9  Q  So even if you don't like the result as an employee, if
10    you don't like the result in front of hearing
11    officer.....
12 A  Uh-huh.
13 Q  .....there's a final step to the city council, correct?
14 A  And it was done.
15 Q  When?
16 A  When? When we all went back up there to go talk to the
17    city council. And I think, what was his name, the --
18    the investigator came from AML that worked for ya'll,
19    of our city council not to talk to us. So at that
20    point in time that -- that grievance step was gone.
21 Q  Well, hold on, hold on. Did you ever.....
22 A  We put in for it. Yes, we did.
23 Q  When?
24 A  Huh?
25 Q  When?

Page 140

1  A  We put in to it through -- I'm trying to think --
2     Carroll, what was her name? She was on the city
3     council at that time, and she put down for the next
4     city council meeting that we were going to come in and
5     talk to the city council -- talk to the city council.
6     And before that even happened we all were -- we were
7     terminated I think soon after that, and then when it
8     came time for the city council meeting Mister -- what's
9     his name from AML, the investigator that came up?
10         MR. WALLERI: Are you talking about Greg
11 Russell?
12 A  Greg Russell went in and informed the city council
13    that -- that they needed to talk to us. So that means
14    that grievance process was broken right then when we
15    didn't get a chance to go in and talk.
16 Q  Let's get this timing down. Okay?
17 A  Uh-huh (affirmative).
18 Q  Let me show you.....
19 A  Everybody had their plane tickets to prove that --
20    yeah, we were up there for that city council meeting
21    and they didn't want to talk to us.
22 Q  Did you submit in writing a grievance request?
23 A  It was put in.
24 Q  Did you submit in writing a grievance request?
25 A  Did I submit in writing a grievance request? I wasn't

Page 141

1  there. They fired me while I was on -- while I was on
2  leave, and on top of that Carroll submitted that we was
3  coming in to talk to them, and they set up a time
4  during the -- the city council meeting.
5  Q  Did you submit in writing a grievance request? Yes or
6     no?
7  A  I had -- we had -- I didn't do it personally because I
8     was fired and I was in Fairbanks.
9  Q  Did you have access to a pad of paper and a pen while
10    you were in Fairbanks?
11 A  Yes, I did.
12 Q  Did you have access to a fax machine?
13 A  Yes, I did.
14        MR. WALLERI: Objection as to argumentative.
15 Go ahead and answer.
16 A  Okay. Yes, I did.
17 Q  So who is it that you say put in a grievance request?
18 A  Actually, I went personally to their lawyers, yes.
19 Q  Who?
20 A  Pakistan [sic] and -- what's that, Paskavan [sic]?
21        MR. WALLERI: Uh-huh (affirmative).
22 A  And went in there for -- when they served me that
23    paperwork and I told him I was going to do this on a
24    grievance and it's come on. I said, this is wrong.
25    I'm going to go in front of the city manager. And at

36 (Pages 138 to 141)

330 Wendell Street, Suite A   LIZ D'AMOUR & ASSOCIATES, INC.   Fairbanks, Alaska 99701
907.452.3678

Exhibit C
Page 6 of 16

2ea19ccb-bd2f...   0654

Page 142

1  that time he was their city attorney, and at that time
2  he should have informed them that -- a statement that I
3  said that I was coming up there. And then I had a city
4  council member put the paperwork in for us. But at
5  that time I informed the city attorney, Paskavan [sic]
6  and Rekin [sic], that I was going to grieve this.
7  Q   Now, let's get this straight. You say that a city
8  council member put in paperwork for you?
9  A   They put in for a -- put in for our grievance for us to
10     speak in front of the.....
11 Q   Put in a request to meet with the city council?
12 A   Yeah.
13 Q   Did this request, do you know if it referenced the
14     grievance policies in the city manual?
15 A   I don't know, sir.
16 Q   Did you ever make a written presentation to the
17     personnel officer indicating your interest in filing a
18     grievance?
19 A   I made a verbal to their attorney, who was at that
20     time -- I was instructed to talk to.
21 Q   And that's it?
22 A   I couldn't have no contact with Ms. Carroll, it was
23     through her attorney.
24 Q   When you were -- you had a copy of the city manual,
25     correct?

Page 143

1  A   Right.
2  Q   The city personnel manual?
3  A   Right.
4  Q   You were aware of the grievance procedures in the
5      manual?
6  A   Right. But that.....
7  Q   At the time you were terminated, did you contact
8      counsel?
9  A   The city council?
10 Q   A lawyer; did you contact a lawyer?
11 A   At the time that I was fired?
12 Q   Yes.
13 A   At that -- at that very point that I was fired? No,
14     not at that point. But I was instructed -- because the
15     city manager had feared that she was going to be sued,
16     got a lawyer to terminate everybody and then we were
17     instructed to go through her lawyer. So at that time
18     that I picked up my termination packet, like I stated,
19     I went and I told him when he handed it to me, I said,
20     I will be grieving this at the city council meeting,
21     this -- whenever the next city council meeting is. He
22     took that and he said, okay, you can do what you want
23     to do, and that's exactly what came out of his mouth
24     when I told him I was going to grieve, so that was a
25     verbal communication between me and their counsel.

Page 144

1  Q   Was that the full content of your communication with
2      the city's lawyer?
3  A   That was basically the full thing.
4  Q   You told him you -- I am going to grieve this and he
5      said, you go ahead and do what you want to do?
6  A   Yeah.
7  Q   Subsequent to that conversation you didn't submit
8      anything in writing to the city regarding a grievance?
9  A   No, I was -- it was verbally submitted to their
10     counsel.
11 Q   Subsequent to your conversation with the city's
12     attorney, did you submit anything in writing to the
13     city regarding.....
14     MR. WALLERI: Asked and answered. Do you mind
15 not badgering the witness?
16 Q   I just want to make sure, because then you said.....
17     MR. WALLERI: He's answered it three times
18 already.....
19     MR. SINGER: I'm sorry, I.....
20     MR. WALLERI: .....that he did not file
21 anything in writing.
22 Q   Did you have any -- subsequent to that conversation
23     with the city's attorney that you just described, did
24     you have any further conversations with anyone from the
25     city regarding a grievance?

