Case 4:04-cv-00034-RRB   Document 107-9   Filed 09/13/2006   Page 1 of 2

Deposition of Todd Schlumbohm
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

### Page 45

1  myself, and Greg Russell.
2  Q. And was -- Reggie Fleming was in town, as
3  well; is that right?
4  A. He was not at Fort Yukon during this.
5  Q. On that day, did you converse with Greg
6  Russell about your prior DUIs and your eligibility for
7  certification with the Alaska --
8  A. We did bring that up, yes.
9  Q. What do you recall of that conversation?
10  A. He asked me -- he had his laptop, he went
11  down, and he said the safety -- the APSC regulations,
12  do you meet these, as he read them off. And when he
13  said two or more DUIs in 10 years, I said, no.
14  Q. And so Greg Russell showed you the Alaska
15  Police Standard Council regulations?
16  A. Yeah, he read them to me.
17  Q. And -- and you said you didn't meet one of
18  those regulations?
19  A. That's correct.
20  Q. And what did he say to you, do you recall?
21  A. He said, why do you think you would be
22  employed as a police officer if you don't meet this
23  regulation? And I said, well, it was my assumption
24  that it was up to the chief to make that decision.
25  Q. What do you recall Mr. Russell telling you

### Page 46

1  then?
2  A. Afterwards, I don't remember what he said.
3  Q. Do you remember telling -- did he tell you
4  that Chief Fleming had done you a disservice?
5  A. No, I don't.
6  Q. Was Chief Fleming in the room, do you
7  remember?
8  A. No, he was not.
9  Q. So in part of this discussion about your
10  continued employment, you learned, really for the first
11  time, that the regulations prohibited employment of an
12  officer with more than two DUIs?
13  A. Yeah. And I had read those.
14    MR. WALLERI: Objection as to form. Go ahead.
15    THE WITNESS: Yeah. And I had read those. I
16  mean, I looked on the computer, I pulled up APSC, I
17  read them all. But I was told it would be up to the
18  chief of police to make that decision.
19  BY MR. SINGER:
20  Q. Greg Russell indicated otherwise to you?
21  A. He didn't say that -- whether Reggie could
22  hire me or not. That was never -- that was never
23  brought up, that I remember.
24  Q. Wasn't Fannie Carroll in the room for this
25  conversation?

### Page 47

1  A. No, she was not.
2  Q. What were the reasons that you believed you
3  were going to be terminated if you did not resign?
4  A. That was told to me by Greg Russell.
5  Q. What -- what was the reason?
6  A. I don't believe there was a reason. He
7  said -- oh, there had been some personnel files, I was
8  on probation for that. And that was an issue with
9  Fannie Carroll.
10    And when I returned the files, she
11  stated that -- or I told her that I did not take these
12  files to deprive or, you know, mislead anybody.
13  Q. Tell me then about the -- your removal of the
14  personnel files.
15  A. One afternoon I was in the police department,
16  she came in, she said she was going to Fairbanks to
17  talk with her attorneys, the city attorneys, and she
18  gave me a letter stating that she wanted 911 evidence
19  tapes, case -- case files and personnel files.
20    I thought it was kind of odd that she would
21  want these tapes and personnel files. It stated on
22  there that I could get further permission if I felt I
23  needed to, and I felt that I needed to.
24    I called Chief Fleming and got told to secure
25  the files. I called Captain Tanner with -- he's a

### Page 48

1  retired captain from the State Troopers, told him the
2  situation, he says, if Reggie's your boss, then that's
3  what you need to do. So I boxed up the files and
4  secured them.
5  Q. What -- you say Fannie Carroll gave you a
6  letter?
7  A. She did.
8  Q. What did you do with the letter?
9  A. I've still got it.
10  Q. Have you produced it to your lawyer?
11  A. I have.
12  Q. Has he produced it in this litigation?
13  A. I haven't seen it, no.
14  Q. Do you know why it hasn't been produced?
15  A. No, I don't.
16    MR. WALLERI: Objection. Assumes facts not in
17  evidence. You're assuming that it has not been
18  produced.
19  BY MR. SINGER:
20  Q. If it -- you don't -- you don't have any
21  knowledge one way or the other if it's been produced;
22  is that your testimony?
23  A. I don't know.
24  Q. Tell me, then, what is it -- what is it that
25  you did to secure these files?

