IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER
DELEON, CHRIS HAMPTON, WILLIAM
D. MCKILLICAN, and TODD
SCHLUMBOHM,

    Plaintiffs,

-vs-

FANNIE CARROLL, and the CITY OF
FORT YUKON, ALASKA,

    Defendants.
_____/
Case No. F04-0034 CIV (RRB)


DEPOSITION OF GREG RUSSELL

Pages 1 - 129 inclusive

August 16, 2006, 9:00 a.m.

Anchorage, Alaska

COPY

Page 6

1  background for me?
2      A. How far back would you like me to go?
3      Q. Just after high school, how's that?
4      A. I graduated from high school in 1973 in Butte,
5  Montana. In 1974 I attended Montana Institute of the
6  Bible in Lewistown, Montana for four years. Graduated
7  with a Bachelor's degree in general Bible. I attended
8  the Municipal Police Academy in 1983 in Sitka. I've had
9  over a thousand hours of Alaska Police Standards Council
10 certified training. I'm a 1995 graduate of the FBI
11 National Academy in Quantico. In a thumbnail, that's
12 pretty much it.
13     Q. Okay. In terms of your work history, when --
14 could you kind of describe that for me, since you got out
15 of high school?
16     A. In 1977 after I got out of college I pastored a
17 church in Montana and I did that for three years. I also
18 worked summers on the Pipeline for various oilfield or
19 construction companies. In 1981 I went to work for the
20 Alaska State Troopers as a specialty commissioned trooper
21 working undercover narcotics. I did that for almost a
22 year as a narc. In 1982 I became a uniformed police
23 officer in Soldotna.
24         I attained rank in 1985 as a patrol sergeant.
25 And over the next almost 15 years, supervised patrol

Page 7

1  investigations, administration, property and evidence.
2  In 2000 I accepted a job as a chief of police in Kotzebue
3  and remained there until I retired in late fall of 2002.
4          In 2003 I formed my own consulting business as a
5  sole proprietorship. In 2006 it became an LLC, which is
6  Russell Consulting.
7      Q. And do you have a contract with the Municipal --
8      A. The Alaska Municipal League Joint Insurance
9  Association, AMLJIA, yes, I do.
10     Q. Could you describe that contract, what it's --
11 what are you contracted to do?
12     A. I provide consulting services. Working
13 predominantly, primarily with their law enforcement line
14 of police pool, the ones that they provide coverage. I
15 do new chief mentoring. I help with policy and
16 procedures. I help on recruiting of police personnel,
17 kind of a troubleshooter in agencies that work that way.
18         I also do on-site visits to help identify
19 potential problems and help avoid them if there is a
20 claim or something like that where my services may be of
21 value. And sometimes I'm sent in to assist in the
22 investigation or the resolution of some internal
23 problems.
24         I also am the program manager for the law
25 enforcement agency accreditation and that's supported by

Page 8

1  AMLJIA, help facility and arrange training in management
2  issues. I'm also a -- they support the skid car trainer.
3  I'm a master trainer for that to help other trainers get
4  certified.
5      Q. Do you have other contracts other than with the
6  Municipal League?
7      A. Yes, I do.
8      Q. Could you describe some of those?
9      A. In broad terms I do preemployment background
10 checks for some agencies, generally on the department
11 head or the executive level for the agencies. And that's
12 the city and boroughs.
13         I also do workplace investigations for other
14 non-AMLJIA members pertaining to various kinds of issues
15 that come up in the workplace.
16     Q. How much of your business is with the Municipal
17 League, would you say, what percentage?
18     A. The majority of it.
19     Q. Over 75 percent?
20     A. I'd say between 75 and 80 percent, yeah.
21     Q. And your familiarity or your association with
22 the City of Fort Yukon, could you describe when you first
23 became involved with the City of Fort Yukon?
24     A. That would have been in February of 2004.
25     Q. Did you have anything -- did you have anything

