211

```
 1  Q      And Fannie Carroll was there?
 2  A      I think she was city clerk at that time.
 3  Q      And.....
 4  A      I want to say that she was -- she started off as being
 5         the city clerk and worked her way up to city manager.
 6  Q      Now, Deborah McCarty testified.....
 7  A      Okay.
 8  Q      .....and she testified that the city, including Fannie
 9         Carroll, was supportive of sending you to Barrow.
10  A      Yes.
11  Q      Yeah?  No opposition to sending you to Barrow to
12         investigate.....
13  A      It was Mr. Carroll.
14  Q      Mr. Carroll?
15  A      Yes.
16  Q      Now, did you tell the city council that you were
17         investigating Richard Carroll?
18  A      No, sir.
19  Q      And you never -- in fact, it's quite an issue here
20         today in this deposition the concern about
21         confidentiality, right?
22  A      Yes, sir.
23  Q      You don't tell people you're investigating them as a
24         police officer?
25  A      Right.
```

```
 1  Q        You don't compromise investigations?
 2  A        I will not -- I did not at that point in time, because
 3           of the seriousness of how much money it is.  He --
 4           nobody asked me -- none of the other city council
 5           members asked me who was involved except for him.  He
 6           came out and said, so who is your suspects are?  And
 7           right off the bat I'm not going to -- that's putting me
 8           out there as saying, I'm investigating you,
 9           Mr. Carroll, so now that leaves me open to anything
10           that he wanted to do.
11  Q        So did you tell him?
12  A        No, I didn't.
13  Q        Did you tell him you were investigating the former city
14           manager?
15  A        Yes.
16  Q        Yes?  And did you ever, from the winter of 2002 until
17           your termination, ever tell Fannie Carroll that you
18           were investigating Richard Carroll?
19  A        I didn't have to tell her.  He told her when she came
20           into the room in front of people and stated, my dad is
21           mad that you are doing this investigation on that money
22           and he wants you to stop and you won't stop, so he's
23           going to Fairbanks to dig up dirt on you.  She said
24           that in front of other people in there with
25           council.....
```


EXHIBIT 3
PAGE 19 OF 36

| | | |
|---|---|---|
| 1 | Q | Now, you never told Fannie Carroll that you were |
| 2 | | investigating her father, correct? |
| 3 | A | Correct. |
| 4 | Q | It's your understanding that Richard Carroll raised |
| 5 | | with Fannie Carroll his concern about you investigating |
| 6 | | the loss of this money? |
| 7 | A | Yes, sir. |
| 8 | Q | You don't know what Richard Carroll told Fannie |
| 9 | | Carroll? |
| 10 | A | When she came to my office and her dad was upset that |
| 11 | | I'm doing the investigation on him and the mis- -- and |
| 12 | | about this missing money, I'm like, how would he know |
| 13 | | that? |
| 14 | Q | Wait..... |
| 15 | A | How would he know, if I didn't say that to anybody, |
| 16 | | that I'm doing an investigation on him, unless he knew |
| 17 | | that he was in on it. |
| 18 | Q | Did she say that he's upset you're investigating him? |
| 19 | A | Him and the missing money, and that I'm doing an |
| 20 | | investigation on this missing money. |
| 21 | Q | Well, he was upset that you were investigating this |
| 22 | | missing money, but did..... |
| 23 | A | I..... |
| 24 | Q | .....Fannie Carroll say to you..... |
| 25 | A | Says..... |

```
 1  Q         .....that she understood you to be -- wait, you're
 2            right.
 3  A         I -- yeah.
 4            MR. WALLERI:  Okay, okay.  Just if I can --
 5  I'll inter- -- you know, I don't want to play -- let him ask
 6  his question, okay, and then you answer, okay, and then we'll
 7  just go that way.
 8  A         Okay.
 9            MR. WALLERI:  Because I know this is very
10  emotional, but let's just try and keep it straight.  So why
11  don't you hold off.  Why don't you ask your question and then
12  we'll go from there.
13  Q         I'm going to try, Mr. Fleming, to just ask narrow
14            questions, if you'll try to just -- I know this is a
15            lot of subject matter here, but if you can try to just
16            answer the narrow question I ask and then we'll keep
17            proceeding through this topic, that will make it easier
18            for the record and I won't be interrupting you.  And,
19            again, my apologies for interrupting you.  Your
20            testimony is that Fannie Carroll came to you and said,
21            my father is upset.  Is that right?
22  A         That's part of it, yes.
23  Q         When did that conversation take place?
24  A         That conversation -- I want to say that conversation,
25            it's hard to say, but that was like maybe two weeks
```

```
 1              before I was terminated.
 2    Q         Anybody else a witness to that conversation?
 3    A         Yes, sir.
 4    Q         Who?
 5    A         We had Officer Schlumbohm in there at that time when
 6              she came in there and.....
 7    Q         And.....
 8    A         .....I want to say we had a dispatcher in there. I'm
 9              not too for sure, but I know Officer Schlumbohm was in
10              there because he turned around and looked at me and
11              stated, I can't believe she even came in here and said
12              that.
13    Q         Now, you went to Barrow. What prompted you to go to
14              Barrow?
15    A         What prompted me to go to Barrow, I did a -- I did a
16              trace. I tracked down Eleanor Lord, because
17              Mr. Carroll inside of the meeting stated that we
18              weren't -- we're not going to send you to -- send you
19              to Barrow unless you know that she's there, because she
20              went to Canada. Like how did he know that she went to
21              Canada? She did go to Canada and then she popped back
22              up in Barrow running a gaming place in Barrow, and I
23              traced her to Barrow and she was there. And I
24              confirmed with the Barrow Police Department that she
25              was up there living.
```

