```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ALASKA

 3

 4   REGINALD FLEMING, CHRISTOPHER    )
     DELEON, CHRIS HAMPTON, WILLIAM   )
 5   D. MCKILLICAN, and TODD          )
     SCHLUMBOHM,                      )
 6                                    )
                 Plaintiffs,          )
 7                                    )
         vs.                          )
 8                                    )
     FANNIE CARROLL and the CITY      )
 9   OF FORT YUKON, ALASKA,           )
                                      )
10               Defendants.          )
     _____)
11   Case 4:04-cv-00034-RRB

12

13

14           VIDEOTAPE DEPOSITION OF TODD SCHLUMBOHM

15              Taken Thursday, August 17, 2006

16          From the hour of 1:48 p.m. to 3:36 p.m.

17              Pages 1 through 103, inclusive

18                          Volume 1

19              Taken by Counsel for Defendants

20                             At

21           Offices of Heartland Court Reporters
                100 Cushman Street, Suite 308
22                  Fairbanks, Alaska 99701

23

24   Reported by:
     CAROL A. McCUE, RMR
25   Heartland Court Reporters
```

COPY

HEARTLAND COURT REPORTERS 907-452-6727

EXHIBIT 5
PAGE 1 OF 8

1    A.   Yeah.  Greg Russell had told me to -- I told
2    him what -- what I write -- I've never wrote a letter,
3    just I said what I just put on there that I resign at
4    this date.  He said, don't put personal reasons.  And
5    then, obviously, he made me write in the 2004 that I
6    had forgot.
7    Q.   And so after you submitted this letter of
8    resignation, did you submit to the city a written
9    grievance?
10   A.   This is the only thing that I gave Fannie
11   Carroll.
12   Q.   Okay.  You didn't, then, ask for a hearing,
13   for example?
14   A.   No.  I only asked about the city council
15   members being present, and that was before this.
16   Q.   That was because of your belief that the city
17   council had to be present to terminate you?
18   A.   A certain amount of members, I thought, had to
19   be present before we were given the option to resign or
20   be terminated.
21   Q.   What was -- where did that belief come from?
22   A.   That's just -- I don't -- who knows.
23   Q.   Did a -- after they were terminated, did
24   Fleming and DeLeon come back to Fort Yukon?
25   A.   Me and DeLeon were -- after terminated, after

80

```
 1    me and DeLeon went up on this date, and he was there,
 2    and I don't -- I think Reggie may have came in later
 3    this day.
 4         Q.   So -- so you -- DeLeon had been fired while
 5    you were in Fairbanks, right?
 6         A.   I can't remember if he was in Fairbanks or
 7    Fort Yukon, either one, Reggie or DeLeon.
 8         Q.   And you guys -- you guys flew back from
 9    Fairbanks to Fort Yukon --
10         A.   Yes.
11         Q.   -- on February 16th --
12         A.   Yes.
13         Q.   -- together?
14         A.   Yes.
15         Q.   And he was no longer a police officer?
16         A.   I -- I don't know if he was or not or if
17    that's why he came up because we knew that there was
18    going to be a city council meeting that night, we
19    wanted to attend the city council meeting.  We were
20    refused to go to the city council meeting.
21         Q.   Why -- why did you refuse to go to the city
22    council meeting?
23         A.   We didn't refuse to, we were asked not to go
24    into the city council member by Greg Russell.  He says,
25    you guys just hang out here.  They went in, they went
```

