CONFIDENTIAL SEALED TRANSCRIPT

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ALASKA

3

4    REGINALD FLEMING, CHRISTOPHER    )
     DELEON, CHRIS HAMPTON,           )         CONFIDENTIAL
5    WILLIAM D. MCKILLICAN, and       )
     TODD SCHLUMBOHM,                 )
6                                     )
                                      )
7         Plaintiffs,                 )
                                      )
     vs.                              )
8                                     )
     FANNIE CARROLL, and the CITY     )
9    OF FORT YUKON, ALASKA,           )
                                      )
10        Defendants.                 )
     _____)
11   Case No. 4:04-cv-00034-RRB

12

13                  **CONFIDENTIAL**

14         **DEPOSITION OF CHRISTOPHER DeLEON**

15           Taken Wednesday, July 19, 2006

16      From the hour of 9:05 a.m. to 3:03 p.m.

17         Pages 1 through 232, inclusive
                      Volume 1
18
              Taken by Counsel for Defendants
19
                           At
20
         Offices of Heartland Court Reporters
21           100 Cushman Street, Suite 308
                Fairbanks, Alaska 99701
22

23

24   Reported by:
     CAROL A. McCUE, RMR
25   Heartland Court Reporters

         HEARTLAND COURT REPORTERS   907-452-6727

EXHIBIT 6
PAGE 1 OF 10

COPY

```
1        A.    Uh-hum.
2        Q.    You say you filled out an F-3 form; is that
3    right?
4        A.    Yes.
5        Q.    What other steps do you recall in the process
6    to get hired?
7        A.    I had a meeting with Reggie and Fannie.
8        Q.    In Fairbanks or in Fort Yukon?
9        A.    In Fort Yukon.
10       Q.    What do you recall of that meeting?
11       A.    Well, pretty much Fannie told me that be
12   selective on who you arrest.  Sometimes you just need
13   to turn your head.  She asked if I was capable of doing
14   that.  I told her I would not.  And she said, well,
15   you'll find it much easier if you turned your head to
16   some things.  And that was it.
17       Q.    This was your first meeting?
18       A.    (Witness nods head.)
19       Q.    Is that right?
20       A.    Yes.
21       Q.    Did she tell -- you say Fannie Carroll told
22   you to be selective on who you arrest; is that right?
23       A.    Correct.
24       Q.    Did she identify who -- what individual you
25   were supposed to be selective about?
```

1    A.   She said there was three families in
2  Fort Yukon, three major families in Fort Yukon.  And,
3  you know, I pretty much took the hint that there's
4  three big families in Fort Yukon, so...
5    Q.   So I just want to -- I want to understand what
6  she said as to the hints that you took.  So she told
7  you there were three big families in Fort Yukon?
8    A.   Yeah.
9    Q.   What -- did she name the families?
10   A.   Not that I remember.
11   Q.   And did Fannie Carroll tell you not to arrest
12  people from these three families?
13   A.   She said be selective about who you arrest.
14  She never said do not arrest them.
15   Q.   And you said that Fannie Carroll told you to
16  turn your head?
17   A.   Yes.
18   Q.   Did she tell you what to turn your head about?
19   A.   Just in general.  I mean, nothing specific.
20   Q.   She didn't tell you to turn your head to
21  particular kinds of crimes, for example, in this
22  meeting?
23   A.   Like I said, she didn't say specifically turn
24  your head to DUI, she didn't say specifically turn your
25  head to -- oh, she did say, now, New Year's Eve and

```
 1           My wife's a doctor, we -- and I had a large
 2   inheritance, I didn't need to, quote, unquote, fly back
 3   for $150 ticket on city -- on state funds or whatever
 4   else like that.  I -- and I -- that never thought
 5   crossed my mind.  So -- but yes.  I can see how maybe
 6   some person could misconstrue that.
 7      Q.   And that -- and you did understand after the
 8   fact that that was a concern in the community?
 9      A.   I don't know why it was such a concern, but I
10   understand some of the citizens were concerned.
11      Q.   And -- and then, well, Reggie Fleming was
12   supposed to return to Fort Yukon that day; isn't that
13   right?
14      A.   That evening, it was my understanding.
15      Q.   And he didn't return; isn't that right?
16      A.   That's my understanding, yeah.  Well, yes.  He
17   did not.  No.
18      Q.   And so then did officers from -- who were on
19   leave in Fairbanks have to return to Fort Yukon?
20      A.   Yes.
21      Q.   Who returned?
22      A.   Myself and Sergeant Schlumbohm.
23      Q.   Now, were you with Sergeant Schlumbohm that
24   evening?
25      A.   Yes.  Well, at the airport when we flew out,
```

1   yes.

2      Q.  Was there a phone call where you were in the
3  same place as Mr. Schlumbohm and you talked to Fannie
4  Carroll?

5      A.  At the house.

6      Q.  You were at the house?

7      A.  The cop house.

8      Q.  Was there a discussion while you were in
9  Fairbanks about the need to go back?  How did you learn
10  that you needed to go back to Fort Yukon?

