```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF ALASKA

 3   REGINALD FLEMING, CHRISTOPHER  )
     DELEON, CHRIS HAMPTON, WILLIAM )
 4   D. MCKILLICAN and TODD         )
     SCHLUMBOHM,                    )
 5                                  )
                   Plaintiffs,      )
 6                                  )
          vs.                       )
 7                                  )
     FANNIE CARROLL and the CITY OF )
 8   FORT YUKON, ALASKA             )
                                    )
 9                 Defendants.      )
     _____) Case No. F04-0034 CIV (RRB)
10
                   DEPOSITION OF FANNIE M. CARROLL
11                          May 26, 2006

12
     APPEARANCES:
13
            FOR THE PLAINTIFFS:     MR. MICHAEL J. WALLERI
14                                  Law Offices of
                                     Michael J. Walleri
15                                  Attorneys at Law
                                    330 Wendell Street
16                                  Suite E
                                    Fairbanks, Alaska 99701
17                                  (907) 452-4716

18          FOR THE DEFENDANTS:     MR. HOWARD S. TRICKEY
                                    Jermain, Dunnagan & Owens
19                                  Attorneys at Law
                                    3000 A Street, Suite 300
20                                  Anchorage, Alaska 99503
                                    (907) 563-8844
21
            ALSO PRESENT:           MR. PETER SANDBERG
22
                              *  *  *  *
23

24

25
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 1
PAGE 1 OF 16



| | | |
|---|---|---|
| 1 | Q | Okay. Are you currently married? |
| 2 | A | No. |
| 3 | Q | When you moved to Fort Yukon in September of 2001, how |
| 4 | | did you support yourself, prior to becoming the city |
| 5 | | manager? |
| 6 | A | I worked a couple of -- I don't know how long exactly, |
| 7 | | but I did some substituting at the Fort Yukon School. |
| 8 | Q | Did you have a house in Fort Yukon? |
| 9 | A | No. |
| 10 | Q | And where did you live? |
| 11 | A | With my parents. |
| 12 | Q | And your parents are? |
| 13 | A | Richard and Eva (ph) Carroll. |
| 14 | Q | And when did you begin your employment with the City |
| 15 | | of Fort Yukon? |
| 16 | A | In October of '01. |
| 17 | Q | And what was your position? |
| 18 | A | City clerk. |
| 19 | Q | How did you learn about that job? |
| 20 | A | They had it posted on bulletin boards. |
| 21 | Q | Do you remember who the city manager was at the time? |
| 22 | A | There wasn't one. |
| 23 | Q | Do you when they acquired a city manager? |
| 24 | A | In February. |
| 25 | Q | That would be February of '02? |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 1
PAGE 2 OF 16

14

```
 1   A      Not exactly.
 2   Q      Has it been a long time?
 3   A      Yes.  What would long be?
 4   Q      Pardon me?
 5   A      What would long be, I don't --
 6   Q      Well, five years?
 7   A      Five years, at least five years.
 8   Q      Okay.  Ten years?
 9   A      Probably 10.
10   Q      Do you -- in terms of your father, Richard Carroll,
11          has he ever been the city manager for Fort Yukon?
12   A      Yes.
13   Q      And when was that?
14   A      I don't know the exact dates.
15   Q      For a number of years?
16   A      Yes.
17   Q      More than five?
18   A      Yes.
19   Q      Do you know if he was the city manager who hired your
20          sister as the liquor store manager?
21   A      I don't have any idea.
22   Q      Any other members of your family that were working for
23          the city?
