```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ALASKA

 3   REGINALD FLEMING, CHRISTOPHER      )
     DeLEON, CHRIS HAMPTON, WILLIAM     )
 4   D. McKILLICAN, and TODD            )
     SCHLUMBOHM,                        )
 5                                      )
                    Plaintiffs,         )
 6                                      )
     vs.                                )
 7                                      )
     FANNIE CARROLL and the CITY OF     )
 8   FORT YUKON, ALASKA,                )
                                        )
 9                  Defendants.         )
     _____)
10   Case No. 4:04-cv-00034-RRB Civil

11              DEPOSITION OF REGINALD FLEMING
                        July 20, 2006
12
     APPEARANCES:
13
          FOR THE PLAINTIFFS:      MR. MICHAEL J. WALLERI
14                                 Attorney at Law
                                   330 Wendell Street, Suite E
15                                 Fairbanks, Alaska 99701
                                   (907) 452-4716
16
          FOR THE DEFENDANTS:      MR. MATTHEW SINGER
17                                 Jermain, Dunnagan & Owens
                                   Attorneys at Law
18                                 3000 A Street, Suite 300
                                   Anchorage, Alaska 99503
19                                 (907) 563-8844

20

21                          * * * *

22

23

24

25
```

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

EXHIBIT 3
PAGE 1 OF 36

| | | |
|---|---|---|
| 1 | Q | That's yes? |
| 2 | A | Sorry about that. Yes, sir. |
| 3 | Q | Now, police officers have a fair amount of discretion |
| 4 | | in terms of whether or not to make an arrest, what |
| 5 | | crimes to investigate. Is that correct? |
| 6 | A | What crime to investigate? No -- no, sir. Now, make |
| 7 | | an arrest, yes, sir. |
| 8 | Q | In terms of prioritizing calls and assignments through |
| 9 | | the day, as the chief of police were you responsible |
| 10 | | for that for the department? |
| 11 | A | Per se, you can say if I was there, yes, but priority |
| 12 | | of calls are normally done by dispatchers. Dispatcher |
| 13 | | knows the priority, which ones take priority, and which |
| 14 | | ones to send -- the officers on first. |
| 15 | Q | Did you conduct personnel evaluations of employees as |
| 16 | | the chief? |
| 17 | A | No, sir. |
| 18 | Q | You didn't do personnel evaluations of some of the |
| 19 | | officers? |
| 20 | A | The city manager did it, sir. And if you're talking |
| 21 | | about the end of it, the city manager was doing it. |
| 22 | Q | Well, during the course of your employment as the chief |
| 23 | | of police, did you conduct personnel evaluations? |
| 24 | A | It's hard to say, sir, if I have. It's been awhile. |
| 25 | Q | So you may have? |

75

|     |   |                                                              |
|-----|---|--------------------------------------------------------------|
| 1   |   | police departments thinking that we were a bunch -- a        |
| 2   |   | bunch of drugs and stuff going on there and a bunch of       |
| 3   |   | corruption, she wants to see that all gone, and that --      |
| 4   |   | that there wouldn't be anybody that would control the        |
| 5   |   | police department per se and making them do corrupt          |
| 6   |   | things or trying to approach the police department.          |
| 7   | Q | So you understood that the chief -- you were                 |
| 8   |   | responsible for running the police department?               |
| 9   | A | With Bonnie Thomas, yes, sir.                                |
| 10  | Q | And how much of your time -- did you also go out on          |
| 11  |   | patrols and do.....                                          |
| 12  | A | Yes, sir.                                                    |
| 13  | Q | .....basic law enforcement?                                  |
| 14  | A | Yes, sir.                                                    |
| 15  | Q | How would you say you -- between the tasks of running        |
| 16  |   | the police department, and that would include all the        |
| 17  |   | administrative functions, scheduling, supervising --         |
| 18  |   | you were a supervisory employee, is that correct?            |
| 19  | A | Yeah, the chief of police.  Yes, sir.                        |
| 20  | Q | So how would you say -- how much time did you spend          |
| 21  |   | doing that, as opposed to out on the street on patrol?       |
| 22  | A | 25 percent and the rest of it was patrol.                    |
| 23  | Q | That's your -- on average you say 25 percent of your         |
| 24  |   | time was supervising and running the police department?      |
| 25  | A | Yeah, yeah.                                                  |

