| | | |
|---|---|---|
| 1 | Q | And Fannie Carroll was there? |
| 2 | A | I think she was city clerk at that time. |
| 3 | Q | And..... |
| 4 | A | I want to say that she was -- she started off as being |
| 5 | | the city clerk and worked her way up to city manager. |
| 6 | Q | Now, Deborah McCarty testified..... |
| 7 | A | Okay. |
| 8 | Q | .....and she testified that the city, including Fannie |
| 9 | | Carroll, was supportive of sending you to Barrow. |
| 10 | A | Yes. |
| 11 | Q | Yeah?  No opposition to sending you to Barrow to |
| 12 | | investigate..... |
| 13 | A | It was Mr. Carroll. |
| 14 | Q | Mr. Carroll? |
| 15 | A | Yes. |
| 16 | Q | Now, did you tell the city council that you were |
| 17 | | investigating Richard Carroll? |
| 18 | A | No, sir. |
| 19 | Q | And you never -- in fact, it's quite an issue here |
| 20 | | today in this deposition the concern about |
| 21 | | confidentiality, right? |
| 22 | A | Yes, sir. |
| 23 | Q | You don't tell people you're investigating them as a |
| 24 | | police officer? |
| 25 | A | Right. |

3
18  36

1  Q       You don't compromise investigations?

2  A       I will not -- I did not at that point in time, because

3          of the seriousness of how much money it is.  He --

4          nobody asked me -- none of the other city council

5          members asked me who was involved except for him.  He

6          came out and said, so who is your suspects are?  And

7          right off the bat I'm not going to -- that's putting me

8          out there as saying, I'm investigating you,

9          Mr. Carroll, so now that leaves me open to anything

10         that he wanted to do.

11 Q       So did you tell him?

12 A       No, I didn't.

13 Q       Did you tell him you were investigating the former city

14         manager?

15 A       Yes.

16 Q       Yes?  And did you ever, from the winter of 2002 until

17         your termination, ever tell Fannie Carroll that you

18         were investigating Richard Carroll?

19 A       I didn't have to tell her.  He told her when she came

20         into the room in front of people and stated, my dad is

21         mad that you are doing this investigation on that money

22         and he wants you to stop and you won't stop, so he's

23         going to Fairbanks to dig up dirt on you.  She said

24         that in front of other people in there with

25         council.....

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678


EXHIBIT 3
PAGE 19 OF 36

| | | |
|---|---|---|
| 1 | Q | Now, you never told Fannie Carroll that you were |
| 2 | | investigating her father, correct? |
| 3 | A | Correct. |
| 4 | Q | It's your understanding that Richard Carroll raised |
| 5 | | with Fannie Carroll his concern about you investigating |
| 6 | | the loss of this money? |
| 7 | A | Yes, sir. |
| 8 | Q | You don't know what Richard Carroll told Fannie |
| 9 | | Carroll? |
| 10 | A | When she came to my office and her dad was upset that |
| 11 | | I'm doing the investigation on him and the mis- -- and |
| 12 | | about this missing money, I'm like, how would he know |
| 13 | | that? |
| 14 | Q | Wait..... |
| 15 | A | How would he know, if I didn't say that to anybody, |
| 16 | | that I'm doing an investigation on him, unless he knew |
| 17 | | that he was in on it. |
| 18 | Q | Did she say that he's upset you're investigating him? |
| 19 | A | Him and the missing money, and that I'm doing an |
| 20 | | investigation on this missing money. |
| 21 | Q | Well, he was upset that you were investigating this |
| 22 | | missing money, but did..... |
| 23 | A | I..... |
| 24 | Q | .....Fannie Carroll say to you..... |
| 25 | A | Says..... |

3
30  36

1    Q       .....that she understood you to be -- wait, you're

2            right.

3    A       I -- yeah.

4                  MR. WALLERI:  Okay, okay.  Just if I can --

5    I'll inter- -- you know, I don't want to play -- let him ask

6    his question, okay, and then you answer, okay, and then we'll

7    just go that way.

8    A       Okay.

9                  MR. WALLERI:  Because I know this is very

10   emotional, but let's just try and keep it straight.  So why

11   don't you hold off.  Why don't you ask your question and then

12   we'll go from there.

