1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA

3

4    REGINALD FLEMING, CHRISTOPHER    )
     DELEON, CHRIS HAMPTON, WILLIAM    )
5    D. McKILLICAN, and TODD    )
     SCHLUMBOHM,    )
6                                    )
             Plaintiffs,    )
7                                    )
         vs.    )
8                                    )
     FANNIE CARROLL and the CITY    )
9    OF FORT YUKON, ALASKA,    )
                                    )
10           Defendants.    )
     _____)
11   Case 4:04-cv-00034-RRB

12

13

14       **VIDEOTAPE DEPOSITION OF WILLIAM D. McKILLICAN**

15          Taken Thursday, August 17, 2006

16       From the hour of 8:40 a.m. to 11:50 a.m.

17          Pages 1 through 141, inclusive

18                   Volume 1

19          Taken by Counsel for Defendants

20                     At

21       Offices of Heartland Court Reporters
            100 Cushman Street, Suite 308
22             Fairbanks, Alaska 99701

23

24   Reported by:
     CAROL A. McCUE, RMR
25   Heartland Court Reporters

1    officer, who turned it into the city finance.

2        Q.    And -- and this was for Title 47 commitments?

3        A.    Yes.

4        Q.    Anybody else that worked for the police

5    department between the time of your hire and Chris

6    Hampton, Chris Hampton's hire?

7        A.    As a police officer?

8        Q.    Yes.

9        A.    Not that I recall, no.

10        Q.    Now, you're aware that Chris Hampton -- there

11    was a complaint made against Chris Hampton for sexual

12    harassment?

13        A.    I'm aware of.

14        Q.    What did you learn about that -- well, when

15    did you learn about --

16        A.    I didn't.

17        Q.    You didn't?

18        A.    No.

19        Q.    When did you first hear about it?

20        A.    I heard about it from the city manager.

21        Q.    What did she tell you?

22        A.    She told me that there was an allegation that

23    one of the dispatchers making against Chris Hampton,

24    and that she needed to see him as soon as he got off

25    the plane.    And that was as far as I got involved.

EXHIBIT ____7
PAGE 2 OF 6

1    one when I first started there and it was quite awhile

2    after I started working there.

3        Q.    Before you quit, you received a copy of the --

4        A.    Yes, I did, because I -- I recall when they

5    first passed these out they said, well, you were

6    supposed to get this and you were supposed to sign this

7    and they wanted me to -- they wanted me to backdate it

8    and I wasn't going to do that.

9        Q.    Now, let's take a look at Page 20 of the

10    Personnel Manual Handbook, Chapter 7.

11        A.    Page 20.  I'm sorry, what chapter?

12        Q.    Up right at the top.

13        A.    Okay.  Right at the top?  Okay.  I'm sorry.

14        Q.    And this is -- there's a grievance policy

15    within the City of Fort Yukon, correct?

16        A.    That's what it says.

17        Q.    You understood there was a process by which an

18    employee could challenge an adverse employment action?

19        A.    Yes.

20        Q.    And in fact, there was a multistep process,

21    right?

22        A.    Yes.

23        Q.    And --

24        A.    I don't know it verbatim, but I see it here in

25    front of me.

EXHIBIT 7
PAGE 3 OF 6

76

1      Q.    And it was spelled out in the -- in the policy

2    manual that you have?

3      A.    Yes.

4      Q.    Now, you never filed a grievance regarding

5    Ms. Carroll's indication to you that she was going to

6    perform a job evaluation, right?

7      A.    No, I didn't.

8      Q.    You believed that the city manager lacked the

9    authority to evaluate you, right?

10     A.    I -- I didn't question her authority, I

11   told -- I did not agree that it was appropriate.

12     Q.    And -- and in part, why did you think it was

13   inappropriate?

14     A.    Because she was not my supervisor.  She didn't

15   see my daily performances, she didn't know what my

16   duties and responsibilities were, she didn't -- she

17   didn't know my job.

18     Q.    Did you also suspect that she had improper

19   motives for being angry with you?

20     A.    Improper motives.  Can you elaborate on that?

21     Q.    Did you -- did you feel that -- that her --

22   Fannie Carroll's interest in doing a job evaluation was

23   motivated by an improper reason?

24     A.    I know she wasn't happy with me for some

25   reason, she was accusing me -- like I said before, she

HEARTLAND COURT REPORTERS 907-452-6727

EXHIBIT 7
PAGE 4 OF 6

1    was accusing me of being a troublemaker.  And going

2    behind her back or something.  I -- I can't recall.

3        Q.   Was that a -- at the time was that a -- were

4    her motives a concern to you?

5        A.   Absolutely.  I mean, that's why I -- that's

6    why I -- you know, I quit.

7        Q.   And in any event, did you understand that if

8    the city manager took an improper action against you

9    that you had grievance rights and you could challenge

10   her decision?

11       A.   Well, I mean, it was -- we had -- yeah, I knew

12   about the policy and I knew the grievance policy, but I

13   mean, it was -- it was useless to do.  I wasn't going

14   to get any satisfaction one way or the other.  I wasn't

15   going to get a fair -- you know, somebody to look at it

16   fairly and justly.

17       Q.   Why do you say that?

18       A.   Because her whole family was on the city

19   council.

20       Q.   Well, when you say her whole family, the City

21   of Fort Yukon is a small town, isn't it?

22       A.   Absolutely.

23       Q.   Big families, right?

24       A.   Yes.  Some big families.

25       Q.   In fact, your attorney took a deposition of

73

```
1     one of the city council members, a woman named Deborah
2     McCarty.  Did you know her?
3          A.   Uh-hum.
4          Q.   Is that a "yes"?
5          A.   Yes.
6          Q.   And your counsel asked her questions regarding
7     whether it would be appropriate for Fannie Carroll to
8     threaten a job evaluation of you because she was angry
9     with you for discussing a domestic restraining order
10    situation, and Deborah McCarty said -- her testimony
11    was that if Fannie Carroll was motivated by some
12    personal reasons to evaluate you, that would be
13    improper, and as a city council member, she would
14    disagree with that.
15         A.   Absolutely.  But there is a -- I mean, that
16    makes sense to me.  I mean, I don't know what Ms. --
17    you know, what Ms. McCarty said personally, but yeah, I
18    mean, that just -- that just seems like common sense to
19    me.  But --
20         Q.   So in fact, at least one city council member
21    who's been deposed has testified if Fannie Carroll was
22    motivated by some improper purpose, the city council
23    wouldn't agree with that, would side with you?
24         A.   I'll disagree with you on that.
25         Q.   But point of fact, you never -- never filed
```

EXHIBIT 7
PAGE 6 OF 6