Michael J. Walleri
Law Offices of Michael J. Walleri
330 Wendell Street, Suite E
Fairbanks, Alaska  99701
(907) 452-4716
(907) 452-4725 (Facsimile)
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| REGINALD FLEMING, CHRISTOPHER DELEON,  CHRIS HAMPTON, WILLIAM D. MCKILLICAN, and  TODD SCHLUMBOHM<br><br>                  Plaintiffs,<br><br>    vs.<br><br>FANNIE CARROLL, and the CITY OF FORT YUKON, ALASKA<br><br>                  Defendants. | **MEMORANDUM**<br><br>**IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT McKILLICAN'S EMPLOYMENT CLAIMS (Counts III and IV)**<br><br>Case No. F04-0034 CIV (RRB) |

The City of Fort Yukon and Fannie Carroll (collectively referred to as the

City) have moved for partial summary judgment as to Officer McKillican with

regards to Count III (Constructive Termination); Count IV (Violation of 42 USC

1983-Procedural Due Process). [1] The thrust of the motion is that these claims should

be not be allowed because Officer McKillican terminated his employment and did

---

[1] This motion does not address Officer McKillican claims in  Count I (Unpaid Overtime).

Michael J. Walleri
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

*Fleming, et. al. v City of Fort Yukon*                                                                                    *Page 1 of 25*
Opp: Partial Sum. Jud. (McKillican; Counts III & IV)
[Docket 105]

not avail himself of the grievance procedures available to him under the Fort Yukon Personnel Policy.  The argument ignores the City's personnel system was wholly ineffective, and the City was not following the personnel system as written, but was acting outside the system created.  The Court should deny the City's motion for partial summary judgment because there is sufficient evidence to raise a genuine issue of fact that Officer McKillican's efforts to pursue a grievance of Ms. Carroll's actions would have been futile.

Officer McKillican has also filed a cross motion for summary judgment seeking a rulings that Officer McKillican was constructively terminated.

As demonstrated below, Fannie Carroll created an "Alice in Wonderland" environment, and cast herself as the Queen of Hearts by

1) Engaging in a pattern of harassment of the police officers, including Officer McKillican,

2) irrational and contradictory orders to Officer McKillican,

3) attempting to discipline through evaluation Officer McKillican for purely personal reasons arising out of Fannie Carroll's inability to separate her personal and official life, and

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

4)   usurpation of Chief Fleming's authority, including the use of

personnel procedures that flagrantly violated the City's personnel code

for improper motives.


I.        STANDARD FOR SUMMARY JUDGMENT.

The City is only entitled to summary judgment if the Court finds that "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits… show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."[2] A dispute over a

material fact exists if the evidence would allow a reasonable fact-finder to return a

verdict for the non-moving party.[3]  "(T)he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no genuine issue of material

fact.[4]  The non-moving party may defeat judgment by producing sufficient specific

facts to establish that there is a genuine issue of material fact for trial.[5]  "The

plaintiff, to survive the defendant's motion, need only present evidence from which

---

[2] *See* FRCP 56(c)
[3] *See Anderson v Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)
[4] *Anderson v Liberty Lobby, Inc.*, 477 U.S., at 247-248
[5] *Celotex Corp. v Catrett,* 477 U.S. 317, 322 (1986).

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial."[6]

In this case, there is sufficient evidence to establish that Ms. Carroll's actions toward Officer McKillican 1) were initiated, in part, by improper motives, 2) were not what a "reasonable person would regard as fair, and 3) would compel a reasonable person in Officer McKillican's position to resign. Additionally, there is sufficient evidence to establish that the City's personnel policy was ineffective to protect Officer McKillican's rights as an employee, and that any effort to resort to the City's personnel policy would be futile.

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

---

[6] *Anderson* v. *Liberty Lobby, Inc., ante*, at 257.

