1

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA

3

4    REGINALD FLEMING, CHRISTOPHER      )
     DELEON, CHRIS HAMPTON, WILLIAM     )
5    D. MCKILLICAN, and TODD            )
     SCHLUMBOHM,                        )
6                                       )
              Plaintiffs,               )
7                                       )
         vs.                            )
8                                       )
     FANNIE CARROLL and the CITY        )
9    OF FORT YUKON, ALASKA,             )
                                        )
10            Defendants.               )
     _____)
11   Case 4:04-cv-00034-RRB

12

13

14        **VIDEOTAPE DEPOSITION OF TODD SCHLUMBOHM**

15         Taken Thursday, August 17, 2006

16     From the hour of 1:48 p.m. to 3:36 p.m.

17        Pages 1 through 103, inclusive

18               Volume 1

19       Taken by Counsel for Defendants

20                  At

21     Offices of Heartland Court Reporters
            100 Cushman Street, Suite 308
22           Fairbanks, Alaska 99701

23

24   Reported by:
     CAROL A. McCUE, RMR
25   Heartland Court Reporters



EXHIBIT 5
PAGE 1 OF 24

1    10 years?

2        A.    Yes.

3        Q.    Reggie Fleming told you it was up to him, he

4    could decide whether to hire you?

5        A.    That is correct.

6        Q.    Have you at any time done anything to

7    independently verify whether Reggie Fleming was correct

8    in that statement?

9        A.    I did.    I actually signed up for a VPO academy

10   in King Salmon and attended that two-week academy for

11   village police officer.    And that was put on by the

12   Alaska State Troopers.    And I got a certificate from

13   that from -- I think it was Colonel Grimes at the time.

14       Q.    You worked -- you were hired as a public

15   safety officer for the City of Fort Yukon, right?

16       A.    Yes.

17       Q.    You weren't hired as a village police officer?

18       A.    My understanding, I was a police officer.

19   That's --

20       Q.    And in fact, you were working for -- you

21   understood you were working for a city government?

22       A.    That's correct.

23       Q.    Not for a village?

24       A.    Well, the Village of Fort Yukon.    They are

25   incorporated, I understand that, but --

EXHIBIT 5
PAGE 2 OF 24

1    of the shift.

2        Q.    Other than the jobs we've discussed, have you

3    had any other employment since leaving Fort Yukon?

4        A.    Two school districts, Alaska Distributors,

5    Securitas.    I don't believe there was any other ones.

6        Q.    Have you had any second jobs or do you have

7    any businesses on the side?

8        A.    No.

9        Q.    Each of the employers you've had since leaving

10    Fort Yukon, they provided you a W-2 form at the end of

11    the year?

12        A.    Yes.

13        Q.    Can you produce those W-2 forms to your

14    lawyer?

15        A.    They are getting them tomorrow.

16        Q.    And those accurately depict your income, as

17    far as you know?

18        A.    Yes.

19        Q.    And do you file tax returns every year?

20        A.    Sure.

21        Q.    Why did you resign from your job at the police

22    department in Fort Yukon?

23        A.    I re -- I resigned from Fort Yukon because, to

24    put it bluntly, it was either get fired or resign.

25        Q.    And why did -- why did you reach that

EXHIBIT 5
PAGE 3 OF 24

1    conclusion?

2        A.    That's what was offered to me.

3        Q.    And who offered that to you?

4        A.    Fannie Carroll and Greg Russell.

5        Q.    Was this in a particular conversation?

6        A.    Between me and Fannie, yes, and Greg Russell

7    had entered the room in private between them two and

8    discussed whatever they discussed, and he would come

9    back and talk to me, then I would go in there, and it

10   was just back and forth.

11            At that time -- the last time he entered the

12   room he came back and he says, she's probably going to

13   offer you to resign or be fired.  And she did.  And I

14   resigned at that time.

15       Q.    Now, when was this, do you remember?

16       A.    February of '04, about the 16th or so, 17th.

17       Q.    So all of this occurred on the same day that

18   you resigned --

19       A.    Yes.

20       Q.    -- February 16th --

21       A.    Yes.

22       Q.    -- 2004?

23       A.    (Witness nods head.)

24       Q.    Who was present when you resigned?

25       A.    The acting chief, J.R. Wallace, Chris DeLeon,

EXHIBIT 5
PAGE 4 OF 24

1    myself, and Greg Russell.

