Case 4:04-cv-00034-RRB    Document 136-4    Filed 10/30/2006    Page 1 of 3

Deposition of Christopher DeLeon    CONFIDENTIAL SEALED TRANSCRIPT    Fleming, et al., vs. Carroll, et al.
Taken July 19, 2006    Case No. 4:04-cv-00034-RRB

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER    )
DELEON, CHRIS HAMPTON,    )
WILLIAM D. MCKILLICAN, and    )
TODD SCHLUMBOHM,    )
    )
      Plaintiffs,    )
    )
  vs.    )
    )
FANNIE CARROLL, and the CITY    )
OF FORT YUKON, ALASKA,    )
    )
      Defendants.    )
_____)
Case No. 4:04-cv-00034-RRB


CONFIDENTIAL

DEPOSITION OF CHRISTOPHER DeLEON

Taken Wednesday, July 19, 2006

From the hour of 9:05 a.m. to 3:03 p.m.

Pages 1 through 232, inclusive
Volume 1

Taken by Counsel for Defendants

At

Offices of Heartland Court Reporters
100 Cushman Street, Suite 308
Fairbanks, Alaska 99701


Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

Ex. O
pg. 1 of 3

Heartland Court Reporters    Phone:  (907) 452-6727
Carol A. McCue, RMR    Email: carol.mccue@acsalaska.net   Fax: (907) 488-7701

4c2f21c0-846e-4461-acf5-fc130c03ccb0

Case 4:04-cv-00034-RRB   Document 136-4   Filed 10/30/2006   Page 2 of 3

Deposition of Christopher DeLeon   CONFIDENTIAL SEALED TRANSCRIPT   Fleming, et al., vs. Carroll, et al.
Taken July 19, 2006                                              Case No. 4:04-cv-00034-RRB

Page 86

1  Q. Did you have a basic certificate from --
2  A. I did not.
3  Q. When did -- do you have that now?
4  A. Yes, I do.
5  Q. When did you acquire a basic certificate from
6  the Alaska Police Standards Council?
7  A. During my employment with the City of
8  Fairbanks. I don't know the exact date.
9  Q. Why didn't you have one back then?
10 A. Well, it takes a year to get that. And as you
11 know, I didn't quite make it.
12 Q. And did you understand -- did you understand
13 under the law that there's a probationary period before
14 you can be certified as a basic --
15 A. Yes.
16 Q. -- APSC, basic police officer?
17 A. Yes.
18 Q. And there's a 12-month probationary period?
19 A. For the APSC, yes.
20 Q. Now, you mentioned -- as your job duties, you
21 mentioned patrolling the City of Fort Yukon, right?
22 A. Yes.
23 Q. And you described for me what you did in
24 patrolling. You also said you'd go out on calls; is
25 that correct?

Page 87

1  A. Yes.
2  Q. How did you get calls?
3  A. If we were in the station, people would call
4  the station and you would get the phone call there. We
5  also had a radio phone.
6  Q. Uh-hum. So --
7  A. Also there was a dispatcher and they -- if you
8  were in the vehicle, you would be dispatched to a call.
9  Q. And so the police department employed
10 dispatchers, right?
11 A. Yes.
12 Q. They worked in the -- the -- just so we're
13 clear, for the record, the police department has a room
14 in the city building, right?
15 A. Correct.
16 Q. Maybe twice as high as this conference room?
17 A. That would be a good -- yeah.
18 Q. And that's -- that's the police department,
19 right?
20 A. Yes.
21 Q. And that's where you kept files and would do
22 your time sheets, for example, right?
23 A. And work our reports, yeah.
24 Q. Yeah. Couple of desks in that room?
25 A. Yes.

Page 88

1  Q. Computers?
2  A. Yes.
3  Q. 911 system?
4  A. Yes.
5  Q. And that's where the dispatchers would go to
6  work?
7  A. Yes.
8  Q. And -- now, did you -- did you work in any --
9  at any time in your tenure with Fort Yukon, did you
10 work in a supervisory capacity?
11 A. No. We had a new hire that, you know, I kind
12 of oversaw for a little bit, but I mean, not --
13 Q. Who was that?
14 A. I can't remember his name right now. It
15 was -- if you --
16 Q. J. R. Wallace?
17 A. No. Well, he was a -- I was hired in
18 seniority to him, but as far as a supervisor, you know,
19 he was -- no. I mean, I guess not.
20 Q. Did you oversee scheduling for dispatchers?
21 A. No.
22 Q. Did you oversee scheduling for other officers?
23 A. No.
24 Q. Did you direct other officers as to what
25 matters to investigate or how to prioritize tasks?

