Case 4:04-cv-00034-RRB   Document 136-5   Filed 10/30/2006   Page 1 of 5
REGINALD FLEMING, et al vs. FANNIE CARROLL, et al          DEPOSITION OF FANNIE M. CARROLL
CASE NO. F04-0034 CIV (RRB)                                         MAY 26, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER    )
DELEON, CHRIS HAMPTON, WILLIAM   )
D. MCKILLICAN and TODD           )
SCHLUMBOHM,                      )
                                 )
            Plaintiffs,          )
                                 )
     vs.                         )
                                 )
FANNIE CARROLL and the CITY OF   )
FORT YUKON, ALASKA               )
                                 )
            Defendants.          )
_____) Case No. F04-0034 CIV (RRB)

DEPOSITION OF FANNIE M. CARROLL
May 26, 2006

APPEARANCES:

    FOR THE PLAINTIFFS:    MR. MICHAEL J. WALLERI
                                 Law Offices of
                                 Michael J. Walleri
                                 Attorneys at Law
                                 330 Wendell Street
                                 Suite E
                                 Fairbanks, Alaska 99701
                                 (907) 452-4716

    FOR THE DEFENDANTS:    MR. HOWARD S. TRICKEY
                                 Jermain, Dunnagan & Owens
                                 Attorneys at Law
                                 3000 A Street, Suite 300
                                 Anchorage, Alaska 99503
                                 (907) 563-8844

    ALSO PRESENT:          MR. PETER SANDBERG

\* \* \* \*

Ex. P
pg. 1 of 5

METRO COURT REPORTING
907.276.3876  745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501 metro@gci.net
ee560b04-bbcd-4750-8104-da372b35e513

Case 4:04-cv-00034-RRB   Document 136-5   Filed 10/30/2006   Page 2 of 5

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al          DEPOSITION OF FANNIE M. CARROLL
CASE NO. F04-0034 CIV (RRB)                                 MAY 26, 2006

### Page 50

| | | |
|---|---|---|
| 1 | | any advice with city manager business, police |
| 2 | | business. I gave that list also to Reggie, I even |
| 3 | | made copies and gave it around to everybody in the |
| 4 | | police department and the city council and |
| 5 | | administration. |
| 6 | Q | Well, you knew Helena Cadzow, correct? |
| 7 | A | I know who she is, yes. |
| 8 | Q | How long have you known Helena Cadzow? |
| 9 | A | I just met her when I got to Fort Yukon. |
| 10 | Q | Okay. And you did not know her before then? |
| 11 | A | No. |
| 12 | Q | And she's from Fort Yukon, correct? |
| 13 | A | She lives there now. |
| 14 | Q | Are you familiar -- did you ever talk to Mr. DeLeon |
| 15 | | and talk to him about the fact that he needed to be |
| 16 | | aware that there were three major families in Fort |
| 17 | | Yukon? |
| 18 | A | I probably did. |
| 19 | Q | What are those three families? |
| 20 | A | The Solomons, the Carrolls and the Peters. |
| 21 | Q | Okay. |
| 22 | A | The larger families. |
| 23 | Q | And the Cadzow is a fairly well known family Fort |
| 24 | | Yukon also, correct? |
| 25 | A | Well known, yes, everybody knows them. |

### Page 51

| | | |
|---|---|---|
| 1 | Q | And that is a long time Fort Yukon family, correct? |
| 2 | A | When I said predominant, I meant large. |
| 3 | Q | Okay. |
| 4 | A | And the Cadzows are known, I mean, but they're not |
| 5 | | large. |
| 6 | Q | They're a smaller family? |
| 7 | A | Yes. |
| 8 | Q | Okay. And the -- were you concerned, in your |
| 9 | | discussions with Mr. DeLeon, did you ever tell him |
| 10 | | that you needed to be aware not to -- that if you |
| 11 | | irritated one member of a family that it would..... |
| 12 | A | So we're not thinking about the Hampton anymore? |
| 13 | Q | I'm just, no, I -- we'll get back to it. |
| 14 | A | I mean, you -- I'm sorry, I just -- you're hopping. |
| 15 | | You were here with Helona and Hampton and now we're |
| 16 | | talking about DeLeon. |
| 17 | Q | Well, I'm just talking about the families of Fort |
| 18 | | Yukon, and what you may have told Mr. DeLeon about |
| 19 | | that? |
| 20 | | MR. TRICKEY: He can jump around if he wants |
| 21 | | to so we can't control..... |
| 22 | A | Well, I just wanted to make sure that you're jumping |
| 23 | | around because -- |
| 24 | | MR. TRICKEY: Yeah. He'll come back to that, |
| 25 | | I'm sure he'll tell you when he comes back to Hampton it'll be |

