Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

REGINALD FLEMING, CHRISTOPHER )
DeLEON, CHRIS HAMPTON, WILLIAM )
D. McKILLICAN, and TODD )
SCHLUMBOHM, )
)
        Plaintiffs, )
)
vs. )
)
FANNIE CARROLL and the CITY OF )
FORT YUKON, ALASKA, )
)
        Defendants. )
_____)

Case No. 4:04-cv-00034-RRB Civil

DEPOSITION OF REGINALD FLEMING
July 20, 2006

APPEARANCES:

    FOR THE PLAINTIFFS:    MR. MICHAEL J. WALLERI
                              Attorney at Law
                              330 Wendell Street, Suite E
                              Fairbanks, Alaska 99701
                              (907) 452-4716

    FOR THE DEFENDANTS:    MR. MATTHEW SINGER
                              Jermain, Dunnagan & Owens
                              Attorneys at Law
                              3000 A Street, Suite 300
                              Anchorage, Alaska 99503
                              (907) 563-8844

                            * * * *

Ex. R
pg. 1 of 4

### Page 74

1  employment review and that you gave him all
2  exceptionals and signed this. Is that correct?
3  A   It's possible here. If he said I did it, I did it,
4  sir.
5  Q   So you don't recall whether or not you were doing
6  employment evaluations?
7  A   Well, I'm not doing employment evaluation, because
8  whatever I -- I do, she is the ultimate. She does
9  the -- she has the ultimate decision. It doesn't
10  matter what I do on there.
11  Q   And you testified that part of the reason you
12  understood you were hired was to help clean up the
13  police department?
14  A   Yes, sir.
15  Q   Did you believe you had the discretion and authority to
16  do that on a day-to-day basis?
17  A   With Bonnie Thomas, yes, sir.
18  Q   And how so?
19  A   She -- when I first got the position, she said the
20  police department is yours to handle. I don't know
21  anything about the police department. I want to see
22  the drugs off the streets, the drugs out of the police
23  department. She wanted to see a better communication
24  with the -- the city, as far as the people living
25  within the city. She wanted -- instead of the other

### Page 75

1  police departments thinking that we were a bunch -- a
2  bunch of drugs and stuff going on there and a bunch of
3  corruption, she wants to see that all gone, and that --
4  that there wouldn't be anybody that would control the
5  police department per se and making them do corrupt
6  things or trying to approach the police department.
7  Q   So you understood that the chief -- you were
8  responsible for running the police department?
9  A   With Bonnie Thomas, yes, sir.
10  Q   And how much of your time -- did you also go out on
11  patrols and do.....
12  A   Yes, sir.
13  Q   .....basic law enforcement?
14  A   Yes, sir.
15  Q   How would you say you -- between the tasks of running
16  the police department, and that would include all the
17  administrative functions, scheduling, supervising --
18  you were a supervisory employee, is that correct?
19  A   Yeah, the chief of police. Yes, sir.
20  Q   So how would you say -- how much time did you spend
21  doing that, as opposed to out on the street on patrol?
22  A   25 percent and the rest of it was patrol.
23  Q   That's your -- on average you say 25 percent of your
24  time was supervising and running the police department?
25  A   Yeah, yeah.

### Page 76

1  Q   And 75 percent was on patrol?
2  A   On patrol.
3       COURT REPORTER: I'm sorry, we need to take a
4  break.
5       (Off record)
6       (On record)
7  Q   Just in case there was a problem with the tape
8  recorder, let's repeat a couple of the questions we
9  just asked. I asked you to estimate how much of your
10  time was spent supervising the police department, as
11  opposed to out on the patrol doing law enforcement.
12  A   25 percent was due to supervision, another 75 percent
13  was patrol.
14  Q   And you'd agree you were always the police chief,
15  whether you're on patrol, in the headquarters, you were
16  always the chief of police?
17  A   Yes, sir.
18  Q   And did you sometimes, while on patrol, get calls from
19  say dispatch with chief questions, that is, questions
20  about how to run the office or.....
21  A   Well, occasionally, if something -- a machine or
22  something went down. Yes, sir.
23  Q   Did -- as the chief of police, did you attend city
24  council meetings?
25  A   Yes, sir.

