```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ALASKA

 3

 4   REGINALD FLEMING, CHRISTOPHER   )
     DELEON, CHRIS HAMPTON, WILLIAM  )
 5   D. MCKILLICAN, and TODD         )
     SCHLUMBOHM,                     )
 6                                   )
                 Plaintiffs,         )
 7                                   )
         vs.                         )
 8                                   )
     FANNIE CARROLL and the CITY     )
 9   OF FORT YUKON, ALASKA,          )
                                     )
10               Defendants.         )
     _____)
11   Case 4:04-cv-00034-RRB

12

13

14      VIDEOTAPE DEPOSITION OF WILLIAM D. McKILLICAN

15            Taken Thursday, August 17, 2006

16        From the hour of 8:40 a.m. to 11:50 a.m.

17            Pages 1 through 141, inclusive

18                       Volume 1

19           Taken by Counsel for Defendants

20                          At

21       Offices of Heartland Court Reporters
              100 Cushman Street, Suite 308
22              Fairbanks, Alaska 99701

23

24   Reported by:
     CAROL A. McCUE, RMR
25   Heartland Court Reporters
```

HEARTLAND COURT REPORTERS 907-452-6727



```
 1                  9:24 a.m. to 9:36 a.m.)
 2              THE VIDEOGRAPHER:  We're back on record, the
 3   time is 9:37 a.m.
 4   BY MR. SINGER:
 5       Q.   Going back to your background, prior to your
 6   employment with the City of Fort Yukon, what law
 7   enforcement training and experience did you have?
 8       A.   I attended the police academy.
 9       Q.   Is that the Tanana Valley?
10       A.   Yes.
11       Q.   And did you complete the academy?
12       A.   I did.
13       Q.   And how -- how many hours did you have there?
14       A.   I believe the graduating certificate has this
15   as 530 something hours of training.  I believe.  Just a
16   guesstimate.  I don't know offhand.
17       Q.   And did you -- did you receive a certificate
18   for graduation?
19       A.   I did.
20       Q.   While we're talking about certification, had
21   you at any time obtained your Alaska Police Standards
22   Council basic certificate?
23       A.   I have.
24       Q.   Did you obtain that after one year of service
25   with the City of Fairbanks Police Department?
```

```
 1         A.    Well, she always referred to him as "that
 2   man."  I mean, it was like he had stepped on her
 3   Cheerios or something, I don't know, lack of better
 4   terms, I apologize.  But you know, like for some
 5   reason, had he made her mad for some reason, I don't
 6   know.
 7         Q.    Anything else?
 8         A.    No.
 9         Q.    Now, were you present when Chris Hampton quit?
10         A.    I was.  I believe so.  I'm pretty -- I'm not
11   certain, but I believe I was in town.
12         Q.    Were you in the room?
13         A.    No.  I don't think I was there when he -- I
14   actually think he told -- because I believe he was the
15   one that told me that he quit.
16         Q.    Now -- so you -- he actually wrote a written
17   resignation.  Did you see him write that?
18         A.    No, I didn't.  I wasn't even sure if he had a
19   written a resignation, to be honest with you.
20         Q.    First time you've heard of it?
21         A.    I may have before, but I -- excuse me.  I
22   don't recall.
23         Q.    Now, you've testified you -- you quit your job
24   in Fort Yukon on or about August 11, 2003, right?
25         A.    Yes.
```

1     Q.  Why did you quit?

2     A.  Because I felt that I wasn't -- that I was
3 going to be fired.

4     Q.  Explain that to me.

5     A.  Well, the city manager had pulled me in her
6 office, she basically, you know, accused me of being a
7 troublemaker.  And when I basically denied everything,
8 she -- and she basically said that she was going to do
9 my evaluation.  And to me, it -- it came across as
10 very -- a very threatening manner, like she was going
11 to retaliate against me.

