Howard S. Trickey
Matthew Singer
JERMAIN, DUNNAGAN & OWENS, P.C.
3000 A Street, Suite 300
Anchorage, Alaska 99503
(907) 563-8844

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| REGINALD FLEMING, CHRISTOPHER DELEON, CHRIS HAMPTON, WILLIAM D. MCKILLICAN, and TODD SCHLUMBOHM, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| FANNIE CARROLL, and the CITY OF FORT YUKON, ALASKA, | ) ) ) |
| Defendants. | ) ) |
| | ) Case No. 4:04-cv-00034-RRB |

**DEFENDANTS' RESPONSE TO OPPOSITION TO
MOTION FOR PARTIAL SUMMARY JUDGMENT ON
MCKILLICAN'S EMPLOYMENT CLAIMS (COUNTS III AND IV)**

**I.    Introduction.**

David McKillican cannot establish a claim for constructive discharge. Taking the facts in the light most favorable to McKillican, he quit his job rather than allow City Manager Fannie Carroll to conduct a performance evaluation. Even speculating, as McKillican does, that his performance evaluation would have been negative, had it

occurred, the law is crystal clear that a single <u>negative performance evaluation does not constitute constructive discharge</u>.  While McKillican tries mightily to assign improper motives to Fannie Carroll's conduct, even offering wild conspiracy theories, his claim fails because he cannot show the necessary <u>intolerable working conditions</u>.

Further, McKillican incorrectly asserts that he had "due process" rights in the performance evaluation process, and he relies only on inadmissible evidence to raise an issue about whether the City's grievance process would have been futile.  Because McKillican was not constructively discharged, and because he failed to exhaust his available administrative remedies, his due process claim fails as a matter of law.

## II. McKillican Fails to Show Any Evidence to Sustain A Constructive Discharge Claim Because the Threat of Negative Job Evaluation is Insufficient as a Matter of Law.

McKillican offers pages and pages of unsupported and un-cited "facts" that seek to assign improper motives to Fannie Carroll and her reasons for wanting to conduct a performance evaluation of McKillican on August 11, 2003.  Plaintiffs' counsel, Mr. Walleri, even appears to have violated the Alaska Rules of Professional Conduct by offering an affidavit where he claims to have subpoenaed tape recordings from the City.[1]  Walleri offers no evidence that the subpoena existed, or that it was ever successfully

---

[1] *See* Alaska Rule of Professional Conduct 3.7 (A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness…).  The City will address Mr. Walleri's improper affidavit in a separate motion.

served on the City. But it makes no difference, because as is typical in this case, these bizarre factual assertions are totally irrelevant to the causes of action asserted by Plaintiffs. McKillican's claim fails as a matter of law because he fails to establish the intolerable working conditions necessary to justify a constructive discharge theory.

It is uncontested that McKillican quit his job solely because Fannie Carroll told him that she was going to do a performance evaluation. [McKillican dep., pp. 70-71] McKillican testified that if Carroll had not proposed to evaluate him, he would not have quit. [*See id.*] He said but for the threatened performance evaluation, he would have stayed employed "Absolutely. I like my job. I like my job." [*Id.* p. 70]

Significantly, McKillican did not quit for any reason other than the prospect of a negative performance evaluation. He does not allege, let alone prove, that any other reason caused him to quit. Instead, he spends pages and pages and pages seeking to ascribe improper motives as Fannie Carroll's reason for wanting to conduct an evaluation. But even if the Court were to assume and speculate, as McKillican does, that Fannie Carroll had the most evil, corrupt, horrible reason for wanting to evaluate McKillican's performance, that would not be enough for McKillican to overcome summary judgment. Fannie Carroll's <u>intent</u> is legally immaterial. The single legal issue

here is whether the City made McKillican's <u>working conditions</u> so intolerable that a reasonable person would have been forced into an involuntary resignation.[2]

As numerous courts have held, as a matter of law these facts cannot sustain a constructive discharge claim. The circumstances to which the employee must be subject before he or she may sustain a claim for constructive discharge must be "'sufficiently <u>extraordinary and egregious</u> to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'"[3] While the presence of adverse information in a personnel file might support a claim of hostile work environment (for example, a claim of retaliation, *see Yartzoff v. Thomas*[4]) the mere existence of a personnel file with negative information in it is not, without more, sufficient to create the intolerable working condition necessary to permit a finding of constructive discharge.[5] Moreover, the Court ought not to confuse a claim of

---

[2]  *See Pitka v. Interior Regional Housing Authority*, 54 P.3d 785, 790 (Alaska 2002).