Page 145

1  A   Yes.
2  Q   What conversation?
3  A   The city -- one of the city council members, and that's
4      how my -- they were telling me they were going to
5      file -- that we come in and tell all -- what all
6      actually happened. And at that time Ms. Carroll put
7      a -- was that a bar or something, where they
8      wouldn't -- we weren't supposed to talk about anything
9      to the city council? What is that called when you.....
10 Q   You signed a gag order or a.....
11 A   What I'm talking about.....
12 Q   .....confidentiality agreement?
13 A   Something with the city council.
14 Q   That was before you were terminated, right?
15 A   No, that was when I was terminated.
16 Q   Did you -- you signed a.....
17 A   No, not me, the city council. She came in and said, we
18     got a lawyer, our lawyer advised us don't talk to them,
19     blah, blah this, and so that just killed us as for our
20     grievance pro- -- process if we can't talk to the city
21     council.
22 Q   So rather than submitting a written grievance, you
23     talked to one member of the city council?
24 A   Who was going to enter it in for us, yes.
25 Q   And that person was?

### Page 146

1  A    It was Ms. Carroll, and I'm trying to think of --
2       what's her first name?
3  Q    Is there a provision in the.....
4       MR. WALLERI: Do you want to just let him think
5  about it for a second before badgering him with other
6  questions?
7       MR. SINGER: I'm sorry, I didn't mean to.....
8       MR. WALLERI: He's trying to think about what
9  the answer to the question is.
10 A    Ms. Carroll and I'm -- I can't get the first name out.
11      I'm sure through this whole thing I'll find -- get her
12      name for you. It's a Carroll.
13      MR. WALLERI: It wasn't -- was it Tony?
14      MR. SINGER: Counsel, please don't testify for
15 the witness.
16 A    Tony?
17      MR. WALLERI: I'm trying to.....
18      MR. SINGER: I don't want you to refresh the
19 witness's recollection. I object to you testifying for the
20 witness.
21      MR. WALLERI: I'm going to object to -- I'm
22 not. I'm ask -- I'm trying to refresh his recollection.
23      MR. SINGER: If you want to ask questions,
24 write them down and ask them when I'm done. It's not a
25 free-for-all.

### Page 147

1  A    Okay. It's -- it's -- well, it's Tony's wife, Tony
2       Carroll's wife -- Tony Carroll's wife. It is Tony
3       Carroll's wife.
4  Q    Where in the personnel manual did it suggest that the
5       way to seek a grievance was to ask one member of the
6       city council?
7  A    Actually, I was told -- I was told per se of the city
8       manager, because I'm under -- I have two sole people
9       that's -- I've got the city council and I got the city
10      manager, when it says or city -- it says city council
11      or city manager. And from what I was told is that you
12      go through and you talk to -- you get the best interest
13      of the city council. If I have -- if there's seven
14      people on there and I got four people that agree with
15      it and telling me I can do this, then I have a
16      consensus from the city council to -- to do.....
17 Q    My question was, in the personnel manual that's right
18      in front of you.....
19 A    I'm not regulated by the personnel manual.
20 Q    So you're not subject to the personnel manual?
21 A    I'm not regulated by what you're saying that -- what
22      the personnel regulations says to me about doing
23      something.
24 Q    You believed you had a different arrangement with the
25      city than what's stated in the personnel manual?

### Page 148

1  A    Per se -- where's my contract at? I can go through
2       there and look at something here. Regulation, conflict
3       of interest, be fair and impartial in dealing with
4       (indiscernible - mumbled speech). I know I had a
5       grievance. Okay. (Indiscernible - mumbled speech) I
6       know I could go in front of the city council. It took
7       the city council and the city manager. And the only
8       person that went for it was the city manager, and then
9       I had the right to go in front of the city council and
10      get their perspective on it, because I was hired by the
11      city manager and the city council.
12 Q    And let me just ask you this. Did you think you had
13      grievance rights?
14 A    At that point, yes, I did.
15 Q    And did you think you were entitled to the multistep
16      grievance policy that was set forth in the.....
17 A    Everybody's entitled to that. If -- if I'm right,
18      everybody's entitled to some kind of grievance process.
19 Q    And that was your understanding when you were
20      discharged from employment?
21 A    Yes, because everybody had to be, you know, by a
22      grievance process. You know, it had to be some kind of
23      action taken upon, just not somebody walk up and say,
24      you're fired, and you can't grieve it.
25 Q    Now, you were involved in the hiring of Todd

### Page 149

1       Schlumbohm?
2  A    Yes, sir.
3  Q    Did you review his F3 form?
4  A    Yes, sir.
5  Q    You were aware that he had two prior DUIs?
6  A    Yes, sir.
7  Q    Now, are you aware that state law prohibits a police
8       department from hiring somebody who has two.....
9  A    No.
10 Q    .....or more DUIs?
11 A    It's not prohibited. It all depends on what you hire
12      him as. I hired him -- I sent him down to VPO academy,
13      village police officer academy, who carry guns and
14      stuff. And if you look in his records, you will see
15      that he received training from the Alaska State
16      Troopers as being a VPO.
17 Q    So did you inform the city council that you were hiring
18      Mr. Schlumbohm?
19 A    Oh, yeah, she.....
20 Q    Not as a.....
21 A    No, she -- he was a police officer, it's just you got a
22      VPO, village police officer, and then you got a police
23      officer.
24 Q    Are you aware of whether the -- state law permits a
25      city, like the City of Fort Yukon, to hire officers