12 (Pages 45 to 48)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Exhibit G
Page 1 of 2

Deposition of Todd Schlumbohm
Taken August 17, 2006

Fleming, et al., vs. Carroll, et al.
Case No. 4:04-cv-00034-RRB

Page 65

1  A.  Right here leaving the District Attorney's
2  Office on Fourth Avenue.
3  Q.  Why were you -- why was your license suspended
4  as the result of an accident?
5  A.  There was no insurance on my vehicle at the
6  time.  I had discussed with my wife while I was in
7  Fort Yukon, my truck is seasonal, can you put insurance
8  on it before I get back this week because that was -- I
9  needed insurance on it to use it.
10 Q.  How long was your driver's license suspension?
11 A.  I think it was 30 days, I can't remember
12 offhand.
13 Q.  Were you placed on leave by Fort Yukon during
14 that 30-day period?
15 A.  I was not.
16 Q.  You continued to work for Fort Yukon?
17 A.  (Witness nods head.)
18 Q.  Yes?
19 A.  Yes.
20 Q.  In fact, continued to patrol.
21 A.  Yeah.
22 Q.  Continued to drive Fort Yukon police vehicles.
23 A.  Uh-hum.
24 Q.  Yes?
25 A.  Yes.

Page 66

1  Q.  And Reggie Fleming knew you were -- you were
2  working on a suspended license?
3  A.  Yeah.  He had issued me a city card.  He did
4  it.  The city had something set up to where they could
5  issue permits or something.
6  Q.  So Reggie Fleming said, I'll take care of it
7  and gave you a city permit?
8  A.  That's correct.
9  Q.  He was very accommodating of you, wasn't he?
10 A.  Sure.
11 Q.  He wanted to hire you despite your
12 DUI arrests, right?
13 A.  (Witness nods head.)
14 Q.  Yes?
15 A.  Yeah.
16 Q.  And willing to look the other way with a
17 suspended license?
18 A.  He didn't actually look the other way, I mean,
19 it was kind of, hey, you screwed up here, it's -- you
20 need to -- you need to get this taken care of.  He just
21 said, you can continue working up here, but he said,
22 limit driving, obviously, which I did, which was nice,
23 I could do my reports, but he said, we'll get a city
24 permit for you.
25 Q.  But, in fact, you did drive the vehicle on

Page 67

1  a -- while you had a suspended --
2  A.  In Fort Yukon, yes.
3  Q.  You drove the Fort Yukon police vehicle while
4  your driving privileges with the State of Alaska were
5  suspended?
6  A.  For the state, yes.
7  Q.  Do you know whether there are any laws or
8  regulations that permit a city police chief to give a
9  city driving permit to someone who has a suspended
10 state driver's license?
11 A.  I don't know.
12 Q.  You just took Reggie Fleming at his word on
13 that?
14 A.  I did, yeah.
15     MR. SINGER:  Let's take a break.  We've been
16 going an hour.  We will go off record.
17     THE VIDEOGRAPHER:  Going off record, the time
18 is 2:50 p.m.
19     (Off record, recess from
20     2:50 p.m. to 2:59 p.m.)
21     THE VIDEOGRAPHER:  Go back on record, the time
22 is 2:59 p.m.
23 BY MR. SINGER:
24 Q.  Do you -- do you know why Reggie Fleming was
25 terminated?

Page 68

1  A.  No, actually, I don't know the final outcome
2  of why he was terminated.
3  Q.  Do you have any -- were you told any reasons?
4  A.  Not -- not -- no specific reasons, no.  I
5  really don't know why he was fired.
6  Q.  So you don't know if the -- what the city
7  manager's motivations were one way or the other for --
8  for firing Reggie Fleming, she didn't tell you?
9  A.  No.  But it was that she didn't like one of
10 the actions of DeLeon, and she was very irritated that
11 Fleming had not fired him, and so she -- I'm guessing
12 that she fired Reggie so she could fire Chris.  I...
13 Q.  What was the action of DeLeon that you think
14 the city manager didn't like?
15 A.  He was wanting to discuss something about his
16 character of -- that this -- they had a petition out.
17 Q.  Were -- were you present at that meeting?
18 A.  I was present, yeah.  Me and Reggie and Chris.
19 Q.  And the meeting was -- it was in the city
20 council conference room, right?
21 A.  Yeah, they had called the city council
22 meeting, but there was only maybe half the city council
23 members were present.
24 Q.  And they proceeded with a meeting about
25 community policing, correct?

Heartland Court Reporters
Carol A. McCue, RMR
E-mail:  carol.mccue@acsalaska.net
Telephone:  907-452-6727
Fax:  907-488-7701

Exhibit G
Page 2 of 2