Page 9

1  to do with them before, between 2002 and 2004?
2      A. I misspoke, it was February of 2003, not 2004.
3      Q. Okay. And that was your first contact with the
4  City of Fort Yukon?
5      A. Yes.
6      Q. And could you describe that contact? I take it
7  that was with -- that had something to do with Officer
8  Hampton?
9      A. Right. That was my first contact with them.
10 I'd received a phone call from Kevin Smith who was the
11 executive director of AMLJIA. I had just come back from
12 a -- another on-site and he asked if I'd be available to
13 go up to Fort Yukon to assist with a sexual harassment
14 investigation or a complaint, to investigate it. I
15 agreed and I went.
16     Q. Could you tell me what -- could you basically
17 tell me what happened?
18     A. Yes, I flew in to Fort Yukon and met with the --
19 one of the dispatchers -- it was -- I conducted an
20 investigation to the allegation of sexual harassment in
21 the police department.
22     Q. And could you describe that investigation?
23     A. It consisted of getting what information was
24 available as far as the complaint, talking to the city
25 manager, talking to the dispatcher that raised the

Page 38

A. I remember something about -- it would be just be speculation right now. I have a real hazy memory of anything about that. I do remember that was a subject, but I don't remember the particulars about it.

Q. Did you think that Officer McKillican was a bad officer?

A. No.

Q. Did you have any -- what did you think about his ability as an officer?

A. I have no clue about his ability as an officer. No clue.

Q. Why were you trying to get Fannie Carroll to hire him back?

A. So that he could complete his 12 months of probation and obtain a basic certificate.

Q. And that was your only reason to do so?

A. Yeah.

Q. Okay. What did Fannie tell you was the reason that she didn't want to do this?

A. I don't think she told me a reason. She just was not open to that idea at all.

Q. Okay. Did you talk to Mr. -- to Chief Fleming about it?

A. About Reggie, or I mean about --

Q. McKillicn?

Page 39

A. McKillican.

Q. Uh-huh.

A. Probably.

Q. Do you have any recollection of that conversation?

A. No, not in particulars. But I probably talked to him about it. Okay.

Q. Did you form any conclusion as to Fannie Carroll's management skills?

A. No.

Q. Did you ever form a conclusion as to Fannie Carroll's management skills, even after this?

A. No.

Q. So did you know -- did you have any idea or do you have a recollection of what the controversy that caused Mr. McKillican to terminate his employment was about?

A. I thought it was the evaluation.

Q. Okay. And merely the evaluation?

A. I'm not privy to any other kind of turmoil that was going on. If there were issues, this was the one that broke the camel's back and that was it.

Q. Okay. So after you had attempted to broker this arrangement to get Officer McKillican back temporarily, unsuccessfully, did you have any contact with the City of

Page 40

Fort Yukon about officer McKillican?

A. I don't think so.

Q. So what was your next contact with the City of Fort Yukon?

A. That would be after they were fired in February of '04, and I went up there.

Q. That would be Officer DeLeon?

A. DeLeon, Reggie, Fleming.

Q. And were you aware of the termination of Officer Schlumbohm?

MR. SINGER: Objection to the characterization.

BY MR. WALLERI:

Q. Were you aware of his termination of employment?

MR. SINGER: Objection to the characterization.

THE WITNESS: I'm going to have to answer the question, but I thought he quit.

BY MR. WALLERI:

Q. Okay. But you were aware of that?

MR. SINGER: That's what I was objecting to, the characterization.

THE WITNESS: You said termination. I think he got -- that would lead me to believe he got fired. he resigned.

BY MR. WALLERI:

Q. Okay. That his employment terminated?

Page 41

A. He resigned.

Q. You were aware that his employment terminated?

MR. SINGER: Objection, vague.

THE WITNESS: I'm aware that he resigned; if it terminated my understanding it was self-inflicted. He terminated himself.

Q. Okay. That was about, that happened all within a short period of all this -- the firings and the resignation of Officer Schlumbohm happened about the same time?

A. Uh-huh, yes.

Q. So let's start off with your first contact with -- after Officer -- Officer McKil -- Officer McKillican incident, do you know when you first had contact with the City of Fort Yukon again?