216

| | | |
|---|---|---|
| 1 | Q | What was your purpose in going to Barrow? |
| 2 | A | To talk to her. |
| 3 | Q | Did you go to Barrow? |
| 4 | A | Yes, I did, sir. |
| 5 | Q | Was she there? |
| 6 | A | Huh? |
| 7 | Q | Was she there? |
| 8 | A | Apparently, we had a hard time trying to find her. |
| 9 | Q | So you don't know if she was there? |
| 10 | A | She was there, sir. She -- she was there, but it was a hard time of finding her. |
| 12 | Q | Did you make contact with her? |
| 13 | A | No, sir. |
| 14 | Q | Do you know if charges were ever pressed against her? |
| 15 | A | She died soon after from what was supposed -- died from cancer soon after. |
| 17 | Q | Possible she actually died before you arrived in Barrow? |
| 19 | A | Unh-unh (negative). She was still alive. Confirmation was made by Barrow Police Department that she was still there. |
| 22 | Q | Did you obtain any kind of subpoena to require her to meet with you? |
| 24 | A | No, sir. |
| 25 | Q | Did you have any jurisdiction in Barrow? |

| | | |
|---|---|---|
| 1 | A | A crime was committed inside of Fort Yukon, that all |
| 2 | | police officers are state certified officers that can |
| 3 | | do investigations through the -- throughout the state. |
| 4 | | We all -- if -- just like if you were down in Anchorage |
| 5 | | and the Fairbanks police was coming down and you were |
| 6 | | speeding, they could pull you over and write you a |
| 7 | | ticket. It's -- it just -- we're all state peace |
| 8 | | officers. |
| 9 | Q | So you never made contact with this woman in Barrow? |
| 10 | A | No, sir. |
| 11 | Q | After that, what other -- what else did you do to |
| 12 | | investigate this former embezzlement? |
| 13 | A | Shifting (ph) through the evidence. |
| 14 | Q | Huh? |
| 15 | A | Shifting (ph) through the evidence, looking for |
| 16 | | alternative means of coming up with different money |
| 17 | | and..... |
| 18 | Q | What evidence did you gather? |
| 19 | A | I had bags full of -- bag full of the -- the gaming |
| 20 | | cards that you have to sign and pay, and all that was |
| 21 | | in there, and just -- just on that, that was enough |
| 22 | | right there, because that was -- it was illegal for |
| 23 | | them to -- to play the game or mess around. If you |
| 24 | | have control and access of the gaming cards, you're not |
| 25 | | allowed to play, along with Rich Carroll, I think he |