HEARTLAND COURT REPORTERS  907-452-6727

EXHIBIT 5
PAGE 3 OF 8

```
 1    to executive session, he came back, he says, we are in
 2    executive session with the city attorneys.  That's it.
 3         Q.   And then did you go in?
 4         A.   No.
 5         Q.   Why not?
 6         A.   We were asked not to go in.
 7         Q.   It's your testimony you were asked not to go
 8    in?
 9         A.   (Witness nods head.)
10              MR. WALLERI:  You need to say -- you need to
11    verbalize.
12              THE WITNESS:  Yeah.  We -- we were asked not
13    to go into the city council meeting and to wait until
14    it was over with.
15    BY MR. SINGER:
16         Q.   Okay.  Now, you never submitted, again, a
17    written grievance or a written request for a hearing?
18         A.   No, I didn't.  I was not aware of what those
19    were at the time.
20         Q.   You were aware that there was a Personnel
21    Manual Handbook?
22         A.   Yeah.
23         Q.   And that it had a grievance chapter in it?
24         A.   Yeah.  I probably -- I'm sure I read it.
25         Q.   Did -- did you -- you're sure you read it?
```

```
 1        Q.   Had -- had she ever asked you for other
 2   records before?
 3        A.   911 tapes, she has.  She's actually came into
 4   the police department during a civil case between her
 5   and Dick Miller and used the police phone just to
 6   record him.
 7        Q.   Do you know what happened to that tape?
 8        A.   I do not know where that tape is.
 9        Q.   Did she have access to that tape?
10             MR. SINGER:  Objection.  Foundation.
11   BY MR. WALLERI:
12        Q.   Do you know whether or not she had access to
13   the tape?
14        A.   I don't believe she did have access to the
15   tape.  Because we -- only the police officer had a key
16   to the back door, until a certain time.
17        Q.   Do you know whether or not she had a key to
18   the evidence locker?
19        A.   I don't believe she did the time that I was
20   there.  To that, to the evidence locker.  She did
21   obtain a key to the back door of the police department.
22        Q.   Do you know whether or not there were other
23   records missing that had some connection with her while
24   you were there?
25        A.   The only thing that I can think of when the
```

1    troopers did the investigation of personnel files was
2    brought to my attention that they could not find the
3    case files or any of the evidence tapes. They were in
4    the same location as they had always been ever since I
5    had worked there.
6         Q.   Do you know which case files were missing?
7         A.   I have no idea. Apparently there was zero
8    case files.
9         Q.   There were no case files?
10        A.   J.R. Wallace stated that when the troopers
11   were up here they could find no case files or no
12   evidence tapes.
13        Q.   So that from your understanding -- and the
14   troopers made inquiry to you about that?
15        A.   They did not. J.R. did.
16        Q.   And what did J.R. ask you?
17        A.   He didn't ask me anything, he had just stated
18   that when the troopers were up here, they did not find
19   any of the case file in the drawers, they did not find
20   any of the evidence tapes.
21        Q.   Okay. Were there -- were you aware that there
22   was an ongoing investigation into Richard Miller?
23        A.   Towards the end of our employment, yes.
24        Q.   Was there a case file on that?
25        A.   Yes, there was.

```
 1        Q.   And how do you know that there was a case
 2   file?
 3        A.   I know that Reggie had started it, there was a
 4   case file, the Maggie John, I think she was a ex-city
 5   manager who had a warrant for her arrest and was
 6   arrested on December 23rd of '03.
 7        Q.   And she was arrested by officer DeLeon,
 8   correct?
 9        A.   That is correct.
10        Q.   Okay.  And she was involved in the
11   investigation?
12        A.   She was.
13        Q.   And do you know whatever happened to that case
14   file?
15        A.   I have no idea.  I would assume that that case
16   file would still be there.  The case should still be on
17   the computers that are still up there.
18        Q.   But officer -- or J.R. Wallace indicated to
19   you that there were no case files?
20        A.   That's correct.  He was the only officer up
21   there for -- I believe, during that investigation with
22   the troopers.
23        Q.   Would that lead you to believe that the
24   investigation file into Fannie Carroll's father was
25   also missing?
```

```
1        A.   Very well could have been.
2             MR. SINGER:  Objection.  Foundation.
3   BY MR. WALLERI:
4        Q.   Go ahead.
5        A.   Very well could have been missing, as well,
6   because that file was supposed to be where -- in the
7   file cabinet, and there were no files in there then,
8   yeah, they would be missing, as well.
9             MR. WALLERI:  Okay.  Thank you, I think that's
10  all I have.
11            MR. SINGER:  Couple other questions.
12                    REDIRECT EXAMINATION
13  BY MR. SINGER:
14       Q.   You mentioned an arrest on December 23rd of
15  Maggie John?
16       A.   Yeah.  I wasn't there for the arrest, but I
17  just remember the date.
18       Q.   You were in Fairbanks?
19       A.   I believe I was in Fairbanks.  We had went
20  over prior to that a few days before with a warrant,
21  and she was not at her residence and we were told that
22  she was in town somewhere.
23       Q.   And so you were in Fairbanks?
24       A.   Yeah.
25       Q.   You were on your leave?
```