11     A.  Charlotte Fleenor, the dispatcher on duty,
12  called.

13     Q.  Did you also have a conversation with Fannie
14  who was --

15     A.  Yes.

16     Q.  You were in Fairbanks and she was in
17  Fairbanks?

18     A.  No.

19     Q.  We need somebody to get back to Fort Yukon?

20     A.  Well, my understanding was that she was in
21  Anchorage.

22     Q.  Okay.  She was in Anchorage.

23     A.  Okay.

24     Q.  And trying to make sure there was a police
25  officer in town?

1    A.   Well, she was -- she wasn't aware.  The
2  problem arose when Eric Tremblay would not go to
3  certain calls of domestic violence.  He refused to
4  go.
5         There was also a lost snow-machiner that
6  they were going to start a search and rescue.  Also
7  was relayed to me is that there was a large shipment
8  of drugs that were being brought in from Circle.
9    Q.   So Charlotte Fleenor, she was the dispatcher,
10 right?
11   A.   Correct.
12   Q.   And she called because these various events
13 were occurring in Fort Yukon?
14   A.   Correct.
15   Q.   And they wanted a police officer in town?
16   A.   Correct.
17   Q.   And didn't have one?
18   A.   Well, just the deputized officer, Eric
19 Tremblay.
20   Q.   Eric Tremblay was the maintenance director of
21 the city?
22   A.   I don't know his title, but he performed
23 maintenance, yes.  Yeah.
24   Q.   So were you -- well, I want to understand.
25 Were you with Todd Schlumbohm that evening in

```
 1     Fairbanks?
 2          A.   Just at the airport.  Just at Warbelow's,
 3     yeah.
 4          Q.   Was he intoxicated?
 5          A.   He had stated that he had a couple beers, yes.
 6     But I wouldn't characterize him as intoxicated.  Was he
 7     under the influence of alcoholic beverages?  Yes, he
 8     had a couple of beers.
 9          Q.   Did you both fly back to Fort Yukon?
10          A.   Yes.
11          Q.   Did you charter a plane?
12          A.   With Fannie Carroll's permission.
13          Q.   All right.  And there was some dispute about
14     the chartered plane?
15          A.   There was.
16          Q.   Yeah.  What was the dispute?
17          A.   She said that she never authorized it and I
18     did it on my own volition.
19          Q.   Is that another one of the events that you
20     think culminated in your termination?
21          A.   I know.
22          Q.   So it was a -- it was a dispute about who
23     authorized the cost of chartering a plane back to
24     Fort Yukon on December 23rd?
25          A.   My understanding was that she told the city
```

```
 1    council that I authorized it without her approval.
 2    There was a 911 tape made of that conversation that she
 3    had with me. She had a closed-door meeting with --
 4         Q.   Do you have -- do you have that tape?
 5         A.   It's evidence. I couldn't take that tape.
 6         Q.   Okay. So you don't -- you don't have that
 7    tape?
 8         A.   No. It's evidence. I -- I can't touch that
 9    tape.
10              Because there's other people calling for
11    service in emergency situations on that tape, so that
12    there becomes evidence.
13              She had a closed-door meeting with us. She
14    told me and told us that there was some unhappy people
15    about this charter.
16              Well, Charlotte said, well, you know, there's
17    a tape of this, and I became aware of this tape prior
18    to the meeting.
19              We played the tape and Ms. Carroll's face
20    turned white as a sheet and she said --
21              (Cell phone ringing.)
22              THE WITNESS: -- she said, stop the tape. The
23    tape was stopped and on the tape, again, there's her
24    approval for the charter.
25              And she said, okay. Nobody's going to tell
```

1  anybody about this. We're going to keep this between
2  us. And we're going to cover the cost of the charter,
3  which I believe was in the neighborhood of $1200, I
4  remember her saying, by impounding vehicles and writing
5  tickets and no one will know.
6  BY MR. SINGER:
7     Q.  Do you remember when that happened? Was that
8  in January?
9     A.  I think so.
10    Q.  Okay. And then there's this petition that
11 circulates?
12    A.  Correct.
13    Q.  Yeah. And what was your -- how did you feel
14 about this petition?
15    A.  Well, it was upsetting to me.
16    Q.  Why was it upsetting?
17    A.  Well, primarily that Paul Shewfelt would issue
18 a petition because I arrested him for him breaking the
19 law. There was also some mistruths about me.
20    Q.  What were the mistruths about you?
21    A.  That I went into --
22        (Cell phone ringing.)
23        THE WITNESS: That I went into a store with
24 two AK-47s, which did not happen. I mean, I don't --
25 AK-47 is a military weapon.

```
 1          Q.   And then at some point, you raised
 2   concerns about your own employment with the city;
 3   is that right?
 4          A.   Well, it was a policing issue.
 5          Q.   So what did you -- how did that -- did you --
 6   did you initiate a discussion about yourself?
 7          A.   I did.
 8          Q.   And how did that come up?
 9          A.   I brought it up.
10          Q.   What did you say?
11          A.   I'd like to have some kind of time to speak
12   about -- I mean, and I'm paraphrasing, about the -- the
13   petition and the mistrusts that are being said against
14   me, you know, and...
15          Q.   Now, you later went back into the room and
16   apologized?
17          A.   Yeah.
18          Q.   Do you remember that?
19          A.   Yes.
20          Q.   And you apologized for getting heated?
21          A.   Yes.
22          Q.   And did you -- would you, sitting here today,
23   testifying under oath, would you say you got heated in
24   your statements?
25          A.   No.  I was listening to the tape and I
```