24   A      When?
25   Q      When you were hired?
```

*METRO COURT REPORTING*
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876



EXHIBIT 1
PAGE 3 OF 16

| | | |
|---|---|---|
| 1 | | as of when you became a city clerk? |
| 2 | A | In October '02 there were two police officers. |
| 3 | Q | And were you involved in the hiring of Chris Hampton? |
| 4 | A | No. |
| 5 | Q | He was hired before you became city manager? |
| 6 | A | Yes. |
| 7 | Q | Okay.  Were you aware of any temporary police |
| 8 | | officers? |
| 9 | A | When? |
| 10 | Q | When you were city clerk? |
| 11 | A | October '02? |
| 12 | Q | Yes.  Upon your return to Fort Yukon? |
| 13 | A | Temporary officers.  Describe temporary. |
| 14 | Q | Well, not full-time? |
| 15 | A | Or define -- I don't know. |
| 16 | Q | Fill in? |
| 17 | A | Fill in, not full-time? |
| 18 | Q | Uh-huh. |
| 19 | A | With the city? |
| 20 | Q | With the city? |
| 21 | A | Not that I'm aware of. |
| 22 | Q | Okay.  Were you aware of any other law enforcement |
| 23 | | officers in the community when you were the city |
| 24 | | clerk? |
| 25 | A | Yes. |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 1
PAGE 4 OF 16

```
 1         any advice with city manager business, police
 2         business.  I gave that list also to Reggie, I even
 3         made copies and gave it around to everybody in the
 4         police department and the city council and
 5         administration.
 6   Q     Well, you knew Helena Cadzow, correct?
 7   A     I know who she is, yes.
 8   Q     How long have you known Helena Cadzow?
 9   A     I just met her when I got to Fort Yukon.
10   Q     Okay.  And you did not know her before then?
11   A     No.
12   Q     And she's from Fort Yukon, correct?
13   A     She lives there now.
14   Q     Are you familiar -- did you ever talk to Mr. DeLeon
15         and talk to him about the fact that he needed to be
16         aware that there were three major families in Fort
17         Yukon?
18   A     I probably did.
19   Q     What are those three families?
20   A     The Solomons, the Carrolls and the Peters.
21   Q     Okay.
22   A     The larger families.
23   Q     And the Cadzow is a fairly well known family Fort
24         Yukon also, correct?
25   A     Well known, yes, everybody knows them.
```

51

```
 1  Q      And that is a long time Fort Yukon family, correct?
 2  A      When I said predominant, I meant large.
 3  Q      Okay.
 4  A      And the Cadzows are known, I mean, but they're not
 5         large.
 6  Q      They're a smaller family?
 7  A      Yes.
 8  Q      Okay.  And the -- were you concerned, in your
 9         discussions with Mr. DeLeon, did you ever tell him
10         that you needed to be aware not to -- that if you
11         irritated one member of a family that it would.....
12  A      So we're not thinking about the Hampton anymore?
13  Q      I'm just, no, I -- we'll get back to it.
14  A      I mean, you -- I'm sorry, I just -- you're hopping.
15         You were here with Helona and Hampton and now we're
16         talking about DeLeon.
17  Q      Well, I'm just talking about the families of Fort
18         Yukon, and what you may have told Mr. DeLeon about
19         that?
20              MR. TRICKEY:  He can jump around if he wants
21  to so we can't control.....
22  A      Well, I just wanted to make sure that you're jumping
23         around because --
24              MR. TRICKEY:  Yeah.  He'll come back to that,
25  I'm sure he'll tell you when he comes back to Hampton it'll be
```

```
 1         clear but try to follow as he moves around to different
 2         subject areas if you can.
 3   Q     (By Mr. Walleri)  In terms of Fort Yukon, did you ever
 4         tell Mr. DeLeon that it was not a good idea, that if
 5         you made one member -- that if you basically irritated
 6         a member of one of the families that you would
 7         irritate the entire family?
 8   A     I don't remember saying that word for word.
 9   Q     Okay.  Does that -- is that generally your
10         understanding of how things work in Fort Yukon?
11   A     Could be.
12   Q     Well, could be or is?
13   A     I don't know.  It would depend on what the situation
14         was.
15   Q     Okay.
16   A     If you, you know, killed someone, yeah, I think you're
17         going to upset like the family and everybody else.
18   Q     What about arresting somebody?
19   A     It's -- over what?
20   Q     Well, let's get back to Mr. Hampton.  Were you -- what
21         did you think about the complaint from Ms. Cadzow?