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

EXHIBIT 3
PAGE 3 OF 36

```
 1  Q      And 75 percent was on patrol?
 2  A      On patrol.
 3              COURT REPORTER:  I'm sorry, we need to take a
 4  break.
 5              (Off record)
 6              (On record)
 7  Q      Just in case there was a problem with the tape
 8         recorder, let's repeat a couple of the questions we
 9         just asked.  I asked you to estimate how much of your
10         time was spent supervising the police department, as
11         opposed to out on the patrol doing law enforcement.
12  A      25 percent was due to supervision, another 75 percent
13         was patrol.
14  Q      And you'd agree you were always the police chief,
15         whether you're on patrol, in the headquarters, you were
16         always the chief of police?
17  A      Yes, sir.
18  Q      And did you sometimes, while on patrol, get calls from
19         say dispatch with chief questions, that is, questions
20         about how to run the office or.....
21  A      Well, occasionally, if something -- a machine or
22         something went down.  Yes, sir.
23  Q      Did -- as the chief of police, did you attend city
24         council meetings?
25  A      Yes, sir.
```



```
 1              MR. WALLERI:  Well, you asked him why she was
 2   acting that way and.....
 3              MR. SINGER:  Well.....
 4              MR. WALLERI:  .....he was going through it.
 5              MR. SINGER:  .....I'll note for the record that
 6   the witness was not given the opportunity to give a complete
 7   answer and I will not assert any proceeding that he did, but
 8   we're already running late and I'd like to finish this so I'd
 9   like to ask some more focused questions.  I think the witness
10   could probably talk for several hours about this subject, you
11   know.
12              MR. WALLERI:  I suspect he might be able to.
13              MR. SINGER:  So let's -- if I can, just try to
14   focus this so we can move along.
15   Q        And, again, I'm not trying to prevent you from
16            answering my question.  You mentioned investigating
17            Richard Carroll.  Is that right?
18   A        Yes, sir.
19   Q        What were you investigating Richard Carroll for?
20   A        Eleanor Lord, Richard Carroll and some other people
21            were involved in the embezzlement of gaming money, and
22            that right there is documented.  If you need
23            documentation, the district attorney saw the paperwork,
24            saw the folder, and told me I needed to do just a
25            little bit more on to it, but by that time we were all
```

| | | |
|---|---|---|
| 1 | | terminated. |
| 2 | Q | So when were you investigating Richard Carroll? |
| 3 | A | Oh, I started from a year ago -- not a year ago, but |
| 4 | | from a year before I was terminated by..... |
| 5 | Q | And what did you do to investigate Richard Carroll? |
| 6 | | First of all, what gave you cause to believe Richard |
| 7 | | Carroll had..... |
| 8 | A | I was..... |
| 9 | Q | .....embezzled funds? |
| 10 | A | Okay. I wasn't the only officer that did the |
| 11 | | investigation. I picked up from another officer, |
| 12 | | Officer Keefer (ph) with UAF Police Department, who I |
| 13 | | picked it up. I was going through the files and I came |
| 14 | | across files that were removed -- removed from the |
| 15 | | police department and I opened them up. They were |
| 16 | | sealed, still sealed, and it had the police seal on |
| 17 | | them. I opened it up and I saw that there was an |
| 18 | | embezzlement of gaming money and I saw Richard |
| 19 | | Carroll's name was being involved, Eleanor Lord's name |
| 20 | | was being -- being involved. I contacted Officer |
| 21 | | Keefer (ph) and talked to him about this, what |
| 22 | | this..... |
| 23 | Q | Can I have time out here? You're talking about a |
| 24 | | contact with Officer Keefer. Okay? |
| 25 | A | Yeah. |