13   Q       I'm going to try, Mr. Fleming, to just ask narrow

14           questions, if you'll try to just -- I know this is a

15           lot of subject matter here, but if you can try to just

16           answer the narrow question I ask and then we'll keep

17           proceeding through this topic, that will make it easier

18           for the record and I won't be interrupting you.  And,

19           again, my apologies for interrupting you.  Your

20           testimony is that Fannie Carroll came to you and said,

21           my father is upset.  Is that right?

22   A       That's part of it, yes.

23   Q       When did that conversation take place?

24   A       That conversation -- I want to say that conversation,

25           it's hard to say, but that was like maybe two weeks

```
 1          before I was terminated.
 2   Q      Anybody else a witness to that conversation?
 3   A      Yes, sir.
 4   Q      Who?
 5   A      We had Officer Schlumbohm in there at that time when
 6          she came in there and.....
 7   Q      And.....
 8   A      .....I want to say we had a dispatcher in there.  I'm
 9          not too for sure, but I know Officer Schlumbohm was in
10          there because he turned around and looked at me and
11          stated, I can't believe she even came in here and said
12          that.
13   Q      Now, you went to Barrow.  What prompted you to go to
14          Barrow?
15   A      What prompted me to go to Barrow, I did a -- I did a
16          trace.  I tracked down Eleanor Lord, because
17          Mr. Carroll inside of the meeting stated that we
18          weren't -- we're not going to send you to -- send you
19          to Barrow unless you know that she's there, because she
20          went to Canada.  Like how did he know that she went to
21          Canada?  She did go to Canada and then she popped back
22          up in Barrow running a gaming place in Barrow, and I
23          traced her to Barrow and she was there.  And I
24          confirmed with the Barrow Police Department that she
25          was up there living.
```

3
22 36

1  Q    What was your purpose in going to Barrow?

2  A    To talk to her.

3  Q    Did you go to Barrow?

4  A    Yes, I did, sir.

5  Q    Was she there?

6  A    Huh?

7  Q    Was she there?

8  A    Apparently, we had a hard time trying to find her.

9  Q    So you don't know if she was there?

10 A    She was there, sir.  She -- she was there, but it was a
11       hard time of finding her.

12 Q    Did you make contact with her?

13 A    No, sir.

14 Q    Do you know if charges were ever pressed against her?

15 A    She died soon after from what was supposed -- died from
16       cancer soon after.

17 Q    Possible she actually died before you arrived in
18       Barrow?

19 A    Unh-unh (negative).  She was still alive.  Confirmation
20       was made by Barrow Police Department that she was still
21       there.

22 Q    Did you obtain any kind of subpoena to require her to
23       meet with you?

24 A    No, sir.

25 Q    Did you have any jurisdiction in Barrow?

3
23 36

Case 4:04-cv-00034-RRB    Document 125-5    Filed 10/17/2006    Page 7 of 19

217

```
 1   A      A crime was committed inside of Fort Yukon, that all
 2          police officers are state certified officers that can
 3          do investigations through the -- throughout the state.
 4          We all -- if -- just like if you were down in Anchorage
 5          and the Fairbanks police was coming down and you were
 6          speeding, they could pull you over and write you a
 7          ticket.  It's -- it just -- we're all state peace
 8          officers.
 9   Q      So you never made contact with this woman in Barrow?
10   A      No, sir.
11   Q      After that, what other -- what else did you do to
12          investigate this former embezzlement?
13   A      Shifting (ph) through the evidence.
14   Q      Huh?
15   A      Shifting (ph) through the evidence, looking for
16          alternative means of coming up with different money
17          and.....
18   Q      What evidence did you gather?
19   A      I had bags full of -- bag full of the -- the gaming
20          cards that you have to sign and pay, and all that was
21          in there, and just -- just on that, that was enough
22          right there, because that was -- it was illegal for
23          them to -- to play the game or mess around.  If you
24          have control and access of the gaming cards, you're not
25          allowed to play, along with Rich Carroll, I think he
```



1               was in charge of that, along with the city manager, and

2               there were.....

3    Q          This evidence -- was this evidence -- did you find it

4               in the box in the storage room?

5    A          Yes, sir.

6    Q          Did you acquire any other documentary evidence?

7    A          A big folder full of information, sir.

8    Q          You acquired it on your own?

9    A          I acquired it from the -- from the folder.

10   Q          So I just want to be -- I just want to understand.  Did

11              you -- in terms of your -- you say you investigated

12              Richard Carroll.....

13   A          Supplement -- supplement and stuff like that.

14   Q          You found a box in a storage room?

15   A          It was -- the folder was in the bag.

16   Q          In a bag was a folder with a police seal?

17   A          Yes.

18   Q          And there was -- you say there was evidence in there,

19              right?