II.    FACTS.

A.    The City's Municipal Code and Personnel System.

The City does not clearly indicate what steps Officer McKillican should have taken to perfect his grievance under the City Personnel Code.  Rather the City suggests that one City Council member – Debra McCarty, Fannie Carroll's cousin[7] --- would have offered McKillican a fair hearing.  Implicit in that understanding however, is the assumption that Officer McKillican could have filed his grievance with the City Council, received a hearing and that legitimate grievances would have been resolved properly. This totally mischaracterizes the situation in Fort Yukon and the wide disparity between the written personnel policy and the way things were being done in Fort Yukon.  Relevant to this motion are the City's procedures respecting evaluations and grievance procedures.

The personnel policy establishes a specific employee evaluation process. Employees are evaluated within 15 days prior to the end of their probationary period and once a year in November.[8]  Special evaluations may be done to document 'employees above or below average performances s needed."[9] However,

---

[7] Plt. Ex. 1 (D. McCarty Depo) 6: 12-14
[8] Plt. Ex. 2, (City Personnel Code) at p. 12 (See § 1)
[9] Id. (See § 2)

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

in all cases, evaluations are to be done by supervisors.[10] The policy provides specifically that law enforcement personnel are to be "evaluated by their respective <u>professional</u> supervisor…."[11] In this case, Officer McKillican's supervisor was Chief Fleming.[12]  Under the personnel policy, the Chief of Police --- i.e. Chief Fleming --- was the only person who could have properly evaluated the police officers.

Secondly, the City of Fort Yukon Personnel policy has grievance procedures (Chapter 7).[13]  Portions of the grievance section of the policy manual are near unintelligible, but clearly provide that an "employee" can file a grievance, and defines a grievance as

> Any dispute between an employee and the City of Fort Yukon, which impacts an employees would not ordinarily give rise to a grievance subject to this grievance procedure, any matter which adversely affects nay employees ability to perform his or her job could be reason of a grievance.

The grievance process is a four-step process involving:

i)   an informal meeting between the employee and his supervisor.

ii) a written presentation to the Personnel officer followed by an informal resolution by Personnel officer;

---

[10] Id. (See §§ 1, 2, and 3) See also, p 10, §13
[11] Id. ( See § 3(C))
[12] Plt. Ex. 3 (McKillican Depo.)  at 70: 3-8; 76:14-17; See also Plt. Ex. 4 (Fleming Depo.) at 73
[13] Plt. Ex. 2, at p. 6 (§ 13)

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

iii) a right of appeal to the City Council.[14]

In this case, Officer McKillican's supervisor was Chief Fleming. Fannie Carroll, as the City Manager was also the City Personnel Officer.[15]  Hence, in this situation, exhausting the grievance system means that McKillican would have to first have an informal meeting with Chief Fleming.  If that did not resolve the problem, he needed to appeal the matter to Fannie Carroll.  If that did not resolve the matter, he could only then appeal the matter to the city council.

Finally, it should be noted that the city code requires "just cause" for disciplinary actions, including terminations,[16] and establishes a progressive disciplinary procedure.[17]  In the later case, only a supervisor may initiate a disciplinary procedure.[18]

---

[14] Id.  p. 21-30.
[15] Id., at p 6 (Chap. 1, §13)
[16] Plt. Ex. 2, (City Personnel Code) at p. 14 (See §§ 1-3)
[17] Plt. Ex. 2, (City Personnel Code) at p. 15 (See § 8a)
[18] Id.

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

### B.  McKillican's Employment and Termination.

Officer McKillican  was hired by the City of Fort Yukon in August 16, 2002.[19]   A little less than a year later, Officer McKillican resigned on August 11, 2003[20]

Chief Fleming testified in his deposition that Fannie Carroll routinely verbally attacked the officers, and had specifically done so with regard to Officer McKillikan.[21]  He indicated that he often had to step into the situation to try and calm things down.  Ms. Carroll would often make accusations about the officer that they offended her or accosted her without foundation.[22]  This was similar to the allegations Fannie Carroll made against Dick Miller: i.e. conversations about City business in City Council work session amounted to unwanted contact between Dick Miller and Fannie.[23]