2         Q.    And was -- Reggie Fleming was in town, as

3    well; is that right?

4         A.    He was not at Fort Yukon during this.

5         Q.    On that day, did you converse with Greg

6    Russell about your prior DUIs and your eligibility for

7    certification with the Alaska --

8         A.    We did bring that up, yes.

9         Q.    What do you recall of that conversation?

10        A.    He asked me -- he had his laptop, he went

11   down, and he said the safety -- the APSC regulations,

12   do you meet these, as he read them off.  And when he

13   said two or more DUIs in 10 years, I said, no.

14        Q.    And so Greg Russell showed you the Alaska

15   Police Standard Council regulations?

16        A.    Yeah, he read them to me.

17        Q.    And -- and you said you didn't meet one of

18   those regulations?

19        A.    That's correct.

20        Q.    And what did he say to you, do you recall?

21        A.    He said, why do you think you would be

22   employed as a police officer if you don't meet this

23   regulation?  And I said, well, it was my assumption

24   that it was up to the chief to make that decision.

25        Q.    What do you recall Mr. Russell telling you

1 then?

2   A. Afterwards, I don't remember what he said.

3   Q. Do you remember telling -- did he tell you

4 that Chief Fleming had done you a disservice?

5   A. No, I don't.

6   Q. Was Chief Fleming in the room, do you

7 remember?

8   A. No, he was not.

9   Q. So in part of this discussion about your

10 continued employment, you learned, really for the first

11 time, that the regulations prohibited employment of an

12 officer with more than two DUIs?

13   A. Yeah.  And I had read those.

14   MR. WALLERI:  Objection as to form.  Go ahead.

15   THE WITNESS:  Yeah.  And I had read those.  I

16 mean, I looked on the computer, I pulled up APSC, I

17 read them all.  But I was told it would be up to the

18 chief of police to make that decision.

19 BY MR. SINGER:

20   Q. Greg Russell indicated otherwise to you?

21   A. He didn't say that -- whether Reggie could

22 hire me or not.  That was never -- that was never

23 brought up, that I remember.

24   Q. Wasn't Fannie Carroll in the room for this

25 conversation?

1     A.   No, she was not.

2     Q.   What were the reasons that you believed you

3   were going to be terminated if you did not resign?

4     A.   That was told to me by Greg Russell.

5     Q.   What -- what was the reason?

6     A.   I don't believe there was a reason.  He

7   said -- oh, there had been some personnel files, I was

8   on probation for that.  And that was an issue with

9   Fannie Carroll.

10         And when I returned the files, she

11   stated that -- or I told her that I did not take these

12   files to deprive or, you know, mislead anybody.

13     Q.   Tell me then about the -- your removal of the

14   personnel files.

15     A.   One afternoon I was in the police department,

16   she came in, she said she was going to Fairbanks to

17   talk with her attorneys, the city attorneys, and she

18   gave me a letter stating that she wanted 911 evidence

19   tapes, case -- case files and personnel files.

20         I thought it was kind of odd that she would

21   want these tapes and personnel files.  It stated on

22   there that I could get further permission if I felt I

23   needed to, and I felt that I needed to.

24         I called Chief Fleming and got told to secure

25   the files.  I called Captain Tanner with -- he's a

1  retired captain from the State Troopers, told him the

2  situation, he says, if Reggie's your boss, then that's

3  what you need to do.  So I boxed up the files and

4  secured them.

5      Q.   What -- you say Fannie Carroll gave you a

6  letter?

7      A.   She did.

8      Q.   What did you do with the letter?

9      A.   I've still got it.

10     Q.   Have you produced it to your lawyer?

11     A.   I have.

12     Q.   Has he produced it in this litigation?

13     A.   I haven't seen it, no.

14     Q.   Do you know why it hasn't been produced?

15     A.   No, I don't.

16          MR. WALLERI:  Objection.  Assumes facts not in

17  evidence.  You're assuming that it has not been

18  produced.