Page 89

1  A. Sometimes, yes.
2  Q. Did you -- you didn't -- you didn't have
3  anything to do with scheduling, you said? Setting
4  schedules?
5  A. No.
6  Q. Who did that?
7  A. Reggie, I think, or -- and when Reggie wasn't
8  there, Todd did once or twice, but not a whole lot.
9  Q. Reggie Fleming was the Chief of Police?
10 A. Yes.
11 Q. Did you understand there to be a chain of
12 command within the police department and the city?
13 A. Yes.
14 Q. Who was on the top of the chain -- chain of
15 command?
16 A. In my department, it would be Chief Fleming.
17 Q. Who did he report to?
18 A. The city manager who was Fannie Carroll.
19 Q. And did you understand she was the personnel
20 director for the city?
21 A. I -- yeah. I came to know that, yeah.
22 Q. And the chief reported to the city manager?
23 A. Well, you know, I don't --
24 Q. As you understood?
25 A. Well, yes and no. I mean, Reggie, I thought,

23 (Pages 86 to 89)

Heartland Court Reporters              Phone: (907) 452-6727
Carol A. McCue, RMR   Email: carol.mccue@acsalaska.net  Fax: (907) 488-7701

Ex. O                4c2f21c0-846e-4461-acf5-fc130c03ccb0
pg. 2 of 3

Case 4:04-cv-00034-RRB   Document 136-4   Filed 10/30/2006   Page 3 of 3

Deposition of Christopher DeLeon   CONFIDENTIAL SEALED TRANSCRIPT   Fleming, et al., vs. Carroll, et al.
Taken July 19, 2006                                               Case No. 4:04-cv-00034-RRB

Page 90

1  reported to the city council was my understanding, but
2  I might have been mistaken, so...
3     Q. And then you reported to the chief?
4     A. Correct.
5     Q. You under -- you saw him as your boss?
6     A. Yes.
7     Q. Did you see him as responsible for hiring you?
8        (Cell phone ringing.)
9        MR. SINGER: Off the record.
10       THE REPORTER: Off record.
11       (Off record, recess from
12       11:04 a.m. to 11:05 a.m.)
13       THE REPORTER: Back on record.
14 BY MR. SINGER:
15    Q. Did you see Chief Fleming as responsible for
16 hiring you?
17    A. Yes. Well, both he and Fannie in that
18 meeting.
19    Q. And then did you see him as responsible for
20 setting your schedule?
21    A. The large portion of it, yes.
22    Q. When you said that you had a promotion to
23 investigator; is that right?
24    A. Uh-hum.
25    Q. Who made that decision?

Page 91

1     A. Reggie.
2     Q. Reggie Fleming?
3     A. Uh-hum. Chief Fleming.
4     Q. How did you your job duties change when you
5  became a investigator?
6     A. Well, I looked into cases a little bit more
7  than I did when just general patrol. With that, I also
8  was the liaison for the District Attorney's Office. So
9  if there was ever an issue or follow-up, I would be
10 assigned to do that. I guess in a nutshell, that
11 changed that way.
12    Q. Let's talk a little bit about the
13 circumstances under which you were terminated from your
14 employment. Okay?
15    A. Yes, sir. I'm sorry for yawning. I worked
16 late last night so -- I'm fine, really. It's just...
17    Q. It's all right. A deposition in a windowless
18 conference room is not the most exciting event, so
19 you're entitled to yawn. And we can take a break at
20 any time.
21       There was a -- there was a meeting, I believe
22 it was the 5th of February of 2004, at the city. Do
23 you remember that?
24    A. Sure.
25    Q. Do you remember the meeting, there was a

Page 92

1  discussion about community policing?
2     A. Yes.
3     Q. Do you remember that meeting?
4     A. Yes.
5     Q. Now, there's a tape recording of that meeting,
6  or it's on a -- we have it on a CD, but there's a
7  recording of that meeting.
8     A. Yes.
9     Q. How did that meeting come to be -- or a
10 portion of that meeting come to be recorded?
11    A. I recorded it.
12    Q. How did you record it?
13    A. On a tape recorder.
14    Q. What kind of -- tell me -- describe for me the
15 recording device?
16    A. It's a small, personal-sized recording that
17 uses the very tiny microcassettes. Uses like double A
18 batteries.
19    Q. Kind of those little handheld --
20    A. Correct.
21    Q. And who -- whose tape recorder was it?
22    A. It was mine.
23    Q. Your personal tape recorder?
24    A. Yes.
25    Q. Not the city's?

Page 93

1     A. No.
2     Q. Whose tapes were they?
3     A. It was mine.
4     Q. Your personal tapes?
5     A. Yes.
6     Q. Whose decision was it to record?
7     A. It was mine.
8     Q. Your decision?
9     A. Yes.
10    Q. Not city?
11    A. No.
12    Q. No directive?
13    A. No.
14    Q. Did you tell anybody you were recording?
15    A. No.
16    Q. Nobody?
17    A. No.
18    Q. Nobody else knew that you were recording?
19    A. No.
20    Q. And what prompted you to record the meeting --
21 or part of the meeting?
22    A. Because I've had some difficulties with the
23 city manager.
24    Q. So what did -- why did you think tape
25 recording would be beneficial?

24 (Pages 90 to 93)

Heartland Court Reporters          Phone: (907) 452-6727
Carol A. McCue, RMR   Email: carol.mccue@acsalaska.net  Fax: (907) 488-7701

Ex. O   4c2f21c0-846e-4461-acf5-fc130c03ccb0
pg. 3 of 3