### Page 52

| | | |
|---|---|---|
| 1 | | clear but try to follow as he moves around to different |
| 2 | | subject areas if you can. |
| 3 | Q | (By Mr. Walleri) In terms of Fort Yukon, did you ever |
| 4 | | tell Mr. DeLeon that it was not a good idea, that if |
| 5 | | you made one member -- that if you basically irritated |
| 6 | | a member of one of the families that you would |
| 7 | | irritate the entire family? |
| 8 | A | I don't remember saying that word for word. |
| 9 | Q | Okay. Does that -- is that generally your |
| 10 | | understanding of how things work in Fort Yukon? |
| 11 | A | Could be. |
| 12 | Q | Well, could be or is? |
| 13 | A | I don't know. It would depend on what the situation |
| 14 | | was. |
| 15 | Q | Okay. |
| 16 | A | If you, you know, killed someone, yeah, I think you're |
| 17 | | going to upset like the family and everybody else. |
| 18 | Q | What about arresting somebody? |
| 19 | A | It's -- over what? |
| 20 | Q | Well, let's get back to Mr. Hampton. Were you -- what |
| 21 | | did you think about the complaint from Ms. Cadzow? |
| 22 | | Did you think it was credible? |
| 23 | A | I don't think that that's my place to think. I think |
| 24 | | that a legal issue came up, a sexual harassment, it's |
| 25 | | not a light thing, we have posted signs and that's in |

### Page 53

| | | |
|---|---|---|
| 1 | | the handbook, that will not be tolerated. And are you |
| 2 | | going to say, oh I believe you and I don't believe |
| 3 | | you? I don't know. I think that that has to be |
| 4 | | handled discreetly and private and I thought that the |
| 5 | | outside investigation was the best way to go and |
| 6 | | that's what I -- it was recommended when I contacted |
| 7 | | AMLJIA, and that's what happened. |
| 8 | Q | Okay. As a city manager, did you have personnel |
| 9 | | responsibilities? |
| 10 | A | Yes. |
| 11 | Q | Okay. And what were those responsibilities? |
| 12 | A | To be the director. |
| 13 | Q | For personnel issues, okay. And so when a sexual |
| 14 | | harassment complaint came to you, that was within your |
| 15 | | responsibilities as a city manager, your personnel |
| 16 | | responsibilities? |
| 17 | A | Yes. |
| 18 | Q | Okay. Did you believe that Ms. Cadzow's complaint was |
| 19 | | credible? |
| 20 | | MR. TRICKEY: Object as to..... |
| 21 | A | I'm not going to answer that because I don't have -- I |
| 22 | | don't have a form -- I don't -- I can't say, I mean, |
| 23 | | she said something happened, I'm going to say no it |
| 24 | | didn't or it did, I mean, that's not my place. I |
| 25 | | can't -- I can't say yes or no to that. |

14 (Pages 50 to 53)

Case 4:04-cv-00034-RRB   Document 136-5   Filed 10/30/2006   Page 3 of 5

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al      DEPOSITION OF FANNIE M. CARROLL
CASE NO. F04-0034 CIV (RRB)                            MAY 26, 2006

**Page 74**

1  A  The 9-1-1 tapes?
2  Q  Are city property?
3  A  City property.
4  Q  Okay. Did you ever use the 9-1-1 system to tape
5     record Mr. Miller?
6  A  I don't know if we used that to use as a recording
7     device to record tapes that I had on my answering
8     machine and Reggie had in his little recorder.
9  Q  Did you ever ask Officer McKillican to destroy or hide
10    9-1-1 tapes recording you and Mr. Miller talking?
11 A  Not that I remember.
12 Q  Do you ever remember a subpoena for the 9-1-1 tapes
13    issued against the City of Fort Yukon in those legal
14    proceedings?
15 A  I -- I don't -- I don't know what subpoena you're
16    talking about.
17 Q  A subpoena for copies of 9-1-1 tapes?
18 A  Do you have a copy of the subpoena?
19 Q  I'm asking you, do you remember it?
20 A  I don't remember it.
21 Q  Okay. In terms of the.....
22    MR. TRICKEY: Let me just ask. It's 12:15,
23 obviously we're going to need to take a lunch break in this
24 proceeding today. Is this a good time or do you want to go
25 for a few more minutes and then.....