### Page 77

1  Q   Regularly?
2  A   Yes, sir.
3  Q   And was that a duty of the other officers?
4  A   Yes, they could fill in for me, sir.
5  Q   Sometimes you'd assign officers to go to council
6  meetings for you?
7  A   No, sir, not if I'm still out on a call and the city
8  council meeting is still going on, another officer
9  would come in. One of them would pick up where I'm at
10  on the call.
11  Q   Now, within the police department, did you report to
12  anybody?
13  A   Within the police department? Sir, there was nobody
14  else to report to except for the city manager or city
15  council, sir.
16  Q   You were the top of the food chain in the police
17  department?
18  A   Yes, sir.
19  Q   And the dispatchers and the other officers all reported
20  to you?
21  A   Not all reported to me. Some reported to the patrol
22  supervisor, then the patrol supervisor will come to me.
23  Q   You were the ultimate authority within the police
24  department?
25  A   No, sir. You can't -- I -- I can't say that I was the

20 (Pages 74 to 77)

330 Wendell Street, Suite A   LIZ D'AMOUR & ASSOCIATES, INC.   Fairbanks, Alaska 99701
907.452.3678

Ex. R
pg. 2 of 4

2ea19ccb-bd2f-4844-8b15-4c2950ce0654

Page 78

1     ultimate authority within the police department when
2     the city manager came in and said she was the ultimate
3     authority.
4 Q Well, you reported to the city manager, correct?
5 A Right.
6 Q And whoever was the city manager, Bonnie Thomas --
7     there were two city managers while you worked there,
8     right?
9 A Right. Fannie Carroll. As soon as Fannie Carroll took
10    over, she thought that she was the ultimate authority
11    and she could make herself police chief or director of
12    public safety if she wanted to.
13 Q So she -- both -- the two city managers you worked for
14    were Bonnie Thomas and then Fannie Carroll, right?
15 A Yes, sir.
16 Q Anybody else?
17 A No, sir, not that I know of.
18 Q There might have been someone in an acting capacity for
19    a short time?
20 A In an acting capacity, yes.
21 Q Both -- you understood both Bonnie Thomas and Fannie
22    Carroll were the top employee for the city, correct?
23 A Yes, sir.
24 Q You understand the city manager is ultimately
25    responsible for the city administration?

Page 79

1 A Yes, sir.
2 Q And the city manager reports directly to the city
3    council?
4 A Not for per se in my -- my contract. I answered to the
5    city council and city manager.
6 Q And, I'm sorry, maybe I wasn't -- I think we
7    miscommunicated.
8 A Okay.
9 Q Did you understand that the city manager, not the chief
10    of police, but the city manager, that person reported
11    directly to the city council?
12 A Yeah, I -- yeah, she was supposed to report directly to
13    the city council.
14 Q The city manager was the top employee of the city.....
15 A Uh-huh (affirmative).
16 Q .....and then reported to the city council, correct?
17 A Yeah, at that point in time. When Ms. Carroll took
18    over, yes.
19 Q And even when you were the chief of police, you
20    understood that Bonnie Thomas was one of your bosses,
21    right?
22 A I -- she was partly my supervisor as well as the city
23    council.
24 Q You reported to the city manager and the city council?
25 A Yes, sir. And this -- this was in my contract. It was

Page 80

1     either/or, so.....
2 Q Now, during the course of your employment with the City
3     of Fort Yukon, were you ever responsible for payroll
4     with the city?
5 A No, sir.
6 Q Who did that?
7 A The city manager Fannie Carroll or Bonnie Thomas and
8     Vera James.
9 Q Vera James was the city treasurer?
10 A Yes, sir.
11 Q And you understood she ran the city's computer system
12    for payroll?
13 A Along with Ms. Carroll, yes.
14 Q And did you ever have any disagreements with Vera James
15    about your payroll?
16 A My payroll? About -- what do you mean, my pay?
17 Q Were your pay stubs accurate?
18 A That I could tell, yes, sir.
19 Q And do you have any reason to dispute that Vera James
20    would be the person most familiar with the payroll
21    system at the City of Fort Yukon?
22 A Most -- she has the most experience, yes, sir.
23 Q Any reason to dispute the voracity of Vera James'
24    statements?
25       MR. WALLERI: Objection; lack of foundation.

Page 81

1 Q If you know?
2 A Per se, there's stuff -- there was stuff that -- that
3     has been brought to my attention as chief of police,
4     sir.
5 Q Were you aware of any of your employees not being paid
6     by the city, not receiving any pay stub at all?
7 A Just pay, sir?
8 Q Just pay.
9 A Not receiving their pay right, yes, sir.
10 Q So there might have been an error on payroll?
11 A A big error on payroll, sir.
12 Q Who are you talking about?
13 A That was going to -- on Dave McKillican's.
14 Q Anybody else?
15 A Well, payroll consists of everything. Yes, Chris
16    DeLeon, Schlumbohm's, and also Chris Hampton's were
17    brought to my attention, and I did go down and make
18    sure that it was getting squared away for them.
19 Q And did it get squared away for them?
20 A I think everybody else got squared away. I think they
21    also changed -- Officer McKillican and Officer Hampton
22    from hourly to -- to salary. And the only one that
23    didn't get it take care of, as far as payroll and
24    compensation and all that, was Officer DeLeon.
25 Q Now, the police officers, the patrolmen and the chief

21 (Pages 78 to 81)