12    Q.  And so rather than allow the city manager to
13 evaluate you, you quit your job?

14    A.  I felt that if I let her evaluate me, bad
15 performance evaluation, that she was going to -- I
16 mean, there was no doubt in my mind she was going to
17 give me a bad performance evaluation.  So I felt that,
18 you know, I didn't have a chance.

19     And, you know, with a bad performance
20 evaluation, I could have been terminated because I
21 hadn't been there a complete year yet, so I was
22 technically still on probation.

23     So if I was on probation, and I believe it was
24 a year probation, I'm not certain on that, but you
25 know, if I was still on probation, they could terminate

1   me for any cause. So that's why I -- you know, I chose
2   to quit. I mean, I -- I didn't have a choice.
3       Q.  But just to --
4       A.  Or get fired for something that I wasn't --
5   that I didn't do.
6       Q.  So it was -- it was specifically the city
7   manager's indication to you that she was going to
8   evaluate you that caused you to quit your job?
9       A.  Her actions, yes.
10      Q.  And so -- well, I want you to assume for a
11  minute that -- that happened in one conversation,
12  right?
13      A.  It was all the same conversation, yes.
14      Q.  Was it the day of August 11th?
15      A.  Yes, it was.
16      Q.  Where did the conversation take place?
17      A.  Her office.
18      Q.  So do you recall what time of day it was?
19      A.  Late morning, mid afternoon.
20      Q.  And -- and it's your testimony that --
21      A.  I know -- I know it was late after -- late
22  morning. I know that for a fact because I was home
23  that evening. I know the last flight going out of
24  Fort Yukon was, like, five o'clock, I believe, or
25  six o'clock or something, so I was home by that

1   I'm going to do -- and you know what, you're due for
2   your evaluation.
3       Q.   And -- and what did you say in response to
4   that?
5       A.   That was an indication, it was like, oh, I
6   didn't think that was appropriate.  I thought that my
7   direct supervisor being the Chief of Police, Reggie
8   Fleming, should do my evaluation.
9       Q.   And then the city manager tell you that she
10  had authority under Title 29 to do your evaluation?
11      A.   She did tell me that, I believe.  I -- I don't
12  remember what exact -- what title it was, but I
13  remember she was -- or she said something about her
14  going to get the personnel manual and she was going to
15  prove to me that she has the authority to write my
16  evaluation.
17      Q.   And then what happened?
18      A.   I told her, I said, you -- I said, don't even
19  bother.  I said because I'm -- I quit.  That's it.
20      Q.   And so I want you to assume for a minute that
21  that conversation didn't take place on that day, that
22  Fannie Carroll did not tell you, I'm going to evaluate
23  you right now.  Would you have stayed employed?
24      A.   Absolutely.  I like my job.  I like my job.
25      Q.   So that was the -- that conversation was the

1    Q.   And it was spelled out in the -- in the policy
2    manual that you have?
3    A.   Yes.
4    Q.   Now, you never filed a grievance regarding
5    Ms. Carroll's indication to you that she was going to
6    perform a job evaluation, right?
7    A.   No, I didn't.
8    Q.   You believed that the city manager lacked the
9    authority to evaluate you, right?
10   A.   I -- I didn't question her authority, I
11   told -- I did not agree that it was appropriate.
12   Q.   And -- and in part, why did you think it was
13   inappropriate?
14   A.   Because she was not my supervisor.  She didn't
15   see my daily performances, she didn't know what my
16   duties and responsibilities were, she didn't -- she
17   didn't know my job.
18   Q.   Did you also suspect that she had improper
19   motives for being angry with you?
20   A.   Improper motives.  Can you elaborate on that?
21   Q.   Did you -- did you feel that -- that her --
22   Fannie Carroll's interest in doing a job evaluation was
23   motivated by an improper reason?
24   A.   I know she wasn't happy with me for some
25   reason, she was accusing me -- like I said before, she