[3]  *Brooks v. City of San Mateo,* 229 F.3d 917, 930 (9th Cir. 2000) (quoting *Turner,* 32 Cal.Rptr.2d 223, 876 P.2d at 1026).

[4]  809 F.2d 1371, 1376-77 (9th Cir. 1987).

[5]  *See Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1113 (9th Cir. 2000) (denying claim for constructive discharge where negative evaluation had no tangible consequences).

hostile work environment with constructive discharge: constructive discharge requires a "higher standard"- conditions so intolerable that a reasonable person must leave the job.[6]

The Alaska Supreme Court holds consistently that criticism of job performance is not enough to sustain a constructive discharge. For example, in *Pitka*, the court held that "'criticism of job performance or other management decisions do not, standing alone, create intolerable workplace conditions' and the record does not indicate that IRHA 'engage[d] in a sustained campaign' against Pitka."[7] The Alaska court has only recognized constructive discharge claims in cases that involved a sustained campaign,[8] or where the employer gave the employee a direct, express ultimatum: "quit or be fired."[9] By focusing his argument on Carroll's intent, rather than the actual working conditions, McKillican essentially concedes that he can show no sustained campaign. And he expressly testified that Fannie Carroll never threatened termination. [McKillican dep., p. 72-73] Instead of showing any intolerable working conditions through a sustained campaign of abuse or an ultimatum to quit or be fired, McKillican argues the wrong legal

---

[6] *Brooks,* 229 F.3d at 930; *see also Manatt v. Bank of Am.,* 339 F.3d 792, 804 (9th Cir. 2003) (declaring the standard for establishing constructive discharge significantly higher than the standard for establishing a hostile work environment).

[7] *Pitka*, 54 P.3d at 790.

[8] *See e.g., Charles v. Interior Regional Housing Authority*, 55 P.3d 57, 60-61 (Alaska 2002); *Cameron v. Beard*, *Cameron v. Beard*, 864 P.2d 538, 547-48 (Alaska 1993).

[9] *See Municipality of Anchorage v. Gregg*, 101 P.3d 181, 185 (Alaska 2004).

standard. Relying almost entirely on a misreading of *Municipality of Anchorage v. Gregg*, McKillican incorrectly asserts that he can sustain a constructive discharge theory by proving that his employer had "an improper motive." [Opp. At 17]

McKillican's heavy reliance on *Municipality of Anchorage v. Gregg* is misplaced.[10] In that case, the employer explicitly told the officer "that she must return to work on Monday or be terminated for abandoning her position."[11] In sharp contrast, Fannie Caroll never said anything to McKillican that reasonably could be construed as a threat of termination. In fact, he admitted that she never said any words to the effect that she was going to terminate him from employment. [McKillican dep., p. 73] All she said was that she was going to evaluate McKillican. He speculated that it would be a negative performance evaluation based on her angry tone. [*See id.*] Unlike *Gregg*, where the employer explicitly gave the officer a "quit or be fired" ultimatum, McKillican faced no such ultimatum. Rather, he elected to quit rather than submit to a single performance evaluation. Because the case law is unequivocal that a negative performance evaluation is not constructive discharge,[12] it is equally so that the mere threat of a negative evaluation is not enough.

---

[10]   101 P.3d 181 (Alaska 2006).

[11]   *Id.* at 185.

[12]   *See Pitka*, 54 P.3d at 790.