38 (Pages 146 to 149)

330 Wendell Street, Suite A   LIZ D'AMOUR & ASSOCIATES, INC.   Fairbanks, Alaska 99701
907.452.3678

Exhibit C
Page 8 of 16

2ea19cc   950ce0654

Page 154

1    think he sent some up for work, yeah, that's.....
2 Q  Now, going back to Mr. DeLeon for a minute.....
3 A  Okay.
4 Q  .....Fannie Carroll called you after that meeting on
5    February 5th and she instructed you, did she not, to
6    suspend DeLeon for 24 hours?
7 A  Yes.
8 Q  And she also instructed you to document it?
9 A  Yes.
10 Q  And did you suspend him?
11 A  Yes.
12 Q  Didn't you in fact just say, I'm not going to suspend
13    you, but you need to go home for the night? Isn't that
14    what you told him?
15 A  Possibility.
16 Q  Then did you document the matter?
17 A  Yes, I did.
18 Q  Where is that document?
19 A  I thought I saw that documentation where I had wrote
20    down, you can't ans- -- come out, you know, and speak
21    out in (indiscernible - garbled speech), and I did it
22    on a sheet, and I put down 24 hours at home, and it's
23    on there.
24 Q  Have you seen that document in this lawsuit?
25 A  I have saw that document. Yes, I have. I saw that

Page 155

1    documentation.
2 Q  You'd agree if that -- if you didn't create that
3    document, it would have been insubordination, that the
4    city manager had made you an express order?
5 A  No, no, it would not have been insubordination. How
6    can it be insubordination when a city council member
7    theirself getting up and walking out on a meeting
8    because it's not what they thought it was, and it
9    wasn't -- it was -- it was no more -- they were like,
10   I'm not going to be here. So once city council members
11   start walking out, that meeting is gone. The city
12   manager -- I mean, how is she going to hold a meeting
13   if the city council members are walking out, talking
14   about this is not what we came here for?
15 A  The question is whether it would be insubordinate for
16   the chief of police to disregard the city manager's
17   instructions regarding writing up what she believed to
18   be an infraction?
19      MR. WALLERI: Objection as to calls for a legal
20 conclusion; beyond the scope of discovery. Go ahead and
21 answer, if you can.
22 Q  As you understood.
23 A  So disregard what she's saying if it's not right?
24   That's what they were paying me for, to make the
25   decisions. That was my job, to make the decisions on

Page 156

1    what was going on with the police department and how to
2    handle situations. Ms. Carroll didn't know how to
3    handle the situation. She didn't know, and all she
4    knew is that she didn't like Christopher DeLeon, so she
5    wanted me to write him up with something that -- I
6    mean, what you going to say? All right, he hollered
7    out in the middle -- he hollered out, or he stated
8    abruptly that they were supposed to be there talking
9    about the charter and -- and about him, them wanting to
10   terminate him. I mean that's -- how can that be
11   insubordination to Officer DeLeon when the city council
12   members were walking out? And they -- they adjourned
13   it theirself when they started walking out of the --
14   the thing, because Ms. Carroll had said they was going
15   to talk about the charter, talk about Officer DeLeon,
16   and then she abruptly said, no, we're not going to talk
17   about it, we're going to turn this into a community
18   policing thing. And the city council members were
19   waiting for the information on Ms. Carroll. A lot of
20   them -- that's what a lot of them was there for, to
21   find out what she was doing in the office that -- that
22   created such a thing and her lying to them. And she
23   turned around and disregarded that and they walked out
24   of it.
25 Q  Now, Deborah McCarty, your attorney took her deposition

Page 157

1    recently.
2 A  Okay.
3 Q  Are you aware of that?
4 A  Yeah.
5 Q  Did you read her transcript?
6 A  I don't think I have.
7 Q  She testified that after your termination you came to
8    her here in Fairbanks. Do you remember that?
9 A  Oh, yeah.
10 Q  And you had your employment file with you.....
11 A  No.
12 Q  .....personnel records?
13 A  I did not have my permanent -- I did not have my
14   personnel files with me. The only person that kept my
15   personnel file was the city manager.
16 Q  So Deborah McCarty's testimony under oath that Reggie
17   Fleming came to my hotel and he had his personnel file
18   with him, you're saying that that's untrue?
19 A  Yeah, I didn't have a personnel file. That wasn't a
20   personnel file, because the personnel file that was on
21   me was kept by the city manager.
22 Q  What personnel files did you have when you arrived with
23   Deb McCarty?
24 A  It was the one that was filled out -- it was my
25   application, my background check, my F3, and the city

Page 158

1 manager Bonnie Thomas did my -- what you -- did my --
2 looked into my background and stuff, and she kept --
3 she had a personnel file on me. I don't know where she
4 kept the personnel files on me. I didn't have my own
5 personnel files.
6 Q   Just to be clear, I want to understand what documents
7   you had with you when you went to see.....
8 A   Oh, with me -- .....
9 Q   .....Deb McCarty.
10 A   .....to me?
11 Q   Yeah, what documents were -- she says you had a file of
12   your personnel record. You told her, I have.....
13 A   That wasn't a file of my personnel record.
14 Q   So what did you have with you? You're saying you had
15   your F3.....
16 A   I had my.....
17 Q   .....your application.....
18 A   .....own personal F3, as any police officer will have a
19   copy of their own F3, their own background
20   investigation, keeping a file on theirself, and that's
21   docu- -- that's how you keep documentation, because you
22   have to fill out a F3 every -- every -- you know, often
23   when you make changes and stuff and you've got to make
24   sure that you get every information -- some information
25   you forget, and that's just a personal thing that all