A. Again, I'm thinking it was in February of '04.

Q. Okay. Did you go to Fort Yukon?

A. Yes.

Q. Okay. And were the officers there?

A. Not right away. I think they came in after I did.

Q. So let's -- so what brought you to the City of Fort Yukon, what initiated your travel to Fort Yukon?

A. The same trigger as before, a request through AMLJIA to me that I go up there.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER
DELEON, CHRIS HAMPTON, WILLIAM
C. MCKILLICAN, and TODD
SCHLUMBOHM,

    Plaintiffs,

-vs-

FANNIE CARROLL, and the CITY OF
FORT YUKON, ALASKA,

    Defendants.
_____/
Case No. F04-0034 CIV RRB

DEPOSITION OF GREG RUSSELL

Pages 1 - 129 Inclusive

August 16, 2006, 9:00 a.m.

Anchorage, Alaska

COPY

FIELD NOTES

Sunday, February 15, 2004, depart ENA at 0630 hours. Anticipate a 0930 departure from ANC. Begin field notes in ANC airport.

Received phone call from Reggie Flemming around 1700. He called my cell number after learning that I was scheduled to travel to FYU. He said one of the council members told him I was coming up. He wanted me to know that FC was lying about his misdeeds, that he was working with DAO, investigating FC culpability with her father's embezzlement. FC was trying to gain access to evidence and was using her position to hinder the investigation.

Called Flemming back later that night, telling him my itinerary. He may come to airport to talk with me in person.

EXHIBIT 10
PAGE 5 OF 7

RUSSELL/GREG

AMLJIA

217 SECOND ST STE 200

JUNEAU AK  99801

　　　FEB 14 2003   ITIN    WG3JPQ  12B7CI  AMLJIA

17 FEB 03 - MONDAY
ALASKA    4823 COACH CLASS   EQUIP-DHC6 TWIN OTTER
LV: KENAI        510A   NONSTOP    MILES-  60  CONFIRMED
AR: ANCHORAGE     540A   ELAPSED TIME- :30
OPERATED BY-ERA AVIATION


ALASKA    89 COACH CLASS   EQUIP-BOEING 737 JET
LV: ANCHORAGE     630A   NONSTOP    MILES- 261  CONFIRMED
AR: FAIRBANKS     734A   ELAPSED TIME- 1:04

FRONTIER FLY  540 COACH CLASS   EQUIP-BEH
LV: FAIRBANKS     820A   NONSTOP    MILES- 144  CONFIRMED
AR: FORT YUKON    855A   ELAPSED TIME- :35

19 FEB 03 - WEDNESDAY
WARBELOWS   261 COACH CLASS   EQUIP-PAG
LV: FORT YUKON    630P   NONSTOP    MILES- 144  CONFIRMED
AR: FAIRBANKS     730P   ELAPSED TIME- 1:00

ALASKA    146 COACH CLASS   EQUIP-BOEING 737 JET
LV: FAIRBANKS     903P   NONSTOP    MILES- 261  CONFIRMED
AR: ANCHORAGE     956P   ELAPSED TIME- :53

ALASKA    4852 COACH CLASS   EQUIP-DHC6 TWIN OTTER
LV: ANCHORAGE    1110P   NONSTOP    MILES-  60  CONFIRMED
AR: KENAI        1140P   ELAPSED TIME- :30
OPERATED BY-ERA AVIATION

At about 1730 hours, this date, I phoned the CM of Fort Yukon and gave her my anticipated itinerary. She said she would meet me at the airport and provide me with a City vehicle while I was in town. She also said that I would be staying at a B & B, without the breakfast! The CM also said that she would not tell the people involved or the police department of my arrival until after I got there. She said that she is getting

EXHIBIT 10
PAGE 6 OF 7

conflicting direction from her City Council on how this matter should be resolved, ranging from firing the cop, to leaving him alone.

EXHIBIT 10
PAGE 7 OF 7