|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | was in charge of that, along with the city manager, and             |
| 2  |   | there were.....                                                      |
| 3  | Q | This evidence -- was this evidence -- did you find it               |
| 4  |   | in the box in the storage room?                                      |
| 5  | A | Yes, sir.                                                            |
| 6  | Q | Did you acquire any other documentary evidence?                      |
| 7  | A | A big folder full of information, sir.                               |
| 8  | Q | You acquired it on your own?                                         |
| 9  | A | I acquired it from the -- from the folder.                           |
| 10 | Q | So I just want to be -- I just want to understand.  Did              |
| 11 |   | you -- in terms of your -- you say you investigated                  |
| 12 |   | Richard Carroll.....                                                 |
| 13 | A | Supplement -- supplement and stuff like that.                        |
| 14 | Q | You found a box in a storage room?                                   |
| 15 | A | It was -- the folder was in the bag.                                 |
| 16 | Q | In a bag was a folder with a police seal?                            |
| 17 | A | Yes.                                                                 |
| 18 | Q | And there was -- you say there was evidence in there,                |
| 19 |   | right?                                                               |
| 20 | A | Yes, sir.                                                            |
| 21 | Q | Including gaming stubs?                                              |
| 22 | A | Yes, sir.                                                            |
| 23 | Q | Did -- other than those documents that you found that                |
| 24 |   | had already been put in a police sealed envelope, did                |
| 25 |   | you go find additional documents?                                    |



```
 1  A     Additional documents like -- like per se on what?
 2  Q     Like did you go to the gaming -- city gaming building
 3        and look at documents there?
 4  A     It was burned down.
 5  Q     So the answer is no?
 6  A     No.  That gaming -- that gaming building was set on
 7        fire.
 8  Q     Did you request from any city -- a city clerk or city
 9        employees any other city files?
10  A     Any other city files?  No, I didn't know at that point
11        who to trust as -- who to trust in this, because it was
12        involving the city -- city members.
13  Q     Did you interview anyone, any witnesses?
14  A     Yes, I did.
15  Q     Which witnesses did you interview?
16  A     I interviewed -- oh, what's her name?  She used to work
17        at the city gaming and I interviewed her.  Oh, man, I'm
18        just getting horrible -- it's been so long that it's --
19        the names.  I have to really get that person's name.  I
20        know who I can get the name from.  I know it's -- all I
21        can say is it was Harlan's mom that I interviewed on
22        that, it's Harlan's mom, because I know the kid.  He
23        still every once in awhile calls and said hi so.....
24              MR. WALLERI:  Would it help if you had looked
25  at the phone book, the Fort Yukon phone book?  Would you have
```

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678



```
 1   objection to that?
 2              MR. SINGER:  No, let's do it on a break.
 3              MR. WALLERI:  Okay.
 4   Q   Other than this woman who you've described as Harlan's
 5       mom, did you -- do you recall interviewing any other
 6       witnesses as part of this investigation?
 7   A   No, sir, not at that point in time.  I was just
 8       shifting (ph) through the evidence trying to make sense
 9       of it, putting it together, upon -- upon doing my other
10       cases, so I -- I already had a big thick file on this
11       so I had a lot of other stuff that was current that had
12       to be pushed forward.  This one has already happened
13       three, four years ago, so I sift through when I have
14       time and piece through it.  I think Officer DeLeon,
15       Investigator DeLeon, I think I was trying to get him
16       involved with it to help at that point, but by that
17       time we were all, like I say, terminated.
18   Q   Now.....
19   A   And the DA saw it after I made my trip from Barrow, and
20       they stated they needed just a little bit more
21       information, do a little bit more searching, and then
22       we can -- then they'll see as far as what they're going
23       to do on it.
24   Q   And which DA?
25   A   Let's see, what's the DA's name?  I got -- I know Jeff
```