22         Did you think it was credible?
23   A     I don't think that that's my place to think.  I think
24         that a legal issue came up, a sexual harassment, it's
25         not a light thing, we have posted signs and that's in
```

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | the handbook, that will not be tolerated.  And are you               |
| 2  |   | going to say, oh I believe you and I don't believe                   |
| 3  |   | you?  I don't know.  I think that that has to be                     |
| 4  |   | handled discreetly and private and I thought that the                |
| 5  |   | outside investigation was the best way to go and                     |
| 6  |   | that's what I -- it was recommended when I contacted                 |
| 7  |   | AMLJIA, and that's what happened.                                    |
| 8  | Q | Okay.  As a city manager, did you have personnel                     |
| 9  |   | responsibilities?                                                    |
| 10 | A | Yes.                                                                 |
| 11 | Q | Okay.  And what were those responsibilities?                         |
| 12 | A | To be the director.                                                  |
| 13 | Q | For personnel issues, okay.  And so when a sexual                    |
| 14 |   | harassment complaint came to you, that was within your               |
| 15 |   | responsibilities as a city manager, your personnel                   |
| 16 |   | responsibilities?                                                    |
| 17 | A | Yes.                                                                 |
| 18 | Q | Okay.  Did you believe that Ms. Cadzow's complaint was               |
| 19 |   | credible?                                                            |
| 20 |   | MR. TRICKEY:  Object as to.....                                      |
| 21 | A | I'm not going to answer that because I don't have -- I               |
| 22 |   | don't have a form -- I don't -- I can't say, I mean,                 |
| 23 |   | she said something happened, I'm going to say no it                  |
| 24 |   | didn't or it did, I mean, that's not my place.  I                    |
| 25 |   | can't -- I can't say yes or no to that.                              |

*METRO COURT REPORTING*
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 1
PAGE 8 OF 16

57

| | | |
|---|---|---|
| 1 | A | I don't remember.  When was this? |
| 2 | Q | During June or July of 2003? |
| 3 | A | And today's May, 2006, no I don't remember. |
| 4 | Q | Okay.  That was not a significant situation with you? |
| 5 | A | I don't remember. |
| 6 | Q | Okay.  Did you claim -- do you remember the stalking case against Mr. Miller? |
| 8 | A | I remember seeing you in court then. |
| 9 | Q | Do you remember what you were claiming? |
| 10 | A | We have a suit here and -- with these police officers against me, and I'm not going to sit here and think about being in court over being stalked. |
| 13 | Q | Do you remember, in your personal -- in that stalking order, that there was a subpoena issued for 911 tapes of the city? |
| 16 | A | I don't remember seeing a subpoena of anything.  I don't remember.  Was I given a subpoena? |
| 18 | Q | No.  I didn't ask you that.  I asked you whether or not you remember that during that litigation, that 911 tapes for the city were subpoenaed by Mr. Miller? |
| 21 | A | I don't -- I don't remember. |
| 22 | Q | Okay.  Do you remember having a conversation with Mr. McKillican about discussions he had with Mr. Miller? |
| 24 | A | When? |
| 25 | Q | On the day that he terminated his employment? |

```
 1              on the tape.
 2    Q         Okay.  Did something happen before the recording?
 3    A         I -- I don't know, I mean, that's what I'm saying, I
 4              don't know what it is.
 5    Q         Well, why were you going to do his evaluation?
 6    A         Why?  Because they work shifts and I wanted his
 7              evaluation done before -- before his one year was
 8              over.
 9    Q         Was there any particular reason why you wanted to do
10              it that day?
11    A         It could possibly be that I didn't know when he was
12              coming back.
13    Q         Well, let's get back to the Mr. Miller thing.  What --
14              how was it that you came to file a petition against
15              Mr. Miller?
16    A         I don't want to talk about that petition here and it's
17              not this case.....
18              MR. TRICKEY:  And I don't think.....
19    A         .....and I'm not going to talk about it.
20              MR. TRICKEY:  I don't see how that's relevant.
21    This has to do with a rumor generated as a result of the court
22    proceeding and evaluation of a police officer's performance.