200

| | | |
|---|---|---|
| 1 | Q | And we'll get back to that in a second.  But you said |
| 2 | | you looked at some files that had been removed. |
| 3 | A | Yes. |
| 4 | Q | Where did you look at the files? |
| 5 | A | Where did I look at them? |
| 6 | Q | Yeah, where were they? |
| 7 | A | They were not in the police station, they were down in |
| 8 | | the files in a bag in the city filing room in a bunch |
| 9 | | of stuff that was going to be tossed out. |
| 10 | Q | What room? |
| 11 | A | The city -- where they file -- where they keep all |
| 12 | | their paperwork, historical paperwork, payments and |
| 13 | | stuff, when they move them out from year's end and they |
| 14 | | stack them up in there to keep -- you know, the -- |
| 15 | | the -- to keep up with each year's money spending and |
| 16 | | files and stuff and they keep them in there in a box. |
| 17 | Q | Physically, what part of the building was that?  Do you |
| 18 | | know where Vera James' desk it? |
| 19 | A | Yeah.  Vera James' office?  It would be -- she has two |
| 20 | | doors that you can go into.  It would be that next door |
| 21 | | down heading back towards the -- the wash room |
| 22 | | facility. |
| 23 | Q | And, now, your testimony, if I'm correct, is you found |
| 24 | | some doc- -- what were you doing looking for documents |
| 25 | | in there? |

```
 1  A     I was looking for to get some -- some equipment and
 2        stuff that I needed, like we needed desks, we needed
 3        paper holders, all that kind of stuff.  And they said
 4        there was stuff back there in a bag and up on the shelf
 5        and stuff like that.
 6  Q     Was this file labeled?
 7  A     This file had a police seal on it.
 8  Q     And you opened it up?
 9  A     Yes.  Since it was a police seal that was per my
10        responsibility.
11  Q     After reading this file, your testimony is that you
12        contacted a police officer with the UAF police?
13  A     Police department.
14  Q     That's where I interrupted you.  Please tell me now
15        your conversation with this police -- what was his name
16        again?
17  A     This is -- is an ongoing investigation.  I don't know
18        if it's still ongoing or what's going on with that.
19             MR. WALLERI:  Let's take a quick break.
20             MR. SINGER:  I'll just -- just for the record,
21  this allegation is stated in the complaint.
22             MR. WALLERI:  Yeah.  I just want to talk to him
23  about what we can talk about and what we can't talk about.....
24  A     Yeah, make statements about.....
25             MR. WALLERI:  .....in terms of.....
```

```
 1  A         .....what another officer say.
 2              MR. WALLERI:  No, the allegation there was an
 3  investigation ongoing is not an issue.  The question is what
 4  can he say and what can't he say about -- because my
 5  understanding is the investigation is still ongoing, but I need
 6  to -- I just need to talk to him and find out for a second.
 7              MR. SINGER:  Okay.  Let's go off.....
 8              (Off record)
 9              (On record)
10              MR. SINGER:  Before you make your record on the
11  subject, just the parties have agreed, in light of the time, to
12  cancel Todd Schlumbohm's deposition.....
13              MR. WALLERI:  Right.
14              MR. SINGER:  .....and we'll reschedule it for a
15  mutually agreeable date before the close of discovery.
16              MR. WALLERI:  Yeah, and we're going to try and
17  coordinate with Mr. McKillican's rescheduled deposition.
18              MR. SINGER:  Thank you, counsel.
19              MR. WALLERI:  Yeah.  The problem that we have
20  is that this is an ongoing investigation.  It's been an ongoing
21  investigation for some time and I think we need to have some
22  discussion about the terms and conditions.  The problem is
23  this, from Mr. Fleming's point of view.  He has certain
24  information relating to an ongoing investigation of
25  embezzlement of funds from the City of Fort Yukon by a number
```

1  of people. The fact that the investigation is going on was
2  known by these parties. We understand it was known by these
3  parties and there's been no -- you know, the fact that the
4  allegation was made in the complaint is -- you know, was
5  nothing new to these -- the problem is, is that in the
6  discovery of going into the nature and quality of evidence
7  relating to the involvement of Eleanor -- is that Lord.....
8  A       Yes, Lord.
9               MR. WALLERI: .....and Richard Carroll and
10 other persons who have not been named to date, we are concerned
11 that Mr. Carroll, who continues to be heavily involved in the
12 City of Fort Yukon, and other members of the Carroll family
13 might gain information. What we would like to do is have some
14 kind of seal or some kind of agreement or stipulation that
15 would not compromise any of the evidence, and I'm not exactly
16 sure how we go about doing that, and I just wanted to talk to
17 counsel on the record about that.
18              MR. SINGER: I.....
19              MR. WALLERI: The problem is, is that I don't
20 know that you can stipulate to not share this with your client.
21              MR. SINGER: No, the.....
22              MR. WALLERI: In particular -- well, in
23 particular.....
24              MR. SINGER: If you could just identify --
25 well, as I understand it, this witness is now employed by the

```
 1  U.S. Government, Department of Defense.  He's not today a
 2  police officer, he's not today involved in any investigation,
 3  unless he's a material witness to something.  So I don't
 4  believe that this witness has any ongoing obligations that
 5  would prevent him from testifying truthfully under oath as to
 6  the facts that he knows.  And, particularly, since this
 7  allegation as asserted in the complaint, you know, the
 8  plaintiff I think believes central to his allegation of
 9  wrongful termination, I have to explore it.  I'm.....
10                 MR. WALLERI:  And there's no objection to
11  exploring it.  Obviously, it's relevant and it's an area that
12  needs to be explored.  We don't have any -- the problem is, I'm
13  wondering -- and maybe what we can do is at least.....
14                 MR. SINGER:  We have previously stipulated
15  to -- I'm sorry, I just interrupted you, but we've.....
16                 MR. WALLERI:  Go ahead.
17                 MR. SINGER:  .....previously stipulated to seal
18  depositions.
19                 MR. WALLERI:  Uh-huh (affirmative).
20                 MR. SINGER:  And if you want to seal this
21  deposition.....
22                 MR. WALLERI:  Why don't we go with that?  Why
23  don't we just seal it until -- at least this point, until the
24  judge -- maybe the judge can figure out how he wants to deal
25  with this.
```