20   A          Yes, sir.

21   Q          Including gaming stubs?

22   A          Yes, sir.

23   Q          Did -- other than those documents that you found that

24              had already been put in a police sealed envelope, did

25              you go find additional documents?



```
 1 │ A      Additional documents like -- like per se on what?

 2 │ Q      Like did you go to the gaming -- city gaming building

 3 │        and look at documents there?

 4 │ A      It was burned down.

 5 │ Q      So the answer is no?

 6 │ A      No.  That gaming -- that gaming building was set on

 7 │        fire.

 8 │ Q      Did you request from any city -- a city clerk or city

 9 │        employees any other city files?

10 │ A      Any other city files?  No, I didn't know at that point

11 │        who to trust as -- who to trust in this, because it was

12 │        involving the city -- city members.

13 │ Q      Did you interview anyone, any witnesses?

14 │ A      Yes, I did.

15 │ Q      Which witnesses did you interview?

16 │ A      I interviewed -- oh, what's her name?  She used to work

17 │        at the city gaming and I interviewed her.  Oh, man, I'm

18 │        just getting horrible -- it's been so long that it's --

19 │        the names.  I have to really get that person's name.  I

20 │        know who I can get the name from.  I know it's -- all I

21 │        can say is it was Harlan's mom that I interviewed on

22 │        that, it's Harlan's mom, because I know the kid.  He

23 │        still every once in awhile calls and said hi so.....

24 │            MR. WALLERI:  Would it help if you had looked

25 │ at the phone book, the Fort Yukon phone book?  Would you have
```



220

```
 1  objection to that?
 2              MR. SINGER:  No, let's do it on a break.
 3              MR. WALLERI:  Okay.
 4  Q   Other than this woman who you've described as Harlan's
 5      mom, did you -- do you recall interviewing any other
 6      witnesses as part of this investigation?
 7  A   No, sir, not at that point in time.  I was just
 8      shifting (ph) through the evidence trying to make sense
 9      of it, putting it together, upon -- upon doing my other
10      cases, so I -- I already had a big thick file on this
11      so I had a lot of other stuff that was current that had
12      to be pushed forward.  This one has already happened
13      three, four years ago, so I sift through when I have
14      time and piece through it.  I think Officer DeLeon,
15      Investigator DeLeon, I think I was trying to get him
16      involved with it to help at that point, but by that
17      time we were all, like I say, terminated.
18  Q   Now.....
19  A   And the DA saw it after I made my trip from Barrow, and
20      they stated they needed just a little bit more
21      information, do a little bit more searching, and then
22      we can -- then they'll see as far as what they're going
23      to do on it.
24  Q   And which DA?
25  A   Let's see, what's the DA's name?  I got -- I know Jeff
```



```
 1            O'Bryant, I know Danielle -- it's the -- it start with
 2            a G.  What's his name?  His name -- it's been awhile
 3            since I dealt with him.  I used to know all the.....
 4   Q        Was it a man or a woman?
 5   A        It was a man.
 6   Q        Did you provide in writing anything regarding your
 7            investigation of embezzlement of the city gaming funds
 8            to the DA?
 9   A        The DA had the -- I took him a folder.
10   Q        You took the whole folder to the DA?
11   A        I took the whole folder.
12   Q        Did you leave it with the DA?
13   A        I let him go through it, they went through it, he went
14            through it, and he looked at everything that I had, and
15            then I took the folder back.  He told me to do some
16            more on it and get some more information on it and then
17            see from where -- where we go from there with it.
18   Q        Did the DA request any specific information?
19   A        He just -- just said, just -- just get more
20            information, we need to build information on it.
21   Q        Did the DA make any copies of your folder?
22   A        I don't know.  I don't know, sir.
23   Q        And.....
24   A        But the DA will confirm that they went through and they
25            looked through it and they knew about it.
```