In July of 2003, Fannie Carroll filed a stalking petition against a City Council member, Dick Miller after an "unpleasant confrontation between the two during a city work session.[24]  About this time, Fannie directed that the police officers not talk

---

[19] See Def. Memo, at 2
[20] Plt. Ex. 3, at 66:23-25
[21] Plt. Ex. 4, at pp. 248-249; 251:6-8
[22] Plt. Ex. 4, at pp. 248-249.
[23] Plt. Ex. 10 (Denial Order), p. 2
[24] Plt. Ex. 5 (Aff't of Counsel); Plt. Ex. 10, at p. 2

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

to any City Council members.[25]  Fannie had attempted to obtain evidence about
Dick Miller by calling him on the City's 911 phone line, which automatically
recorded conversations.[26]  Ms. Carroll alleged that Mr. Miller was calling her and
making unwanted contact with her, and that she had tape recordings of a
conversation with him on the 911 line that would support her allegations.[27] The
undersigned attorney represented Mr. Miller, and, on behalf of Mr. Miller, the
undersigned subpoenaed the tapes from the City, but the tapes were never
produced.[28] During the termination of Chief Fleming and Officer DeLeon, Fannie
Carroll demanded 911 tapes from Officer Schlumbohm, and all such tapes have
since been "lost."[29]

On August 12, 2003, the Carroll/Miller hearing on long-term orders was
scheduled.[30]  The 911 tapes were to be produced at the hearing.[31]  Prior to the
hearing, Dick Miller had called the police department and requested a meeting with
Officer McKillican.  Officer DeLeon described the situation as follows:

[25] Plt. Ex. 3 (McKillican Depo.)  at 129:15-19
[26] Plt. Ex. 6 (DeLeon Depo) at 198:22-24; See also Plt. Ex. 7 (Schlumbohm Depo) at 93:1-6
[27] Plt. Ex. 5
[28] Id.
[29] Plt. Ex. 7 (Schlumbohm Depo) at pp. 93 -95
[30] Plt. Ex. 5
[31] Id.

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

I was there when Dick Miller called for police service. And McKillican told Dick Miller, look, I can't go out there unless it's a real emergency, we have other things pending. And then Dick Miller said, well, I'm requesting police, you know, presence now. So he had no choice but to go.[32]

Prior to his termination, Officer McKillican had been up for about 72 hours because of a search and rescue that turned into a body search. During this time, Chief Fleming was out of town on his time off.[33] Officer McKillican's deposition contains an extensive detail of events surrounding the search.[34] Essentially, a young boy and his grandfather had been out on the Porcupine River, and the boy returned to town after being separated from his grandfather. McKillican conducted an interview with the boy, contacted the Troopers, and was advised that the Troopers were to come up the next afternoon to do a search and rescue. The Troopers had requested that McKillican assist with the search and rescue, however, Fannie Carroll informed McKillican that he was not to go, and insisted that the boy go with the troopers. McKillican and the Troopers disagreed with the idea of the boy going on the search and rescue because they were afraid that their effort would turn into a body recovery, and felt it inappropriate to place the child in this situation. McKillican went to the police barracks and was beginning to lay down, when Officer

---

[32] t. Ex. 6 (DeLeon Depo) at 102:24- 103:4
[33] Plt. Ex. 4 (Fleming Depo.) at 242:8-17
[34] Plt. Ex. 3., pp. 124-128  the following narrative is a summary of this testimony.

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

DeLeon called and advised him that he was going to go on the search and rescue

after all.  As Officer McKillican describes it as follows:

> I believe it was Chris DeLeon that was calling me saying that Fannie Carroll
> was down at the airport with the   troopers and was severely upset why I
> wasn't there at    the airport to meet the troopers.  So he said that I was
> supposed to go with the troopers and that was the -- what they told me.  Or
> that's what the -- she had said to him.  So I put my uniform back on, packed a
> few things up, 15 minutes later I was down at the airport meeting the
> troopers.  She -- I mean, there was a -- because of the  circumstances, there
> was a crowd of people at the airport, and she began to verbally flog me, for
> lack of better terms, in front of all these people, you know.   As a matter of
> fact, I know with the trooper had said when we were flying up there, he was
> like,  well, that was kind of inappropriate, wasn't it?  Well, that's Ms.
> Carroll.[35]