19  BY MR. SINGER:

20     Q.   If it -- you don't -- you don't have any

21  knowledge one way or the other if it's been produced;

22  is that your testimony?

23     A.   I don't know.

24     Q.   Tell me, then, what is it -- what is it that

25  you did to secure these files?

1          A.    The best I could, I had a -- there was a box I

2    taped.   I took the box to our residence, which was

3    placed in my bedroom that only I stayed in.   The next

4    morning we flew to Fairbanks and I had the files with

5    me at my residence.   And that's what I was told to do

6    with them, just keep them secured.

7          Q.    Well, let me -- let me understand.   Did Reggie

8    Fleming instruct you to take the files and bring them

9    to Fairbanks?

10         A.    That's correct.

11         Q.    So that's -- when he told you to secure them,

12   he specifically instructed you, get the personnel files

13   and bring them to me in Fairbanks?

14         A.    He didn't say, bring them to me in Fairbanks.

15         Q.    What did he say?

16         A.    He said secure them, and that was the best

17   that I could secure them.

18         Q.    The best you could secure them was to tape

19   them up and take them --

20         A.    Keep them in my possession, yes.

21         Q.    Now, they weren't in your possession when you

22   got on the plane, correct, you checked them as luggage?

23         A.    They were still in the same area as I was

24   because Warbelow's flies your cargo behind you.

25         Q.    Right.   And there's an evidence locker at the

1    police department?

2        A.    There is.

3        Q.    You didn't put them in there?

4        A.    No.

5        Q.    You didn't put them under a lock and key?

6        A.    No, I did not.

7        Q.    You took -- now, what -- isn't it true that

8    the -- what you -- what you removed was one box, right?

9        A.    That is correct.

10       Q.    And that box was the personnel files for the

11   police department?

12       A.    That is correct.

13       Q.    Not 911 evidence tapes?

14       A.    No.

15       Q.    Not case files?

16       A.    Nope.

17       Q.    You didn't secure those?

18       A.    Those were in their own locker inside the

19   police department.

20       Q.    So there was a secure locker within the police

21   department?

22       A.    There's an evidence locker that is secured --

23       Q.    And it was secured?

24       A.    -- with a lock.

25       Q.    And so you felt you were complying with your

1    chief's direct order to secure these documents and

2    evidence by leaving them secure in the police

3    department?

4        A.   No, I brought them back with me.

5        Q.   As to the -- but there -- you said there were

6    three items, the 911 evidence tapes, right?

7        A.   Those are just what she requested, not what I

8    had taken.

9        Q.   So did Reggie Fleming tell you only to secure

10   the personnel files?

11       A.   Yeah.  And he said don't -- and do not give

12   her the tapes.

13       Q.   Did he tell you to secure the tapes with the

14   case files?

15       A.   I didn't know where the tapes were that she

16   was looking for.

17       Q.   And what about the case files?

18       A.   The case files were in the same drawer that

19   they had always been put in.

20       Q.   Under lock?

21       A.   I don't believe those were locked.

22       Q.   So you weren't concerned about securing -- or

23   you took no action to secure 911 evidence tapes or case

24   files?

25       A.   The tapes were in the police department and

1    they were in a pull-out drawer.  That's where all of

2    our evidence tapes were --

3        Q.   So you took --

4        A.   -- were put.

5        Q.   -- so you took no action to secure the

6    911 evidence tapes?

7        A.   Those, I did not bring with me.

8        Q.   Or -- you didn't do anything to secure the

9    911 evidence tapes?

10       A.   I didn't.  I didn't.

11       Q.   Nor did you do anything to secure case files?

12       A.   Case files, no.

13       Q.   The thing -- the thing that you decided to

14   secure was the personnel files?