**Page 75**

1     MR. WALLERI: Just a few more minutes on the
2  McKillican thing if that's okay.
3     MR. TRICKEY: All right.
4  Q  (By Mr. Walleri) When you advised Mr. McKillican that
5     you were going to do an evaluation of him, did you
6     plan on giving him a good evaluation?
7  A  The evaluation, I had no forethought at that time of
8     an outline, that I was going to use.
9  Q  So you had no -- it's your testimony that you had no
10    idea whether or not it would be a good evaluation or a
11    bad evaluation?
12 A  I don't have an outline that I have possession of
13    because I never made one to do that evaluation,
14    because it never needed to be done. So what the
15    answers to the questions would be is nobody knows.....
16 Q  Including you?
17 A  .....because it didn't happen. That's correct.
18 Q  So you had no intentions at the time that you told him
19    that you were going to have an evaluation that day.
20 A  Uh-huh (affirmative).
21 Q  You had no idea whether or not it would be a good
22    evaluation or a bad evaluation?
23 A  I -- I did not have an outline drawn up with questions
24    to ask, the answers to the questions, how could I know
25    what it is now because the evaluation never occurred.

**Page 76**

1     So you're asking me a question about something that
2     never occurred.
3  Q  No, I'm asking about.....
4  A  Yeah, you are.
5  Q  .....your state of mind at the time. Did you have any
6     belief.....
7  A  There was no perceived outcome of it before that,
8     before it occurred. How could I say what the
9     evaluation outcome would be if I didn't give the
10    evaluation?
11 Q  I'm asking your intention, your state of mind?
12 A  I was going to give him an evaluation. I did not.
13 Q  What was your intention as to whether it would be
14    a.....
15 A  To give an evaluation, that was the intention.
16 Q  And what was your understanding of Mr. McKillican's
17    performance as a police officer at that time?
18 A  He would have had to come into my office and answer
19    questions and he did not.
20 Q  And you.....
21 A  So I'm saying, it didn't happen, I don't have the end
22    result for you. I can't perceive what it was going to
23    be.
24 Q  So your understanding of how you were going to conduct
25    the evaluation had nothing to do with how he -- your

**Page 77**

1     observations as to the performance of his duties as a
2     police officer, prior to your evaluation of him?
3  A  He had been there for months and months and months. I
4     cannot sit here and answer what the outcome would be.
5  Q  So it was all dependent on what his answers to his
6     (ph) questions in his evaluation were going to be?
7  A  Certainly.
8  Q  Okay. And if he gave good answers, he was going to
9     have a good evaluation, I assume?
10 A  One would assume.
11 Q  Okay. The -- do you believe or did you believe on
12    August 11th that Mr. McKillican had performed his
13    duties as a police officer in an adequate fashion?
14 A  I -- I can't -- I can't say. All I know is that the
15    evaluation was never performed and anything would be
16    speculative about what the outcome would be or would
17    have been or whatever. It's -- I can't answer that
18    because I don't have an answer.
19 Q  Okay. Is there some reason why you couldn't have
20    waited for Mr. Fleming to come back and do the
21    evaluation with Mr. Fleming?
22 A  The only thing I can think of is what I, you know,
23    what is the scheduling of who's coming and who's
24    going, what is the rotation? When Fleming came in,
25    would McKillican be going out, or whatever, was there

Case 4:04-cv-00034-RRB    Document 136-5    Filed 10/30/2006    Page 4 of 5

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al
CASE NO. F04-0034 CIV (RRB)
DEPOSITION OF FANNIE M. CARROLL
MAY 26, 2006

### Page 78

1. an overlap? I imagine that if they kept the schedule that that would be answered.
2. MR. TRICKEY: Seems like we're at a breaking point for lunch?
3. MR. WALLERI: No, just a couple more questions.
4. Q (By Mr. Walleri) At that time, were you aware of any deficiencies in Mr. McKillican's performance as a police officer?
5. A I -- I can't think of exact incidences to answer that question.
6. Q So you were.....
7. A I don't know.
8. Q .....in your recollection, you were unaware of any deficiencies in Mr. McKillican's performance as a police officer for the City of Fort Yukon as of August 11th, 2003?
9. A This is his first job as being a police officer and I'm sure that it was a learning experience so to say am I aware of any deficiencies? I -- I couldn't pinpoint anything right off the top of my head.
10. Q Were you aware of any deficiencies or not?
11. A I -- like I said, I can't sit here and tell you case by case what -- what a deficiency of his would be. I don't know.