330 Wendell Street, Suite A    LIZ D'AMOUR & ASSOCIATES, INC.    Fairbanks, Alaska 99701
907.452.3678

Ex. R
pg. 3 of 4

2ea19ccb-bd2f-4844-8b15-4c2950ce0654

### Page 270

```
 1  leading.
 2  A   I'm going to have to say I -- I -- I could not take it
 3      seriously, and that's why I had an outsider come in.
 4  Q   In terms of Mike Hardy, what's his relationship to
 5      Deborah Hardy?
 6  A   I think.....
 7          MR. SINGER: Objection; foundation.
 8  A   Okay. That's supposed to be his aunt or something.
 9  Q   And then Mike Hardy, when was -- he was working -- what
10      was his relationship, or what was he doing in the city
11      in terms of law enforcement?
12  A   He was the VPSO.
13  Q   And do you know when he stopped being the VPSO?
14  A   He got sent off to school. He came back from school
15      and said he couldn't handle the school, and then after
16      that he stopped being.....
17  Q   Do you know when that was that he stopped?
18  A   I want to say -- I think he went to school in the
19      winter of -- when Officer McKillican was there, I want
20      to say about -- Officer McKillican got there in 2002,
21      if I'm right, and the winter of 2002 he left to go
22      there, then he came back within a matter of weeks.
23  Q   Prior to the arrest of Maggie John, had there been any
24      successful investigations by the Fort Yukon police into
25      crimes involving embezzlement?
```

### Page 271

```
 1  A   Yes, sir.
 2  Q   And could you tell me about some of those?
 3  A   The mayor -- I got the old mayor embezzling funds from
 4      the AC store. It took awhile to get all the paperwork.
 5      I think it -- I think it even took up to two years to
 6      actually get everything, had to get audit done, just go
 7      through standard procedures in getting the stuff done,
 8      but we had a successful conviction.
 9  Q   And do you know when that was?
10  A   Let me see, the mayor -- I want to say that was in --
11      that was in 2002 when we started that investigation
12      into the embezzlement from the AC store.
13  Q   And when did you conclude the investigation?
14  A   The end of 2003.
15  Q   So roughly shortly before you were terminated?
16  A   Yes.
17  Q   Do you know if there was -- if the city council was
18      surprised, or do you know, did they express surprise
19      that you were able to complete an embezzlement
20      investigation?
21  A   Yes, sir. Sir, Mr. Carroll was shocked that I -- that
22      I pulled it off.
23  Q   And how do you know that Mr. Carroll was shocked?
24  A   Because he -- he stated that he -- it's been a long
25      time since anybody got caught in the city for
```

### Page 272

```
 1      embezzlement.
 2  Q   And in terms of Mr. DeLeon -- well, strike that. You
 3      indicated there was a list of jail guards?
 4  A   Yes.
 5  Q   And who maintained that list of jail guards?
 6  A   The police department and the city manager.
 7  Q   With regard to the evaluation of Mr. McKillican, do
 8      you -- in your mind at that time who did you believe
 9      was supposed to be doing evaluations of police
10      officers?
11  A   At that time it was me, sir.
12  Q   Were you -- did you consider yourself Mr. McKillican's
13      supervisor?
14  A   Yes, I did, sir. And that was what the city manager
15      stated. She said that she would do mine and I had to
16      do the rest, anybody else was my problem, so she only
17      had to evaluate me.
18  Q   And which city manager was that?
19  A   Ms. Carroll.
20          MR. WALLERI: That's all I've got.
21          MR. SINGER: Just to follow up a couple
22  questions.
23          REGINALD FLEMING
24  testified as follows on:
25          REDIRECT EXAMINATION
```

### Page 273

```
 1  BY MR. SINGER:
 2  Q   Now, the -- just to understand, the police department
 3      would sometimes take custody of intoxicated
 4      individuals?
 5  A   Yes.
 6  Q   And that was under Title 47?
 7  A   Yes, sir.
 8  Q   And that's not the criminal -- those aren't the
 9      criminal statutes, right?
10  A   No, sir.
11  Q   That's a health and safety issue?
12  A   Yes.
13  Q   You can take somebody and hold -- you can actually hold
14      them against their will?
15  A   It's -- it's to hold them because they cannot take care
16      of theirself, and if an officer comes across a person
17      that cannot take care of theirself and they let him go,
18      then that becomes a liability to that officer and that
19      police department.
20  Q   So the city would have an obligation to watch out for
21      people who were terribly intoxicated, particularly on
22      really cold nights?
23  A   Yes, sir.
24  Q   And so the city would take those people into custody,
25      correct?
```

69 (Pages 270 to 273)

330 Wendell Street, Suite A   LIZ D'AMOUR & ASSOCIATES, INC.   Fairbanks, Alaska 99701
907.452.3678

Ex. R
pg. 4 of 4

2ea19ccb-bd2f-4844-8b15-4c2950ce0654