1    was accusing me of being a troublemaker.  And going
2    behind her back or something.  I -- I can't recall.
3         Q.   Was that a -- at the time was that a -- were
4    her motives a concern to you?
5         A.   Absolutely.  I mean, that's why I -- that's
6    why I -- you know, I quit.
7         Q.   And in any event, did you understand that if
8    the city manager took an improper action against you
9    that you had grievance rights and you could challenge
10   her decision?
11        A.   Well, I mean, it was -- we had -- yeah, I knew
12   about the policy and I knew the grievance policy, but I
13   mean, it was -- it was useless to do.  I wasn't going
14   to get any satisfaction one way or the other.  I wasn't
15   going to get a fair -- you know, somebody to look at it
16   fairly and justly.
17        Q.   Why do you say that?
18        A.   Because her whole family was on the city
19   council.
20        Q.   Well, when you say her whole family, the City
21   of Fort Yukon is a small town, isn't it?
22        A.   Absolutely.
23        Q.   Big families, right?
24        A.   Yes.  Some big families.
25        Q.   In fact, your attorney took a deposition of

```
 1        Q.   In retrospect --
 2        A.   Like I stated before, I liked my job up there.
 3        Q.   If you had quit your job 12 months and one day
 4   after starting, would you have been eligible for your
 5   APSC certificate?
 6        A.   No.
 7        Q.   Why?
 8        A.   Because you have to be employed at the time
 9   you receive certification.  So me just going to work
10   there for one year and leaving on that date, I would
11   have to work there for 12 consecutive months, or 365
12   days, to meet the -- meet the criteria for APSC, and
13   then I would have to be employed with them in order to
14   obtain my certification.
15        Q.   You made a tape recording of a -- the
16   conversation on August 11th you had with Fannie
17   Carroll; is that right?
18        A.   I did.
19        Q.   Tell me what -- first, what tape recording
20   device did you use?
21        A.   My personal police recorder.
22        Q.   You had a police recorder?
23        A.   I did.
24        Q.   And what -- what did you use the police
25   recorder for?
```

Case 4:04-cv-00034-RRB   Document 138-4   Filed 10/30/2006   Page 10 of 18

101

```
1        MR. SINGER:  I just want him to say it for the
2   record that he's -- so --
3        THE WITNESS:  At the advice of my attorney,
4   no.
5   BY MR. SINGER:
6        Q.   Were you aware that last year your attorney
7   made a partial settlement proposal in this lawsuit?
8        A.   I believe so.  I don't recall the -- I don't
9   recall the stipulations of the partial settlement.  I
10  don't recall the -- I remember something being said
11  about one and I think we collectively all decided not,
12  against it.
13       Q.   How is it that you think -- setting aside your
14  claim for overtime for a minute, how is it that you
15  think you were damaged by your resignation of
16  employment?
17       A.   I feel I was wrongly terminated.
18       Q.   You were not terminated, right?
19       A.   I was.
20       MR. WALLERI:  Objection.  Argumentative.  If
21  you wish to put -- state a question, please do it in a
22  non-argumentative manner.
23  BY MR. SINGER:
24       Q.   You were not terminated, were you?
25       MR. WALLERI:  Objection.  It's argumentative.
```

HEARTLAND COURT REPORTERS 907-452-6727

3
10—18

```
 1                    CROSS-EXAMINATION
 2   BY MR. WALLERI:
 3        Q.   You testified that under your understanding,
 4   if you had completed your one year and gotten your
 5   basic certification that you would have been able to
 6   work at the Fairbanks Police Department for -- at a --
 7   at a -- at the higher rate, employment pay rate?
 8        A.   The starting rate is higher if you come in
 9   with a certification, yes.
10        Q.   Okay.  And that's -- and your understanding is
11   that you would have been the 23, which is what you
12   got --
13        A.   Yes.
14        Q.   -- when you got your basic certification?
15        A.   Yes.
16        Q.   And you also, as I understand it, you're also
17   saying that you were not eligible for -- for overtime
18   at the beginning?
19        A.   No, I wasn't.  No.
20        Q.   Okay.  But if you'd come in as a basic -- as a
21   certified officer, would you have been eligible for
22   overtime?
23        A.   Once the completion of the FTO program, yes.
24        Q.   Okay.  And how long is the FTO program?
25        A.   Abbreviated -- the certified officers, they
```