McKillican tries to analogize his case to *Gregg*, where the officer quit in part because she believed being terminated would jeopardize her police certification. But here the facts are reversed. At the time he quit, McKillican did not have a police certificate. If he had stayed on the job for just a short period, he would have satisfied the one-year requirement for eligibility to obtain a basic certificate from the Alaska Police Standards Council.[13] [Russell dep., pp. 31-33 (attached to Docket 127 as Ex. 9)] By quitting, he made himself ineligible and had to start all over and work a full year with the Fairbanks Police Department before obtaining his certificate. [*See id.*] Unlike the *Gregg* employee who was protecting her certificate, McKillican's irrational decision to quit his job was the career equivalent of shooting himself in the foot. This was his self-inflicted wound, and he has no rational basis for blaming the City.

McKillican next argues that he was constructively discharged because the City wouldn't re-hire him after he quit. Here McKillican stretches logic beyond the breaking point. Again, a constructive discharge is when the working conditions are so intolerable that a reasonable person feels compelled to quit.[14] What happened <u>after</u> McKillican quit cannot possibly explain why he quit in the first place. After McKillican angrily quit his job, having insubordinately refused to submit to a performance evaluation by the City Manager, the City was under no obligation to re-hire or reinstate. McKillican cites no

---

[13]   *See* 13 AAC 85.040.

[14]   *See Pitka v. Interior Regional Housing Authority*, 54 P.3d 785, 790 (Alaska 2002).

authority to suggest that the City's refusal to reinstate amounts to constructive discharge or supports a wrongful termination claim. Unless McKillican was a clairvoyant or a time traveler, it is logically impossible for the City's post-resignation conduct after August 11 to be the catalyst for his resignation on August 11.

If McKillican wanted to work for the City, he should not have quit his job in anger on August 11, 2003. And if he disagreed with the City Manager's intention to conduct a performance evaluation, he should have first participated in the evaluation and then filed a grievance as provided in the personnel manual. Instead, he quit. These facts do not sustain a claim of constructive discharge. The mere threat of a single negative evaluation is not sufficiently <u>extraordinary and egregious</u> to support a constructive discharge theory.[15] Consequently, the City is entitled to summary judgment on this claim.

### III. McKillican's Due Process Claim Fails as a Matter of Law.

McKillican quit his job rather than exercise his rights under the City's grievance process to challenge what he speculated would be a negative performance evaluation by Fannie Carroll. These facts do not sustain a due process claim

McKillican cites *City of Fairbanks v. Rice*[16] for the proposition that "he need not have filed a grievance because it was closely related to his §1983 claim." [Opp. at 20] This argument misstates the holding in *Rice*, and, more significantly, misses the point.

---

[15] *See id.*

[16] 20 P.3d 1097 (Alaska 2000).

As the City made clear in its opening brief, it is not arguing that McKillican's failure to utilize the grievance procedures itself bars his Section 1983 claim. Rather, the City contends that McKillican's failure to utilize the available due process procedures is not a due process violation on the part of the employer.

To show a violation of due process, McKillican has to show first that the City deprived him of a protected property interest.[17] He cannot do so. In the complaint, McKillican asserted that he was denied due process grievance rights. That claim is completely without merit – his failure to exercise his rights is a "self-inflicted wound" and not a due process violation.[18] Apparently recognizing his flawed theory, McKillican now offers a brand new theory. He now asserts Chief Flemming, not Fannie Carroll, was supposed to perform his job evaluation, and that she violated his "procedural due process rights" by proposing herself to perform his evaluation.

First, Carroll never even did the evaluation, so there can be no possible deprivation of a right. Nor can a performance evaluation by the City Manager possibly be considered a deprivation of a property right.

McKillican thinks that he had a due process right in the section of the personnel manual that he claims requires that he be evaluated by his direct supervisor, Chief

---

[17]   *See Dorfmont v. Brown*, 913 F.2d 1399, 1404 (9th Cir. 1990).

[18]   *See U.S. v. Segal*, 423 F.3d 767, 776-77 (7th Cir. 2005).