Page 159

1   officers keep a copy of their F3 form. And that was
2   not a personnel file. Like I said, Bonnie Thomas did
3   my personnel file. And if -- my personnel file was
4   not -- it was in the city manager's office. And you
5   can ask J.R. Wallace, because when he had the personnel
6   files, he would not have seen my personnel file in
7   there because the city manager kept hold of mine. I
8   kept hold of the officers underneath me and she kept
9   hold of my personnel file.
10 Q   There was an issue with the removal of personnel files
11   at or about the time of your termination.
12 A   I was out of town, and which you already know I was in
13   Fairbanks.
14 Q   So what do you know about that?
15 A   What I know about that, sir, is Officer Schlumbohm
16   called and told me that she wanted to remove 911 tape,
17   case files and personnel files from our office. And I
18   told him, no, do not release them, you secure those,
19   because she -- she had no business having the 911 tape,
20   she has no business having case files. She cannot --
21   so if she can just walk in an office and say, give me
22   these case files, no, she can't do that. Underneath --
23   underneath the Alaska state statute, I'm responsible
24   for those case files, I'm responsible for any
25   information in that -- in the police department, and I

Page 160

1   will not release it to her, not when I can go to jail
2   over releasing that information. I will not.
3 Q   The conversation you had with Mr. Schlumbohm where you
4   said secure those files?
5 A   I said secure the case files, the 911 tape and the
6   personnel files, because there is some information in
7   there that she cannot be going through. And case files
8   and 911 tapes, no, that's no -- she wrote a letter
9   stating that she wanted case files, personnel files and
10   911 tape, and you can't have those.
11 Q   That conversation that you had where you asked
12   Mr. Schlumbohm to secure the files.....
13 A   Yes.
14 Q   .....at that point you had been terminated from
15   employment?
16 A   No, I was not.
17 Q   You were not?
18 A   No, because he asked me on a Friday. I did not get
19   ter- -- I did not get terminated until Monday.
20 Q   And how did you instruct him to secure those files?
21 A   I said, please secure them.
22 Q   How did you instruct him? Did you give him
23   instructions about what method to use to secure the
24   files?
25 A   I said, keep those files with you, yeah, secure

Page 161

1   them.....
2 Q   You told him to.....
3 A   .....because she had -- she was having the locks
4   changed and stuff like that. The security of the
5   police department depends on -- solely on the police
6   officer. When the city manager is having the locks
7   changed on the police department, there's something
8   wrong somewhere, so that she can have access to it.
9   Secure those files, because my -- until I got a
10   termination letter saying that I was through being the
11   chief of police, I was responsible for everything in
12   that doggone police department and I -- I am not going
13   to jail because the city manager wants to get ahold of
14   information inside the police department. And I made
15   sure that it was well documented [sic] that I said,
16   secure those files, don't let anybody in there, because
17   if something -- over -- almost 100 cases were thrown
18   out in court because she had access into that doggone
19   police department, and I wanted to make sure that, by
20   all means, my name was out there that I didn't allow
21   her that.
22 Q   Did you call the state troopers?
23 A   Oh, yeah, the state troopers were called.
24 Q   You called the state troopers?
25 A   I had Officer -- I instructed Officer Schlumbohm, since

## Page 162

1  he was up there, he is the one on duty, that he needs
2  to get with the district attorney, get with the state
3  troopers and let them know.
4  Q  Now, Schlumbohm took files and removed them from Fort
5     Yukon, put them on a plane, correct?
6  A  I think, yes, sir.
7  Q  And did they come to you in Fairbanks?
8  A  I -- I tell you, I went to the airport and I met him.
9  Q  You met him -- picked Schlumbohm up and he had the
10    files with him?
11 A  No, I just met there to talk to him, I didn't pick up
12    any files.
13 Q  And he had the files with him?
14 A  He had just -- I think he just had the personnel files.
15 Q  He had.....
16 A  He didn't have any case files, 911, the other stuff he
17    locked in a cabinet.
18 Q  He had his file, his personnel file?
19 A  He had personnel files.
20 Q  Dave McKillican's personnel file?
21 A  I did not go through the box. I can't -- personally,
22    if -- if -- if that's the truth, then he -- he had
23    personnel files, as being -- I assume that those
24    were.....
25 Q  What did you do with the files when you saw him there?

## Page 163

1  A  I did not touch the files.
2  Q  Did you give him any instructions with regard to the
3     files?
4  A  After that I said he just needed to secure it.
5  Q  You instructed Schlumbohm to.....
6  A  To secure.....
7  Q  .....personally secure them?
8  A  I told him, secure the 911 tapes, secure the case
9     files, make sure everything was locked up, and
10    personnel files.
11 Q  At the time -- at the point when you met Schlumbohm at
12    the airport, had you been terminated?
13 A  No, I didn't get terminated until -- I think I was
14    terminated later on.
15 Q  What prompted you to tell Schlumbohm to secure the
16    files and bring them to Fairbanks?
17 A  I don't think I told him to bring them to Fairbanks, I
18    just told him to secure the files the best way that he
19    could.
20 Q  Why were you meeting him at the airport?
21 A  I just knew he was on his way down.
22 Q  Did you usually meet Todd Schlumbohm at the airport?
23 A  Yes, I have met all officers on their way back down,
24    and if I was on leave to -- to see what was all going
25    on, you know, face-to-face interaction with the