3
77 36

| | | |
|---|---|---|
| 1 | | O'Bryant, I know Danielle -- it's the -- it start with |
| 2 | | a G. What's his name? His name -- it's been awhile |
| 3 | | since I dealt with him. I used to know all the..... |
| 4 | Q | Was it a man or a woman? |
| 5 | A | It was a man. |
| 6 | Q | Did you provide in writing anything regarding your |
| 7 | | investigation of embezzlement of the city gaming funds |
| 8 | | to the DA? |
| 9 | A | The DA had the -- I took him a folder. |
| 10 | Q | You took the whole folder to the DA? |
| 11 | A | I took the whole folder. |
| 12 | Q | Did you leave it with the DA? |
| 13 | A | I let him go through it, they went through it, he went |
| 14 | | through it, and he looked at everything that I had, and |
| 15 | | then I took the folder back. He told me to do some |
| 16 | | more on it and get some more information on it and then |
| 17 | | see from where -- where we go from there with it. |
| 18 | Q | Did the DA request any specific information? |
| 19 | A | He just -- just said, just -- just get more |
| 20 | | information, we need to build information on it. |
| 21 | Q | Did the DA make any copies of your folder? |
| 22 | A | I don't know. I don't know, sir. |
| 23 | Q | And..... |
| 24 | A | But the DA will confirm that they went through and they |
| 25 | | looked through it and they knew about it. |

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

EXHIBIT 3
PAGE 28 OF 36

```
 1  Q      But one particular individual?
 2  A      It won't be just one particular, it would be also the
 3         head, the DA, too.
 4  Q      Whose that?
 5  A      Matter of fact, that was -- that was the DA right there
 6         that just walked past.  Did you see him?
 7              MR. WALLERI:  No.
 8  A      I don't know if he works for the DA's office anymore,
 9         but that was him that just walked past.
10              MR. WALLERI:  Oh, you mean the big tall guy?
11  A      Yeah.
12              MR. WALLERI:  Oh.
13  A      He just walked past.
14              MR. WALLERI:  Oh, yeah, that's.....
15  A      Mr. O'Bryant also knows about it.  Yeah.
16              MR. WALLERI:  He doesn't work with the DA's
17  office anymore.
18  Q      So.....
19              MR. WALLERI:  Okay.
20  Q      So you -- after the DA told you he needed more
21         information, what additional information did you
22         acquire?
23  A      I just tried to -- just basically worked it up, just
24         thought all -- what all happened, you know, then you
25         try to piece it all together as what -- try to get
```

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678


EXHIBIT 3
PAGE 29 OF 36

|    |   |                                                                                  |
|----|---|----------------------------------------------------------------------------------|
| 1  |   | dates, as much dates as possible.  There was a lot of                            |
| 2  |   | dates in there and just -- I need to do a supplement                             |
| 3  |   | after going through everything, write up, you know,                              |
| 4  |   | what was all going on, and just try to get some more                             |
| 5  |   | information, tying them -- you know, tying them to it,                           |
| 6  |   | and that's why I went and interviewed as many people                             |
| 7  |   | that I -- I started off only interviewed one and that                            |
| 8  |   | was, like I said, Harlan's mom.  And I had to finish                             |
| 9  |   | shifting (ph) through the rest of it and try to see if                           |
| 10 |   | I can have anybody else that could piece together, give                          |
| 11 |   | me a little bit more information and -- to get it                                |
| 12 |   | complete.                                                                        |
| 13 | Q | Did you ever interview any other individuals?                                    |
| 14 | A | Not at that point.  It was -- a lot of stuff was going                           |
| 15 |   | on, and this was more like a cold case file, you know,                           |
| 16 |   | it was more like a cold case file, and I worked on it                            |
| 17 |   | as I could.  I ran with it when -- when it was hot,                              |
| 18 |   | when I saw it, and I'm like I need to get started on                             |
| 19 |   | this, at least get the paperwork going and get a paper                           |
| 20 |   | trail going and I ran with it.  And then when I got                              |
| 21 |   | back we just got swamped in other stuff and we had to                            |
| 22 |   | do our cases, then I would go back and look through,                             |
| 23 |   | shift (ph) through it.  And then I went and interviewed                          |
| 24 |   | Harlan's mom, then I put it away for a little bit, work                          |
| 25 |   | on my other cases that I had, courts and stuff like                              |