23    What happened between her and Mr. Miller and why a complaint
24    was filed is irrelevant.  I'm not going to let you inquire
25    into it.  It's upsetting to the witness and I don't think it
```

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 1
PAGE 10 OF 16

75

| | | |
|---|---|---|
| 1 | | MR. WALLERI: Just a few more minutes on the |
| 2 | | McKillican thing if that's okay. |
| 3 | | MR. TRICKEY: All right. |
| 4 | Q | (By Mr. Walleri) When you advised Mr. McKillican that you were going to do an evaluation of him, did you plan on giving him a good evaluation? |
| 7 | A | The evaluation, I had no forethought at that time of an outline, that I was going to use. |
| 9 | Q | So you had no -- it's your testimony that you had no idea whether or not it would be a good evaluation or a bad evaluation? |
| 12 | A | I don't have an outline that I have possession of because I never made one to do that evaluation, because it never needed to be done. So what the answers to the questions would be is nobody knows..... |
| 16 | Q | Including you? |
| 17 | A | .....because it didn't happen. That's correct. |
| 18 | Q | So you had no intentions at the time that you told him that you were going to have an evaluation that day. |
| 20 | A | Uh-huh (affirmative). |
| 21 | Q | You had no idea whether or not it would be a good evaluation or a bad evaluation? |
| 23 | A | I -- I did not have an outline drawn up with questions to ask, the answers to the questions, how could I know what it is now because the evaluation never occurred. |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 1
PAGE 11 OF 16

```
 1              So you're asking me a question about something that
 2              never occurred.
 3    Q         No, I'm asking about.....
 4    A         Yeah, you are.
 5    Q         .....your state of mind at the time.  Did you have any
 6              belief.....
 7    A         There was no perceived outcome of it before that,
 8              before it occurred.  How could I say what the
 9              evaluation outcome would be if I didn't give the
10              evaluation?
11    Q         I'm asking your intention, your state of mind?
12    A         I was going to give him an evaluation.  I did not.
13    Q         What was your intention as to whether it would be
14              a.....
15    A         To give an evaluation, that was the intention.
16    Q         And what was your understanding of Mr. McKillican's
17              performance as a police officer at that time?
18    A         He would have had to come into my office and answer
19              questions and he did not.
20    Q         And you.....
21    A         So I'm saying, it didn't happen, I don't have the end
22              result for you.  I can't perceive what it was going to
23              be.
24    Q         So your understanding of how you were going to conduct
25              the evaluation had nothing to do with how he -- your
```

| | | |
|---|---|---|
| 1 | | observations as to the performance of his duties as a |
| 2 | | police officer, prior to your evaluation of him? |
| 3 | A | He had been there for months and months and months. I |
| 4 | | cannot sit here and answer what the outcome would be. |
| 5 | Q | So it was all dependent on what his answers to his |
| 6 | | (ph) questions in his evaluation were going to be? |
| 7 | A | Certainly. |
| 8 | Q | Okay. And if he gave good answers, he was going to |
| 9 | | have a good evaluation, I assume? |
| 10 | A | One would assume. |
| 11 | Q | Okay. The -- do you believe or did you believe on |
| 12 | | August 11th that Mr. McKillican had performed his |
| 13 | | duties as a police officer in an adequate fashion? |
| 14 | A | I -- I can't -- I can't say. All I know is that the |
| 15 | | evaluation was never performed and anything would be |
| 16 | | speculative about what the outcome would be or would |
| 17 | | have been or whatever. It's -- I can't answer that |
| 18 | | because I don't have an answer. |
| 19 | Q | Okay. Is there some reason why you couldn't have |
| 20 | | waited for Mr. Fleming to come back and do the |
| 21 | | evaluation with Mr. Fleming? |
| 22 | A | The only thing I can think of is what I, you know, |
| 23 | | what is the scheduling of who's coming and who's |
| 24 | | going, what is the rotation? When Fleming came in, |
| 25 | | would McKillican be going out, or whatever, was there |

```
 1              an overlap?  I imagine that if they kept the schedule
 2              that that would be answered.