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

3
11  36

```
 1              MR. SINGER:  Here's what I will agree.
 2              MR. WALLERI:  Is this a jury trial?
 3              MR. SINGER:  I believe there's a jury demand.
 4              MR. WALLERI:  Yeah, okay.
 5              MR. SINGER:  We won't agree as to trial.....
 6              MR. WALLERI:  Right.
 7              MR. SINGER:  .....you know, we'll let the judge
 8  decide what comes in and what does not.
 9              MR. WALLERI:  Right.
10              MR. SINGER:  If there's sensitive information,
11  the judge gets to decide.  We will treat this deposition as
12  sealed.  If there's portions of the deposition related to this
13  ongoing investigation of Mr. Carroll that we need to attach to
14  dispositive motions, we will file those under seal with the
15  court.  We will agree not to show the transcript of this
16  deposition to our clients for 30 days from the date that the
17  court reporter serves us with the transcript, and counsel will
18  have that time to seek an order from the court if he wishes.
19  And if counsel moves during that time, we will wait until the
20  court issues a decision.
21              MR. WALLERI:  Okay.  The -- we may -- I may
22  talk to Mr. O'Bryant about it, okay, and of the state -- the
23  state is more likely -- is really the true party in interest
24  here.  And if the state moves -- you know, what I want to do is
25  I want to have an opportunity to give Mr. O'Bryant an
```

1   opportunity to see if he wants to do that or not, because it's
2   really their interest. So why don't -- I will -- it is not our
3   intention to move -- to secure, we just don't want to
4   compromise any evidence and, you know, possibly incur certain
5   criminal liability for obstruction of justice or anything like
6   that. So we'll -- with the understanding it is -- we will not
7   be moving for a protective order. We will inform Mr. O'Bryant
8   and give him an opportunity to take a look at this information,
9   and if he wishes to seek a protective order of some kind, then
10  that's -- then we'll leave it up to them. I think that's
11  probably the best way to deal with it.
12              MR. SINGER: Fair enough.
13              MR. WALLERI: Okay. Thank you.
14  Q    You -- I believe where we left off was you were having
15       a conversation with a University of Alaska Fairbanks
16       police officer?
17  A    Yes, sir.
18  Q    What was that officer's name?
19  A    Officer Keefer.
20  Q    Keefer?
21  A    Yes, sir.
22  Q    And was this a confidential communication between the
23       two of you?
24  A    It was across a secure line, a police line.
25  Q    Anybody else participate in the conversation?

| | | |
|---|---|---|
| 1 | A | Just me and him, sir. |
| 2 | Q | And in that conversation what did he tell you? |
| 3 | A | I told him I found the file, I stated on an |
| 4 | | embezzlement case, that he started -- that he had |
| 5 | | started working on. And he stated that he..... |
| 6 | Q | Was he a former Fort Yukon police officer? |
| 7 | A | Yes, sir. |
| 8 | Q | And was this a file that he had generated as an officer |
| 9 | | in Fort Yukon? |
| 10 | A | He started the file, yes. |
| 11 | Q | Sorry to interrupt you. Please..... |
| 12 | A | He stated that the file -- I told him I found this file |
| 13 | | and it wasn't in a police -- you know, stored in a |
| 14 | | police, you know, secure location. And he said that |
| 15 | | file should have been there in a police location. He |
| 16 | | left it in there, the secure locker, and that somebody |
| 17 | | had to get into the secure locker and remove it. And I |
| 18 | | asked him, so what was going on with this embezzlement |
| 19 | | case. |
| 20 | Q | Let me stop you there for a second..... |
| 21 | A | Uh-huh. |
| 22 | Q | .....and we're going to get back to this. Do you know |
| 23 | | how the file moved from the police department to the |
| 24 | | place where you found it? |
| 25 | A | They had a number of police officers that were involved |