EXHIBIT 3
PAGE 28 OF 36

```
 1   Q      But one particular individual?

 2   A      It won't be just one particular, it would be also the

 3          head, the DA, too.

 4   Q      Whose that?

 5   A      Matter of fact, that was -- that was the DA right there

 6          that just walked past.  Did you see him?

 7                MR. WALLERI:  No.

 8   A      I don't know if he works for the DA's office anymore,

 9          but that was him that just walked past.

10                MR. WALLERI:  Oh, you mean the big tall guy?

11   A      Yeah.

12                MR. WALLERI:  Oh.

13   A      He just walked past.

14                MR. WALLERI:  Oh, yeah, that's.....

15   A      Mr. O'Bryant also knows about it.  Yeah.

16                MR. WALLERI:  He doesn't work with the DA's

17   office anymore.

18   Q      So.....

19                MR. WALLERI:  Okay.

20   Q      So you -- after the DA told you he needed more

21          information, what additional information did you

22          acquire?

23   A      I just tried to -- just basically worked it up, just

24          thought all -- what all happened, you know, then you

25          try to piece it all together as what -- try to get
```



EXHIBIT 3
PAGE 29 OF 36

223

```
 1          dates, as much dates as possible.  There was a lot of
 2          dates in there and just -- I need to do a supplement
 3          after going through everything, write up, you know,
 4          what was all going on, and just try to get some more
 5          information, tying them -- you know, tying them to it,
 6          and that's why I went and interviewed as many people
 7          that I -- I started off only interviewed one and that
 8          was, like I said, Harlan's mom.  And I had to finish
 9          shifting (ph) through the rest of it and try to see if
10          I can have anybody else that could piece together, give
11          me a little bit more information and -- to get it
12          complete.
13     Q    Did you ever interview any other individuals?
14     A    Not at that point.  It was -- a lot of stuff was going
15          on, and this was more like a cold case file, you know,
16          it was more like a cold case file, and I worked on it
17          as I could.  I ran with it when -- when it was hot,
18          when I saw it, and I'm like I need to get started on
19          this, at least get the paperwork going and get a paper
20          trail going and I ran with it.  And then when I got
21          back we just got swamped in other stuff and we had to
22          do our cases, then I would go back and look through,
23          shift (ph) through it.  And then I went and interviewed
24          Harlan's mom, then I put it away for a little bit, work
25          on my other cases that I had, courts and stuff like
```

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

3
30 of 36

224

```
 1            that.
 2   Q        The interview with Harlan's mom, was that before or
 3            after you went to Barrow?
 4   A        That was after.
 5   Q        How long after?
 6   A        Let's see, there you go.
 7                 MR. WALLERI:  Oh, that's Burglin.  What's his
 8   name again?  Oh, yeah, Dave Burglin, yeah.
 9   Q        Is Dave Burglin the name of the DA that you met with?
10   A        At that time.
11                 MR. WALLERI:  For the record, he's standing
12   outside the window and he's being pointed to and that's Dave
13   Burglin.
14   Q        Again, when did you interview Harlan's mom?
15   A        I want to say a month after I got back.
16   Q        Winter of 2002 or.....
17   A        The win-.....
18   Q        .....early 2003?
19   A        Early 2000 -- it could have been early 2003 or in the
20            winter of 2002.
21   Q        So after interviewing Harlan's mom, until the date of
22            your termination, you did not interview any other
23            witnesses regarding this investigation?
24   A        I -- I had to shift (ph) through all the evidence.
25            Like I said, it was a thick folder with a big old bag
```

3
31 36

1       of stuff, and just trying to place times and dates.

2       And, you know, you got ticket stubs and you want to

3       look at the ticket stubs, oh, on this date, blah, blah,

4       blah, on this date.  And if you got a big old bag of

5       stuff, that's going to take awhile.

6   Q   But just for the record, the question I'm asking is,

7       after interviewing Harlan's mom, until the date of your

8       termination, yes or no, did you interview any

9       additional witnesses?

10  A   No, sir.

11  Q   And you continued to look at the file that you had

12      found in the storage room?

13  A   Yes, sir.

14  Q   Did you make any notations to the file?

15  A   Just supplements and stuff like that.

16  Q   Did you create those on a computer?

17  A   Yes.

18  Q   In a Microsoft Word document?

19  A   No, CrimeStar.

20  Q   In CrimeStar?

21  A   Yes, sir.

22  Q   And did you log that you were investigating a

23      particular individual?