Officer DeLeon's recounting of the events confirms the events as reported by

Officer McKillican.[36]

After McKillican returned from the body recovery, on August 11, 2003 — the day

before the Carroll/Miller stalking hearing --- Fannie wanted to meet with McKillican

and had a conversation with McKillican, which McKillican taped.[37]  A copy of the

tape has been entered into court in connection with the motion to compel deposition

testimony from Fannie Carroll.  In the conversation, Fannie reported to McKillican

---

[35] Plt. Ex. 3, at 128:24-129:16
[36] Plt. Ex. 6 (DeLeon Depo) at 103:5- 104:3
[37] Plt. Ex. 3, at 83:15-18;  See also p. 128

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

that she had heard reports from two unnamed persons that McKillican had been

spreading rumors about what happened at the prior stalking hearing, and that

McKillican was telling people Dick Miller was "a fine person".  She told McKillican

that the rumors were not true, but did not tell him the content of the rumors.

Fannie indicated that she was upset, and that she was happy that she was making

McKillican upset.  She accused McKillican of being a troublemaker stating that he

was involved in "every little up set in the police department".  McKillican

acknowledged that he was upset, and that he was aware that she thought he was a

troublemaker because he raised deficiencies in the department.  At this point, Fannie

said that "We're going to have a meeting" and told him that she was going to do his

evaluation. McKillican objected because Chief Fleming was only allowed to evaluate

him.  Fannie told McKillican that an "investigator" – presumably Greg Russell – had

told her she was the city personnel manager, and that "you are employed under

me".  She indicated that she intended to proceed with the evaluation and that if he

didn't participate, she would note it in the file.   During this exchange, Fannie used a

very anger tone, which is reflected in the tape.


Remarkably, Fannie testified, in a highly evasive manner, that she had no idea

how she was going to evaluate Officer McKillican, and was not intent upon giving

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

him a bad review.[38]  However, the tape-recorded conversation clearly indicates that Fannie was motivated by her anger at McKillican because she believed that he had been spreading rumors about her personal life.  When asked why she needed to do the evaluation,  Fannie replied

> C. Why?  Because they work shifts and I wanted his evaluation done before -
> - before his one year was over.
> Q. Was there any particular reason why you wanted to do it that day?
> A    It could possibly be that I didn't know when he was
>    coming back.[39]

Later, she testified as follows:

> Q    Okay.  Is there some reason why you couldn't have waited for Mr.
>    Fleming to come back and do the evaluation with Mr. Fleming?
> A    The only thing I can think of is what I, you know, what is the
>    scheduling of who's coming and who's going, what is the rotation?
>    When Fleming came in, would McKillican be going out, or whatever,
>    was there an overlap?  I imagine that if they kept the schedule that that
>    would be answered.[40]

In reality, McKillican's evaluation wasn't due for three months --- i.e. the end of November.   Moreover, McKillican was correct in stating that she did not have the power to do the evaluation, since the personnel policy clearly states that Chief Fleming was to do the evaluation.  More to the point, in the conversation, Fannie did not mention the body recovery and her anger at McKillican not being ready to go

---

[38] Plt. Ex. 8 (Carroll Depo.) at 75:4-77:18
[39] Plt. Ex. 8 (Carroll Depo.) at 61:5-12
[40] Id., at 77:19-78:2

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

after she told him not to go in the first place. It is clear, that her anger was clearly

and solely focused upon the fact that she had heard that McKillican was spreading

"rumors" – of an undisclosed nature—about Dick Miller and Fannie Carroll, which

was going to hearing the next day. However, McKillican had nothing to do with the

matter. In short, Fannie was having a bad day. As was her nature and routine, as

reported by Chief Fleming, she decided to verbally attack McKillican. The incident

the day before ---her telling McKillican not to go on the body recovery, and than

reversing herself, and publicly berating him and attempting to humiliate him for not

being ready, was clearly retaliation for her fanciful and unfounded belief that

McKillican was spreading rumors about her and Dick Miller.