15       A.   That's what I was told to do.

16       Q.   By Reggie Fleming?

17       A.   That's correct.

18       Q.   Did he tell you not to bother with the

19   911 tapes and --

20       A.   Did not.

21       Q.   -- case files?

22       A.   Did not.

23       Q.   And so --

24       A.   What he told me was don't give her any of the

25   tapes.  Take the personnel files and get them out of

1          MR. WALLERI:  Objection.  Assumes that Fannie

2     Carroll is, in fact, the city.  But go ahead.

3          THE WITNESS:  Can you repeat that?  I'm sorry.

4     BY MR. SINGER:

5          Q.  Was it your understanding that there was a

6     change with regard to the city's view of your -- of

7     your performance and continuing employment after you

8     removed the files?

9          A.  I don't think their view of my performance had

10     changed.

11          Q.  The city manager made it clear she was not

12     happy with your decision to take personnel files from

13     the police department and remove them to Fairbanks,

14     right?

15          A.  That's correct.

16          Q.  Are you aware that the city contacted the

17     State Troopers about that removal?

18          A.  I am.

19          Q.  How are you aware of that?

20          A.  I called up there to talk with J.R., and one

21     of the trooper -- I can't remember his name offhand --

22     answered the phone.

23          Q.  And what did he tell you?

24          A.  He said, I think it was Trooper Carbajol, he

25     said, we are up here doing an investigation, he said,

1    and J.R. is not here.

2        Q.    An investigation of what?

3        A.    Didn't state.

4        Q.    Did you know they were investigating the

5    removal of the personnel files?

6        A.    I did not at that time.

7        Q.    When did you learn that?

8        A.    After we had went back up and I returned the

9    files.

10       Q.    And the city didn't pursue any charges against

11   you, right?

12       A.    No.

13       Q.    They made it clear they were happy that you

14   returned the files?

15       A.    Sure.  Yes.

16       Q.    They weren't going to try to punish you for

17   that?

18       A.    No.

19       Q.    Now, you were aware there was a Personnel

20   Manual Handbook, right?

21       A.    Yeah.

22       Q.    You had seen that?

23       A.    I have.

24       Q.    You had a copy of it?

25       A.    Uh-hum.

1      A.   Yeah.  Greg Russell had told me to -- I told

2   him what -- what I write -- I've never wrote a letter,

3   just I said what I just put on there that I resign at

4   this date.  He said, don't put personal reasons.  And

5   then, obviously, he made me write in the 2004 that I

6   had forgot.

7      Q.   And so after you submitted this letter of

8   resignation, did you submit to the city a written

9   grievance?

10      A.   This is the only thing that I gave Fannie

11   Carroll.

12      Q.   Okay.  You didn't, then, ask for a hearing,

13   for example?

14      A.   No.  I only asked about the city council

15   members being present, and that was before this.

16      Q.   That was because of your belief that the city

17   council had to be present to terminate you?

18      A.   A certain amount of members, I thought, had to

19   be present before we were given the option to resign or

20   be terminated.

21      Q.   What was -- where did that belief come from?

22      A.   That's just -- I don't -- who knows.

23      Q.   Did a -- after they were terminated, did

24   Fleming and DeLeon come back to Fort Yukon?

25      A.   Me and DeLeon were -- after terminated, after

80

1    me and DeLeon went up on this date, and he was there,

2    and I don't -- I think Reggie may have came in later

3    this day.

4        Q.   So -- so you -- DeLeon had been fired while

5    you were in Fairbanks, right?

6        A.   I can't remember if he was in Fairbanks or

7    Fort Yukon, either one, Reggie or DeLeon.

8        Q.   And you guys -- you guys flew back from

9    Fairbanks to Fort Yukon --

10       A.   Yes.

11       Q.   -- on February 16th --

12       A.   Yes.

13       Q.   -- together?

14       A.   Yes.

15       Q.   And he was no longer a police officer?

16       A.   I -- I don't know if he was or not or if

17   that's why he came up because we knew that there was

18   going to be a city council meeting that night, we

19   wanted to attend the city council meeting.  We were

20   refused to go to the city council meeting.

21       Q.   Why -- why did you refuse to go to the city

22   council meeting?

23       A.   We didn't refuse to, we were asked not to go

24   into the city council member by Greg Russell.  He says,

25   you guys just hang out here.  They went in, they went

EXHIBIT 5
PAGE 16 OF 24

1    to executive session, he came back, he says, we are in

2    executive session with the city attorneys.  That's it.