### Page 79

1. Q Okay. So you were unaware of any deficiencies by the officer as of August 11th, 2003, in his performance of his duties as a police officer?
2. A To be exact, correct. Could I ask you to define what you mean by deficiency or does -- do I have to have you ask.....
3. MR. TRICKEY: No, no. If you're not sure you're answering the question accurately, you can ask for clarification.
4. Q (By Mr. Walleri) A deficiency that he had basically performed his public -- his duties as an officer in an inappropriate or improper manner?
5. A Thank you for the definition.
6. Q Does that change your answer?
7. A I -- I can't pinpoint an exact time.
8. MR. WALLERI: Okay. This is a good point.
9. (Off record)
10. (On record)
11. Q (By Mr. Walleri) If we could return for just a minute to Mr. Hampton. Were you aware of Mr. Hampton's primary duties as a police officer when he was hired?
12. A When Mr. Hampton was hired?
13. Q Uh-huh.
14. A The only duties I knew of when he was hired was what

### Page 80

1. was in the city manual.
2. Q Okay. Would it refresh your recollection to suggest that he -- his primary duties were to begin enforcement of traffic ordinances in Fort Yukon?
3. A Is it my recollection that his primary duty was to enforce traffic?
4. Q Correct.
5. A On what -- did it start a new day or from his first day or --
6. Q From his first day that his primary.....
7. A I was the city clerk, I wouldn't have privy to that, I don't know.
8. Q Okay. Were you aware of complaints about Mr. Hampton in the performance of his duties?
9. A I think that there had to have been some dissatisfaction in the community if all of a sudden one day they get stopped where they were never stopped before so probably.
10. Q Okay. And do you know after -- or you became the city manager during Mr. Hampton's tenure there, correct?
11. A Correct.
12. Q Do you remember ever talking to Mr. Hampton about his enforcement of -- well, let's be very specific, about his enforcement of the one stop sign in Fort Yukon?
13. A Not specifically and not particularly.

### Page 81

1. Q Do you remember him writing a number of tickets or, excuse me, do you remember him issuing a number of warnings to people that the city police force was going to begin enforcing traffic ordinances in Fort Yukon?
2. A Do I remember of him issuing a number of warnings?
3. Q A number of warnings to people that -- and advising them that the city police department was going to start enforcing traffic ordinances in Fort Yukon?
4. A I probably was given that information.
5. Q Do you remember whether or not there was -- how that was received generally by the citizenry of Fort Yukon?
6. A Well, I think it was -- some people were happy and some people were not. Probably the speeders were not.
7. Q Okay.
8. A I can't give you a census on that.
9. Q Would it be fair to say that there was division in the community about it?
10. A Define division.
11. Q Was it controversial?
12. A Does that mean were people talking about it?
13. Q Yes.
14. A I guess people were talking about it.
15. Q Do you remember, as the city manager, receiving any complaints about Mr. Hampton's activities in this

21 (Pages 78 to 81)

METRO COURT REPORTING
907.276.3876   745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501 metro@gci.net

ee560b04-bbcd-4750-8104-da372b35e513

Ex. P
pg. 4 of 5

Case 4:04-cv-00034-RRB   Document 136-5   Filed 10/30/2006   Page 5 of 5

REGINALD FLEMING, et al vs. FANNIE CARROLL, et al          DEPOSITION OF FANNIE M. CARROLL
CASE NO. F04-0034 CIV (RRB)                                 MAY 26, 2006