1  come in on for hire have an abbreviated field training
2  program of two weeks.  So I would have had to do two
3  weeks there, and then I would have been able to -- been
4  eligible for overtime.
5      Q.  Okay.  So all of that was delayed for about a
6  year because you didn't have your basic certification?
7      A.  Yes.
8      Q.  The --
9      A.  No, I take that -- let me rephrase that.  It
10 was delayed for approximately four months, four and a
11 half months, while I was in the field training program.
12 Once I went to a regular shift, I was eligible.
13     Q.  Sparky -- does it refresh your recollection if
14 I -- if I suggest that his name might have been Gary
15 Weber?
16     A.  Gary Weber, that's it.  Yes, it is.
17     Q.  Do you know what Gary Weber was doing?  Do you
18 know what his job title was?
19     A.  When he first -- well, we had hired him
20 occasionally to be a jail guard for when we had
21 somebody that we were titling, under Title 47.  And
22 then they needed a dispatcher and he applied for the
23 position and he was hired.
24     Q.  Did he continue to be a jail guard during the
25 period that he was a dispatcher?

124

1    A.   Yes.  Occasionally.  When it -- when it didn't
2    conflict with his dispatcher duties, yes.
3    Q.   And do you know how long Gary was there, Gary
4    Weber was there?
5    A.   I couldn't say accurately.
6    Q.   That's all right.
7    A.   I don't know.
8    Q.   Now, you said that when you were fired that --
9         MR. SINGER:  Objection to the
10   characterization.
11        MR. WALLERI:  Hmm?
12        MR. SINGER:  He wasn't fired, he hasn't
13   testified he was fired.
14        MR. WALLERI:  Okay.  Excuse me.
15   BY MR. SINGER:
16   Q.   When you were -- during your conversation with
17   the city manager, Fannie Carroll, you said that on
18   the -- shortly before you terminated employment, you
19   indicated that she accused you of being a troublemaker.
20   A.   Yes.
21   Q.   Did she give you any examples of why -- well,
22   what were you doing just before that conversation?
23   A.   You will have to be a little more specific
24   because I -- that -- those last couple of days were
25   kind of blurry.

```
 1        Q.   Why is that?
 2        A.   It was a long day.  We had -- we had just a
 3   lot of stuff going on.  And we -- I think we were -- we
 4   had been up for, like, 72 hours.  It was a -- it was
 5   just one of those rotations that just hit us hard.
 6        Q.   Why is that?
 7        A.   We had occasional ones like that.  And we'd
 8   had a -- we had two long nights just basic domestics,
 9   you know, call after call.  It was, you know, just a
10   rough -- I believe it was just everybody drinking and
11   partying it up, you know, for two days straight.  And
12   then the third night we went into -- we had a missing
13   persons that turned into a body recovery.  And that was
14   a nightmare.  So it was a long, long three days.
15        Q.   When you -- when you had your discussion with
16   the city manager, did she express any concerns over
17   your recent performance in terms of the body recovery?
18        A.   Well, she got -- she kind of tried to publicly
19   humiliate me in front of everybody at the airport.
20        Q.   And what was that about?
21        A.   Well, we -- the young man -- well, what it --
22   just -- now, I don't want to go into any details or
23   anything because of the nature of the situation, but
24   basically, what it was, was a young man and his
25   grandfather had went up the Yukon -- or the Porcupine
```