Flemming, and not the City Manager. The manual, however, places no such limitation on the City Manager, stating only: "[s]upervisors shall be responsible for counseling employees and informing them of their job performance as per Chapter 3." [Ex. D at 11] While there are to be regularly scheduled evaluations, the manual also allows special evaluations at any time. Chapter 3 contains a section for "Special Evaluation" and provides that "Supervisors may conduct personnel evaluation to document employees above or below average performance as needed." [Ex. D. at 12] The manual does not define "Supervisors" but does indicate that the City Manager's job duties are detailed by law in AS 29.20.500. [Ex. D at 26] That statute provides that the City Manager is the personnel director and responsible for appointing and terminating employees.[19] As a matter of law, the City Manager is a supervisor.

Even if the personnel manual contained a restriction that evaluations were to be done only by direct-line supervisors, not the City Manager, the Ninth Circuit holds that such procedural requirements can create a protected property interest only if the procedures are intended to be a significant substantive restriction on decision-making.[20]

---

[19]     AS 29.20.500 ("As chief administrator the manager shall … (1) appoint, suspend, or remove municipal employees and administrative officials, except as provided otherwise in this title and AS 14.14.065… (7) serve as personnel officer, unless the governing body authorizes the manager to appoint a personnel officer.").

[20]     *See Rizzo v. Dawson*, 778 F.2d 527, 531 n.3 (9th Cir. 1985) (*citing Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984)).

Nothing in the personnel manual contains any <u>substantive</u> restriction on decision-making or the content of personnel evaluations. Simply put, McKillican has no possible due process claim based on his tortured reading of the personnel manual and Fannie Carroll's attempt to conduct a performance evaluation. Carroll's proposed action did not deprive McKillican of any cognizable property interest.

### IV.     McKillican's Failure to Exhaust is Not Excused by Futility.

McKillican seeks to excuse his failure to exhaust his administrative remedies by criticizing intermediate steps in the grievance process and then suggesting, based only a speculative, inadmissible affidavit, that the final step before the City Council would have been futile because the City Council was biased. Because McKillican cannot show that an adverse decision by the Council was a certainty, he cannot avoid his duty to exhaust.

First, McKillican cannot avoid his duty to exhaust by criticizing intermediate steps in the grievance process. In *Voight v. Snowden, II* the Alaska Supreme Court addressed this issue, finding that the plaintiff's criticism of an intermediate step did not excuse him from exhausting the available administrative remedies.[21] In that case the plaintiff took part in the first two steps of the administrative process.[22] His "next step in the administrative process was to request a hearing …. He did not. Instead, [his] attorney

---

[21]     *Voigt v. Snowden, II*, 923 P.2d 778, 783 (Alaska 1996).

[22]     *Id.* at 780.

wrote to Chief Justice Rabinowitz, indicating that further administrative proceedings would be futile and that his client would pursue his case[.]"[23] The Alaska Supreme Court found that futility had not been established as a matter of law and that his claim was barred.[24]

The same is so here. McKillican may not have liked the intermediate steps in the grievance process, but the final step was to appeal to the City Council. [Ex. D at 21] McKillican never alleges that the City Council had not had any previous involvement in his performance evaluation such that it would not be able to render a fair review.

Rather, McKillican asserts that the Council was biased against him, based solely on an inadmissible affidavit from Richard Miller, one of the former Council members. "To survive summary judgment, [the plaintiff] must present admissible evidence, not mere speculation[.]"[25] "[M]ere speculation is not evidence[.]"[26] Mr. Miller's speculations of what other members of the council would have done are plainly inadmissible.

---

[23] *Id*.

[24] *Id*. at 783.

[25] *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1161 (9th Cir. 2003).

[26] *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 634 (9th Cir. 2005).