## Page 164

1  officers, just as well that they met me when I came
2  back. I did not instruct him to -- to bring it down.
3     MR. WALLERI: I would request counsel not to
4  throw documents at me.
5     MR. SINGER: Counsel, I didn't throw a document
6  at you. What number is it?
7     COURT REPORTER: Number 6.
8        (Deposition exhibit 6 marked)
9  Q  Mr. Fleming, have you seen the document that's marked
10    as exhibit 6?
11 A  Uh-huh (affirmative).
12 Q  Is this your termination letter?
13 A  Uh-huh (affirmative).
14 Q  And when did you receive this letter?
15 A  I didn't receive this letter until that following
16    Monday.
17 Q  And do you know the date?
18 A  I'd need to look at a calendar.
19 Q  And I don't have a calendar with me, but it would be
20    the Monday following February 9th, is your testimony?
21 A  If I remember -- I remember she was saying -- and when
22    we went to court over benefits, that she fired me on --
23    fired me like on that Friday, but she didn't tell me
24    anything, she let her lawyer do it on a Monday.
25 Q  How did you receive this letter?

## Page 165

1  A  I went to the lawyer's office myself, and that's when I
2     made referral to a lawyer that I would be grieving
3     this. I personally picked this up from the lawyer
4     office.
5  Q  Now, you filed a -- did you file a claim with the State
6     of Alaska?
7  A  Yes, I did, sir.
8  Q  Yeah? And what was the claim?
9  A  Well, it was just a grievance. I was going to get
10    unemployment benefits.
11 Q  And did you obtain unemployment benefits?
12 A  Yes, sir.
13 Q  And that was resolved to your satisfaction?
14 A  It -- if you're talking about if I won on that, yes, I
15    did win on that. That's part of -- they had to have a
16    reason that I was doing misconduct, and the courts seen
17    that there was no misconduct on my part on the
18    termination.
19        (Deposition exhibit 7 marked)
20 Q  Mr. Fleming, do you recognize the document marked as
21    exhibit 7?
22 A  Yes, sir.
23 Q  And is this a job announcement for the Fort Yukon
24    Police Department?
25 A  Yes, sir.

Page 170

1  Q   .....in terms of deciding, you know, when Tara would
2      work or when Charlotte Fleener would work, was that
3      something that you decided? You worked with the
4      dispatcher to pick their times?
5  A   Well, I worked with the dispatcher and the city manager
6      on that. Like I say, all decisions were not up to me
7      when Miss -- when Ms. Carroll took over.
8  Q   You worked with her?
9  A   I worked with her. I wanted to keep that open
10     communication with her, as far as if she had things
11     that she felt that needs to be in there, I would go
12     through and I would try to appease what she needs done,
13     as well as getting stuff that we are required to get
14     done.
15 Q   And then you would issue directives yourself, like
16     these memorandums, to the dispatchers?
17 A   Yeah, I would issue them to them. but only after the
18     city manager approved.
19 Q   Now, your contract with the city included the city
20     providing rental for you. Is that correct? The city
21     didn't cover utilities, right, you did?
22 A   No, not exactly. That's not how it went.
23 Q   Is that how -- if you look back at exhibit 1, is that
24     what was stated in your original contract?
25 A   Yes.

Page 171

1  Q   Did it change?
2  A   Yes.
3  Q   How did it change?
4  A   It changed when office -- when we had officers move in
5      and they said they would take care of everything.
6  Q   And did they?
7  A   I'm assuming they did.
8  Q   And you were involved in the decision -- you had a
9      house rented in Fort Yukon, right?
10 A   Yes, sir.
11 Q   And you agreed to share that housing with other
12     officers?
13 A   I agreed to -- yes, I did.
14 Q   Now, you continued to have in your contract a promise
15     of -- regarding housing, right?
16 A   Yes.
17 Q   None of the other officers had contractual promises
18     about housing, did they?
19 A   Verbal contractual promises.
20 Q   Verbal promises, not written?
21 A   They moved everybody in. She stated -- she gave us a
22     table and said, all right, all officers is going to
23     move in, Reggie, and she got us furniture, she did
24     everything, and.....
25 Q   Did you object to that?

Page 172

1  A   No, I didn't.
2  Q   Regarding your own certification from the Alaska Police
3      Standards Council.....
4  A   Okay.
5  Q   .....what certifications, if any, do you have?
6  A   MOI, method of instructions, I have Glock
7      certification, shotgun certification, Datamaster, I
8      have my -- my Alaska Police Standards certification.. I
9      have to go.....
10 Q   The question was about the Alaska Police Standards
11     Council.
12 A   Okay.
13 Q   Do you understand they have a level -- different levels
14     of certification?
15 A   Yes.
16 Q   There's a basic?
17 A   Yes.
18 Q   You testified already you understood there's an academy
19     requirement, or an education requirement to get
20     basic.....
21 A   Yes, yes.
22 Q   .....as well as a minimum time having worked?
23 A   Yes, yes.
24 Q   Did you obtain that certification? Do you have a basic
25     certification?

Page 173

1  A   Yes.
2  Q   Do you have any other Alaska Police Standards Council
3      certifications?
4  A   MOI, method of instruction, all -- well, everything
5      that you get from a police officer has to be approved
6      and -- approved by the Alaska Police Standards, so my
7      shotgun, my Glock, my OC.
8           (Deposition exhibit 9 marked)
9           MR. SINGER: Is that 9?
10          COURT REPORTER: Yes.
11 Q   We looked at this document earlier, but I want you
12     to -- exhibit 9 is the termination letter you received
13     from the City of Fort Yukon, correct?
14 A   Uh-huh (affirmative).
15 Q   And it's dated February 9th, 2004. Is that right?
16 A   This is what I received from Paskvan and Ringstad.
17 Q   And just for the record, in the bottom righthand corner
18     that's your initial, or that's your signature. Is that
19     right?
20 A   Yes, sir.
21 Q   And you dated -- you wrote that you received this on
22     the 9th day of February 2004?
23 A   Then -- then that has to be the Monday.
24 Q   Whatever day of the week it was, you wrote on the time
25     that you received this document on the 9th of February