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

3
30   36

```
 1              that.
 2   Q    The interview with Harlan's mom, was that before or
 3        after you went to Barrow?
 4   A    That was after.
 5   Q    How long after?
 6   A    Let's see, there you go.
 7             MR. WALLERI:  Oh, that's Burglin.  What's his
 8   name again?  Oh, yeah, Dave Burglin, yeah.
 9   Q    Is Dave Burglin the name of the DA that you met with?
10   A    At that time.
11             MR. WALLERI:  For the record, he's standing
12   outside the window and he's being pointed to and that's Dave
13   Burglin.
14   Q    Again, when did you interview Harlan's mom?
15   A    I want to say a month after I got back.
16   Q    Winter of 2002 or.....
17   A    The win-.....
18   Q    .....early 2003?
19   A    Early 2000 -- it could have been early 2003 or in the
20        winter of 2002.
21   Q    So after interviewing Harlan's mom, until the date of
22        your termination, you did not interview any other
23        witnesses regarding this investigation?
24   A    I -- I had to shift (ph) through all the evidence.
25        Like I said, it was a thick folder with a big old bag
```

|    |   |                                                                       |
|----|---|-----------------------------------------------------------------------|
| 1  |   | of stuff, and just trying to place times and dates.                   |
| 2  |   | And, you know, you got ticket stubs and you want to                   |
| 3  |   | look at the ticket stubs, oh, on this date, blah, blah,               |
| 4  |   | blah, on this date. And if you got a big old bag of                   |
| 5  |   | stuff, that's going to take awhile.                                   |
| 6  | Q | But just for the record, the question I'm asking is,                  |
| 7  |   | after interviewing Harlan's mom, until the date of your               |
| 8  |   | termination, yes or no, did you interview any                         |
| 9  |   | additional witnesses?                                                 |
| 10 | A | No, sir.                                                              |
| 11 | Q | And you continued to look at the file that you had                    |
| 12 |   | found in the storage room?                                            |
| 13 | A | Yes, sir.                                                             |
| 14 | Q | Did you make any notations to the file?                               |
| 15 | A | Just supplements and stuff like that.                                 |
| 16 | Q | Did you create those on a computer?                                   |
| 17 | A | Yes.                                                                  |
| 18 | Q | In a Microsoft Word document?                                         |
| 19 | A | No, CrimeStar.                                                        |
| 20 | Q | In CrimeStar?                                                         |
| 21 | A | Yes, sir.                                                             |
| 22 | Q | And did you log that you were investigating a                         |
| 23 |   | particular individual?                                                |
| 24 | A | I'm thinking it should be in the log file, that -- the                |
| 25 |   | court case -- not the court case, but the police case                 |

```
 1         number should be in the file in CrimeStar.
 2    Q    And did that file indicate Richard Carroll was a
 3         suspect?
 4    A    Oh, yes, and I wasn't the only officer.  Like I said,
 5         it was Officer Keefer who named him as a suspect.
 6    Q    Now, do you know if any charges have been brought
 7         against Richard Carroll?
 8    A    I don't know as of this date, no.
 9    Q    Now, there was a statement earlier that there may be an
10         ongoing investigation.  Do you have any knowledge to
11         believe.....
12    A    I don't know anything what's going on.  It could be, I
13         don't know.
14    Q    So after leaving employment with Fort Yukon on or about
15         February 9th, 2004, have you heard anything more
16         regarding this matter?
17    A    After I left, I had nothing else to do with the -- the
18         case.
19    Q    You haven't been contacted by the DA's office?
20    A    No, sir.
21    Q    You haven't been contacted by other police officers?
22    A    No, sir.
23    Q    You haven't been contacted by the troopers with regard
24         to this embezzlement matter?
25    A    When I -- when I got -- when I was terminated, yes,
```