 3                   MR. TRICKEY:  Seems like we're at a breaking
 4  point for lunch?
 5                   MR. WALLERI:  No, just a couple more
 6  questions.
 7  Q       (By Mr. Walleri)  At that time, were you aware of any
 8           deficiencies in Mr. McKillican's performance as a
 9           police officer?
10  A       I -- I can't think of exact incidences to answer that
11           question.
12  Q       So you were.....
13  A       I don't know.
14  Q       .....in your recollection, you were unaware of any
15           deficiencies in Mr. McKillican's performance as a
16           police officer for the City of Fort Yukon as of August
17           11th, 2003?
18  A       This is his first job as being a police officer and
19           I'm sure that it was a learning experience so to say
20           am I aware of any deficiencies?  I -- I couldn't
21           pinpoint anything right off the top of my head.
22  Q       Were you aware of any deficiencies or not?
23  A       I -- like I said, I can't sit here and tell you case
24           by case what -- what a deficiency of his would be.  I
25           don't know.
```

|   |   |   |
|---|---|---|
| 1 |   | a good leader, he needs to delegate and give people |
| 2 |   | their own responsibilities.  In January, I you know, |
| 3 |   | was pleading and demanding it.  By the beginning of |
| 4 |   | February, there still was nothing to resolve his |
| 5 |   | staffing.  There..... |
| 6 | Q | Well, what exactly did you want him to do? |
| 7 | A | I really in particularly (sic) wanted a calendar of |
| 8 |   | work schedule for his guys.  You know, they need to |
| 9 |   | know, it would be nice for us to know, who's coming, |
| 10 |   | who's going, who's doing what.  They needed to overlap |
| 11 |   | their information.  One guy would go out, the case is |
| 12 |   | still going on, you know, just because you leave town |
| 13 |   | doesn't mean your case is going to wait for you to get |
| 14 |   | back.  It's like growing pains in a department.  He |
| 15 |   | needed to keep up with it and not -- not everybody is |
| 16 |   | a doer on their own, you just can't expect people to |
| 17 |   | take responsibility all of the time. |
| 18 | Q | Was it your understanding that there was no schedule |
| 19 |   | for on-duty or off-duty of the officers? |
| 20 | A | If you can show me that I received and a schedule was |
| 21 |   | kept for one complete month, that -- that would be |
| 22 |   | great, I mean, there wasn't even -- if you've got |
| 23 |   | documentation on that, I would love to see it. |
| 24 | Q | Well, I'm saying was there -- do you know whether or |
| 25 |   | not there was a schedule for when the..... |

107

| | | |
|---|---|---|
| 1 | A | I think they -- they made schedules.  It was that |
| 2 | | Reggie wasn't making the schedule for him to know who |
| 3 | | was where and who was, you know, home. |
| 4 | Q | Do you know who was making the schedules? |
| 5 | A | Well, I think the buck got passed a lot.  It -- that's |
| 6 | | called confusion, nobody really knew.  The only people |
| 7 | | that were consistent in there would be a dispatcher |
| 8 | | that stayed and, you know, do you ask them to do |
| 9 | | someone else's job, I mean, that's just -- |
| 10 | Q | Well..... |
| 11 | A | There -- there was a lot of disorder. |
| 12 | Q | Were you aware of the failure of staff to having |
| 13 | | officers on duty in Fort Yukon? |
| 14 | A | Was I aware -- |
| 15 | Q | In January and February, or let's say in January of |
| 16 | | 2004? |
| 17 | A | You have to repeat that, you said it too fast. |
| 18 | Q | Were you aware of failures to have police officers in |
| 19 | | Fort Yukon during January of 2004? |
| 20 | A | I don't know about January but I remember for December |
| 21 | | when DeLeon left on the 23rd, he was the last officer |
| 22 | | in town and Reggie, his replacement, didn't come in. |
| 23 | Q | And do you know -- was there anybody else in town at |
| 24 | | that -- on the 23rd? |
| 25 | A | As an officer? |