|    |   |   |
|----|---|---|
| 1  |   | in working there, and any -- anyone before I got there |
| 2  |   | could have removed a file out of there. You had to |
| 3  |   | have the keys to do it. |
| 4  | Q | So you don't know how? |
| 5  | A | No. |
| 6  | Q | Please proceed, then. You -- you're conversing with |
| 7  |   | this officer? |
| 8  | A | I converse with him, and I ask him, so what's going on |
| 9  |   | with this case? And he stated that gaming money was |
| 10 |   | being embezzled from the City of Fort Yukon. He stated |
| 11 |   | that almost 2 -- I think about $200,000 has been |
| 12 |   | embezzled -- embezzled from the city. And he said the |
| 13 |   | two -- the two people on here, this Eleanor Lord, who |
| 14 |   | at the time was the city manager, and Mr. Carroll, who |
| 15 |   | at that time was the mayor, and that -- that he |
| 16 |   | didn't -- he looked at it, he went through it, he was |
| 17 |   | gathering evidence, then somebody set the city gaming |
| 18 |   | building on fire and tried to destroy all the evidence. |
| 19 |   | He gathered up as much evidence as he could, and the |
| 20 |   | two big bags that I later on recovered out of the -- |
| 21 |   | the city's office, I recovered the evidence bag that |
| 22 |   | had names on it of people that was playing -- how they |
| 23 |   | were actually doing it was that they would go in to the |
| 24 |   | city manager's office, who has -- supposed to have |
| 25 |   | control over -- control over the gaming thing, and |

|   |   |   |
|---|---|---|
| 1 |   | would play and open them up there, then sign their |
| 2 |   | names on the back and cash it in.  These people had |
| 3 |   | their names cashed in on the back of these -- on the |
| 4 |   | back of the -- the gaming cards.  They were not -- as |
| 5 |   | city personnel, you cannot play the game.  You cannot |
| 6 |   | play with -- if you're in charge of it with the mayor |
| 7 |   | and the city manager, if you're in charge of that |
| 8 |   | gaming and having these game things, you're not allowed |
| 9 |   | to play.  So they were opening it up in the back of |
| 10 |   | the -- in either the city manager's office and getting |
| 11 |   | the winners out and taking the funds and cashing in on |
| 12 |   | the funds with it.  And I called the gaming committee |
| 13 |   | about it, too. |
| 14 | Q | So this is something that occurred before Bonnie Thomas |
| 15 |   | was the city manager..... |
| 16 | A | Yes. |
| 17 | Q | .....right? |
| 18 | A | Yes. |
| 19 | Q | And before Fannie Carroll was the city manager? |
| 20 | A | Yes. |
| 21 | Q | And you were investigating a crime that had occurred |
| 22 |   | several years prior? |
| 23 | A | Yes, sir. |
| 24 | Q | The conversation you had with this former Fort Yukon |
| 25 |   | police officer who was now working for the University |

210

```
 1           of Alaska Fairbanks, do you know when it occurred?
 2   A       Let's see, I knew it when Sergeant McKillican was
 3           there, and that was during the wintertime, so.....
 4   Q       When you say Sergeant McKillican was there, was he in
 5           the room with you?
 6   A       It's when he was an officer there, because he -- I left
 7           to go to Barrow to do an investigation and he was -- he
 8           stayed behind.
 9   Q       So.....
10   A       And he knew I was working on it, because he looked at
11           the file along with Mike Hardy, who also looked at the
12           file.
13   Q       So McKillican was hired as a public safety officer for
14           the City of Fort Yukon in August 2002 and.....
15   A       Okay.  Then it had to be the winter of 2002.
16   Q       So winter of 2002 you found this file, right?
17   A       No, I found it before that.  That's when I flew to
18           Barrow to do the investigation.  I got the okay from
19           the city council, who went into executive session to
20           talk about the money and to talk about how much money
21           was stolen and documentation and all that, and they
22           wanted to know at that point how much money was
23           missing.
24   Q       Now, did you participate in that executive session?
25   A       Yes, I did.
```

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

3
17  36