24  A   I'm thinking it should be in the log file, that -- the

25      court case -- not the court case, but the police case

226

| | | |
|---|---|---|
| 1 | | number should be in the file in CrimeStar. |
| 2 | Q | And did that file indicate Richard Carroll was a |
| 3 | | suspect? |
| 4 | A | Oh, yes, and I wasn't the only officer. Like I said, |
| 5 | | it was Officer Keefer who named him as a suspect. |
| 6 | Q | Now, do you know if any charges have been brought |
| 7 | | against Richard Carroll? |
| 8 | A | I don't know as of this date, no. |
| 9 | Q | Now, there was a statement earlier that there may be an |
| 10 | | ongoing investigation. Do you have any knowledge to |
| 11 | | believe..... |
| 12 | A | I don't know anything what's going on. It could be, I |
| 13 | | don't know. |
| 14 | Q | So after leaving employment with Fort Yukon on or about |
| 15 | | February 9th, 2004, have you heard anything more |
| 16 | | regarding this matter? |
| 17 | A | After I left, I had nothing else to do with the -- the |
| 18 | | case. |
| 19 | Q | You haven't been contacted by the DA's office? |
| 20 | A | No, sir. |
| 21 | Q | You haven't been contacted by other police officers? |
| 22 | A | No, sir. |
| 23 | Q | You haven't been contacted by the troopers with regard |
| 24 | | to this embezzlement matter? |
| 25 | A | When I -- when I got -- when I was terminated, yes, |

3
33 36

```
 1              they wanted to know what was going on with that

 2              investigation.  They asked -- you know, asked different

 3              questions about the files and -- and stuff like that.

 4              Like the gaming committee already knows about it, too,

 5              so I don't -- like I say, I don't know what the gaming

 6              committee is doing or what anybody else -- I contacted

 7              the gaming committee while I was the police chief

 8              there.

 9    Q         Now, while employed by Fort Yukon, you kept time

10              sheets, correct?

11    A         Yes, sir.

12    Q         Did you keep true and accurate time sheets?

13    A         To the best of my knowledge, yes.

14    Q         And did you.....

15    A         To the best of my ability and my knowledge, yes.

16    Q         Did you require the other employees of the police

17              department to do the same?

18    A         Yes, sir.

19    Q         And did you provide instructions to the other police

20              officers about how to fill out time sheets?

21    A         Yes, sir, that came down from the city manager.

22    Q         What were the instructions?

23    A         That no officer -- at one point she came and said, no

24              officers would have over 12 hours on their time sheet.

25              She didn't care.
```

**LIZ D'AMOUR & ASSOCIATES, INC.**
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

3
34 36

271

1  A      Yes, sir.

2  Q      And could you tell me about some of those?

3  A      The mayor -- I got the old mayor embezzling funds from

4         the AC store.  It took awhile to get all the paperwork.

5         I think it -- I think it even took up to two years to

6         actually get everything, had to get audit done, just go

7         through standard procedures in getting the stuff done,

8         but we had a successful conviction.

9  Q      And do you know when that was?

10 A      Let me see, the mayor -- I want to say that was in --

11        that was in 2002 when we started that investigation

12        into the embezzlement from the AC store.

13 Q      And when did you conclude the investigation?

14 A      The end of 2003.

15 Q      So roughly shortly before you were terminated?

16 A      Yes.

17 Q      Do you know if there was -- if the city council was

18        surprised, or do you know, did they express surprise

19        that you were able to complete an embezzlement

20        investigation?

21 A      Yes, sir.  Sir, Mr. Carroll was shocked that I -- that

22        I pulled it off.

23 Q      And how do you know that Mr. Carroll was shocked?

24 A      Because he -- he stated that he -- it's been a long

25        time since anybody got caught in the city for

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678


EXHIBIT 3
PAGE 35 OF 36

```
 1        embezzlement.
 2   Q    And in terms of Mr. DeLeon -- well, strike that.  You
 3        indicated there was a list of jail guards?
 4   A    Yes.
 5   Q    And who maintained that list of jail guards?
 6   A    The police department and the city manager.
 7   Q    With regard to the evaluation of Mr. McKillican, do
 8        you -- in your mind at that time who did you believe
 9        was supposed to be doing evaluations of police
10        officers?
11   A    At that time it was me, sir.
12   Q    Were you -- did you consider yourself Mr. McKillican's
13        supervisor?
14   A    Yes, I did, sir.  And that was what the city manager
15        stated.  She said that she would do mine and I had to
16        do the rest, anybody else was my problem, so she only
17        had to evaluate me.
18   Q    And which city manager was that?
19   A    Ms. Carroll.
20             MR. WALLERI:  That's all I've got.
21             MR. SINGER:  Just to follow up a couple
22   questions.
23                       REGINALD FLEMING
24   testified as follows on:
25                    REDIRECT EXAMINATION
```

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