    After the termination, Gregg Russell with the Alaska Municipal League Joint

Insurance Association became involved in the matter.[41]   He attempted to arrange for

McKillican to return to Fort Yukon to at least finish out his 12-month probationary

period so that he could obtain his full police certification.[42]  Fannie refused to allow

McKillican to return to Fort Yukon under any circumstances.[43]  The timing of the

termination is particularly important.  As explained by Russell,

---

[41] Plt. Ex. 9 (Russell Depo) 31:1-21
[42] Id, at 32:2-9.
[43] Id.

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

> And I believe that he was within two weeks of his 12-year -- or 12-month probationary period, which is significant in police circles, because you're eligible then to get your basic certificate through Police Standards Council.[44]

In fact, McKillican ultimately obtained his basic police standards certification, but he had to start his year all over again with the Fairbanks Police Department, and was delayed a year in obtaining his certification.[45] Clearly, McKillican had every incentive to remain employed with Fort Yukon until he obtained his basic certification, and his ability to work for any other Alaska police department.  But, McKillican resigned, days short of his certification because he he felt that he was going to receive a bad evaluation, which would lead to his termination, and injure his ability to work in police work in the future.[46]

### III. McKILLICAN WAS THE SUBJECT OF CONSTRUCTIVE DISCHARGE.

To show constructive discharge under Alaska law the employee must prove that a "reasonable person in the employee's position would have felt compelled to resign." *Municipality of Anchorage v. Gregg, 101 P.3d 181, 192n40 2004 (Alaska 2004)*  In

---

[44] Id. at 30: 8-13  As Russell further explained. "I said getting your 12-month probation period behind you is a significant event, because in police circles, in order to get a basic certificate, you have to complete a 12-month probationary period, and become eligible to get your HSE basic" Id., at 32:13-18. "There is a provision for a 2-month extension with Alaska Police Standards Council, if, for no fault of your own, that you're not able to meet one of the requirements, you can get an extension.  I know they can extend it once.  They may be, depending on the circumstances, able to approach it even more than that.  But if you don't meet those goals and you don't  get your certificate at this point, you either have to  start all over and go again, but you can't have continued employment with that agency as a peace officer."  Id., at 33:7-16

[45] Plt. Ex. 3, at 41:20-23; 122:3-123:7

[46] Id. 67:12- 68:2; See also 101:6-8

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

that case, a police officer who was involved in a extra-martial affair resulting in various violent confrontations between her husband and her lover. She was found to have been constructively discharged because she was forced to either resign or risk being fired and losing her police certification, because she was seeking leave that she was entitled to under federal, state, and local laws.

In *Charles v. Interior Hous. Auth.*, 55 P.3d 57, 59-60 (Alaska 2002), the Court explained

> To prevail on a wrongful termination claim an employee must prove: (1) that the employee was discharged by its employer and (2) that the employer breached a contract or committed a tort in connection with the employee's termination. … Constructive discharge "satisfies the discharge element in a wrongful claim. A constructive discharge occurs when "an employer makes working conditions so intolerable that the employee is forced into an involuntary resignation." To establish constructive discharge it is not necessary that the employee actually "prove that the employer acted with the specific intent of causing the employee to resign.""

In *Charles*, the Court noted that constructive discharge may occur as a result of a sustained campaign of harassment. However, in *Gregg,* there was no sustained campaign of harassment. Rather, the fact that Gregg was "was forced to either resign or risk being fired and losing her police certification" was a basis for constructive discharge. There was no campaign of harassment in *Gregg*; rather the Plaintiff in *Gregg* was forced to resign because of the chaos in her private life and not

Michael J. Walleri
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

related to job performance.  In other words, she was forced to resign for an improper

motive.