3        Q.   And then did you go in?

4        A.   No.

5        Q.   Why not?

6        A.   We were asked not to go in.

7        Q.   It's your testimony you were asked not to go

8    in?

9        A.   (Witness nods head.)

10       MR. WALLERI:  You need to say -- you need to

11   verbalize.

12       THE WITNESS:  Yeah.  We -- we were asked not

13   to go into the city council meeting and to wait until

14   it was over with.

15   BY MR. SINGER:

16       Q.   Okay.  Now, you never submitted, again, a

17   written grievance or a written request for a hearing?

18       A.   No, I didn't.  I was not aware of what those

19   were at the time.

20       Q.   You were aware that there was a Personnel

21   Manual Handbook?

22       A.   Yeah.

23       Q.   And that it had a grievance chapter in it?

24       A.   Yeah.  I probably -- I'm sure I read it.

25       Q.   Did -- did you -- you're sure you read it?

EXHIBIT 5
PAGE 17 OF 24

1      Fannie Carroll where you recorded her?

2          A.   Yes.

3          Q.   And what was the reason?

4          A.   My reason was she had -- first of all, I had

5      the water and sewer project manager come to me stating

6      that the female had called him stating that my husband

7      was coming to pick up his check, and it -- and in

8      actuality, it was not her husband that picked up the

9      check, she -- she received the check.

10              I contacted the guy that supposedly, or who

11     had owned the check, stated he didn't get his check and

12     that my wife had called and said he could go down and

13     pick up the check.  Or had a guy call so she would pick

14     up the check.  She, in turn, went to the city and

15     cashed the check.

16              I went to the city clerk, or the accounting

17     office where the check was, I asked them if I could get

18     a copy of that check, she brought the check out, and it

19     was taken from me by Fannie Carroll.

20         Q.   And you --

21         A.   And she stated to me that it's the city's

22     money, it will come back to us no matter what, so don't

23     even bother with it.  I had that tape.  I talked to her

24     in her office afterwards, for probably 15 minutes.  She

25     was on tape then.  Some of it was -- most of it was not

88

1    related to the topic of my investigation at that time.

2    The case was open when I left.

3        Q.    What did you do with that tape?

4        A.    That tape was given to J.R. Wallace.  I told

5    him to hang on to this tape, the case is in the

6    computer, you're going to need this tape for that.

7        Q.    And do you know what happened to that tape?

8        A.    I have no idea.

9        Q.    Still could be in evidence in Fort Yukon, as

10    far as you know?

11        A.    Could be.

12        Q.    You didn't remove it?

13        A.    I did not remove it.  I gave it to J.R.

14    Wallace who was the acting chief at the time.

15        Q.    Would it have been appropriate for you to

16    remove the tape?

17        A.    No.

18        Q.    That's evidence?

19        A.    Evidence.

20        Q.    That's taken in the course of your

21    professional work as a police officer?

22        A.    That's correct.

23        Q.    Did you do a taser training while you were

24    employed by the city of Fort Yukon?

25        A.    I did.

1    driver's license.

2         Q.    Who brought it to -- you said it was brought

3    to your attention that you didn't need a driver's

4    license.

5         A.    It was when, I think, McKillican and Reggie

6    and myself were discussing that, and we also asked the

7    city manager for her input and what she thought.  It

8    was not an issue.

9         Q.    And who is the city manager?

10        A.    Fannie Carroll.

11        Q.    And it was her opinion that you didn't need

12   one?

13        A.    Yeah.  We were -- she told us not to -- not to

14   push the issue with people with no driver's license.

15        Q.    In terms of your training, I was curious, you

16   said that you -- you actually attended two academies,

17   correct?

18        A.    I did.  That's correct.

19        Q.    And what was the first academy?

20        A.    The first one was the Tanana Valley Campus,

21   the extension of the University of Fairbanks.  I was

22   APSC certified, 490 hours of academy.

23        Q.    And the -- and the VPO, and the second one was

24   the VPO academy?