### Page 106

```
 1      a good leader, he needs to delegate and give people
 2      their own responsibilities. In January, I you know,
 3      was pleading and demanding it. By the beginning of
 4      February, there still was nothing to resolve his
 5      staffing. There.....
 6   Q  Well, what exactly did you want him to do?
 7   A  I really in particularly (sic) wanted a calendar of
 8      work schedule for his guys. You know, they need to
 9      know, it would be nice for us to know, who's coming,
10      who's going, who's doing what. They needed to overlap
11      their information. One guy would go out, the case is
12      still going on, you know, just because you leave town
13      doesn't mean your case is going to wait for you to get
14      back. It's like growing pains in a department. He
15      needed to keep up with it and not -- not everybody is
16      a doer on their own, you just can't expect people to
17      take responsibility all of the time.
18   Q  Was it your understanding that there was no schedule
19      for on-duty or off-duty of the officers?
20   A  If you can show me that I received and a schedule was
21      kept for one complete month, that -- that would be
22      great, I mean, there wasn't even -- if you've got
23      documentation on that, I would love to see it.
24   Q  Well, I'm saying was there -- do you know whether or
25      not there was a schedule for when the.....
```

### Page 107

```
 1   A  I think they -- they made schedules. It was that
 2      Reggie wasn't making the schedule for him to know who
 3      was where and who was, you know, home.
 4   Q  Do you know who was making the schedules?
 5   A  Well, I think the buck got passed a lot. It -- that's
 6      called confusion, nobody really knew. The only people
 7      that were consistent in there would be a dispatcher
 8      that stayed and, you know, do you ask them to do
 9      someone else's job, I mean, that's just --
10   Q  Well.....
11   A  There -- there was a lot of disorder.
12   Q  Were you aware of the failure of staff to having
13      officers on duty in Fort Yukon?
14   A  Was I aware --
15   Q  In January and February, or let's say in January of
16      2004?
17   A  You have to repeat that, you said it too fast.
18   Q  Were you aware of failures to have police officers in
19      Fort Yukon during January of 2004?
20   A  I don't know about January but I remember for December
21      when DeLeon left on the 23rd, he was the last officer
22      in town and Reggie, his replacement, didn't come in.
23   Q  And do you know -- was there anybody else in town at
24      that -- on the 23rd?
25   A  As an officer?
```

### Page 108

```
 1   Q  Uh-huh.
 2   A  I -- I don't -- I'm not aware of one.
 3   Q  Were you aware that Tremblay was enlisted to help with
 4      that?
 5   A  Tremblay was not an officer.
 6   Q  Were you aware that he was enlisted to help with that?
 7   A  He was not an officer.
 8         MR. TRICKEY: Well, let me just object as to
 9      foundation. Now you're talking about December of 2003
10      specifically?
11         MR. WALLERI: Uh-huh.
12   A  On the 23rd?
13   Q  (By Mr. Walleri) In December of 2003, you're saying
14      that Mr. DeLeon was not in town. Now as I understand
15      it, there were four police officers?
16   A  Right.
17   Q  Okay. Mr. DeLeon was not in town?
18   A  Uh-huh (affirmative).
19   Q  Okay. Was there any other officer in town?
20   A  Oh, no. No, not on the 23rd.
21   Q  Okay. And so Mr. J.R. Wallace was not in town?
22   A  No.
23   Q  Mr. Schlumbohm was not in town?
24   A  No.
25   Q  And Reggie was not in town?
```

### Page 109

```
 1   A  Right.
 2   Q  Okay. Did they make any other arrangements to have
 3      the position covered that you're aware of?
 4   A  All I know is DeLeon told me and Vera James at the
 5      same time in the same office that he had Reggie's word
 6      that Reggie was coming in on the last flight. DeLeon
 7      was leaving on the afternoon flight like at 2:00
 8      o'clock.
 9   Q  Okay. So as you understand it, Mr. DeLeon knew that
10      Reggie was coming -- or believed that Reggie was
11      coming into town?
12   A  Right.
13   Q  Okay.
14   A  I mean, I -- I just, you know, for no police coverage
15      and for him to take that girl in, it's just odd. Odd
16      timing, that's it.
17   Q  Okay. Now, was there ever -- after you received the
18      petition about Mr. DeLeon, it's your understanding
19      that the city was going to have a community policing
20      meeting, correct?
21   A  Right, right.
22   Q  Okay. And what was the purpose of that meeting?
23   A  There was a question that seemed to need an answer and
24      the question is this, does a police officer uphold
25      every state law all the time? If there is a law on
```