1  River to go to his cabin to go grayling hunt -- or
2  grayling fishing. The young man and his grandfather
3  became separated.
4      The grandson, he was only like 14 years old, I
5  believe, at the time, after several hours of waiting
6  and waiting, became alarmed and jumped back in the boat
7  and came back to Fort Yukon and got his mother and came
8  to the police department. You know, they were
9  concerned that something had happened to the
10 grandfather.
11     So that's when we had sat down and conducted
12 an interview with the family and the -- and the
13 14-year-old boy. We then contacted the troopers for
14 search and rescue. The troopers informed us that the
15 soonest they could be up was the next afternoon. And
16 they -- they instructed me that -- to be ready to go
17 with the trooper that was coming up because he was
18 coming up by himself.
19     So I had to prepare to go with them for the --
20 for the recovery. It was a search and rescue at the
21 beginning, but being the nature of it and we kind of
22 assumed that it was going to turn into a recovery, and
23 it did, unfortunately.
24     The next -- the next day, I was informed by
25 Ms. Carroll that I wasn't allowed to go, that it would

```
 1   only leave one police officer in town, if something
 2   happens and I got stranded out there, then there
 3   wouldn't be adequate coverage in the town, so she
 4   wanted me to stay in town.
 5           So I said, okay.  Fine.  I notified the
 6   troopers by phone and said, hey, we've got an issue
 7   here, the city manager will not let me go;
 8   unfortunately, you're going to have to be on your own.
 9           City manager had talked to the troopers, I
10   don't -- I don't know how she did it, but she talked to
11   the troopers about sending the boy up with the trooper,
12   now, which we totally disagreed with 100 percent.
13           Being the nature of the circumstances and what
14   it could possibly turn into, which it did, it wouldn't
15   have been a good situation to put a child into.  And
16   against our, you know, better, I guess, advice, you
17   might say, she disregarded that and the troopers
18   allowed the boy to go.
19           So we were all at the house.  And like I said,
20   it was a long, long day.  So I was at the house, I
21   wanted to get some sleep, I had just laid down, just
22   got out of the shower and laid down, and I got -- the
23   phone rang.  The radio rang.
24           And I answered the radio and it was -- I
25   believe it was Chris DeLeon that was calling me saying
```

1    that Fannie Carroll was down at the airport with the
2    troopers and was severely upset why I wasn't there at
3    the airport to meet the troopers.
4         So he said that I was supposed to go with the
5    troopers and that was the -- what they told me.  Or
6    that's what the -- she had said to him.  So I put my
7    uniform back on, packed a few things up, 15 minutes
8    later I was down at the airport meeting the troopers.
9         She -- I mean, there was a -- because of the
10   circumstances, there was a crowd of people at the
11   airport, and she began to verbally flog me, for lack of
12   better terms, in front of all these people, you know.
13        As a matter of fact, I know with the trooper
14   had said when we were flying up there, he was like,
15   well, that was kind of inappropriate, wasn't it?  Well,
16   that's Ms. Carroll.
17        So she wasn't too happy with me over that
18   situation.  She said that I was supposed to be there,
19   even though she told me not to, and so I just -- I
20   didn't want to argue with her in front of all the
21   people.  I just got on the helicopter and went with the
22   troopers and the grandson.
23   Q.   And it was -- there was, in fact, you had to
24   recover the body?
25   A.   Yeah, we did.

1   Q.   And then when you got back into town, how
2   long -- were you able to sleep before you had a
3   conversa -- before you had the conversation with
4   Ms. Carroll?
5   A.   Yeah, I got back into town, I believe it was
6   closer to evening.  I can't recall the time, but it was
7   in the evening time.  And -- and I talked to her the
8   next day.
9   Q.   Okay.  And --
10  A.   I believe it was the next day.  I'm not -- I
11  can't be certain, but I'm pretty sure it was the next
12  day.
13  Q.   In your tape recording she talks about Dick
14  Miller.
15  A.   Uh-hum.
16       MR. SINGER:  Objection to the
17  characterization.
18  BY MR. WALLERI:
19  Q.   Do you remember her talking about Dick Miller
20  during your conversation with her?
21  A.   Yes.
22  Q.   Okay.  What was all that about?
23       MR. SINGER:  Objection.  Form and foundation.
24  BY MR. WALLERI:
25  Q.   Go ahead.