Several courts have held that similar affidavit testimony is inadmissible to defeat a summary judgment motion in.[27] For example, in *Minus v. West*, the plaintiff tried to defeat summary judgment by offering the affidavit of a co-worker, who testified about the employer's alleged motivations, including "Schemitz did not want blacks in his office" and "Minus's race and color where factors in not being promoted …."[28] The court disregarded these affidavit opinions, holding that Evidence Rule 701 "bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision … unless the person testifying is involved in the employment decision at issue."[29] Similarly, in *Connell v. Bank of Boston*, the First Circuit held that the testimony of an employee who said that employer was "determined

---

[27] *See Cebula v. General Electric Co.*, 614 F. Supp. 260, 266 (N.D. Ill. 1985) (on summary judgment motion, court held as inadmissible an affidavit containing hearsay statements of co-workers asserting that GE had a plan to replace older workers with younger workers in order to cut costs.); *Farrar v. Dorothea Dix Hospital*, 829 F. Supp. 140, 145 (E.D. N.C. 1993) (plaintiff could not avoid summary judgment on civil rights claims by presenting affidavit of co-worker who testified about the employer's alleged mistreatment of plaintiff – the affidavit did not appear to be based on personal knowledge and lacked enough specificity to create a factual dispute); *Farrell v. Potomac Electric Power Co.*, 616 F. Supp. 995 (D.D.C. 1985) (plaintiff could not survive summary judgment where her affidavit did not measure up to the requirements of Civil Rule 56(e) because it contained only allegations and not "specific facts" that would be admissible as evidence).

[28] 2003 WL 21295122, *4. (E.D. N.Y. May 30, 2003).

[29] *Id.* (*quoting Hester v. BIC Corp.*, 225 F.3d 178, 182-85 (2nd Cir. 2000) (vacating trial court's judgment on jury verdict where co-workers were permitted to testify that supervisor's treatment of employee was racially motivated).

to eliminate … senior employees" was inadmissible because the testimony pointed to no specific facts to buttress such a "broad assertion."[30]  In *Hester v. BIC Corporation*, the Second Circuit rejected the testimony of employees who said that the employer's actions were motivated by race.  The court held that "their speculative lay opinion that this differential is attributable to race rather than anything else, is not helpful in this case because it 'merely tells the jury what result to reach.'"[31]

Miller indicates in his affidavit that he himself would have voted in McKillican's favor.  The only other Council member to testify is Debra McCarty (a family member of Fannie Carroll), who testified that she would not have been afraid to "contradict or disagree with Fannie Carroll."  [McCarty Dep. at 51, Ex. E]

Simply put, McKillican cannot show that an adverse decision by the City Council was a certainty, as is required to be excused from exhausting his administrative remedies.[32]  He cannot establish futility by offering an inadmissible affidavit where one of the City Council members offers naked speculation about how the other members would have voted on a matter that never came before them.  Without producing some

---

[30]   924 F.2d 1169, 1177 (1st Cir. 1991).

[31]   *Hester*, 225 F.3d at 185 (*quoting United States v. Rea*, 958 F.2d 1206, 1215 (2nd Cir. 1992).

[32]   *Voigt v. Snowden, II*, 923 P.2d 778, 783 (Alaska 1996).

actual evidence that an adverse decision was a certainty, McKillican was required to exhaust. His failure to do so bars his claims.

## V. Conclusion.

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor on McKillican's constructive discharge and due process claims.

DATED at Anchorage, Alaska this 13th day of November, 2006.

JERMAIN, DUNNAGAN & OWENS, P.C.

By: s/ Matthew Singer
Matthew Singer
Alaska Bar No. 9911072

By: s/ Howard S. Trickey
Howard S. Trickey
3000 A Street, Suite 300
Anchorage, AK  99503
Phone:  (907) 563-8844
Fax:  (907) 563-7322
Alaska Bar No. 7610138

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (MCKILLICAN) [DOCKET 104]
FLEMING, ET AL. V. CARROLL, ET AL.
CASE 4:04-CV-00034-RRB

PAGE 15 OF 16

*CERTIFICATE OF SERVICE*

I hereby certify that on November 13, 2006,
a true and correct copy of the foregoing
document was served electronically
on the following counsel of record:

Michael J. Walleri
330 Wendell St., Suite E
Fairbanks, AK 99701

s/ Matthew Singer
#135374