Page 174

1   2004, right?
2 A Yeah, that's my signature.
3 Q We can look at a calendar and see what day is
4   February 9th?
5 A Yes, yes.
6 Q Now, prior to receipt of this letter.....
7 A And also check my -- my -- my cell phone, because they
8   called me on my cell phone on that same day, and I
9   could probably get my cell phone bill to tell me to
10   come down from Paskvan and what-you-call him.
11 Q I think you may have just read my mind, but,
12   Mr. Fleming, prior to hand delivery of this letter, had
13   you received notice that you were to be terminated?
14 A I did not get anything from her. I did not receive any
15   information. It came to a total surprise to me.
16 Q So what prompted you to go to the lawyer's office?
17 A They called me.
18 Q And what did they say?
19 A They said that I need to come down and pick up some
20   paperwork.
21 Q That's it?
22 A That was it.
23 Q You were here in Fairbanks at the time?
24 A Yes.
25 Q Now, prior to your termination you had a phone call

Page 175

1   right -- with Fannie Carroll.
2 A Right.
3 Q You were in Fairbanks, she was in Fort Yukon?
4 A Right.
5 Q She directed you to come back to Fort Yukon?
6 A Yes.
7 Q You said no?
8 A Yes.
9 Q What were your reasons for saying no?
10 A I'd been constantly, constantly called back off my time
11   off; tired, burned out, I'd been rushed to the hospital
12   from over working, and the city -- some of the city
13   council members, I got the feel from the city council
14   members that said, you need to take care of yourself,
15   don't come back, because you've been -- you were rushed
16   to the hospital and I was on -- put on medication for
17   six months; my health.
18 Q So when did that all -- was that sometime prior to.....
19 A Yeah.
20 Q .....2004?
21 A Yes.
22 Q What year?
23 A I want to say it was 2000 -- 2003. I got -- I think I
24   got rushed twice, if I'm right. I got rushed twice to
25   the hospital.

Page 176

1 Q Which hospital?
2 A The one in Fort Yukon, the clinic.
3 Q Did you see any medical care providers.....
4 A Yes.
5 Q .....in Fairbanks?
6 A I saw the ones in Fort Yukon.
7 Q In Fort Yukon?
8 A Yes.
9 Q So at the time that you had this conversation with
10   Fannie Carroll in February 2004, at that time you were
11   not under medical care?
12 A Oh, yes, I was still taking medicine.
13 Q What medicine?
14 A I think I was still taking the medicine.
15 Q What medicine? What was the.....
16 A I don't know the name of the medicine.
17 Q What was it for?
18 A It was for -- it was -- it was -- it was -- I think it
19   was for anxiety -- anxiety and so I can relax, so, you
20   know -- because that -- I had the chest pains, I was
21   having chest pains. And they were like, you need to
22   rest before you hurt yourself.
23 Q Who prescribed the medicine?
24 A It either was Mr. Miller or Debbie McCarty.
25 Q Now, what did Fannie Carroll tell you in that phone

Page 177

1   call?
2 A That I need to come back to work.
3 Q Anything else?
4 A And that I needed to finish reprimanding Officer
5   DeLeon, that I didn't do it. And I said I did do it
6   and she had the paperwork to prove it, that I did it.
7   She wanted me to fire Officer DeLeon. That was her
8   thing, you need to come back and handle the situation
9   and fire him.
10 Q Now, at that time there was a -- a petition had been
11   circulated in the community, right?
12 A This was after that happened. This was when -- this
13   was after we had that city council meeting and
14   everybody walked out of it, and that was -- matter of
15   fact, that was the same time, because I went on leave
16   the next day. And I did what she wanted me to do, I
17   got on the plane, I went home to relax.
18 Q And so you were home for a couple of days?
19 A Not even a couple of days, not even four hours.
20 Q So you were home for a few hours, and Fannie Carroll
21   called you and said you need to come back?
22 A Yes.
23 Q And you said no?
24 A No.
25 Q Did you say anything else to her?

**Page 178**

1  A   I said, if you're going to fire me, fire me, but my
2      health is deteriorating. And I told her, I said, my
3      health is bad, and you already know -- you already know
4      this. And every time that I do go on leave, you're
5      calling me back. I need to relax, I need to unwind.
6      I'm working 166 hours, I'm doing 100 -- all the way up
7      to 188 hours, I need to relax. And I said that the
8      city council members already told me that I need to
9      relax before I hurt myself.
10 Q   And you did not go back to Fort Yukon?
11 A   I did not.
12 Q   Now, is it your testimony you went back to Fort Yukon
13     after receiving your notice of termination?
14 A   Yes.
15 Q   And did you go back with other individuals?
16 A   Yes, we all went back up for the grievance.
17 Q   When you say we all, who?
18 A   It was me, Officer DeLeon and Officer Schlumbohm at
19     that time for grievance.
20 Q   Well, you say for grievance. Now, Officer DeLeon
21     testified yesterday.....
22 A   Uh-huh.
23 Q   .....and Officer DeLeon had a lawyer at the time. Did
24     you know that?
25 A   I think I -- I think he did. I'm not too for sure on