|    |   |                                                                       |
|----|---|-----------------------------------------------------------------------|
| 1  |   | they wanted to know what was going on with that                       |
| 2  |   | investigation.  They asked -- you know, asked different               |
| 3  |   | questions about the files and -- and stuff like that.                 |
| 4  |   | Like the gaming committee already knows about it, too,                |
| 5  |   | so I don't -- like I say, I don't know what the gaming                |
| 6  |   | committee is doing or what anybody else -- I contacted                |
| 7  |   | the gaming committee while I was the police chief                     |
| 8  |   | there.                                                                |
| 9  | Q | Now, while employed by Fort Yukon, you kept time                      |
| 10 |   | sheets, correct?                                                      |
| 11 | A | Yes, sir.                                                             |
| 12 | Q | Did you keep true and accurate time sheets?                           |
| 13 | A | To the best of my knowledge, yes.                                     |
| 14 | Q | And did you.....                                                      |
| 15 | A | To the best of my ability and my knowledge, yes.                      |
| 16 | Q | Did you require the other employees of the police                     |
| 17 |   | department to do the same?                                            |
| 18 | A | Yes, sir.                                                             |
| 19 | Q | And did you provide instructions to the other police                  |
| 20 |   | officers about how to fill out time sheets?                           |
| 21 | A | Yes, sir, that came down from the city manager.                       |
| 22 | Q | What were the instructions?                                           |
| 23 | A | That no officer -- at one point she came and said, no                 |
| 24 |   | officers would have over 12 hours on their time sheet.                |
| 25 |   | She didn't care.                                                      |

271

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And could you tell me about some of those? |
| 3 | A | The mayor -- I got the old mayor embezzling funds from |
| 4 | | the AC store.  It took awhile to get all the paperwork. |
| 5 | | I think it -- I think it even took up to two years to |
| 6 | | actually get everything, had to get audit done, just go |
| 7 | | through standard procedures in getting the stuff done, |
| 8 | | but we had a successful conviction. |
| 9 | Q | And do you know when that was? |
| 10 | A | Let me see, the mayor -- I want to say that was in -- |
| 11 | | that was in 2002 when we started that investigation |
| 12 | | into the embezzlement from the AC store. |
| 13 | Q | And when did you conclude the investigation? |
| 14 | A | The end of 2003. |
| 15 | Q | So roughly shortly before you were terminated? |
| 16 | A | Yes. |
| 17 | Q | Do you know if there was -- if the city council was |
| 18 | | surprised, or do you know, did they express surprise |
| 19 | | that you were able to complete an embezzlement |
| 20 | | investigation? |
| 21 | A | Yes, sir.  Sir, Mr. Carroll was shocked that I -- that |
| 22 | | I pulled it off. |
| 23 | Q | And how do you know that Mr. Carroll was shocked? |
| 24 | A | Because he -- he stated that he -- it's been a long |
| 25 | | time since anybody got caught in the city for |

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678



```
 1            embezzlement.
 2   Q        And in terms of Mr. DeLeon -- well, strike that.  You
 3            indicated there was a list of jail guards?
 4   A        Yes.
 5   Q        And who maintained that list of jail guards?
 6   A        The police department and the city manager.
 7   Q        With regard to the evaluation of Mr. McKillican, do
 8            you -- in your mind at that time who did you believe
 9            was supposed to be doing evaluations of police
10            officers?
11   A        At that time it was me, sir.
12   Q        Were you -- did you consider yourself Mr. McKillican's
13            supervisor?
14   A        Yes, I did, sir.  And that was what the city manager
15            stated.  She said that she would do mine and I had to
16            do the rest, anybody else was my problem, so she only
17            had to evaluate me.
18   Q        And which city manager was that?
19   A        Ms. Carroll.
20            MR. WALLERI:  That's all I've got.
21            MR. SINGER:  Just to follow up a couple
22   questions.
23                    REGINALD FLEMING
24   testified as follows on:
25                  REDIRECT EXAMINATION
```

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