But the holding in *Charles* and *Gregg* are important to note that an employer

must act in a manner that a reasonable person would regard as fair.[47]  Thus, an

employer violates the covenant of good faith and fair dealing and wrongfully

terminates an employee when firings violate public policy.  Thus, a sustained

pattern of harassment is not necessary to show constructive termination. Rather, as

in *Gregg*, unreasonable actions by a city in threatening termination or loss of

certification, or both, places a policeman in a situation where a reasonable person

would resign rather than endanger his future career.   This is more important where

the firing violates public policy.  In *Gregg*, the city was violating the Family Medical

Leave Act.  In the present case, the City Manager was  angry over her problems with

Dick Miller.  Fannie improperly used the 911 system and and the 911 tapes  were

lost.  The tapes were evidence under subpoena in a hearing in court the following

day.

---

[47] *Charles v. Interior Hous. Auth.*, 55 P.3d, at 62

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

The city points to *Pitka v Interior Regional Housing Authority*[48] to suggest that mere criticism of job performance or other management decisions do not, standing alone, create intolerable workplace conditions." [49]  The argument is specious.  The present case is clearly distinguishable from *Pitka*. The evidence is crystal clear that Fannie was not criticizing Officer McKillican for job performance.  Rather, she was angry because she had heard he was spreading rumors about her personal life. Ultimately, Fannie was denied a stalking order against Dick Miller because the unwanted contact of which Fannie complained was made during City Council work sessions.[50]  Fannie's anger at McKillican had nothing to do with his job performance. McKillican could not have been terminated because Fannie thought he spread rumors about her.  An employer may not do constructively something that he cannot do directly.[51]   Nor is Fannie's chaotic personal life and penchant for mixing her personal life with City business have anything to do with McKillican's job duties.  Stated otherwise, Fannie's personal drama is no excuse to discipline or terminate McKillican.

---

[48] 54 P.3d 785 (Alaska 2002)
[49] Def. Memo, at 16
[50] Plt. Ex. 10 (Order of Denial)
[51] *N.L.R.B. v. Holly Bra of California, 405 F.2d 870, 872 (9th Cir. 1969)* ("An employer cannot do constructively what the act prohibits his doing directly

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

The evidence is also clear that McKillican's belief that Fannie was going to terminate him is fully justified. Indeed, the City's own expert – Gregg Russell testified that Fannie refused to allow McKillican to return to Fort Yukon. McKillican agreed to return to Fort Yukon to transition into another officer. Fannie refused his offer. That fact is clear evidence that Fannie wanted McKillican terminated, and that his termination had nothing to do with job performance. His termination was solely related to Fannie's obsession about the scandal surrounding her stalking petition against a city council member, which was going badly.

Clearly, a reasonable person in Officer McKillican's position would feel compelled to resign, and when he offered to return, Fannie declined McKillican's offer, effectively terminating him. Moreover, the termination violated public policy in that it was totally related to Fannie's embarrassment of the scandal surrounding her personal life, and had nothing to do with Officer McKillican's job performance.

**IV. McKILLLICAN NEED NOT HAVE FILED A GRIEVANCE.**

The City now claims that McKillican's should have filed a grievance. This is incorrect, because McKillican need not have filed a grievance because it was closely related to his §1983 claim, and that such a grievance process would have been futile.

Michael J. Walleri
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

*Fleming, et. al. v City of Fort Yukon*                                      *Page 19 of 25*
Opp: Partial Sum. Jud. (McKillican; Counts III & IV)
[Docket 105]

**A) McKillican need not have filed a grievance because it was closely related to his §1983 claim.**  In *City of Fairbanks v. Rice, 20 P.3d 1097 (Alaska, 2000)* the Court held that exhaustion of remedies was not required where the constructive discharge claims are intertwined with §1983 claims.  That is the case here.

There can be little question that Fannie was engaged in discipline of McKillican.  Equally there is little question that Fannie's announced intention to use of the evaluation process violated city procedures and violated McKillican's procedural due process rights, as defined in the City personnel policy.  Fannie could not do his evaluation. She could not initiate a disciplinary action.  The City code requires a "pre-termination" hearing before dismissal.[52]  The employee is to be given notice and a hearing before such steps are taken.[53] Only Chief Fleming could do these things under the Fort Yukon personnel policy.   Fundamentally, Fannie's action denied McKillican the normal due process of the evaluation, disciplinary and dismissal procedures contained in the city's personnel policy.   Alaska law excuses a municipal employee from pursuing a city's grievance process when the constructive

---

[52] Plt. Ex. 2, (City Personnel Code) at p. 14 (See § 3)
[53] Id.