25        A.    In King Salmon; that's correct.

HEARTLAND COURT REPORTERS 907-452-6727


EXHIBIT 5
PAGE 20 OF 24

93

1      Q.   Okay.  And when did you -- when did you take

2    the VPO academy?

3      A.   I know it was in the wintertime of '03, I want

4    to say it was right after Christmas or somewhere just

5    before or just after.  I can't remember the exact

6    dates.  I'd have to look at my certificate.

7      Q.   And why did you take the VPO academy?

8      A.   Fleming sent me there.  He said, you're going

9    to this academy.  I said, well, I don't really want to.

10   But you're going.  So he sent me, got it all arranged

11   for me, and sent me to the VPO academy.

12     Q.   Okay.  Did you ever -- when you received the

13   direction from Chief Fleming to secure the records, did

14   he say why he wanted you to secure the records?

15     A.   He didn't say why he wanted me to secure them.

16   He said, secure the records, don't let her have them.

17   It was left at that.

18     Q.   Did you have any experience that would lead

19   you to believe that the records might be missing in the

20   City of Fort Yukon?

21     A.   They would have been missing because she was

22   asking for them at that -- because she was very

23   persistent on getting those.  She was very, very upset

24   that I had told her, no, I'm not going to hand her the

25   personnel files.

94

1     Q.   Had -- had she ever asked you for other

2     records before?

3     A.   911 tapes, she has.  She's actually came into

4     the police department during a civil case between her

5     and Dick Miller and used the police phone just to

6     record him.

7     Q.   Do you know what happened to that tape?

8     A.   I do not know where that tape is.

9     Q.   Did she have access to that tape?

10     MR. SINGER:  Objection.  Foundation.

11     BY MR. WALLERI:

12     Q.   Do you know whether or not she had access to

13     the tape?

14     A.   I don't believe she did have access to the

15     tape.  Because we -- only the police officer had a key

16     to the back door, until a certain time.

17     Q.   Do you know whether or not she had a key to

18     the evidence locker?

19     A.   I don't believe she did the time that I was

20     there.  To that, to the evidence locker.  She did

21     obtain a key to the back door of the police department.

22     Q.   Do you know whether or not there were other

23     records missing that had some connection with her while

24     you were there?

25     A.   The only thing that I can think of when the

5
22-24

1    troopers did the investigation of personnel files was

2    brought to my attention that they could not find the

3    case files or any of the evidence tapes.  They were in

4    the same location as they had always been ever since I

5    had worked there.

6         Q.   Do you know which case files were missing?

7         A.   I have no idea.  Apparently there was zero

8    case files.

9         Q.   There were no case files?

10        A.   J.R. Wallace stated that when the troopers

11   were up here they could find no case files or no

12   evidence tapes.

13        Q.   So that from your understanding -- and the

14   troopers made inquiry to you about that?

15        A.   They did not.  J.R. did.

16        Q.   And what did J.R. ask you?

17        A.   He didn't ask me anything, he had just stated

18   that when the troopers were up here, they did not find

19   any of the case file in the drawers, they did not find

20   any of the evidence tapes.

21        Q.   Okay.  Were there -- were you aware that there

22   was an ongoing investigation into Richard Miller?

23        A.   Towards the end of our employment, yes.

24        Q.   Was there a case file on that?

25        A.   Yes, there was.

1        Q.    And how do you know that there was a case

2    file?

3        A.    I know that Reggie had started it, there was a

4    case file, the Maggie John, I think she was a ex-city

5    manager who had a warrant for her arrest and was

6    arrested on December 23rd of '03.

7        Q.    And she was arrested by officer DeLeon,

8    correct?

9        A.    That is correct.

10        Q.    Okay.  And she was involved in the

11    investigation?

12        A.    She was.

13        Q.    And do you know whatever happened to that case

14    file?

15        A.    I have no idea.  I would assume that that case

16    file would still be there.  The case should still be on

17    the computers that are still up there.

18        Q.    But officer -- or J.R. Wallace indicated to

19    you that there were no case files?

20        A.    That's correct.  He was the only officer up

21    there for -- I believe, during that investigation with

22    the troopers.

23        Q.    Would that lead you to believe that the

24    investigation file into Fannie Carroll's father was

25    also missing?