**Page 179**

1      that.
2  Q   And Officer DeLeon testified that -- and his lawyer
3      wrote that he did not want a hearing.
4  A   Okay. If that's what his lawyer wrote, then I can't
5      say anything on that at this time.
6  Q   So you don't -- you wouldn't dispute that?
7          MR. WALLERI: Objection as to foundation, as to
8      whether or not he has any personal knowledge of that.
9          MR. SINGER: Fair enough.
10 A   Yeah.
11         MR. SINGER: Let me ask it this way.
12 Q   Do you have any personal knowledge to contradict
13     Mr. DeLeon's testimony that he did not ask for a
14     grievance hearing?
15 A   That he did not ask? I don't know if he asked.
16         MR. WALLERI: Objection as to form.....
17 A   I don't know.
18         MR. WALLERI: .....of the question.
19 A   I don't.
20 Q   You don't know one way or the other?
21 A   Well, actually, if you're talking about that meeting, I
22     knew before that he had set up for a grievance what you
23     call it, and they had put Mary Beth Solomon, if I'm
24     right, if I'm -- if I'm -- if I'm right, that they had
25     put Mary Beth Solomon, and they saw that set-up. That

**Page 180**

1      was the set-up. Like I was saying, it was a set-up, as
2      far as she was arrested by him, and they were setting
3      her up as being.....
4          MR. SINGER: Let's take -- we've been going a
5      long time. Let's go off the record.
6          (Off record)
7          (On record)
8  Q   Mr. Fleming, I'd like to just try and walk you through
9      a sequence of events. You had a -- you attended, with
10     Chris DeLeon, this meeting, community policing meeting,
11     correct?
12 A   Yes, sir.
13 Q   And there were two council members there, right?
14 A   Not at first, there were more councils there -- members
15     there.
16 Q   But there were at least two council members there?
17 A   Yes, sir.
18 Q   And the city clerk was there?
19 A   Yes, sir.
20 Q   And the city manager?
21 A   Yes, sir.
22 Q   And that meeting occurred on a Wednesday evening. Is
23     that right?
24 A   I can't be precise on when that took place, sir.
25 Q   Does that fit with your recollection?

**Page 181**

1  A   I can't describe what day exactly that happened on,
2      sir.
3  Q   Now, you left Fort Yukon on a morning flight soon after
4      that meeting, right?
5  A   Yes, sir.
6  Q   Did you leave the next day or the day after?
7  A   I want to say that it was the next day, sir.
8  Q   Now, Fannie Carroll indicates that she called you
9      approximately 5:00 p.m. on a Friday and left a message
10     for you. You had left town, she called you at home and
11     left a message. Do you recollect that?
12 A   I left on a Friday -- she called me the same day that I
13     left, four hours -- four hours after I left.
14 Q   Now.....
15 A   She didn't leave a message -- message with me, she
16     talked to me on the phone.
17 Q   Her recollection is of leaving a message on one day and
18     then the following day calling you again, and on that
19     day speaking with you and having a conversation
20     consistent with what you've described to me. Is that
21     possible?
22 A   I remember her calling me as soon as I got in and me
23     and her -- no more than four hours later, talking to
24     her on the line, and then that's when we got into that
25     conversation.

Page 250

1  A   Difficult at times. Yes, sir.
2  Q   Poor communication skills?
3  A   Yes, and in particular on how to deal with her issues,
4      or how to deal with issues with people. It's either
5      her -- her way or the highway. And I can't see how she
6      can tell an officer to do police work when she has no
7      training or nothing like that. And when I'd try to
8      give her information, it's my way, I'm the city
9      manager, and I'm -- well, we're going to get in trouble
10     this way. And I would tell -- to protect the city, I
11     would tell the officers, I will give you your
12     directions. I mean, you can't -- for instance, she
13     would want us to remove a guy out in the middle of
14     winter, to toss him out on his butt in 40 degree
15     weather, and we know you can't do that. And I told
16     them, no, don't do it, you know, and that's what I'm
17     talking about. She's -- if you don't do it her way,
18     she get mad at you.
19 Q   Was she -- the behavior that you saw from Fannie
20     Carroll, did she -- was she like that with -- she was
21     like that with you?
22 A   She has gotten -- she got that way with me, yes.
23 Q   She belittled you?
24 A   Oh, tried to.
25 Q   Criticized you?

Page 251

1  A   Tried to.
2  Q   Challenged your authority?
3  A   Tried to.
4  Q   Give you directions that you disagreed with?
5  A   Tried to.
6  Q   She did the same thing to -- did you see her do the
7      same thing to Dave McKillican?
8  A   I've seen her. Yes, sir.
9  Q   How about Chris Hampton?
10 A   Chris Hampton? He wasn't there long enough for that to
11     start happening. But after what was -- after the
12     incident, then she became -- then she started going in
13     that direction.
14 Q   Let me ask you about Chris Hampton. He was employed as
15     a police officer for about six weeks, right?
16 A   Yes, sir.
17 Q   You were chief at the time?
18 A   Yes, sir.
19 Q   Now, one of the dispatchers, Helona Kadzow (ph), she
20     made a complaint about him, right?
21 A   Yes, sir.
22 Q   Did you see that complaint?
23 A   Yes, sir.
24 Q   Were you in the city at the time the complaint came in?
25 A   I'd have to go back and look at that. Poss- -- I

Page 252

1      probably was, yes.
2  Q   You were aware of the complaint?
3  A   Yes, yes.
4  Q   Yeah. And the city brought in Greg Russell of the
5      Alaska Municipal League to do an investigation?
6  A   Yes. That was, I want to say, about -- well, I think I
7      had at that time got somebody to do the investigation.
8      That's when I was supposed to go on my couple of days
9      to relax, and I came back up to do that, to do my part
10     of the interview.
11 Q   You met with Mr. Russell?
12 A   Yes.
13 Q   Did you have any objections to the city having
14     Mr. Russell investigate?
15 A   At that point in time, no, I did not have any object --
16     objection. I wanted either the state troopers or
17     somebody else to come in that wasn't -- I didn't know
18     what -- Mr. Russell, I thought he was just an
19     independent investigator.
20 Q   You thought it was appropriate to bring somebody from
21     outside?
22 A   Yes, sir.
23 Q   And do you know, did the troopers participate in
24     employment, sex harassment, discrimination type.....
25 A   Well, you can put in a request for that.