**Michael J. Walleri**
*Attorney at Law*
330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

*Fleming, et. al. v City of Fort Yukon*                                    *Page 20 of 25*
Opp: Partial Sum. Jud. (McKillican; Counts III & IV)
[Docket 105]

discharge claims are interwoven with the §1983 claims.    That is the case here.

Officer McKillican was not obliged to pursue the grievance procedures.


       **B) The Grievance Process Was Futile.**  The City's complaint that Officer

McKillican violated city's personnel policy is extremely ironic given that Fannie

totally ignored the personnel policy in dealing with Officer McKillican.


       Courts have held that failure to exhaust administrative remedies may be

excused where the administrative procedures are ineffective because of lack of

meaningful access, bias, futility, or the possibility that the claimant could face

irreparable harm if the administrative process is followed.[54]    In this case,

McKillican  believed that grievance was futile because the city council was bias.

---

[54] *Bruns v. Municipality Of Anchorage, Anchorage Water & Wastewater Utility, 32 P.3D 362, 371 (Alaska, 2001)*; Citing Kevin W. Reese, Administrative Remedies Must Be Exhausted Absent Circumstances Supporting an Exception to Exhaustion Doctrine, 47 S.C. L. Rev. 17, 22 (1995); *see also McCarthy v. Madigan, 503 U.S. 140, 148, 117 L. Ed. 2d 291, 112 S. Ct. 1081 (1992)* (explaining principle that a failure to exhaust administrative remedies may be excused when the administrative process is biased); *Bowen v. City of New York, 476 U.S. 467, 483-84, 90 L. Ed. 2d 462, 106 S. Ct. 2022 (1986)* (holding that a failure to exhaust administrative remedies may be excused when the claimant faces a danger of irreparable harm from the administrative process); *Robyns v. Reliance Standard Life Ins. Co., 130 F.3d 1231, 1236 (7th Cir. 1997)* (applying standard that a failure to exhaust administrative remedies may be excused where "there has been a lack of meaningful access to the review procedures"); *Eidelson v. Archer, 645 P.2d 171, 181 (Alaska 1982)* (establishing that failure to exhaust administrative remedies may be excused where the pursuit of the administrative remedy would be futile due to the certainty of an adverse decision.)

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

The city suggests that the city council was the entity to which McKillican should seek relief, but that is not the process set out in the personnel policy. First, McKillican would have to raise the issue informally with Chief Fleming. However, Chief Fleming was clear in stating that Fannie Carroll undermined his authority as chief of police.[55] Moreover, Fannie Carroll was Chief Fleming's boss,[56] which meant that the Chief would be reviewing his bosses actions. It is highly doubtful that Fleming could overrule his bosses decisions. More to the point, however, if Fleming could not resolve the problem, the personnel policy required McKillian to appeal to Fannie, the city manger. Of course, this stage of the grievance process would be meaningless since Fannie would be reviewing her own decision. Only at the final stage, would McKillican be able to go to the council. However, the Council was highly bias in favor of Fannie Carroll.

In his deposition, Officer McKillican testified as follows:

Q. And in any event, did you understand that if the city manager took an improper action against you that you had grievance rights and you could challenge her decision?
A. Well, I mean, it was -- we had -- yeah, I knew the policy and I knew the grievance policy, but I mean, it was -- it was useless to do. I wasn't going to get any satisfaction one way or the other. I wasn't going to get a fair -- you know, somebody to look at it fairly and justly.