Page 253

1  Q   Do you know if the troopers.....
2  A   They didn't want to do it.
3  Q   They didn't want to do it?
4  A   No.
5  Q   You understood the troopers did not want to.....
6  A   Right, yeah.
7  Q   They saw it as a personnel matter?
8  A   Yes. Or they -- they didn't want to get involved in
9      that -- that type of situation.
10 Q   Did you have -- do you have any objections to the way
11     Mr. Russell conducted himself with you?
12 A   No. No, I did not.
13 Q   Now, he prepared a report.
14 A   Uh-huh (affirmative).
15 Q   Did you see that report?
16 A   I didn't see the full report, I just saw one page, a
17     one-page report with a paragraph that stated what he
18     found.
19 Q   Now, Mr. Hampton testified in his deposition yesterday.
20     Are you aware of that?
21 A   Yeah, he was scheduled for it. Yeah.
22 Q   Have you talked to him.....
23 A   No.
24 Q   .....since yesterday? He testified that he resigned
25     from employment.

Page 266

1  A   Excuse me, sir?
2  Q   Have you looked at this regulation today?
3  A   I'm looking at it now, sir.
4  Q   For the first time today?
5  A   For the first time today. Yes, sir.
6  Q   And it states in the first sentence of this regulation
7      is that a participating police department may not hire
8      a person as a police officer unless the person meets
9      the following qualifications, right?
10 A   Yes, sir.
11 Q   And if we look at section (b)(2), what does it say with
12     regard to DWI offenses?
13 A   It says, a person -- or two or more DWI offenses. I
14     already told you he was a VPO officer. That's a
15     difference between a police officer and a VPO officer.
16     That's different. They -- they make that quite clear,
17     because it's hard to get people out into the rural
18     areas, and people in the village to be police officers,
19     because they don't meet the hire criteria. There is a
20     lesser criteria, which he did go to the academy and get
21     trained, and you have to be accepted into that academy.
22     And if they -- with background checks and all that,
23     they had to see it and they wouldn't let you in.
24 Q   So it's your testimony that you knew that Todd
25     Schlumbohm did not meet the basic standards to be a

Page 267

1      police officer under the Alaska Police Standards
2      Council?
3  A   He could be a VPO officer, sir.
4  Q   So he could not be a police officer?
5  A   He was a police officer, he was just a different type.
6      He carried a gun, everything was just a different name,
7      village police officer instead of what they call a
8      police officer.
9  Q   Did you make any documentation in his personnel file
10     that Todd Schlumbohm was a village police officer
11     instead of a city police officer?
12 A   Well, he had his -- yes, it was. You should have had
13     his cer- -- certificate of training from his -- from --
14     from the schooling that he had as being a VPO officer.
15     The city manager had a copy of it. There was
16     documentation; that documentation is enough alone.
17 Q   Now, Todd Schlumbohm resigned from his employment with
18     the City of Fort Yukon, correct?
19 A   Correct, sir.
20 Q   And you were not in Fort Yukon at the time. Is that
21     right?
22 A   I was on leave, sir. Well, I think at that time -- I'm
23     trying to think what date was -- was he resigned.
24 Q   It's possible that you had already been terminated on
25     the date that he resigned?

Page 268

1  A   If he resigned after Monday, then that's when I found
2      out that I was terminated.
3  Q   So you don't have any personal knowledge about the
4      circumstances under which Todd Schlumbohm resigned?
5  A   I have no personal knowledge, sir.
6  Q   Mr. Fleming, have you testified truthfully today?
7  A   To the best of my ability to remember everything, sir.
8  Q   Is there anything that I've asked you that you, upon
9      reflection, feel you need to correct?
10 A   There was a name, Kelly Carroll was the name that we
11     were looking for, on the person that I asked to submit
12     my grievance then to the city council.
13 Q   Did you do that in person or on the phone?
14 A   On the phone, because I was up in -- and she said that
15     she would do it. And I'm thinking that we were put on
16     the agenda and we were just bypassed.
17 Q   Did you attend the city council meeting?
18 A   I was there.
19 Q   Thank you for your testimony today, sir.
20 A   No problem, sir.
21 Q   I may have follow-up questions, depending on
22     Mr. Walleri.
23          MR. WALLERI: I have a couple of questions.
24 I'll try and make this quick.
25          REGINALD FLEMING

Page 269

1  testified as follows on:
2          CROSS EXAMINATION
3  BY MR. WALLERI:
4  Q   In terms of -- in Mister -- let's start off with
5      Mr. Hampton. Did you take the allegations from Helona
6      Kadzow against Mr. Hampton? What did you think about
7      those?
8  A   On that part, I had to sit back and really think on
9      what was going on, and that's why personally I wanted
10     outside of the police department, knowing the
11     information that I have already known, that they would
12     look at me and say I was not a viable person, knowing
13     that Marsha Hampton (ph) had just cited her husband,
14     knowing that Officer McKillican and Officer Hampton
15     found porno pictures on her -- on her computer where
16     she was taking a picture of herself in the -- in the
17     buff, I -- so I already knew this so I could not
18     personally do this. I could not personally do this --
19     do that, because they were -- it would have been --
20     they would have said it would have been unfair.
21 Q   Did you seriously question Ms. Kadzow's accusations
22     because of the use of -- her use of her machine for
23     porno and the fact that her husband had been recently
24     cited by Mr. Hampton?
25          MR. SINGER: Objection; founda- -- form;