---

[55] Plt. Ex. 4, at 170: 5-7
[56] Id. at 79-80

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

  Q. Why do you say that?
  A. Because her whole family was on the city council.[57]

  The City's argument proves the point.  The city points to the testimony of one city council member that if an employee followed the grievance process, McKillican would receive a fair hearing.  But the city council member the city point to was Fannie's cousin, i.e. Debra McCarty.  The fact that the city council was made up of Fannie's family --- including  Fannie's cousin, Debra McCarty, her father Richard Carroll (who was under investigation by the police for embezzlement), [58] and Fannie's sister in law[59] --- would strongly suggest to a reasonable person that the City council lacked of neutrality.  Indeed, the city municipal code recognizes that family relations could be a basis for bias and conflict of interest.[60]  Indeed, Fannie Carroll acknowledged that her family – the Carroll's – were one of the largest families in Fort Yukon, a fact she mentioned to Officer DeLeon.[61]  She told DeLeon to be mindful that these families ran Fort Yukon.[62]  Indeed, Fannie Carroll helped create the impression in the officers, including Officer McKillican, that in Fort Yukon decisions were made along family lines and that she belonged to one of the largest families.  The fact that Officer McKillican was aware that several members of her

---

[57] Plt. Ex. 3, at 77: 7-19
[58] See Related Motion and Cross Motion for summary judgment of Reggie Fleming
[59] Plt. Ex. 6 (DeLeon Depo) 136:23- 137: 9.
[60] Plt Ex. 11 (City Code) See generally pp. 19-20
[61] Plt. Ex. 8 (Carroll Depo.) at 50: 14-22
[62] Plt. Ex. 6 (DeLeon Depo) at 65:21-66:8

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

family were on the City council strongly would lead naturally to the perception of bias.

Finally, the accompanying affidavit of Richard Miller, who was serving on the City Council at the time, confirms that the City Council would not be a neutral form.  According to Richard Miller, the majority of the City Council would have supported  Fannie Carroll in such a grievance.  He indicates that it is most probable that only he would have supported McKillican.  Frankly, it would be hard, under the circumstances, to suggest that Dick Miller would be neutral in the matter, since McKillican was being terminated by Fannie because of McKillican's alleged association with Miller.

The evidence is clear.  The City Council of Fort Yukon was highly biased in relation to any grievance that McKillican would have filed.  As a result, McKillian would have been excused from pursing such a meaningless course of action such as a grievance. [63]

---

[63] It should also be noted that Chief Fleming, Officer DeLeon, and Officer Schlumbohm attempted to meet with the Council and were denied access, which is a separate basis for excuse to not pursue a grievance. The latter experiences of these officers – detailed in the related motions for summary judgment – confirm Officer McKillican's belief that appeal to the City Council would have been futile.

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

*Fleming, et. al. v City of Fort Yukon*                                    *Page 24 of 25*
Opp: Partial Sum. Jud. (McKillican; Counts III & IV)
[Docket 105]

**CONCLUSION**

The Court should deny the City's motion to grant summary judgment as to McKillican's claims as to Count III and Count IV for the reasons set forth above. The Court should grant McKillican's cross motion for summary judgment holding that he was constructively terminated.

DATED: October 30, 2006                    s/ Michael J. Walleri

Michael J. Walleri
Law Offices of Michael J. Walleri
330 Wendell Street, Suite E
Fairbanks, Alaska 99701
(907) 452-4716
(907)452-4725 (Facisimile)
walleri@gci.net
AK. Bar No. 7906060

Certificate of Service
I hereby certify that under penalty of perjury that a true and
correct copy of the foregoing was sent to the following counsel
of record on October 30, 2006 via ECFl  to:
Mr. Howard S. Trickey
Mr. Matt Singer
Jermain, Dunnagan & Owens, P.C.
3000 A Street, Suite 300
Anchorage, AK 99503

_____

**Michael J. Walleri**
*Attorney at Law*

330 Wendell St., Suite E
Fairbanks, Alaska 99701
(907) 452-4716
FACSIMILE
(907) 452-4725

*Fleming, et. al. v City of Fort Yukon*                    *Page 25 of 25*
Opp: Partial Sum. Jud. (McKillican; Counts III & IV)
[Docket 105]